## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| **GENWORTH FINANCIAL WEALTH**<br>**MANAGEMENT, INC.** | :<br>: |
| | : **Civil Action No.** |
| **Plaintiff,** | : |
| | :  **3:09-cv-1521 (VLB)** |
| **v.** | : |
| | : |
| **TIMOTHY McMULLAN, JAMES COOK,** | : |
| **TIMOTHY McFADDEN, KAREN BAZON,** | : |
| **TAMARA RIVERA and TJT CAPITAL** | : |
| **GROUP, LLC.** | : |
| **Defendants.** | : |

_____

| | |
|---|---|
| **TIMOTHY McMULLAN, JAMES COOK,** | : |
| **TIMOTHY McFADDEN, and TJT CAPITAL** | : |
| **GROUP, LLC** | : |
| **Third–Party Plaintiffs,** | : |
| | : |
| **v.** | : |
| | : |
| **GURINDER AHLUWALIA,** | : |
| | : |
| **Third-Party Defendant.** | :     **June 10, 2010** |

_____

### MEMORANDUM OF DECISION AND ORDER GRANTING THE PLAINTIFF'S MOTION FOR IMMEDIATE TEMPORARY RESTRAINTS [DOC. #43]

Before the Court is Plaintiff Genworth Financial Wealth Management, Inc.'s

("Genworth") [Doc. #43] Motion for Temporary Restraints and Expedited

Discovery.  The Plaintiff seeks to enjoin the Defendants Timothy McMullan,

1

James Cook, Timothy McFadden, Karen Bazon, Tamara Rivera, and TJT Capital Group LLC. ("TJT Capital") from unlawfully using confidential, proprietary and trade secret-protected Genworth information.  The Plaintiff contends that it can meet the standard for preliminary injunction, including the likelihood that it will suffer irreparable harm to its business and reputation, a likelihood of success on the merits of its claims, and that it is therefore entitled to the entry of immediate injunctive relief that would restrict the Defendants' usage and disclosure of confidential information that they allegedly acquired and misappropriated through unauthorized means. [Doc. #44].  For the foregoing reasons, the Plaintiff's motion is hereby granted.

### Background

Genworth initiated this action against the Defendants, former employees of Genworth and its Private Client Group ("PCG") which serves as an investment advisor to a select group of high net worth individual investors.  Genworth's PCG provides investment strategies based upon asset allocations recommended by investment manager Robert Brinker ("Brinker"), who is the host of the financial talk program MoneyTalk and publishes Marketimer, a regular monthly investment newsletter.

The Plaintiff alleges that the individual Defendants, prior to making staggered departures from Genworth, during the summer of 2009, downloaded and copied confidential documents including Genworth's Automated Contract

Tracking (ACT) database, which contains client names, phone numbers, contact information, portfolio management history, and client notes.  Genworth further alleges that upon leaving the company, the individual Defendants formed TJT Capital, a competitor to Genworth, and used confidential client data to solicit and divert Genworth clients to their newly formed entity, and that the Defendants continued to access Genworth's computer system even after their departure. Genworth has therefore brought claims pursuant to the Computer Fraud and Abuse Act 18 U.S.C. §1030, the Connecticut Uniform Trade Secrets Act (CUTSA) Conn. Gen. Stat. §35-50 et seq., the Connecticut Unfair Trade Practices Act (CUTPA) Conn. Gen. Stat. §42-110 et seq., the Stored Communications Act (SCA) 18 U.S.C. §2701 et seq., and Connecticut common law for claims of breach of contract, and prohibition of tortious interference with business relationships. [Doc. #1].

In August 2009, in anticipation of the pending action, counsel for Genworth, submitted a letter instructing the Defendants to preserve all electronically stored information (ESI) and other potentially relevant information in anticipation of litigation.  [Doc. #47, Exh. W].  On December 22, 2009, subsequent to the filing of this action, a class action lawsuit was initiated against the Plaintiff by client investors in Genworth's BJ Group Services Portfolios regarding Genworth's alleged failure to manage the portfolio in compliance with Brinker's recommendations, as represented. Goodman v. Genworth Financial Wealth Management, Inc., No. 2:09-cv-05603-LDW-ARL (E.D.N.Y. 2009).   On

February 25, 2010, the Plaintiff filed the [Doc. #43] instant motion noting that evidence had recently come to light establishing the "Defendants' ongoing and blatant misuse of stolen, proprietary Genworth client data, and their continuing false statements to current Genworth clients." [Doc. #44, pg. 1].  As part of its request for injunctive relief, the Plaintiff further alleges that the Defendants have used confidential client data, after the filing of this action, to contact Genworth clients and provide inaccurate information regarding Genworth's relationship with Brinker.  In particular, the Plaintiff alleges that on February 17, 2009, Defendant McMullan told a client that "Brinker was not working with Genworth anymore" and that McMullan also sent that client a letter that forwarded a press release concerning the class action, stating: "I left Genworth many months ago for several reasons, one in particular you should be aware of.  Attached is a public notice that I feel an obligation to make [you] aware of . . ."  [Doc. #44, pg. 14].

On April 8, 2010, and April 12, 2010, the parties participated in a motion and evidentiary hearing during which the Plaintiff presented documentary evidence in support of its [Doc. #43] request for injunctive relief and a separate [Doc. #34] Motion to Compel Forensic Imaging of Defendants' Computers.  [Doc. ##85, 87].  During the hearing, Defendant McMullan testified regarding his handling of Genworth client data, and Genworth presented evidence that the Charles Schwab Corporation ("Schwab"), a custodian of assets for TJT Financial, produced pursuant to subpoena, email correspondence from Defendant McMullan and

Cook's personal email account and computer that was not produced as part of the Defendants' response to Genworth's discovery requests, although they were responsive to such requests.  Id.  The correspondence reflects the Defendants' submission of Genworth client data and information to Schwab, while still employed by Genworth, as part of efforts to establish TJT Capital and secure Genworth business for the new entity.  [Plaintiff's Demonstrative Exhs. 4-6, 9-10, 12-16].  During the hearing, the Plaintiff also presented evidence that the client information at issue, was password protected and that the Defendants were subject to a Code of Ethics, while at Genworth, that highlighted the confidential nature and restricted the use of Genworth client information [Doc. #46, pg. 2; Doc. #47, Exh. B].  Also during the hearing, the Plaintiff contended that the class action complaint represented yet another inappropriate disclosure of confidential information as it contained non-public information that only past or current employees would be privy to, and provided evidence of email correspondence between the Defendants and the attorney for the class action plaintiffs regarding the submission of information for the benefit of the class action complaint. [Docs. ##85; 87; 76, Exh. E].

  Analysis

  In this proceeding, the Defendants, who are the adverse party to the request for temporary restraint, received adequate notice and participated in an adversarial hearing on the application for a temporary restraining order.  [Docs.

## 48, 85, 857].  Accordingly, the Court treats the Plaintiff's request as a motion for a preliminary injunction.  See  Levas and Levas v. Village of Antioch, Ill., 684 F. 2d 446, 448 (7th Cir. 1982); Delaware Valley Transplant Program v. Cove, 678 F. Supp. 479, 480 n. 1 (D. N. J. 1998); Wright & Miller, Federal Practice and Procedure: Civil § 2951.  Authorized by Federal Rule of Civil Procedure 65(b), a party is entitled to a preliminary injunction when that party can demonstrate: "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and irreparable harm in the absence of the injunction," Faiveley Transport Malmo AB v. Wabtec Corp.  559 F.3d 110, 116 (2d Cir. 2009) (internal citations and quotation marks omitted).

The Plaintiff introduced evidence indicating that the Defendants misappropriated a trade secret in violation of CUTSA to support its contention that it is likely to succeed on the merits, noting that the "Defendants have admitted that on numerous occasions, and in a variety of ways, all without Genworth's authorization, they copied and improperly accessed Genworth's password-protected databases and forwarded specific client lists and contact information to themselves and for use outside of Genworth's business purposes" and that "evidence produced by Schwab reveals that one or more Defendants forwarded private and protected client account data . . . without authorization, and for the stated purpose of later transferring (or attempting to transfer)

6

Genworth accounts to TJT." [Doc. #44, pg. 19].  The Defendants claim in response that "the names of the clients that Mr. McMullan, Mr. Cook, and Mr. McFadden serviced at Genworth cannot amount to trade secrets for several reasons, but primary among them is the fact that the names and contact information are generally known or are readily ascertainable from public sources" and that the "names were not removed by downloading and printing a client list, but by simply remembering as many client names as they could." [Doc. #70, pg. 23].  The Defendants further contend that the information was not obtained or disclosed through improper means, as they were identified through memory, and communications with Schwab that occurred while the Defendants were under the mistaken impression that such downloading and distribution was authorized under the Protocol For Broker Recruiting ("Protocol), which authorizes employees of firms that are signatories to remove certain account information at their time of resignation.  [Doc. #70].

The Connecticut Supreme Court has noted that "[g]enerally speaking, in the absence of a restrictive covenant, a former employee may compete with his or her former employer upon termination of employment.  Even after the employment has ceased, however, the employee remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." Elm City Cheese Co., Inc. v. Federico, 752 A.2d 1037, 1044 (Conn., 1999) (internal citations and quotation marks omitted).

7

CUTSA defines a trade secret as:

information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35-51(d).

In evaluating trade secrets, Connecticut courts have considered the following factors: (1) the extent to which information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competition; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others; (7) the extent to which the employer-employee relationship was a confidential or fiduciary one; (8) the method by which the employer acquired or compiled the information; and (9) the unfair advantage gained by the employee from using the employer's information.

Blue Cross &  Blue Shield of Conn., Inc. v. DiMartino, 1991 WL 127094 at *4 (Conn.

Super. Ct. 1991).  CUTSA, in turn, defines misappropriation as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to

maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Conn. Gen. Stat. § 35-51(b).

In interpreting CUTSA's provision, the Connecticut Supreme Court upheld a trial court's finding that the plaintiff's customer information and pricing scheme constituted a trade secret based on evidence that the plaintiff treated such information as confidential and that the former employees of the company would have been aware of the information's confidentiality.  Smith v. Snyder, 839 A.2d 589, 594 (Conn., 2004).  The Connecticut Supreme Court also upheld the trial court's finding that the Defendants had misappropriated the trade secrets by soliciting "customers and divert[ing] them to the defendants' new business venture."  Id. at 596.

The Court finds, based on the Plaintiff's allegations and evidence presented at the evidentiary hearing, that it is likely to succeed on the merits due to strong indication that the Defendants misappropriated trade secrets in a manner akin to the claim in  Snyder.  The Plaintiff has demonstrated that Genworth took steps to maintain the confidentiality of the client information in question.  The evidentiary hearing supported the Plaintiff's contention that [t]he identity of, and detailed data about, Genworth's clients is not known and cannot be known outside of Genworth's business" and that "[w]ith few exceptions, clients did not come to Genworth because of relationships with any of the Individual Defendants.  Instead, Genworth built its roster of PCG clients over a

9

decade based principally on leads from Bob Brinker. . ." [Doc. ##44, pg. 10; 46, pg. 2]. The Plaintiff has also provided evidence that access to the client databases, including the ACT database, featured restricted access and password protection, and that the Defendants signed a Code of Ethics acknowledging their duty to maintain the confidentiality of the client data. [Doc. #46, pg. 2-4].

The Plaintiff has also demonstrated that the information was of high economic value, as its client database was in part purchased at a "high premium from its predecessor businesses and from Bob Brinker as leads." [Doc. #44, pg. 21]. Lastly, the Plaintiff demonstrated that the Genworth client information is voluminous, detailed, and not readily accessible, and that it would take significant time and effort to identify and solicit even just the individuals that the Defendants interacted with directly by memory alone. The Court notes in particular that the client data list that was provided by the Defendants to Schwab included several typographical inconsistencies that were direct matches to inconsistencies found in Genworth's database, undermining the explanation that the lists were created from alternate sources. [Doc. #75, pg. 2]. Similarly, internet searches disclosed by the Defendants as evidence of their ability to retrieve the client information from alternate sources lack credibly due to evidence that the searches were conducted after the clients in question had initiated the transfer of their account from Genworth to TJT Capital. [Id., pg. 2-3]. In addition, Defendant McMullan's testimony further reflected that the Defendants lacked a reasonable basis to conclude that their actions were authorized under the Protocol, as

Genworth was not a signatory to the Protocol and Genworth's Code of Conduct noted the proprietary nature of client information.  Moreover, the Defendant McMullan testified that he had never read the Protocol and did not know if Genworth was a signatory to the Protocol at the time of his actions [Doc. #85].

The Court further concludes that the Defendants' activities including use of inappropriately acquired client information to solicit clients to their newly formed entity, submission of client list information to Schwab in furtherance of its client solicitation efforts, and communications with Genworth clients regarding the class action and Brinker's relationship with Genworth likely qualifies as unauthorized disclosure of a trade secret, and therefore misappropriation under CUTSA.  Con. Gen. Stat. § 35-51(b).  This conclusion is solidified by the premeditated nature of the Defendants actions, as reflected by communications with Schwab prior to the Defendant's resignation. [Doc. # 47, Exhs. D, L-N].  Accordingly, the Plaintiff has demonstrated a likelihood of success on the merits and the Court must now consider whether the Plaintiff has demonstrated a likelihood of irreparable harm.

The Second Circuit notes that a showing of "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (internal citations and quotation marks omitted).  "To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and

imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Id.  Furthermore, "[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances."  Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506 (2d Cir. 2005).  Accordingly, this Court must consider whether Genworth's alleged ongoing misappropriation of Genworth trade secrets is an actual and imminent injury that cannot be otherwise remedied.

The Plaintiff argues that "[c]ases involving the misappropriation of trade secrets present a particularly compelling context for injunctive relief" and notes that the "Connecticut Uniform Trade Secrets Act specifically provides for injunctions in the face of actual, or even threatened misappropriation." [Doc. #44, Pg. 17].  The Defendants in turn argue that "Genworth's alleged harm, if present at all, is entirely compensable through monetary damages" and that Plaintiff therefore cannot demonstrate irreparable harm.  [Doc. #70].  The Defendants further contend that money damages are available because any harm suffered is easily quantifiable because transactions in the securities industry are highly regulated and documented. [Id., pg. 19].

The Second Circuit has clarified whether irreparable harm is presumed for scenarios involving trade secret misappropriation:

> We have previously observed that the loss of trade secrets cannot be measured in money damages where the secret, once lost, is lost forever.  Some courts in this Circuit have read this passing observation to mean that a presumption of irreparable harm automatically arises upon the determination that a trade secret has

been misappropriated.  That reading is not correct.  A rebuttable
presumption of irreparable harm might be warranted in cases where
there is a danger that, unless enjoined, a misappropriator of trade
secrets will disseminate those secrets to a wider audience or
otherwise irreparably impair the value of those secrets.  Where a
misappropriator seeks only to use those secrets-without further
dissemination or irreparable impairment of value-in pursuit of profit,
no such presumption is warranted because an award of damages will
often provide a complete remedy for such an injury.  Indeed, once a
trade secret is misappropriated, the misappropriator will often have
the same incentive as the originator to maintain the confidentiality of
the secret in order to profit from the proprietary knowledge.

Faiveley Transport Malmo AB v. Wabtec Corp.  559 F.3d 110, 118-119 (2d Cir.

2009) (internal citations and quotation marks omitted).

        The Second Circuit therefore noted that misappropriation of trade secrets

by a competitor is not necessarily irreparable harm, because that entity is likely

motivated to protect the secret to serve its own purposes, and that injunctive

relief is inappropriate absent incentive to further disseminate or impair the value

of the information.  The Second Circuit further explained that in scenarios where

there is a danger of further dissemination or that a misappropriator will impair the

value of trade secrets, "a 'narrowly drawn' preliminary injunction that protects the

trade secret from further disclosure or use may be appropriate.  In all cases, the

relief should be 'narrowly tailored to fit specific legal violations' and to avoid

'unecessary burdens on lawful commercial activity.'"  Id. at 119 (citing Waldman

Pub. Corp. V. Landoll, Inc., 43 F.3d 775, 785 (2d Cir.1994)).

        Here, the evidence shows that the individual Defendants, as the founders

of TJT Capital not only used proprietary client list information to establish a

competing entity, but to in fact to impair the value of the client list information by using information regarding the company's operations and relationship with Brinker to discredit the utility of services provided by Genworth's PCG group.

Additionally, evidence presented at the April 8 and April 12, 2010 motion hearing reflects that the Defendants have continued to disseminate confidential information by providing Genworth information to the counsel for the class action, as well as analysis of that information for inclusion in the class action complaint. [Doc. #85, 87].  In particular, Genworth presented evidence of email communications between McMullan and Jeffrey K. Brown, the lead class counsel who filed the class action complaint. [Doc. #76, Exh. E].  The communications reflect that McMullan not only directed former Genworth clients to speak with Brown, but provided proprietary Genworth information regarding asset allocation directly to Brown in order to initiate the class action. [Id.]  In a November 5, 2009 email communication, approximately a month before the class action complaint was filed, McMullan notes to a former Genworth client:

> Well I can only say that Jeff was just as shocked at what transpired as anybody.  We'll see where this goes, but we are all in agreement that none of this had to happen.  It was very simple – just follow Bob Brinker's recommendations . . . The spreadsheet that I sent to you is just a breakdown of the asset allocation of mutual funds in your accounts versus Bob Brinker's official recommendation.  It does not report performance, although I am working on that as well.   Jeff asked me for your statements.  I told him that I would need your approval before I sent him anything.  Feel free to contact me if you have any questions or need anything.

[Id.]

The class action complaint itself includes performance charts that included detailed quarterly descriptions regarding Genworth's purchase of funds that did not fall within Brinker's recommendation.  <u>Goodman v. Genworth Financial Wealth Management, Inc.</u>, No. 2:09-cv-05603-LDW-ARL (E.D.N.Y. 2009) [Doc. #1]. The class action complaint also makes repeated reference to a "former high level employee in the Private Client Group Division" as the source of information regarding the performance of Genworth's portfolios as compared to Brinker's published models and internal discussions regarding the underperformance, and the existence of a "internal, undisclosed portfolio for aggressive, growth and balanced models that were internally referred to as a 'Brinker Basic.'"  <u>Id</u>. Additionally, the Plaintiff provided email correspondence from November 2009, showing that McMullan contacted at least one former client, to encourage him to contact Jeffrey Brown regarding Brown's handling of former "GE/Genworth 'Brinker' client" complaints.  [Doc. #76, Exh. F]

Genworth has therefore provided evidence that McMullan disclosed proprietary information to lead class counsel, and that such information pervades the class action complaint, further demonstrating that the Defendants have misappropriated protected, proprietary Genworth information and is motivated to further impair both the value of Genworth's reputation and the exclusivity of the information in question.  Accordingly, the Court finds that the Plaintiff has demonstrated a presumption of irreparable harm that the Defendants have not rebutted.

Additionally, the existence of irreparable injury is further indicated by questions over whether the Plaintiff would be able to collect an eventual judgment from the Defendants.  During the proceeding, the Court invited the Defendants to provide evidence of net worth, and their ability to pay an eventual judgment, whether through insurance or otherwise, to which the Defendants declined.  [Id.]  Further, evidence adduced at the hearing suggested that the Defendants had no appreciable resources other than fees generated through the sale of financial advice to the customers that Genworth alleges that the Defendants pirated through the misappropriation of trade secrets.  [Id.]  Accordingly, this lack of evidence regarding the ability to satisfy an eventual judgment supports a finding that the Defendants fail to rebut the presumption of irreparable harm.  See Alvenus Shipping Co., Ltd. V. Delta Petroleum, 876 F.Supp. 482, 487) (S.D.N.Y, 1994). (granting a preliminary injunction in part due to the fact that "[t]here [was] nothing in the record that even remotely suggests that [the Defendant] could pay [the plaintiff's] likely award . . .")

Lastly, this District Court has recognized that a company's threatened loss of goodwill and customers, as is the case in this proceeding, supports a finding of irreparable harm that is not rectifiable by money damages.  Elizabeth Grady Face First, Inc. v. Escavich, 321 F. Supp.2d 420, 423 (D.Conn., 2004) (citing Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 444-45 (2d Cir. 1977)). Here, the evidence shows the Defendants' unabashed attempt to destroy

Genworth's goodwill and customer relations, in addition to converting Genworth customers to TJT.

Accordingly, the Court must issue a preliminary injunction that is "narrowly drawn" to protect Genworth's trade secret information from further disclosure or use." Faiveley, 559 F.3d at 119.  The Plaintiff requests an injunctive order that would 1) enjoin the Defendants from communicating with current Genworth clients, or known Genworth client prospects, except to the extent such a client or prospect has already entered into a binding written agreement with TJT Capital; 2) enjoin the Defendants from utilizing any of Genworth's client information, lists, or data for any purpose; 3) direct the Defendants to retrieve Genworth client information, lists, or data, that were provided to third parties absent Genworth's authorization; and 4) enjoin the Defendants from making statements to anyone, including Genworth clients, potential clients, or clients transferred from Genworth to TJT Capital, concerning the class action lawsuit or Genworth's relationship with Robert Brinker.  [Doc. #44, pg. 30].

The Defendant contends that the relief requested by the Plaintiff is broad and would "cause great harm to Defendants" noting particular concern that the request that the Defendants be prevented from speaking with anyone regarding the pending class action and Genworth's relationship with Brinker is overbroad. [Doc. #70, pg. 37].  In response, the Plaintiff argued during the April 12 proceedings that the class action complaint is permeated with non-public information, including the distribution of fund investments and the extent to

which they complied with Brinker's recommendations, that was presumably provided by the Defendants, as suggested by the documented email contact between the Defendants and the attorney for the class action plaintiffs, prior to the class action's filing.  [Doc. #87].  As the Court has discussed above, the Plaintiff has satisfied the burden for its requested relief through the presentation of evidence demonstrating that the contents of the class action complaint reflect the misappropriation of a trade secret.  Accordingly, while counsel for the plaintiffs in the class action will likely be entitled to, and will likely receive information regarding Genworth's compliance with Brinker's recommendations through the process of discovery, the Court notes that an order restricting the Defendants' further disclosure or discussion of the proprietary information reflected in the class action complaint would be sufficiently narrowly tailored so as to avoid unwarranted interference with commercial operations.  Accordingly, due to the Plaintiff's demonstrated irreparable injury and likelihood of success on the merits, as evidenced at the evidentiary and motion hearing on April 8 and April 12, the Court grants and hereby orders the following injunctive relief:

(1) The Defendants shall refrain from communicating in any way or manner with any current client or known client prospect of Genworth, except to the extent that such a client or prospect has already entered into a binding written agreement with TJT Capital Group LLC, or to the extent that the Defendants can affirmatively  demonstrate that such a client or prospect's information was not

included in confidential client information, lists, or data acquired by the Defendants from Genworth;

(2) The Defendants shall refrain from utilizing any of Genworth's client information, lists, or data for any purpose, other than as authorized by Federal Rules of Civil Procedure for this pending litigation;

(3) The Defendants shall retrieve from all third-parties, including but not limited to the Charles Schwab Corporation, any of Genworth's client information, lists, or data previously provided to that third party by any Defendant, and shall immediately return such material to Genworth, except to the extent that transmittal of such material to a third party was specifically authorized by a client or prospect under a binding written agreement with TJT Capital Group LLC;

(4) The Defendants shall refrain from disclosing, or further disclosure of, any client or information regarding Genworth's operations where such information is a protected trade secret, or consists of confidential information that the Defendants learned during the course of their employment with Genworth;

(5) The Defendants shall refrain from disclosing the nature of Genworth's relationship with Robert Brinker, and the contents of the class action complaint,

to the extent that such information reflects protected trade secrets, or other confidential information that the Defendants learned during the course of their employment with Genworth;

(6)  The Defendants shall not use any of Genworth's proprietary information for their own advantage or on the behalf, or for the benefit of, a third party, including without limitation to providing context for the pending class action proceeding;

(7) The Defendants shall face sanction for failure to comply with the foregoing, absent a further order from the Court.

**IT IS SO ORDERED**

Signed this 10th day of June, 2010.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

20