EXHIBIT B

# EXHIBIT "B"

CONFIDENTIAL

1

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF CONNECTICUT
3    ---------------------------------
4    GENWORTH FINANCIAL WEALTH    )
5    MANAGEMENT, INC.,            )          CONFIDENTIAL
6         Plaintiff,              )
7    vs.                          )   Civil Action No.
8    TIMOTHY McMULLAN, JAMES      )   3:09-cv-01521-VLB
9    COOK, TIMOTHY McFADDEN,      )
10   KAREN BAZON, TAMARA RIVERA   )
11   and TJT CAPITAL GROUP, LLC,  )
12        Defendants.             )
13   ---------------------------------)
14   AND RELATED CROSS-ACTIONS.   )
15   ---------------------------------
16
17         **C O N F I D E N T I A L**
18
19        Deposition of ROBERT BRINKER, taken at
20   Venetian Resort Hotel & Casino, Suite 3-209,
21   3355 Las Vegas Boulevard South, Las Vegas, Nevada,
22   commencing at 7:54 p.m., Monday, March 22, 2010,
23   before Janet C. Trimmer, RPR, CRR, Certified Court
24   Reporter in and for the States of Nevada and
25   California.

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   For the PLAINTIFF:
 4       SONNENSCHEIN, NATH & ROSENTHAL, LLP
 5       BY:  BRENDAN E. ZAHNER, ESQ.
 6       1221 Avenue of the Americas
 7       New York, New York  10020-1089
 8       (212) 768-5339
 9       bzahner@sonnenschein.com
10
11   For the DEFENDANTS:
12       STARK & STARK, P.C.
13       BY:  JOHN MacDONALD, ESQ.
14            MICHAEL J. BRITTAN, ESQ.
15           (Appearances by Telephone.)
16       993 Lenox Drive
17       Lawrenceville, New Jersey  08648
18       (609) 896-9060
19       jmacdonald@stark-stark.com
```

Page 3

```
 1   APPEARANCES (CONTINUED):
 2
 3   For the DEPONENT:
 4       SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY
 5       & THOMPSON
 6       BY:  NICHOLAS J. SANTORO, ESQ.
 7       400 South Fourth Street, 3rd Floor
 8       Las Vegas, Nevada 89101
 9       (702) 791-0308
10       nsantoro@nevadafirm.com
11
12   ALSO PRESENT:
13       TIM McMULLAN (telephonically)
```

Page 4

```
 1              LAS VEGAS, NEVADA; MONDAY, MARCH 22, 2010
 2                              7:54 P.M.
 3                               -oOo-
 4
 5                          ROBERT BRINKER
 6   having been first duly sworn to testify to the truth,
 7   was examined and testified as follows:
 8
 9                          EXAMINATION
10
11   BY MR. ZAHNER:
12       Q.  Good evening, Mr. Brinker.  My name is
13   Brendan Zahner.
14       A.  Good evening.
15       Q.  I'm an attorney with Sonnenschein, as I
16   mentioned earlier off the record.  I represent
17   Genworth and Gurinder Ahluwalia in a lawsuit that's
18   pending in Connecticut that involves TJT Capital.
19           Are you familiar with that litigation?
20       A.  Generally.
21       Q.  Generally.
22           Have you ever had your deposition taken?
23       A.  This is the first time that I've ever had a
24   deposition taken.  Other than as a juror, I've never
25   been in a courtroom in my life.
```

Page 5

```
 1       Q.  Okay.  So let me just explain some of the
 2   rules about how this will work.
 3           We have somebody over here to my right and
 4   your left, the court reporter, who is going to make a
 5   transcript of everything we say tonight.  I'm going to
 6   be asking questions and I'd like you to answer
 7   questions.  This means a few things.
 8           One is that you have to answer verbally, you
 9   can't nod your head yes or no, because she can't take
10   that down.  It also means that when I'm asking a
11   question, you may see where I'm going with the
12   question, but I'd ask you just to let me complete it,
13   because she can't write down what both of us are
14   saying at the same time.
15           And I'll try and do the same thing.  If you
16   are giving an answer and if I start to cut you off,
17   you are not done, just let me know, I'll let you
18   finish.
19           Is that clear?
20       A.  Yes, sir.
21       Q.  And if at any time during this deposition I
22   ask a question that's unclear, you don't know what I'm
23   talking about, you don't know a word or what I'm
24   referring to, anything like that, I'll just ask that
25   you let me know and I'll try and clarify it so that we
```

**78**

1    (Exhibit 16 was marked for identification
2    by the Certified Court Reporter.)
3  BY MR. ZAHNER:
4    Q. Exhibit 16 is a document Bates stamped
5  GEN0003337. It's an e-mail from Mr. McMullan to
6  yourself, dated July 29th, 2005. It says:
7        "Bob, I received the fax you sent with
8        your signature. Thank you. I am thrilled to
9        continue our relationship."
10        Do you recall seeing this e-mail?
11   A. Yes.
12   Q. And did you understand that Genworth was
13  happy to continue the relationship with you?
14   A. Yes, yes.
15       THE REPORTER: Seventeen.
16       (Exhibit 17 was marked for identification
17       by the Certified Court Reporter.)
18  BY MR. ZAHNER:
19   Q. This is an e-mail Bates stamped GEN0003338.
20  It's a June 15th, 2007, e-mail from Mr. McMullan to
21  yourself. It says:
22       "Bob, we are thrilled to extend our
23       agreement another year."
24       Did you understand at that time that Genworth
25  was happy to continue its relationship with you?

**79**

1    A. Yes.
2    Q. Were you aware that -- I may have asked this.
3  I apologize if I did.
4        Were you aware that Genworth used your
5  likeness and your name to market the BJ portfolio?
6    A. I believe that under the agreement they had
7  the ability to do that, and so although I didn't
8  follow it chapter and verse, I think it would have
9  been something that would have been consistent with my
10  understanding of the agreement.
11   Q. And did you have an understanding of whether
12  you were --
13   A. Correction. Certainly through July 31st of
14  2009, and I guess for the one-year extension to this
15  July of 2010 also would be my opinion.
16   Q. And you understand that the use of your name
17  is key to that business model?
18       MR. MacDONALD: Objection to form.
19       MR. SANTORO: Yeah. I object to foundation,
20  as well.
21       THE WITNESS: I'm missing something here.
22  Counsel, you make an objection. And the other
23  counselor looks at me for an answer. I don't know
24  whether --
25       MR. SANTORO: Unless I instruct you not to

**80**

1  answer, you can answer the question. If you know the
2  answer, you can answer it. I'm just putting my
3  objection on the record.
4        THE WITNESS: Could you just repeat the
5  question?
6        MR. ZAHNER: Could you --
7        (Record read by reporter as follows:
8        "Q. And you understand that the use of
9        your name is key to that business model?")
10       THE WITNESS: The answer is yes, and I think
11  that is self-evident.
12       THE REPORTER: Eighteen.
13       (Exhibit 18 was marked for identification
14       by the Certified Court Reporter.)
15  BY MR. ZAHNER:
16   Q. This is an e-mail from Mr. McMullan to you,
17  dated June 4th, 2008, Bates stamped GEN0002595. It
18  states:
19       "Bob, we are thrilled to continue our
20       relationship, as we value it immensely."
21       Did you understand at that time that Genworth
22  valued its relationship with you?
23   A. Yes.
24       THE REPORTER: Nineteen.
25

**81**

1    (Exhibit 19 was marked for identification
2    by the Certified Court Reporter.)
3  BY MR. ZAHNER:
4    Q. You are being shown what's been marked as
5  Exhibit 19, Bates stamped GEN0001249. Do you
6  recognize this agreement?
7    A. Yes.
8    Q. Who negotiated this agreement?
9    A. Mary Jo Zandy.
10   Q. Do you recall when the negotiations started?
11   A. I believe she was negotiating in July of
12  2009, as I recall.
13   Q. Do you recall when Genworth first approached
14  you concerning this agreement?
15   A. They would not -- the normal procedure would
16  be for this to go through Mary Jo. I avoided direct
17  negotiations on this year after year. I didn't want
18  to be involved in the negotiating process.
19   Q. Do you recall whether Ron Cordes contacted
20  you and introduced himself?
21   A. I think he did contact me and introduce
22  himself sometime in that time frame.
23   Q. When you say "that time frame," was that July
24  or --
25   A. I would say the summer of 2009, would be my

90

1  document, a timeline?
2      Q. I believe May of 2009.
3      A. No. Never saw it. Never heard of it.
4      Q. And you were unaware that that was their
5  plan?
6      A. Totally.
7      Q. You mentioned earlier the seriousness of the
8  copyright infringement. Would you allow somebody to
9  use your name or likeness without permission?
10     A. No.
11         MR. MacDONALD: Form objection.
12 BY MR. ZAHNER:
13     Q. To the extent that TJT in fact planned to
14 move clients from Genworth, could they have done that
15 without using your name and likeness?
16         MR. SANTORO: Objection. Lack of foundation.
17         MR. MacDONALD: Same objection.
18         THE WITNESS: I wasn't aware of it.
19 BY MR. ZAHNER:
20     Q. But I asked you a different question, which
21 was, could they have moved the Brinker clients from
22 Genworth without using your name or a relationship
23 with you?
24         MR. SANTORO: Objection. Lack of foundation.
25         MR. MacDONALD: Objection to form.

91

1          THE WITNESS: Here we are in this position
2  again where --
3          MR. SANTORO: If you know, you can answer the
4  question.
5          THE WITNESS: And the question is?
6          MR. ZAHNER: Can you repeat the question?
7          (Record read by reporter as follows:
8          "Q. But I asked you a different
9          question, which was, could they have moved
10         the Brinker clients from Genworth without
11         using your name or a relationship with you?")
12         THE WITNESS: I don't see any way they could
13 move Brinker clients from Genworth. I don't see how
14 you can do that. They are Genworth clients. I don't
15 see how you could do that.
16 BY MR. ZAHNER:
17     Q. So you don't see how TJT could move clients
18 from Genworth?
19     A. I don't see how anybody could -- anybody
20 could move clients from Genworth. No, I don't see how
21 they could. They're Genworth clients.
22     Q. Well, are you aware in fact that a number of
23 those clients have moved to TJT?
24     A. As I said earlier, I have learned that from
25 Mary Jo.

92

1      Q. And do you know how that happened?
2      A. No.
3      Q. Well, why do you say you don't know how
4  clients could be moved from Genworth?
5      A. Because they're Genworth clients.
6      Q. I don't think I understand your answer.
7      A. I feel that if you are a client of Genworth,
8  that why would you move.
9      Q. We looked at the business plan that was
10 submitted to Charles Schwab and it said that they
11 intend to move 85 or 90 percent of the clients from
12 Genworth. Do you recall that?
13     A. Sir, as I testified, to the best of my
14 recollection, I've never seen this business plan until
15 you put it on the table tonight, and I was not aware
16 of it.
17     Q. But you have read it with me?
18     A. I looked at it.
19     Q. Okay. Do you know how they planned to move
20 85 to 90 percent of the clients?
21     A. I have no idea.
22         MR. MacDONALD: Objection to form.
23         MR. SANTORO: Objection. Foundation; calls
24 for speculation.
25         THE WITNESS: I have no idea.

93

1  BY MR. ZAHNER:
2      Q. You understand that the clients of Genworth
3  are in Brinker portfolios, they have your name, they
4  use your likeness when they market those?
5          MR. MacDONALD: Objection. Who uses it?
6          MR. ZAHNER: Genworth.
7          MR. MacDONALD: Thanks.
8          THE WITNESS: I know that the use of my name
9  is part of the business plan and is the reason that we
10 have an agreement through July of this year to do
11 that.
12 BY MR. ZAHNER:
13     Q. And the use of your asset allocation advice,
14 is that the reason why the clients are with Genworth?
15         MR. SANTORO: Objection. Lack of foundation.
16         MR. MacDONALD: Same objection.
17         THE WITNESS: I think it's the market timing
18 advice, the asset allocation advice, and the history
19 they have with me that goes way back to the 1980s as a
20 market forecaster, not perfect, but good enough to win
21 the trust of those people.
22 BY MR. ZAHNER:
23     Q. Okay. I understand you've already testified
24 you were not aware of this business plan. Had you
25 been aware of that business plan, would you have