UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC.,<br><br>Plaintiff,<br>v.<br><br>TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA and TJT CAPITAL GROUP, LLC,<br><br>Defendants. | Civil Action No. 3:09-CV-1521-VLB<br><br>PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PROTECTIVE ORDER |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, AND TJT CAPITAL GROUP, LLC,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>GURINDER AHLUWALIA,<br><br>Third-Party Defendant. | January 28, 2011 |

Plaintiff Genworth Financial Wealth Management and Third Party Defendant Gurinder Ahluwalia (collectively "Genworth" or "Plaintiff") hereby file their Reply Memorandum in Further Support of their Motion for a Protective Order ("Motion", filed as Doc. No. 145) and state as follows:

## INTRODUCTION

To read Defendants' Memorandum in Opposition ("Opp. Mem."), one would not know that, after a day and a half full evidentiary hearing, at which Defendant McMullan testified, Judge Bryant found that Defendants – all while represented by

**their current counsel – had lied to the Court under oath, had destroyed relevant evidence with "consciousness of wrongdoing," had repeatedly provided Genworth's confidential information wrongfully to class counsel in the *Goodman* class action, which information "pervades the class action complaint," and had misappropriated protected, proprietary Genworth information with a motivation to impair the value of Genworth's reputation.**

**In the face of these findings, reflecting the actual harm to Genworth of allowing these Defendants to have this information, Defendants face a heavy burden seeking further voluminous proprietary and non-public Genworth information, in document requests, interrogatories, and further deposition questioning. Yet Defendants' papers fail to explain how such information is in the least bit relevant to Genworth's claims that the Defendants misappropriated Genworth's confidential information while preparing to leave and after they left Genworth in the Summer of 2009. Further, Defendants fail to explain how Genworth's internal documents about how it conducted its business in 2004-2009 have any bearing on Defendants' counterclaims that Genworth misrepresented to its clients Defendants' relationship with Bob Brinker, which allegedly occurred only <u>after</u> the individual Defendants left Genworth to form TJT in the Summer of 2009.**

**As anticipated in Genworth's moving papers, Defendants repeat, like a mantra, over and over again in their Opposition, in conclusory fashion with no analysis, that their reasons for leaving Genworth are somehow relevant to the claims and counterclaims in this case, without ever explaining <u>how</u> those reasons are relevant. Respectfully, the Defendants were at will employees who could resign for any reason or no reason. Why the Defendants left Genworth, and**

**whether they were justified in leaving, are not at issue in this case. This is not an employment case, and no matter how justified the Defendants believed themselves to be in choosing to leave Genworth, that would not excuse stealing confidential information and trade secrets. Nor would it have any bearing on the Defendants' counter claims, which all relate to whether Genworth allegedly misrepresented the newly-formed TJT's relationship with Brinker to Genworth's own customers.**

**Also as expected, Defendants argue that they should be allowed to argue Genworth's "unclean hands," and that they left Genworth because it had "inappropriately invested clients' assets" (Opp. Mem. at 18). They seek this evidence to "vindicate their repeated claims that Genworth had inappropriately invested clients' assets." (*Id.*). Their hope is to testify to this at trial so that "the trier of fact may deem Defendants' behavior less culpable or not culpable at all." (*Id.*). However, *even if* Genworth "had inappropriately invested clients' assets," these are not claims that these former employees of Genworth – none of whom were Genworth clients – can make or assert in this action. That is what the *Goodman* class action is all about. In addition, Defendants completely ignore clear Second Circuit, Connecticut Supreme Court, and District of Connecticut law holding that Genworth's alleged unclean hands in dealing with its customers is irrelevant to the claims against Defendants in this case, and may not be raised by employees as a defense to stealing Genworth's confidential information. (Genworth's initial Mem. of Law [Doc. 146] at 14-16). "Misconduct ... unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands." *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) (quoting *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 18 (2d Cir.**

**1968)), and other cases cited. As Genworth stated in its motion, *even if* it somehow misled its customers, that did not give Defendants license to steal Genworth's "Coca Cola formula" in order to sell the popular soda themselves.**

**Lastly, Defendants argue that the evidence of Genworth's conduct of its business for its customers can be disclosed to counsel's eyes only. However, given that Defendants want to use this evidence at trial to testify that their own misconduct was justified, this is not a workable protection. Moreover, Defendants' counsel will undoubtedly claim the need to discuss this technical evidence with their clients in order to fully analyze and understand it. Further, the Defendants here continued to misuse confidential information, have failed to preserve, and have affirmatively destroyed evidence, well after they retained these counsel and well after they were advised in writing that they were not allowed to use, and that they should preserve for trial, Genworth's information already in their possession. Given Defendants' attenuated and inadequate showing of the relevance of the information sought, Genworth should not be required to provide even more confidential information to the Defendants, and then hope that despite having shown disregard for the Court's Orders and the instructions of their own counsel, perhaps now the Defendants should be trusted.**

**Considering the wide array of evidence against the Defendants in this case, it is perhaps understandable that they wish they were litigating a different case against Genworth. But they are in a case that has nothing to do with the allegations of the class action, and the Court should not allow discovery into completely irrelevant collateral allegations, which would cause Genworth to**

**divulge further confidential information to dishonest ex-employees who have already misused such information to harm Genworth.**

## **ARGUMENT**

### **1. The Defendants' Alleged Reasons for Resigning from Genworth Are Irrelevant to This Litigation**

**The Defendants have provided no support for the claim that their allegations of Genworth's wrongdoing towards its own clients are relevant to the issues in this case. Instead, they simply recite in a conclusory manner that the material is relevant. For example, the Defendants state: "[e]lements of Genworth's implementation of, or deviation from, Mr. Brinker's recommended investment strategies are relevant to Defendants' counterclaims." (Opp. Mem. at 10). Notably, the Defendants never attempt to explain exactly how or why that is. They fail to provide an explanation because the Defendants were not clients of Genworth, and whatever Genworth did or did not do with respect to its clients clearly does not form the basis of any of the counterclaims in this lawsuit. Instead, the counterclaims are based on the sole allegation that Genworth falsely claimed that TJT did not have a relationship with Mr. Brinker.**

**Similarly, the Defendants cite paragraph 12 of their counterclaim at length, which makes various allegations concerning the composition, marketing and performance of Genworth's portfolios. (*Id.*). The Defendants then claim that those allegations "and other allegations" form the basis of their counterclaims for defamation, disparagement, unfair trade practices and unfair competition. Again, the Defendants give no inkling of how an alleged security fraud by Genworth against its own clients disparaged TJT, defamed TJT, interfered with TJT or constituted an unfair trade practice or unfair competition with regard to TJT's**

business, which was formed in the Summer of 2009. That is because there is simply no relationship between the baseless allegations that Genworth defrauded its clients and the Defendants' counterclaims of defamation and unfair competition.

The Defendants also put forth the notion that if they can litigate the entire class action here (i.e. "vindicate their repeated claims that Genworth had inappropriately invested clients' assets"), and can further show that they had an obligation "to honestly disclose the true facts to clients", then that might have a "rehabilitative effect" for the Defendants.[1] (Opp. Mem., p.19). Although Defendants carefully avoid using the phrase "unclean hands," this is the argument that the Defendants can mount an unclean hands defense based on Genworth's alleged conduct towards its clients. The Defendants may choose to completely ignore the controlling authority cited in Plaintiff's brief, but the rule remains that collateral conduct not directed towards a party cannot form the basis for an unclean hands defense. This relevance argument must therefore fail.

The Defendants are effectively arguing that if they can show that Genworth did bad things with regard to Genworth's clients, then whatever the Defendants did to Genworth is excused. Genworth is unaware of any such legal defense, and the Defendants have provided no legal support for its existence.

Although the Defendants' opposition periodically complains that the Defendants must be allowed to explore how Genworth protected its trade secrets

[1] Curiously, the Defendants' so-called "obligation" to tell what they call the truth apparently only arose once the Defendants were marketing their competing business, and not during their many years working for Genworth. And as discussed below, the Defendants are particularly poorly positioned to claim to be well-intentioned truth tellers.

or whether the information was truly proprietary, none of the challenged discovery is directed at those topics. Instead, it is primarily directed at the composition, marketing and performance of Genworth's portfolios. This discovery is truly class action oriented, and the Defendants ultimately admit as much when they argue that they need to "vindicate their repeated claims that Genworth had inappropriately invested clients' assets."

The discovery at issue does not make the existence of any material fact more or less likely, and has no prospect of leading to evidence that will. It is therefore irrelevant and should not be permitted.

2. The Defendants Should Not Be Entrusted with Irrelevant But Confidential Information

While the irrelevance of the information sought is an adequate basis to bar discovery, the Defendants have also hardly shown themselves to be trustworthy keepers of sensitive information. In connection with this case, they have shown various shades of untruthfulness that permeates their conduct. At one end of the spectrum, the Court found that "Defendant McMullan falsely testified before this court. . ." (June 1, 2010 Order at p. 9) In papers filed with the Court, the Defendants also claimed that they "did not remove from Genworth any customer lists or client contact information" (*See, e.g.*, Defendants' Brief filed as docket entry 42 at p. 7), a claim proven false by documents produced by third party Charles Schwab. In the same brief, Defendants argued that they had given "numerous assurances that nothing had been or would be deleted from any of the Defendants' computers," only to later admit under questioning by this Court that Defendant McMullan had thrown out his critical personal computer "in a trash can, hard drive and all." (Docket entry 42 at p. 3; June 1 Order p. 9).

**Despite a pending motion for sanctions based on the foregoing conduct, the Defendants' disregard for the truth and attempts to mislead this Court unfortunately continue to this day.**

**In their Opposition Memorandum, the Defendants continue to obfuscate the truth. For example, the Defendants make the following statement:**

> **Third, Genworth alleges that Defendants "fed to Class Counsel" information regarding the Brinker portfolios. Jeff Brown, who was a client of Genworth, as was his mother, was communicating with a current Genworth Advisor, Alex Overkamp, about his own account. Mr. Overkamp communicated information to Mr. Brown, which resulted in Mr. Brown questioning whether his account was invested in accordance with the Brinker model portfolio as had been represented to him by Genworth.**

**See Tim McMullan Declaration (Doc. No. 148-3), Exhibit "A" (Emphasis added). Exhibit A to Mr. McMullan's declaration is an email dated November 12, 2009 from Mr. Brown to Mr. McMullan, forwarding an email exchange of that date with Mr. Overkamp. Mr. McMullan implies that Mr. Overkamp's communication was the cause of concerns, which only arose at that point, and that Mr. Brown first brought these concerns to Mr. McMullan's attention on November 12, 2009.**

**Mr. McMullan again misleads this Court. Approximately two weeks earlier, on October 30, 2009, in what was not their first contact, Mr. McMullan wrote an email to Mr. Brown and Mr. Tullman (co-class counsel), stating:**

> **Jim:**
>
> **It was nice speaking with you today. Over the next several days I will be sending you information on how Genworth marketed and sold the Brinker services to provide the background, context, and as much of the facts as I can in order to determine the merits of any complaint and potential next steps.**

* * *

**(See October 30, 2009 email from Tim McMullan to Jim Tullman and Jeff Brown,**

**attached as Ex. P). Exhibit P is redacted to protect confidential information, but consists of 3½ single spaced pages of Mr. McMullan listing his various grievances with Genworth. Defendants' statement to this Court that class counsel came to have his own independent concerns based on communications with Alex Overkamp is debunked by further emails showing that Tim McMullan was actually guiding Jeff Brown in those communications, such as this one, also on October 30th:**

> **Jeff:**
>
> **My suggestion is to call up Alex Overkamp at Genworth and have him send you an updated Brinker brochure (kit).**
>
> **Just tell him you are interested in taking another look.**
>
> **Thanks,**
>
> **Tim**

**(See October 30, 2009 email from Tim McMullan to Jeff Brown, attached as Ex. Q). Mr. McMullan can be seen commenting on obtaining information from Mr. Overkamp several days before this as well:**

> **Jeff:**
>
> **FYI the statements happen to be on the I-drive, and Alex certainly has access to them.**
>
> **It's is a relatively simple process for most, I guess Alex is not aware of that. When you get them, forward them to me and I'll run an analysis. We'll take it from there.**
>
> **Thanks,**
>
> **Tim**

**(See October 26, 2009 email from Tim McMullan to Jeff Brown, attached as Ex. R).**

**The Defendants' admitted spoliation of evidence makes it impossible to determine exactly when the Defendants began providing information to class**

counsel, but from the content of the above email it is clear that they had been speaking before late October 2009. And again, it should be reiterated that all of these communications took place:

- after the Defendants had retained Stark & Stark PC;
- after the Defendants had been advised by Stark & Stark that they had no right to Genworth's information;
- after the Defendants had been reminded in writing by Genworth that they were not permitted to use Genworth's information.

And the question of how and when the Defendants began contact with class counsel is not the only example of what is, at best, artful misdirection aimed at the Court. The Defendants' current brief also states that Mr. McMullan did not send customer names to Charles Schwab after April 2009. (Opp. Mem. pp. 7-8). Yet Defendants Cook and McFadden repeatedly sent lists of client names and addresses to Charles Schwab in August of 2009, and those lists have been matched to Genworth's confidential client databases.

For example, on August 3, 2009 in a comically self-serving charade, Mr. Cook wrote to Charles Schwab:

> Chris/Schwab,
>
> Attached is a list of clients that I have been able to recall from memory. My assistant, Tamara Rivera, and I were able to locate their addresses and phone numbers via the internet and public information phone directory. I would appreciate any help you can give with the forms.
>
> As I continue to recall client names and am successful in locating their contact information via public sources, I will forward them to you for help with the forms.
>
> Thank you,
>
> Jim

**(See August 3, 2009 email from Mr. Cook to Chris D'Angelo, attached as Ex. S). The attachment to this email lists the same client names and addresses multiple times. As Judge Bryant noted, Mr. Cook's list had the identical typographical inconsistencies as Genworth's TNET database, such as sometimes using "Drive" or "Dr." for the various addresses listed for a single client. (Joseph Declaration, docket entry 75, ¶ 5). There are repeated examples of client list spreadsheets being sent to Charles Schwab; they all contain repeated entries for a single client, as well as typographical inconsistencies that match Genworth's database.**

**Despite what these cover emails state, Mr. McMullan sought to explain the discrepancies as resulting from the Defendants taking data off client statements, thus copying the discrepancies verbatim. (McMullan Declaration dated March 22, 2010 filed as docket entry 70-6). While that is implausible on its face, it also ignores the fact that multiple clients on the lists sent to Schwab <u>never transferred their accounts to TJT</u>. (Joseph Declaration, docket entry 75, ¶ 5) These claims, found in the Defendants' declarations, are just another example of the Defendants twisting and turning to avoid admitting what they clearly did.**

**These emails were all sent <u>after</u> the Defendants were represented, and were warned by Stark & Stark, in early July of 2009, that Genworth was not a signatory to the Broker Protocol and that they had no right to Genworth's information. (Hearing transcript of April 8, 2010 at pp. 45-46, attached as Ex. T). Instead of returning the information to Genworth (or even destroying it, as they falsely claim to have done), the Defendants kept sending it to Schwab, just repeatedly (and**

tellingly) adding the mantra that the names had been recalled "from memory" and the addresses looked up "online."

The bottom line is that the Defendants have defied the Court (by lying under oath in the courtroom) and their own lawyers (by continuing to use Genworth's confidential information after being told they had no right to). Genworth should not have to bear the substantial risk of the Defendants misusing even more of Genworth's confidential information, particularly given the extremely attenuated claim of relevance.

3. Genworth Has Not "Opened the Door" or Recognized the Relevance of This Discovery

One of Genworth's allegations in this lawsuit is that the Defendants knowingly and intentionally misled Genworth's clients into believing that Genworth did not have an ongoing relationship with Mr. Brinker, in an effort to have the clients cease doing business with Genworth. (Complaint at ¶ 38). This allegation supports Genworth's claim of unfair and deceptive trade practices and its claim of tortious interference with contractual and/or advantageous business relations. The Defendants are therefore incorrect in claiming that Plaintiff "opened the door" to class action discovery merely by asking whether Genworth used Mr. Brinker's name and likeness in marketing and whether Genworth's clients sought Mr. Brinker's asset allocation advice. (Opp. Mem. p. 19). All that was being elicited was the value of the Brinker relationship to Genworth in

**obtaining/keeping its clients, which is an aspect of the claims that the Defendants knowingly misled Genworth's clients concerning that relationship.[2]**

**Plainly the handful of questions asked by Genworth's counsel did not broach the subjects of how the portfolios were composed or how they performed, or whether they were deceptively marketed, as the class action alleges. Indeed, as already detailed in Genworth's moving Memorandum, counsel for Genworth immediately objected to Defendants' counsel asking about those topics. The notion that Plaintiff has "recognized the relevance" of class action discovery here or that such discovery "is in the same category of information" sought by Plaintiff is simply incorrect. The Defendants should not be permitted to expand this litigation to include discovery for the class action that they plainly fomented against Genworth.**

---

**[2] Incidentally, the Defendants have essentially admitted that they made misrepresentations to Genworth's clients when soliciting them. For example, in a declaration submitted to this Court Mr. McMullan states:**

> **When Dr. Brandner inquired about Genworth's relationship with Mr. Brinker, I stated only that Genworth was no longer on Mr. Brinker's website and was no longer in Mr. Brinker's Marketimer newsletter, both of which are true statements.**

**(Declaration of Tim McMullan dated March 22, 2010 (Doc. No. 70-6) at p. 10, ¶ 28). This conversation took place in February of 2010, when Mr. McMullan was well aware that Mr. Brinker was working with Genworth. Mr. McMullan probably thought he was being clever by conveying selected true facts that would leave a false impression, but "[o]f course, even if the facts explicitly and implicitly represented are literally true, there may still be a misrepresentation if the statement is a half-truth because it omits reference to material unfavorable matter." *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987). This is a textbook example of a party conveying certain facts and omitting others in order to create a false impression.**

### 4. The Protective Order Should be Granted to Avoid the Burden and Expense of Conducting Irrelevant Discovery

Contrary to the claims of the Defendants, conducting discovery into multiple years of Genworth's investment practices would clearly be burdensome. Among other things, the Defendants seek all documents concerning Genworth's investment process from 2004 to 2009, all emails between Mr. McMullan and others at Genworth and all communications from Mr. Brinker over the same time period. The Defendants also seek, with no time limitation, all records of Genworth PCG employees logging into Genworth's computer system remotely. The Defendants seek all FedEx billing records between 2004 and 2009 between Mr. McMullan and Gurinder Ahluwalia. Plainly, not only would a massive amount of documents and electronic discovery be involved, but also multiple additional witnesses would be required to discuss the material produced. Searching for and reviewing these documents and preparing and defending additional witnesses would entail a substantial expense. This would unfairly burden Genworth, particularly given that no showing of relevance has been made and there are only two months left before fact and expert discovery must be completed.

## CONCLUSION

For the foregoing reasons, Genworth respectfully requests that this Court grant Genworth's Motion for Protective Order, deny Defendants' Cross- Motion to Compel in its entirety, and grant such other relief to the Plaintiff as this Court deems proper.

**Dated: Hartford, Connecticut**
**January 28, 2011**

**Respectfully Submitted,**

***/s/ Elizabeth M. Smith***
**Elizabeth M. Smith (CT 19808)**
**mfishberg@rc.com**
**esmith@rc.com**
**ROBINSON & COLE LLP**
**280 Trumbull Street**
**Hartford, CT 06117**
**Tele: (860) 275-8338**
**Fax: (860) 275-8299**

**SNR DENTON US LLP**
**Reid L. Ashinoff *(admitted phv)***
**Sandra D. Hauser *(admitted phv)***
**David R. Baum *(admitted phv)***
**Brendan E. Zahner *(admitted phv)***
**1221 Avenue of the Americas**
**New York, NY 10020**
**reid.ashinoff@snrdenton.com**
**sandra.hauser@snrdenton.com**
**david.baum@snrdenton.com**
**brendan.zahner@snrdenton.com**
**Tele: (212) 768-6700**
**Fax: (212) 768-6800**

***Counsel for Plaintiff Genworth Financial Wealth Management, Inc. and Third-Party Defendant Gurinder Ahluwalia***

## CERTIFICATE OF SERVICE

**The undersigned hereby certifies that I have caused to be served a true and correct copy of the foregoing document on this 28th day of January 2011 via email and electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.**

***/s/ Elizabeth M. Smith***
**Elizabeth M. Smith**