UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA and TJT CAPITAL GROUP, LLC, <br><br> Defendants. | Civil Action No. 3:09-CV-1521-(PCD) |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, AND TJT CAPITAL GROUP, LLC, <br><br> Third-Party Plaintiffs, <br><br> v. <br><br> GURINDER AHLUWALIA, <br><br> Third-Party Defendant. | June 30, 2011 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

SNR DENTON US LLP
1221 Avenue of the Americas
New York, NY 10020
Reid L. Ashinoff  *(admitted phv)*
Sandra D. Hauser *(admitted phv)*
Brendan E. Zahner *(admitted phv)*
Tele: 212.768.6700
Fax:  212.768.6800

McCARTER & ENGLISH, LLP
City Place I, 185 Asylum Street
Hartford, Connecticut 06103-3495
Eric Watt Wiechmann (CT 04331)
Elizabeth M. Smith (CT 19808)
Tele: 860.275.6763
Fax: 860.560.5970

**TABLE OF CONTENTS**

**Page**

**SUMMARY OF POSITION** ........................................................................................ 1

**FACTS** ...................................................................................................................... 5

I.      **Genworth Spent Millions of Dollars Over Nearly a Decade to Purchase and
        Maintain the Business that Defendants Stole** ................................................ 5

II.     **Defendants' Scheme to Steal Genworth's Information and Take Its Business** .......... 7

        A.      While Still Employed by Genworth, Defendants Secretly Gathered
                Confidential Information and Transmitted it to Schwab ............................ 7

        B.      McMullan Abused His Position to Solicit Brinker's Services for TJT ................ 9

        C.      After Resigning, Defendants Continued to Misuse Genworth's
                Confidential Information to Solicit Genworth's Clients, Despite Having
                Received Additional Warnings from Genworth that Its Information was
                Confidential .......................................................................................... 10

        D.      Defendants Signed Multiple Contracts With Genworth That Expressly
                Prohibit Precisely their Conduct Here ..................................................... 12

        E.      Genworth Protected Its Confidential Information with Multiple Layers of
                Security ................................................................................................. 14

        F.      Defendants' Repeated Submission of Contradictory Sworn Statements and
                Destruction of Evidence Further Demonstrates Their Wrongful Conduct .......... 15

        G.      Defendants Instigated a Class Action Lawsuit Against Genworth Which
                They Used for Their Own Benefit, and Spread Untruths Regarding
                Genworth's Relationship with Brinker ..................................................... 20

        H.      This Court Entered an Injunction Against Defendants' Further Misuse of
                Genworth's Information, which Defendants Continue to Violate ..................... 21

**ARGUMENT** ............................................................................................................. 22

I.      **The Summary Judgment Standard is Met** ................................................... 22

II.     **The Individual Defendants Breached their Contracts with Genworth** ................... 22

        A.      The Defendants Violated Their Contracts with Genworth by Stealing its
                Client Information and Using it to Misappropriate Genworth's Business .......... 23

        B.      The Defendants Caused Substantial Damage to Genworth ........................... 25

III.    **The Defendants Misappropriated Genworth's Trade Secrets** ............................. 25

        A.      Genworth's Client Information Is a Trade Secret ..................................... 25

        B.      Defendants' Theft of Genworth's Trade Secrets Constitutes
                Misappropriation Under CUTSA .............................................................. 28

        C.      The Law Protects the Stolen Material ..................................................... 29

**IV.**     **The Defendants Engaged in Unfair and Deceptive Trade Practices** ........................ 30

      A.      The Defendants Acted Unfairly and Deceptively Because they Abused their Positions of Trust and Confidence at Genworth to Steal its Information and Transfer its Business to Themselves ........................................ 31

**V.**     **Defendants Tortiously Interfered with Genworth's Contracts and Relationships** ............................................................................................... 33

      A.      Genworth Had Contracts And Beneficial Relationships ..................................... 34

      B.      Defendants Had Knowledge of Genworth's Contracts and Relationships .......... 34

      C.      Defendants Intended to Interfere with Those Contracts and Relationships ........ 34

      D.      The Defendants' Interference was Tortious ........................................................ 35

**VI.**    **Defendants Violated the Computer Fraud and Abuse Act by Exceeding the Authorization Genworth Gave them to Access Its Computer Systems, and Instead Obtained Genworth's Confidential Information to Start a Competing Business** ........................................................................................... 35

**VII.**   **Plaintiff is Entitled to Both an Injunction and Damages** ............................................ 36

      A.      Permanent Injunctive Relief is Necessary to Deter and Prevent Continued Misconduct and Intentional Impairment of Genworth's Business ...................... 36

      B.      Genworth is Entitled to Monetary Damages in the Amount of its Lost Revenue, As Well As Punitive Damages and Attorneys' Fees .......................... 39

**CONCLUSION** .......................................................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*AGC, Inc. v. Baillargeon*,
  2011 WL 1176141 (Conn. Super. Mar. 9, 2011) ....................................................32

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................22

*Blake v. Levy*,
  191 Conn. 257 (1983) ............................................................................................35

*Blue Cross & Blue Shield of Conn., Inc. v. DiMartino*,
  1991 WL 127094 (Conn. Super. Ct. 1991) .................................................... passim

*Brennan v. Brennan Associates*,
  293 Conn. 60, 977 A.2d 107 (Conn. 2009)............................................................37

*Conaway v. Prestia*,
  191 Conn. 484 (1983) ............................................................................................39

*Delaware & H.R. Co. v. Conrail*,
  902 F.2d 174 (2d Cir. 1990)...................................................................................22

*Dunsmore & Assoc., Ltd. v. D'Alessio*,
  1998 Conn. Super. LEXIS 2522 (1998).............................................................29, 39

*Elizabeth Grady Face First, Inc. v. Escavich*,
  321 F. Supp.2d 420 (D.Conn. 2004) .....................................................................37

*Elm City Cheese Co., v. Federico*,
  251 Conn. 59, 752 A.2d 1037 (1999) .................................................................29, 39

*Gargano v. Heyman*,
  203 Conn. 616, 525 A.2d 1343 (1987) ...................................................................40

*General Reins. Corp. v. Arch Capital Grp., Ltd.*,
  2007 WL 3121766 (Conn. Super. Ct. 2007)...........................................................38

*Goodman v. Genworth Financial Wealth Management, Inc.*,
  No. 2:09-cv-05603-LDW-ARL (E.D.N.Y. 2009).............................................1, 3, 37

*Holiday Food Co. v. Munroe*,
  37 Conn.Supp. 546 (1981)......................................................................................26

- iii -

*Kitchens of Bedford, Inc. v. Schultheis*,
  1997 Conn. Super. LEXIS 1673 (1997)............................................................29, 38

*Lydall, Inc. v. Ruschmeyer*,
  282 Conn. 209, 919 A.2d 421 (Conn. Sup. Ct. 2007)............................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).............................................................................................22

*Minnesota Mining and Manuf. Co. v. Francvilla*,
  191 F. Supp.2d (D. Conn. 2002)............................................................................38

*Naples v. Keystone Bldg. & Development Corp.*,
  295 Conn. 214 (2010) ..........................................................................................31

*Nationwide Mut. Ins. Co. v. Stenger*,
  695 F.Supp. 688 (D.Conn.1988)............................................................................26

*Nationwide Mut. Ins. Co. v. York*,
  2000 WL 1683452 (Conn. Super., Oct. 13, 2000) ..................................................26

*Newinno, Inc. v. Peregrim Development, Inc.*,
  No. CV010390074S, 2002 WL 31875450 (Conn. Super. Dec. 3, 2002)..................23

*North Atlantic Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999)....................................................................................29

*OneBeacon Professional Partners, Inc. v. Ironshore Holdings (U.S.), Inc.*,
  2009 WL 765666 (Conn. Super. Feb. 27, 2009)....................................................29

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
  306 F.3d 99 (2d Cir. 2002).....................................................................................19

*Rioux v. Barry*,
  283 Conn. 338, 927 A.2d. 304 (2007) ..................................................................34

*Sequoia Sciences, Inc. v. Wood*,
  2006 U.S. LEXIS 14921 (D. Conn. 2006)..............................................................38

*Smith v. Snyder*,
  839 A.2d 589 (Conn. 2004) ..................................................................................29

*Town & Country House & Homes Services, Inc. v. Evans*,
  150 Conn. 314 (1963) ..........................................................................................26

*U.S. v. Buddhu*,
  2009 WL 1346607 (D. Conn, May 12, 2009).........................................................37

*United Natural Foods, Inc. v. Hagen*,
    Civil No. 3:10cv807 (JBA), 2010 WL 3211070 (D. Conn. Aug. 13, 2010)...........................22

## STATUTES

18 U.S.C. §1030...................................................................................................................35, 36

18 U.S.C. § 1030(a)(2)...............................................................................................................36

18 U.S.C. § 1030(e)(2)...............................................................................................................36

18 U.S.C. § 1030(e)(6)...............................................................................................................36

Conn.Gen.Stat. § 35-51(b).........................................................................................................28

Conn.Gen.Stat. § 35-51(d).........................................................................................................25

Conn. Gen. Stat. § 35-52.......................................................................................................25, 38

Conn. Gen. Stat. § 35-53(a)........................................................................................................39

Conn. Gen. Stat. § 35-53(b)........................................................................................................40

Conn. Gen. Stat. § 42-110(g)......................................................................................................39

Conn. Gen. Stat. § 42-110g(a)....................................................................................................40

Conn. Gen. Stat. § 42-110g(d)....................................................................................................40

## OTHER AUTHORITIES

Fed.R.Civ.P. 56(c) .....................................................................................................................22

## SUMMARY OF POSITION

Genworth Financial Wealth Management Inc. ("Genworth" or "GFWM") respectfully moves for summary judgment against Defendants, based upon an overwhelming and uncontested evidentiary record of documents and sworn admissions by the principal Defendants that, over a period of months both during and after their employment with Genworth, they systematically misappropriated and misused Genworth's confidential and password protected customer lists and other business information to start a competing business against Genworth.

In June of 2010, Judge Bryant, after full briefing and a two-day evidentiary hearing, granted Genworth both sanctions for the destruction of evidence and significant injunctive relief against all of the Defendants.  (Doc. Nos. 100 and 101).  This Court found that Mr. McMullan "falsely testified before the Court," and the Defendants had "misappropriated Genworth's confidential information" with "consciousness of wrongdoing," misused this information in an "unabashed attempt to destroy Genworth's goodwill and customer relations" for their own personal gain, engaged in "apparent deceit", knowingly destroyed "incriminating evidence" and "relevant information," and made numerous claims and assertions that were "utterly incredulous."  Judge Bryant also stated that Defendants wrongfully disclosed Genworth's proprietary information to class counsel in the action *Goodman v. Genworth Financial Wealth Management, Inc.*, No. 2:09-cv-05603-LDW-ARL (E.D.N.Y. 2009), with the motivation of impairing Genworth's reputation and client relationships, as well as taking Genworth's clients.

Faced with overwhelming evidence from third party discovery that Defendants both acted improperly and hid their wrongdoing, the principal Defendants have been forced to recant and contradict their prior sworn denials -- and admit under oath that they repeatedly accessed Genworth's client lists, notwithstanding their knowledge that this information belonged to Genworth and that Genworth and its predecessors paid over $17 million to purchase and develop

this client base over a decade.  The identities of these select clients, and client leads, who were followers of the asset allocation and market timing strategies of Mr. Robert Brinker, a nationally known commentator and newsletter (*Marketimer*) publisher, were known only to Genworth and its corporate predecessors, for whom the individual Defendants worked.  Defendants concede that no list of these unique clients, who were self-identified as followers of Mr. Brinker and scattered around the United States, was available publicly or anywhere else.  Indeed, when Mr. Brinker initially sold this business to Centurion Capital Management Corp., which then sold it to Genworth's corporate predecessor, GE, the confidential identities of these customers and their assets under management were acknowledged as highly confidential by Mr. Brinker and were the principal assets for which Mr. Brinker received $12 million from Centurion.  Thereafter Genworth paid $5 million for Mr. Brinker's exclusive investment advisory services, leads and referrals over the next decade.  Virtually all of these clients came to Genworth as original clients of Mr. Brinker's business, the BJ Group, or as leads from Mr. Brinker.  None of these Defendants found or paid to find these clients themselves.

Because of this uniquely valuable set of trade secrets, Genworth employees, including each of the Defendants, agreed in writing both when they started and as a condition of their continuing employment with Genworth, to use these password protected client lists, identities and other valuable personal client information *solely* for the business interests of Genworth.

The evidentiary record here is uncontroverted that commencing in early 2009, the individual Defendants secretly planned to leave Genworth and misappropriate what they hoped in writing to be 85-90% of Genworth's Private Client Group (PCG) clients -- a group Defendant McMullan headed for Genworth.  Towards this end, they copied and removed from Genworth, and misused to start their own business, information from four different password protected confidential repositories of Genworth's client information, including its ACT and TNET

systems.  Even in the months before they left Genworth, these Defendants secretly misused and shared Genworth's detailed client information to facilitate the prompt start of TJT's relationship with their new custodian, Charles Schwab & Co. ("Schwab").

Using all of this confidential information even before Genworth realized they had taken it for use in their competing business, Defendants stole over 600 client accounts with assets under management (AUM) of approximately $135 million before Judge Bryant enjoined their conduct. To this day, Defendants admit that up to 95% of TJT's client base constitutes former Genworth clients.  Defendants also violated the law by using Defendant McMullan's access as a Genworth employee to Mr. Brinker, to convince Mr. Brinker both to end his exclusive relationship with Genworth and his provision of leads to Genworth, and to agree to serve as an investment advisor to their new business TJT.  When asked at his deposition whether he consulted with Genworth to preserve Genworth's ongoing relationship with Mr. Brinker once he announced his intention to leave, Defendant McMullan candidly admitted that he did not.

Were this not enough, Defendants went further in their clandestine and illegal scheme to destroy Genworth's business and reputation and steal its entire client base.  They located class action counsel, briefed them extensively (though not always truthfully) about Genworth's confidential internal workings, provided extensive allegations concerning Genworth's non-public data and investment results, and fomented a securities class action lawsuit (the *Goodman* complaint) accusing Genworth of fraud on their investment clients.  They provided substantially all of the content for both the class action complaint, as well as the public notice of the complaint drafted by class counsel, and suggested edits "especially . . . getting the notice to have more bite."  Defendants then forwarded the lawsuit notice to Genworth's clients, using client contact information they stole, claiming that they felt "an obligation" to make their allegations known to Genworth's clients -- thus publicly and wrongfully disseminating confidential knowledge they

gained as Genworth's trusted employees "in an unabashed attempt to destroy Genworth's goodwill and customer relations."  (Doc. No. 101)  They also falsely advised Genworth's clients that Mr. Brinker no longer had a relationship with Genworth.

When sued, Defendants stonewalled Genworth and this Court by refusing to produce -- indeed by deliberately destroying -- the relevant evidence of this misconduct, and lying about what they had done.  When caught red-handed by Schwab's document production, and later by this Court's examination at hearing and the court-ordered forensic examination of their computers' hard drives, Defendants told one lie after another -- under oath -- still trying to hide but also justify their wrongful conduct.  Defendants' lies and excuses are meritless.  Defendants' dishonesty and wrongdoing along with spoliation of evidence, chronicled herein and in the accompanying affidavits and Rule 56 statement, are uncontroverted and clearly warrant summary judgment that Defendants are liable to Genworth for violating (1) Defendants' agreements with Genworth, (2) the Connecticut Uniform Trade Secrets Act, and (3) the Connecticut Unfair Trade Practices Act, and further, (4) that Defendants tortiously interfered with Genworth's contractual business relationships with its clients and with Mr. Brinker.  Defendants' conduct has inflicted, and, unless permanently enjoined, would inflict irreparable harm on Genworth.

While the evidence shows that Defendants have caused millions of dollars of damages to Genworth, on this motion Genworth seeks holdings of liability and entitlement to permanent injunctive relief in addition to damages.  Genworth proposes that the amount of damages to be awarded against Defendant TJT, and the scope of the permanent injunctive relief against each Defendant, be addressed swiftly at hearing after liability is established by grant of this motion.

<u>**FACTS**</u>

**I.** **Genworth Spent Millions of Dollars Over Nearly a Decade to Purchase and Maintain the Business that Defendants Stole**

The clients of Genworth's PCG are an elite set of private individuals and family trusts across the United States who are self-selected followers of the asset allocation investment strategies of Robert Brinker, an advisor to Genworth who for many years has hosted the financial radio program *MoneyTalk* and published the investment newsletter *Marketimer*. (Ex. A at 21:19-25; 22:1-3; Ex. B at 35:25; 36:1-15)  With very few exceptions, clients did not come to the PCG because of relationships with employees like Defendants.  Instead, the PCG clients -- whose identities and specific investment accounts are the furthest thing from "publicly known" -- were acquired at a cost of many millions of dollars to Genworth and its predecessors, through both the purchase of Mr. Brinker's book of business and direct paid referrals from Mr. Brinker himself.

The facts clearly establish that: (1) The identities, contact and account information of Genworth clients are confidential and not available to the public; (2) The clients of the PCG belong to Genworth, not to individual advisors like Defendants who were employed by Genworth simply to service Genworth's relationships with these clients, and (3) Defendants were given access to Genworth's client information exclusively to perform their jobs at Genworth.

The present-day PCG originated from an advisory firm that Mr. Brinker founded in 1986 called The BJ Group.  The BJ Group was purchased in 2000 by Centurion Capital Management Corp. ("Centurion") for $12 million, a price reflecting both the BJ Group clients' identities and assets under management and the stream of fee revenue they generate (Ex. C at 15:7-25;161:3; 16:13-20)  Mr. Brinker recognized that the confidential nature of his clients' contact, account and investment information was central to the value of his business -- and in fact agreed on behalf of himself and his affiliates upon sale of the business not to disclose the BJ Group's client

information to anyone, or contact or solicit any clients of the BJ Group or Centurion. (Ex. D)  In

2001, GE Financial Assurance Holdings, Inc. purchased Centurion, and the business was

renamed General Electric Private Asset Management.  Genworth Financial, Inc. and GFWM

(including the PCG) were later spun off from the General Electric Corp. (Ex. V at 21:11-23)

The Defendants admit that the PCG client base is unique to Genworth because no other

investment advisor knows who the subscribers to Mr. Brinker's newsletter are.  (Ex. E at 69:8-

22)  Mr. Brinker testified that he has not ever, and would not ever, give or sell his list of

newsletter subscribers to any money management firm.  (Ex. C at 35:7-21)

In addition to the purchase price that Genworth paid for the book of business, Genworth

has also paid approximately $5 million to Mr. Brinker for advisory services and client leads over

the years.  (Ex. F)  Nearly every new client came to PCG from either these leads or referrals by

existing clients.  (Ex. G 21:9-22; 46:13-47:4; 126:7-129:3)  Indeed, outside of leads and referrals

from existing clients, Mr. McMullan and Mr. McFadden could each name only *one* client that he

had ever brought to the PCG, in Mr. McFadden's case over more than a decade.  (*Id.* at 100:12-

101:14; Ex. E at 33:10-22).  Mr. Cook could name none.  (Ex. H at 33:20-34:3)  Defendants

Bazon and Rivera were administrative assistants at Genworth, and did not recruit or develop any

clients.  The same remains the case today, as Defendants have testified that up to 95% of TJT's

clients are former Genworth clients, not clients they originated.  (Ex. E at 332:17-25; 333:1-2).

Mr. Cook and Mr. McFadden were employed initially by The BJ Group, and later by its

successors, Centurion, GE, and Genworth, to service the accounts of existing clients and to

handle the inflow of leads from Mr. Brinker -- not to independently prospect for clients.  (Ex. H

at 15:18-25; 16:1-16; Ex. G at 28:21-25)  Mr. McMullan was hired in 2004 to manage the PCG,

not to service individual clients at all.  Not only did Defendants Cook and McFadden have no

role in generating leads for the accounts that they serviced, but from time to time, their managers

(including McMullan) would re-assign the clients that each serviced to a different investment advisor. (Ex. G at 53:1-8; 54:12-17)  None of the Defendants received any remuneration from Centurion's or GE's purchase of what clearly was Mr. Brinker's business, nor did they pay for the business leads. (Ex. G at 30:6-13; Ex. H at 17:5-13; Ex. E at 124:23-25; 124:1-12)

## II.      Defendants' Scheme to Steal Genworth's Information and Take Its Business

Defendants initially hatched their plan to start a competing business by systematically poaching Genworth's confidential business information while they were still Genworth employees -- and pursued their plan both before and after their departures, even after repeated warnings and reminders regarding their obligations to Genworth under contract and law, including the injunctive Order entered by this Court.

### A.      While Still Employed by Genworth, Defendants Secretly Gathered Confidential Information and Transmitted it to Schwab

At least as early as December 22, 2008, six months before he resigned from Genworth, Mr. McMullan began meeting with representatives of Schwab to develop plans to start a business to compete against Genworth and to take Genworth's client accounts.  (Ex. E at 86:22-25; 87:1)[1] By January 21, 2009, Mr. McMullan referred to Mr. Cook and Mr. McFadden as his "two partners" in their new competing venture.  (Ex. I)  That Defendants had a deliberate plan to steal Genworth's clients is apparent from the Business Plan they submitted to Schwab in or around April 2009, which brazenly declares that they intended to take the business Genworth had purchased and grown, and predicted near complete success: "we would be shocked if we did not ultimately transfer more than 85%-90% of our current client base . . ."  (Ex. J)

"Phase I" of the Business Plan is described as "Transition our existing client base." (*Id.*) "Phase II" of the Business Plan indicates Defendants' express intent to pirate and use

Genworth's client lead lists, promising that Defendants would "continue to engage our current list of qualified prospects and re-engage with our former clients . . ." (*Id.*) The Business Plan also states: "We plan on an email and print marketing campaign to our former clients as well as our extensive list of high net worth prospects . . ." (*Id.*) Of course, the identities and contact information for all of these client leads and former clients belonged to Genworth, because Defendants had no client or prospect list of their own.

Dovetailing with the above plans, on April 29, 2009, two months before he resigned, Mr. McMullan sent a "sample" list of <u>Genworth's</u> client names and account numbers to Schwab, observing that the listed clients might have open Schwab accounts and might be more easily transitioned. (Ex. K) This list was sent to Schwab employee Christopher D'Angelo, whose sole job responsibility was to help McMullan and individuals like him transition clients from other custodian firms to Schwab. (Ex. L at 34:15-22) D'Angelo testified that McMullan provided names and accounts to Schwab because it "would save us a lot of paperwork" to know in advance which Genworth clients were already in Schwab's system -- *i.e.,* McMullan's competing business could steal clients without completing new custodial applications. (*Id.* at 32:15-18)

Genworth's client account numbers were non-public information, as Mr. D'Angelo testified. (*Id.* at 26:20-23) Mr. Magnus of Schwab confirmed that this data "typically isn't data that we receive from advisers before resignation" because "it's typically data that's owned *by another custodian*." (Ex. M at 97:11-25; 98:1-2) (emphasis added) McMullan's provision of this information to Schwab is so improper that Mr. Magnus testified that he assumed that Mr. D'Angelo would have responded "that [Schwab] couldn't accept this data" -- although unfortunately, Schwab did. (Ex. M at 97:14-19; Ex. K) Mr. D'Angelo both accepted the

---

(...continued)

[1]  Schwab ultimately provided TJT with a credit line of over $300,000 and currently acts as the custodian for the

(continued...)

information and continued dialogue with McMullan toward the transfer of Genworth clients.

The breaches of confidence only grew from there. On May 19, 2009, prior to leaving Genworth Mr. McMullan sent Mr. Magnus a *complete list* of every asset held by all of the clients of the PCG serviced by Mr. Cook and Mr. McFadden. (Ex. N; Ex. E at 106:2-12; Ex. M at 83:4-17) The source of this information was Genworth's confidential TNET database, a double-password protected system that houses the bulk of Genworth's client data. (Ex. E at 107:16-20) As Mr. McMullan admitted, the specific securities in which Genworth's clients were invested is confidential non-public information. (*Id.* at 204:14-25; 205:1-13) Yet McMullan testified in Court that he made a personal CD with this information while in his office at Genworth, brought it home, and then emailed it to Schwab. (Ex. O at 63:10-13)

In addition, during this same time period, at McMullan's instruction, Defendant Bazon repeatedly requested copies of Genworth's Automated Contact Tracking ("ACT") client database. (*See* Doc. Nos. 47-4, 47-5) McMullan admits that he made a copy of the ACT database -- the principal system through which Genworth maintained detailed client contact information, lists of prospects and leads, and portfolio management notes used to handle the relationships -- with the intent of creating his own client list. (*See* Doc. Nos. 47-5, 47-21 and 47-22) On June 12, 2009, three days before McMullan gave notice of his resignation, Bazon requested and received yet another back-up of the ACT database. (Doc. No. 47-5)

### B.     McMullan Abused His Position to Solicit Brinker's Services for TJT

One of Mr. McMullan's duties as the manager of the PCG was to negotiate for Genworth the extensions of Mr. Brinker's contracts. (Ex. E at 63:20-24; 275:11-16) Mr. McMullan used this position in 2009 to induce Mr. Brinker to abandon the exclusivity of his then 9-year

---

(...continued)

assets of Defendant TJT's clients. (Ex. H at 95:19-20)

relationship with Genworth and its predecessors, so that McMullan and TJT could boast to

potential clients that it enjoyed the same (or only) advisory agreement with Mr. Brinker.

Between April 7, 2010 and June 23, 2010, Mr. McMullan had several long conversations

with Mr. Brinker.  (Ex. P)  Mr. McMullan admits that he "may have" asked Mr. Brinker to

completely end his relationship with Genworth and instead work with the Defendants (Ex. E at

291:24-25; 292:1-15), and that he "may have" asked Mr. Brinker to refer leads to McMullan's

new business.  (*Id.* at 297:17-23)  Then, directly after McMullan left Genworth on June 29, Mr.

Brinker made known that he would no longer provide leads to or recommend the PCG, and that

he no longer intended to work on an exclusive basis with the PCG -- all after Mr. McMullan

assiduously courted him while a PCG employee.  (Ex. Q; Ex. R)  Even before Genworth first

reached out to Mr. Brinker's representative Mary Jo Zandy to renew Brinker's contract, Zandy

told Mr. McMullan on July 18, 2009 that "I think Bob has decided to work with <u>both</u> Genworth

<u>and your group</u> and on a different basis going forward" -- reflecting that Brinker had been

courted for an exclusive deal with TJT.  (Ex. Q) (emphasis added).  McMullan abused the unique

access to Bob Brinker that Genworth had provided him for his own personal gain.

    **C.**    **After Resigning, Defendants Continued to Misuse Genworth's Confidential Information to Solicit Genworth's Clients, Despite Having Received Additional Warnings from Genworth that Its Information was Confidential**

On at least 36 separate occasions following Defendants' resignations from Genworth

Defendants sent detailed spreadsheets with Genworth's client names, addresses and account

types to Schwab -- all stolen information, all sent from Defendants' personal home email

addresses.  (Ex. S)  Not a single one of these emails was produced by Defendants in this case.

(Zahner Decl. at ¶ 6)  Mr. Cook himself sent lists containing the names and addresses of over

400 Genworth accounts to Charles Schwab.  (*Id.*)  The data sent to Schwab matches Genworth's

protected TNET client database, complete with its unique idiosyncrasies, typographical

inconsistencies and the other detailed information in TNET.

For example, of the 437 names and addresses Defendant Cook sent to Schwab, 402 have an exact match to Genworth's data in TNET.  (*Id.* at ¶ 7)  What makes the exact matching so telling are the numerous idiosyncrasies in the data.  For example, a husband and wife may have multiple accounts, including normal taxable accounts, retirement accounts and trust accounts for their children.  But the names and addresses of accounts even within a family typically have many differences, for example: (1) whether a middle name, middle initial, or nothing is used; (2) whether or not words like "Street" or "Avenue" are abbreviated; (3) whether a period is used after middle initials and abbreviations; (4) whether zip +4 is used or not; (5) typographical errors or wrong zip codes; (6) the use of titles such as "Dr."; (7) the use of "&" versus "and"; and so on.  The discrepancies among the accounts of one client also exist between different clients.

As Judge Bryant found, there is no plausible explanation for hundreds of idiosyncratic matches, other than the improper taking and use of Genworth's confidential information.  (Doc. No 100 at 9)  Moreover, Mr. McMullan sent lists of account types matching the names and addresses sent by Defendants Cook and McFadden, and there is no public source that shows what type of account a particular client had at Genworth (*i.e.*, IRA, ROTH IRA, SEP IRA, IRA R/O, JTWROS, Tenants in Common, JT TEN, etc.) (*See, e.g.,* Ex. T; Ex. E at 234:12-15; 241:8-15)  This data matches TNET as well.  A few lines of data from Defendants' lists sent to Schwab after they resigned, with their corresponding entries in TNET illustrate the point:[2]

Redacted

---

[2] This illustration contains Genworth's confidential client information and is the subject of a Consent Motion to Seal (Doc. No. 191).  If the Consent Motion to Seal is granted, unredacted copies will be mailed to the Court.

- 11 -

In addition, after their departures, McFadden improperly accessed password-protected and proprietary Genworth databases on at least six separate occasions.  (Doc. No. 70-8 at 3)

Using information they misappropriated, Defendants transferred more than 200 client groups, reflecting over 600 accounts and close to $135 million of assets under management to TJT.  (Joseph Decl. at ¶ 4)

### D.    Defendants Signed Multiple Contracts With Genworth That Expressly Prohibit Precisely their Conduct Here

As a condition of their employment, all of the Defendants signed a contract -- the Proprietary Information and Inventions Agreement ("PIIA") -- through which they expressly agreed not to use or disclose Genworth's secret or confidential information or materials, whether during or subsequent to their employment.  (Ex. U)

In accepting this contract as a condition of employment, the Defendants agreed:

> Not to use, publish or otherwise disclose (except as authorized when my Company duties may require) either during or subsequent to my employment, any secret or confidential information or materials of the Company or its affiliates or any information or data of others that the Company or its affiliates are obligated to maintain in confidence.

(*Id.*)  The PIIA undoubtedly extends to customer information and other information concerning Genworth's operations, and is not limited to theft of documents.  The agreement continues:

> **<u>Such secret or confidential information or materials include any information or materials that are not generally known</u>**, regardless of whether in oral, written, machine readable, or other form.  **Examples include**, but are not limited to, information or materials concerning the Company's product or marketing plans, distributor, vendor or **<u>customer relationships</u>**, finances, research or development efforts, methods, processes, trade secrets, know-how, inventions, discoveries, computer software, technology, **<u>and other information concerning the Company's business operations or affairs</u>**.

(*Id.*, emphasis added).  Defendants also agreed that if any question or doubt existed regarding confidentiality they would consult a supervisor or counsel, and the PIIA required the return of secret or confidential materials to Genworth upon the termination of employment. (Id.)

Integrity First is a second contract between Genworth and its employees, which was reaffirmed by Defendants year after year.  (Ex. V at 17:12-17)  Integrity First requires employees to be aware of and protect Genworth's intellectual property, and to consult with Genworth's legal counsel before disclosing Genworth's proprietary information or accepting the proprietary information of outsiders.  (Ex. W at 29)  All Defendants admit that they signed an agreement to follow Integrity First.  (Ex. H at 45:23-47:13; Ex. G at 70:19-71-7; Ex. E at 37:6-19)

Defendants' awareness of the prohibition on using Genworth's information and material is uncontested; Defendants swear that they were told this by their own counsel, even though they continued transmitting data to Schwab.  (Ex. X)  If that were not enough, the Defendants also received Genworth's standard letter to all departing employees reminding them of their obligation not to misuse Genworth's secret or confidential information.  (Ex. Y at 68:7-25; 69:1-3)  Genworth sent Mr. McMullan a letter on July 18, 2009, to communicate that "Genworth takes seriously the protection of its intellectual property rights" and that customer lists are among the information that Genworth considers to be confidential, proprietary and in some cases trade secrets.  (Ex. Z)  A similar letter was sent to Mr. McMullan (again) and Mr. Cook on July 29, 2009 (Exs. AA, BB), and to Mr. McFadden on August 4, 2009.  (Ex. CC)

Moreover, all Defendants received a warning letter hand delivered by Genworth's former outside counsel on August 19 or 20, 2009, which again stated that Genworth considered its client lists proprietary information and demanded that the Defendants *preserve and not destroy* all hardcopy and electronic documents relating to this matter.  (*See, e.g.,* Ex. E at 431:21-24; Ex. G at 264:21-25; 265:2-4)  Mr. McMullan confirmed that he received this letter no later than August 20, 2009, potentially *before* he destroyed additional evidence including discarding his own computer, "hard drive and all."  (Ex. E at 431:21-24; Ex. O at 74:11-78:25)

All three Defendants admit to multiple violations.  McMullan admits that "perhaps" he

- 13 -

violated the policy by not safeguarding Genworth's assets when he downloaded Genworth's client information.  (Ex. E at 221:7-222:16)  Mr. Cook candidly testified that in "resourcing [the] TNET database and client account statements and other Genworth information to create a list of the names and addresses of Genworth's clients," he was not complying with Integrity First.  (*Id.* at 224:15-22)  His only explanation was "these are my clients."  (Ex. H at 77:11-19)  Mr. McFadden too testified that despite agreeing to both Integrity First and the PIIA, "taking a name, an address and an account title, there is nothing that is wrong with that."  (Ex. G at 123:15-17)

### E.    Genworth Protected Its Confidential Information with Multiple Layers of Security

Because the client information Defendants stole from Genworth is valuable, Genworth protects it both physically and digitally from misappropriation.  Four databases accessible to PCG employees house the information Defendants took: (1) the ACT database, used primarily for contact information, prospects and notes of client conversations; (2) the PCG website, where PCG clients and employees can view client names, addresses, holdings and transaction data; (3) the TNET database, which houses information for the 95% of PCG clients whose assets are custodied with Genworth Financial Trust Company; and (4) the Schwab website, which houses information for the PCG clients whose assets are custodied at Schwab.  (Murray Decl. at ¶ 2)

Each of these databases is either single or double password protected and access to them is limited to those employees who need to use them to perform their duties for Genworth.  (*Id.*)  In addition, Genworth's physical files are kept under lock and key, in offices allowing entry only by those with security ID cards or their authorized visitors.  (*Id.*)  The many layers of protection of Genworth's data, both in the physical plant and online are detailed in the Declaration of John Murray, filed with this Motion, and are also set forth in the evidence detailed in Genworth's Rule 56 statement also filed simultaneously herewith.

**F.      Defendants' Repeated Submission of Contradictory Sworn Statements and Destruction of Evidence Further Demonstrates Their Wrongful Conduct**

Defendants repeatedly have been caught in lies in their sworn statements and testimony and have destroyed evidence to hide their theft of Genworth's information.  Indeed, after full briefing and a two-day evidentiary hearing, Judge Bryant found that Mr. McMullan "falsely testified before this Court," and "spoliated evidence" with "consciousness of wrongdoing." (Doc. No. 100 at 9)  Each Defendant has also sworn to several conflicting stories, which have "evolved" and broken down as the evidence mounts against them.  Importantly, regardless of which story is to be believed, if any, all show that Defendants violated their agreements with Genworth and the law by misappropriating Genworth's confidential, protected information.

**1.      STORY #1:  Defendants Knew They Could Not Use Genworth's Client Information, Yet They Used Client Names and Looked Up the Corresponding Contact Information Online**

At the outset of this case, prior to realizing that they would be caught transmitting lists of Genworth's client information, Defendants swore that TJT's clients were developed purely from memory of their interactions with Genworth's clients.  The essential elements of this story were:

- Prior to departure from Genworth, McMullan collected Genworth's client information under the mistaken belief that Genworth was a signatory to the Protocol for Broker Recruiting (the "Broker Protocol"), (Ex. X), which Defendants' counsel described as an agreement to forebear from enforcing limits on the solicitation of clients and to avoid litigation among member firms.  (Ex. O at 31:1-8)

- "[A]fter speaking with legal counsel and learning that Genworth was not a member of the Protocol for Broker Recruiting and **further being advised that the downloading of the information was not permissible**," (emphasis added), Defendants "deleted, shredded or securely disposed of any such documents."  (Ex. X)

- "At no point in time did any of the Defendants use any Genworth information to contact or otherwise solicit clients." (*Id.*)

- Defendants then recalled client names from memory and looked up the corresponding client contact information online, ultimately writing that information down and later discarding it.  (Ex. H at 88:16-25; 89:1-9)

This initial story manages to simultaneously deny using Genworth's information while admitting

that the Defendants used information concerning Genworth's client relationships to create their own solicitation lists.  This would have left the Defendants equally liable to Genworth -- but in reality each element of this story was later disproved and recanted by them after Schwab produced the spreadsheets of client information that Defendants had sent to Schwab.

**(a)    Defendants Lacked Any Basis to Ever Conclude that Their Actions Were Authorized Under the Broker Protocol**

As to the alleged mistaken belief that Genworth's confidential information could be taken because Genworth was a member of the Broker Protocol, Defendants could not have reasonably relied on the Protocol because, as Judge Bryant ruled, (1) Genworth was not a signatory to the Protocol, an easily ascertainable fact and expressly known by Defendants by early July 2009 at the latest; and (2) neither the Protocol's procedures nor its substance were followed by any Defendants, putting the lie to the notion that they ever understood it to apply and protect them. The following exchange between Judge Bryant and Defendant McMullan is instructive:

> **The Court:** Okay.  And getting back to this protocol signatory issue, did you have any understanding of your obligation to disclose to Genworth what it was you were compiling, assuming that it was a signatory to the protocol? Had you read anything, or were you just operating on the basis of conjecture and rumor?
>
> **Mr. McMullan**: It was more the latter.
>
> **The Court**: All right, so you hadn't read anything.
>
> **Mr. McMullan**: No.
>
> **The Court:** You didn't really understand what it meant to be a protocol signatory, what your rights and responsibilities were?
>
> **Mr. McMullan**: That is correct.
>
> **The Court**: You were just operating on the basis of your -- the information that you obtained from the rumor mill, basically, discussions from other brokers?
>
> **Mr. McMullan**: That's right.
>
> **The Court:** You conducted no research, no investigation, no due diligence whatsoever regarding your responsibilities and the limitations of your rights, assuming that Genworth was a signatory to the protocol?

- 16 -

**Mr. McMullan**: I did not.

(Ex. O at 49:19-25; 50:1-18)  Judge Bryant later summed up this exchange by observing that "clearly, the protocol had no bearing on any action that he took."  (*Id.* at 86:7-11; *see also* Doc. No. 101 at 10-11)  Mr. McMullan failed to even pretend to comply with the terms the Broker Protocol imposes on departing brokers -- specifically, to disclose to management exactly what a broker is taking with him before he takes it -- were it to apply at all.  (Ex. O at 38:1-39:4)

In addition, Mr. McMullan had been sued by Merrill Lynch, a previous employer, regarding the taking of client information, and knew that he had an obligation to tread carefully. (Ex. E at 4:21-25; 5:1-3)  Ultimately, whether Defendants ever believed Genworth was a signatory to the Broker Protocol is of no moment.  They admit that they were informed by their counsel that Genworth was not a signatory in July, before they transmitted voluminous Genworth client information to Schwab in August, 2005, (Ex. X; Ex. E at 173:22-25; 174:1-11; 177:3-8; Ex. DD at 152:22-25; 153:1-4), and yet they transmitted this information anyway.

**(b)     Defendants Did Not Immediately Delete the Genworth Information They Had in Their Possession, Nor Reproduce the Client Base by "Memorization" Before Using It.**

Within just a few months of Defendants' initial false sworn statements in this case, Schwab produced hundreds of pages of documents that put the lie to their story in its entirety -- in particular, emails sent by the Defendants in early and mid August, attaching pages of "voluminous and detailed" lists of Genworth client names, addresses and account information, all sent from Defendants' home email addresses as described above.  (Doc. No. 100 at 9) Clearly, Defendants had not deleted or destroyed Genworth's confidential information after learning from their counsel in July that they could not use that information.  Defendant McFadden further impeached his sworn statement, as well as the initial sworn statement of Defendant McMullan that "[n]either I nor any of my colleagues at TJT Capital retained copies of

- 17 -

the back-ups after we resigned from Genworth" (Doc. No. 70-6 at ¶ 14), by producing a CD

containing the ACT database in February of 2011 -- over a year and a half after Defendants

swear they deleted or destroyed the information in their possession.  (*Id.*)

Similarly, Mr. Cook originally testified he had no role in assembling client information,

deleted the sole electronic file he happened to possess with client information and searched in

July of 2009, and could not find any hard copy documents with client information.  (Ex. DD at

150:11-153:4)  Mr. Cook also had sworn that he had done no preparation of client lists using a

computer.  (Id. at 89:17-19)  This was all demonstrably false since 15 separate emails attaching

15 separate spreadsheets were sent from his home email address in August 2009.  (Ex. S)

### 2.    STORY #2: Defendants Admit to Creating and Transmitting Spreadsheets with "Some" Aid from Genworth's TNET Database

When confronted with the evidence, Defendants not only betrayed their original stories as

a complete fabrication, but launched into another set of untruths.  Cook stated in his April 7,

2010 Declaration that "while still employed at Genworth" he sought to "commit to memory" by

"viewing Genworth's TNET database, the spelling of client names, client addresses, [and]

certain account type information" then created spreadsheets and cross-referenced them with

documents he had at home "to conduct business on behalf of Genworth."  (Doc. No. 82)  Mr.

McFadden likewise swore that while employed he created lists of Genworth clients "from

memory" and used "Genworth's TNET database" to "cross-reference" those lists.  Both claim

this happened for only a small portion of the clients they serviced.

Of course, these are confessions that Defendants stole and used information from TNET.

But beyond that, it cannot explain how they could have used Genworth's TNET system to create

only a "small portion" of their lists when 95% of the entries on those lists matched entries in

Genworth's TNET system word for word and typo for typo.  (Zahner Decl. at ¶ 17)  Judge

Bryant again found these assertions "utterly incredulous" based on the "voluminous and detailed nature of the client information at issue."  (Doc. No. 100 at 9)

### 3. Defendants Spoliate the Evidence Required to Determine the Truth of Their Claims

After backing away from their initial sworn interrogatory response that they never used any Genworth information to contact or solicit clients, Defendants sought to explain why they had not produced in this litigation any of the emails to Schwab or their attendant spreadsheets. (Ex. X)  Defendants McFadden and McMullan testified that they had deleted every email and every copy of every spreadsheet sent to Schwab in August 2009.  (Ex. G at 146:13-147:14; Ex. E at 429:13-19)  According to McMullan, this was because it was his general practice to delete sent emails from his "sent" folder.  (Ex. E at 429:13-19)  Of course, this does not explain deletion of attached spreadsheets containing client information -- information central to Defendants' business.  Mr. Cook further claims that he did not retain copies of the client account documents he supposedly used to cross-reference the names and addresses of Genworth's clients.  (*Id.*)

Judge Bryant saw through this destruction of evidence, when she stated after a two day hearing that "Defendant McMullen, while testifying before this Court, admitted that he spoliated evidence when he discarded a personal computer, on which he admittedly accessed and transmitted Genworth's proprietary information, in a trash can, hard drive and all.  He further testified that he discarded the computer after having been advised by counsel that he had no right to the Genworth data that he had downloaded while employed by Genworth."  (Doc No. 100 at 8-9)  Judge Bryant found that "the timing of the computer's disposal evidences a consciousness of wrongdoing as to his disclosure of Genworth information."  (*Id.*)[3]

---

[3]  Genworth will ask this court for an adverse inference sanction against Defendants should they attempt to invoke an argument that relies on evidence they admit having destroyed.  *See Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

G.    **Defendants Instigated a Class Action Lawsuit Against Genworth Which They Used for Their Own Benefit, and Spread Untruths Regarding Genworth's Relationship with Brinker**

Beyond stealing data to start their competing venture, the Defendants launched additional efforts to pilfer clients and turn them against Genworth.  As Judge Bryant explained, Defendants:

> [N]ot only used proprietary client list information to establish a competing entity, but to in fact impair the value of the client list information by using information regarding the company's operations and relationship with Brinker to discredit the utility of services provided by Genworth's PCG group.

(Doc. No. 101 at 13-14)  Mr. McMullan gathered and provided confidential information to class counsel (albeit through a distorted lens), reviewed and edited the class securities fraud Complaint and notice, and informed clients about the class action to both solicit them to join and to move accounts away from Genworth.  (*Id.* at 14; Ex. E at 407:10-410:5)  Defendants' goal was to use the notice of class action as a marketing tool to impair Genworth's reputation and its client relationships, and then solicit those clients and their fee revenue to TJT.  To that end, they suggested edits "especially" geared towards "getting the notice to have more bite." (Ex. EE)  Mr. McMullan's close work with class counsel included seeking to "provide additional incentive" for clients to join the class action.  (Ex. FF)  Defendants then sent the notice to Genworth's clients, never mentioning that the lawsuit was brought at their own instigation, but instead claiming they felt an "obligation" to make Genworth's clients aware of the class action allegations.  (Ex. GG)  They effectively packaged self-interested allegations as a lawsuit and then disseminated it in a way they never could have done absent the facade of third party imprimatur.

Defendants also intentionally misled Genworth's clients concerning Genworth's relationship with Mr. Brinker.  Mr. McMullan admits that instead of answering questions directly and truthfully, he "only" conveyed "true statements" that convey a completely false impression:

> When Dr. Brandner inquired about Genworth's relationship with Mr. Brinker, I stated <u>only</u> that Genworth was no longer on Mr. Brinker's website and was no longer in Mr. Brinker's Marketimer newsletter, both of which are true statements.

(Doc. No. 70-6 at 10, ¶ 28) (emphasis added).  This conversation with a Genworth client was in February of 2010, when Mr. McMullan knew that Mr. Brinker still worked with Genworth.  Mr. Cook likewise told a client "Tell him you noticed that the money management link for Genworth is no longer on bobbrinker.com .. why?"  (Ex. HH)  Multiple Genworth clients told Genworth's account executives that Defendants told them that Genworth no longer had an agreement with Mr. Brinker.  (Ex. JJ)  Mr. Brinker himself received at least one inquiry whether he still had an agreement with Genworth, based on Defendants' spreading of misinformation:

> Okay, I understand. But for your information my Genworth account manager, Mr Cook, said Bob Brinker was leaving Genworth. Mr Cook mailed me letters indicating Bob's intent to leave so I moved my account to Charles Schwab.

(Ex. II)  Other clients reported that they had been told, falsely, that the entire business unit had moved.  (Ex. JJ)  TJT was aware that Genworth had agreed to renew its agreement with Mr. Brinker, because Ms. Zandy sent Mr. McMullan an email on July 18, 2009 telling him that, and Ms. Bazon was informed of this while she still worked at Genworth, which she was "shocked" to learn.  (Ex. A at 209:23-25; 210:1-6; Ex. KK at 91:18-25; 92:1-6; 93:1-5)

### H.    This Court Entered an Injunction Against Defendants' Further Misuse of Genworth's Information, which Defendants Continue to Violate

In June of 2010, Judge Bryant, after full briefing and a two-day evidentiary hearing, granted Genworth both sanctions for Defendants' destruction of evidence and significant injunctive relief preventing Defendants from communicating with Genworth's clients or providing more of its confidential information to counsel for the Class Action.  (Docket Nos. 100 and 101)  Mr. McFadden admits that only a month *after* the injunction was issued, he violated it on behalf of TJT by communicating with Genworth's client Jerome George.  (Ex. G at 207:1-222:9)  Mr. McFadden admits that he solicited Mr. George to leave Genworth and to become a

client of TJT, which Mr. George has since done.  (*Id.*)  Mr. McFadden admits that that he

successfully solicited two more of Genworth's clients in the ensuing months, William Clay and

Bylsma Allen, with the full knowledge of Mr. Cook and Mr. McMullan.  (*Id.*)  Mr. McFadden's

communications with Mr. Allen took place as late as February or March of 2011.  (*Id.*)

## ARGUMENT

### I.      The Summary Judgment Standard is Met

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed.R.Civ.P. 56(c).  There is no genuine issue of material fact and summary judgment is

appropriate when "the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).  A material fact is one that "might affect the outcome of the suit under the governing

law," and an issue is genuine when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

However, "[c]onclusory allegations will not suffice to create a genuine issue." *Delaware & H.R.

Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir. 1990).  Here, summary judgment is appropriate based

on Defendants admissions alone.  (*See* Defendants' Dispositive Admissions in Genworth's Local

Rule 5b(a)(1) Statement).

### II.     The Individual Defendants Breached their Contracts with Genworth

Where an employee signs a confidentiality or non-disclosure agreement but then

discloses the employer's proprietary or confidential information, causing damage to the

employer, the employee is liable for breach of contract.  *See Lydall, Inc. v. Ruschmeyer*, 282

Conn. 209, 243, 919 A.2d 421, 442 (Conn. Sup. Ct. 2007); *United Natural Foods, Inc. v. Hagen*,

Civil No. 3:10cv807 (JBA), 2010 WL 3211070, at *4 (D. Conn. Aug. 13, 2010).

Here, the PIIA and Integrity First, independently and together, are valid contracts between Genworth and the Defendants, through which the Defendants agreed to safeguard Genworth's information and not to use Genworth's confidential information other than for their work at Genworth.  There is no dispute that Genworth employed the Defendants in return for their agreements, until the Defendants terminated their employment of their own volition.  The Defendants clearly breached the agreements by stealing confidential information and using it to form a competing business, causing serious damage to Genworth.

### A. The Defendants Violated Their Contracts with Genworth by Stealing its Client Information and Using it to Misappropriate Genworth's Business

The PIIA prohibits the misuse or disclosure of Genworth's secret or confidential information or materials, whether during or subsequent to their employment at Genworth, as detailed above.  (Ex. U)  Integrity First similarly requires that employees "Avoid actions or relationships that might conflict or appear to conflict with your job responsibilities or the interests of Genworth" and "not misuse Genworth resources, intellectual property, time or facilities for personal gain, including office equipment, e-mail and computer applications." (Ex. W; Ex. H at 224:5-13)  Defendants testified that they read these policies and understood that these contracts applied to them.  (Ex. H at 223:10-18; McMullan at 219:12-15; Ex. G at 83:17-20)  Confidentiality and non-disclosure agreements in the employment context "may define proprietary or confidential information more broadly than CUTSA or common law and may contractually preclude employees from disclosing such information at least to the extent that the agreements are consensual, reasonable and supported by consideration."  *Newinno, Inc. v. Peregrim Development, Inc.*, No. CV010390074S, 2002 WL 31875450, at *8 (Conn. Super. Dec. 3, 2002).

### 1. James Cook

Mr. Cook admits that by "resourcing [the] TNET database and client account statements and other Genworth information to create a list of the names and addresses of Genworth's clients," he was not complying with Integrity First. (Ex. H at 224:15-22)  Contrary to Mr. Cook's fanciful testimony that "I had every right to compete and use [the information]" (*Id.* at 77:11-19), he agreed under the PIIA not to use Genworth's client information for any purpose other than his work for Genworth, and he agreed to return all confidential information when he terminated his employment.  The notion that Mr. Cook is free to use information if somebody did not ask for it back is effectively the opposite of the terms of the contract to which he agreed.

### 2. Timothy McMullan

Mr. McMullan likewise violated Integrity First and the PIIA.  While employed at Genworth, Mr. McMullan sent lists of client account numbers and assets to Schwab for the purposes of forming TJT. (Ex. K; Ex. N; Ex. E at 106:2-12; Ex. M at 83:4-17)  He also sent to Schwab account types corresponding to the client lists that were sent by Mr. Cook and Mr. McFadden in August 2009, and admits taking the ACT database CD.  Further, Mr. McMullan abused his position of trust with Genworth to solicit Mr. Brinker to sign an agreement with TJT and abandon his Genworth exclusive.  Finally, Mr. McMullan fed Genworth's confidential information to Class Counsel to foment the Class Action against Genworth, and Judge Bryant found that this information "pervades the class action complaint."  (Doc. No. 101 at 15)

### 3. Timothy McFadden

Mr. McFadden swore that while still employed at Genworth, he used the names, addresses and account types of Genworth's clients to create his TJT solicitation lists, and even admits that he used TNET in some instances.  He admits to accessing Genworth's systems following his departure without authorization.  He admits contacting Genworth clients even after

having been enjoined by this Court.  Mr. McFadden clearly used Genworth's confidential

information and material concerning its customer relationships, violating both the PIIA and

Integrity First.

> **B.      The Defendants Caused Substantial Damage to Genworth**

Defendants used confidential information to pirate away Genworth's business and impair

its reputation amongst its clients.  Hundreds of accounts, and a stream of fee revenue of more

than $1.2 million per year (based on both Genworth and TJT data), have been transferred from

Genworth to TJT directly as a result of Defendants' wrongdoing.  (*See* Section VII.B below).

**III.      The Defendants Misappropriated Genworth's Trade Secrets**

The Connecticut Uniform Trade Secrets Act ("CUTSA") prohibits misappropriation of

trade secrets, including the identities of customers.  Under CUTSA, both damages and injunction

are appropriate where, as here, a defendant has misappropriated a trade secret, defined as:

> <u>information</u>, including a formula, pattern, computation, program, process,
> drawing, cost data or <u>customer list</u> that: (1) derives independent economic value,
> actual or potential, from not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can obtain economic value
> from its disclosure or use, and (2) is the subject of efforts that are reasonable
> under the circumstances to maintain its secrecy.

Conn.Gen.Stat. § 35-51(d) (emphasis added) and § 35-52; *see generally* Doc. No. 101 at 8, citing

*Blue Cross & Blue Shield of Conn., Inc. v. DiMartino*, 1991 WL 127094 at *3 (Conn. Super. Ct.

1991).  This Court previously applied these factors, and found that TJT's and the individual

Defendants' theft and use of Genworth's client information misappropriated Genworth's trade

secrets under CUTSA, and that an injunction (and eventually damages) would be appropriate to

compensate Genworth for its lost business and to prevent Defendants from causing further harm.

> **A.      Genworth's Client Information Is a Trade Secret**

Courts consider the following factors in determining whether information constitutes a

trade secret under CUTSA:

(1) the extent to which information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competition; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others; (7) the extent to which the employer-employee relationship was a confidential or fiduciary one; (8) the method by which the employer acquired or compiled the information; and (9) the unfair advantage gained by the employee from using the employer's information.

Doc. No. 101 at 8-9;  *Nationwide Mut. Ins. Co. v. Stenger*, 695 F.Supp. 688, 691 (D.Conn.1988);

*Town & Country House & Homes Services, Inc. v. Evans*, 150 Conn. 314, 319, (1963); *Holiday*

*Food Co. v. Munroe*, 37 Conn.Supp. 546, 551 (1981); *Blue Cross*, 1991 WL 127094 at *4.

The Court need not find that each factor favors Genworth to rule the stolen information a

set of trade secrets (*see Nationwide Mut. Ins. Co. v. York,* 2000 WL 1683452 at *7 (Conn.

Super., Oct. 13, 2000)), but here -- as this Court has already found when granting Genworth a

preliminary injunction in this case -- every factor is met and the information is clearly protected.

### 1.  Client Identities Are Kept Secret By Genworth, Are Not Readily Ascertainable, and Are Shared Only with Trusted Employees (Factors 1, 2, 3, 7, 8)

There is no question that the identity and contact information of Genworth's clients are

not known outside of Genworth's business and cannot be learned by legitimate means.

Genworth does not publish the names of its clients, and there is no public source to learn who

they are.  (Doc. No. 101 at 9; Ex. C at 35:7-21; Ex. E at 69:8-22; Ex. G at 97:16-22)

The identities of Genworth's clients are closely guarded in password protected databases,

and access to these databases is limited to employees who need client information to perform

their jobs.  (Ex. LL at 27:25-28:22)  As Mr. Cook admits, client information was shared with

Defendants prior to their resignation only because they held a position of trust and confidence

within Genworth.  (Ex. H at 71:17-21; 80:6-10)  In fact, Defendants completed annual online

classes and executed annual attestations of their obligations to keep client information

confidential.  (See Doc. No. 1-3, 1-4)  They were also sent letters after they resigned reminding

them of their post-employment obligation not to use or disclose Genworth's confidential,

proprietary or trade secret information, including its client information.  (Ex. Z, AA, BB, CC;

Doc. No. 47-24, 47-26)

To the extent that Defendants argue that Genworth failed to protect its data because other

employees kept Genworth materials after resigning from the company or retained access to the

Charles Schwab website for some period of time after termination, these arguments are specious.

Genworth's primary method of protecting its data from theft by its employees was the contract

all employees signed agreeing not to misappropriate this information.  That Genworth was not

always absolutely vigilant in physically collecting its material and deactivating passwords

immediately upon resignation does not mean that employees were free to steal from Genworth

without objection.  Moreover, Mr. McMullan headed the PCG for years until Defendants left

Genworth, and Mr. Cook was the PCG administrator for access to the computer databases.  To

argue that Genworth failed to promptly remove a handful of PCG employees from the databases

is to indict their own failures.  The fact that no other employee of the PCG has ever

misappropriated Genworth's customer information for personal gain shows that Genworth makes

clear that its information was not to be used for personal gain.

### 2.    Genworth's Information Has High Economic Value and Was Obtained with Significant Effort and Expense (factor 4, 5, 9)

Genworth invested heavily to acquire and maintain its client relationships, spending over

$12 million to acquire the business and $5 million just on client leads and Mr. Brinker's services

from 2000 to 2009, as detailed above.  TJT gained a tremendous unfair advantage from

Genworth's information, allowing it to quickly build a firm generating at least $1.2 million in

annual revenue and with $135 million in assets under management.  Had Defendants not

misappropriated and misused Genworth's information, TJT would have had none of those clients -- and likely no business at all other than the *three* clients Defendants independently recruited at Genworth.  To this day, according to Mr. McMullan, up to 95% of TJT's client base comprises Genworth former clients, which is based on its misappropriation of Genworth's information.

**3.     Genworth's Confidential Client Information Cannot be Acquired or Duplicated by Others Absent Misappropriation (Factor 6)**

As detailed above, Genworth's client information is not available publicly and is vigorously protected from theft by competitors.  Nor does Mr. Brinker make available the names of his subscribers.  Even if Defendants' own contradictory explanations as to how they created their lists are to be believed, their ability to create a list of Genworth's clients was the direct result of their employment by Genworth and its predecessors.  A competitor who did not have access to Genworth's information could not recreate it from another source.  Client lists are listed as an example of a trade secret in CUTSA, and given that all nine factors are met here, there is no doubt that the client lists stolen on behalf of TJT are entitled to trade secret protection.

**B.     Defendants' Theft of Genworth's Trade Secrets Constitutes Misappropriation Under CUTSA**

CUTSA defines misappropriation as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."  Conn.Gen.Stat. § 35-51(b).

Here, Defendants improperly used Genworth's client information to solicit Genworth's clients, and disclosed information to Schwab without Genworth's consent or even its knowledge. Defendants knew or had reason to know that they had a duty to maintain the secrecy of

Genworth's information, because they signed multiple agreements requiring them to do just that. The Defendants clearly misappropriated Genworth's trade secrets under CUTSA.

### C.     The Law Protects the Stolen Material

Courts -- including this Court in this case -- consistently determine that customer lists are trade secrets where, like here, the clients of a business are not public, nor their specific information readily ascertainable, and the confidential information is taken for personal or competing business gain.  *See, e.g., North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44-48 (2d Cir. 1999) ("customer list developed by a business through substantial effort and kept in confidence may be treated as a secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not readily ascertainable") (quotation omitted); *Smith v. Snyder*, 839 A.2d 589 (Conn. 2004) (customer data used by former employee to start competing business was a trade secret); *Dunsmore & Assoc., Ltd. v. D'Alessio*, 1998 Conn. Super. LEXIS 2522 at *9-13 (1998) ("customer list at issue, consisting of files, lists and records of the plaintiff, constituted confidential information or a trade secret"); *Kitchens of Bedford, Inc. v. Schultheis*, 1997 Conn. Super. LEXIS 1673 at *5-6 (1997) (customer list was "proprietary information"); *Blue Cross*, 1991 WL 127094 at *4 (Conn. Super. Ct. 1991) (same); *Elm City Cheese Co., v. Federico*, 251 Conn. 59, 752 A.2d 1037 (1999) (same).

Defendants' claim that they memorized Genworth's information rather than taking it physically is demonstrably false and, in any event, affords them no defense.  *See North Atlantic Instruments, Inc.*, 188 F.3d at 46-47 ("customer lists, . . . in which customers are not readily ascertainable and in which patronage has been secured only through the expenditure of considerable time and money, are protectable trade secrets," regardless of whether an employee is able to reproduce the list from memory); *OneBeacon Professional Partners, Inc. v. Ironshore Holdings (U.S.), Inc.*, 2009 WL 765666 at *7 (Conn. Super. Feb. 27, 2009) ("Evidence that trade

secrets were taken by physical or electronics means is not required, since misuse of trade secret information retained in a person's memory is actionable.") (citation omitted)

*Blue Cross* is instructive.  There, defendant DiMartino was a customer service consultant at Blue Cross, whose primary responsibility was to solicit employer groups to purchase Blue Cross health plans.  1991 WL 127094 at *1.  Like Defendants in this case, DiMartino was given a password to Blue Cross's computer system to obtain information on Blue Cross's clients.  *Id.* This information was very similar to the information that was available to Defendants on Genworth's TNET system.  It included "the identity of [client] groups, their specific [insurance] policies, their addresses," and other identifying information.  *Id.*  DiMartino copied this information and marketed it to independent insurance agents for his own personal gain.  *Id.* at *2.

The court found that Blue Cross "took reasonable precautions" to protect the stolen data, which mirror the precautions Genworth took in this case, including "limiting access, maintaining confidential computer access codes for employees, and conducting employee training on the importance of maintaining the confidentiality of this information."  *Id.*  On the basis of this evidence, the court found that the information DiMartino had stolen amounted to trade secrets and that DiMartino had misappropriated them and therefore violated CUTSA.  *Id.* at *4-*5.

## IV.   The Defendants Engaged in Unfair and Deceptive Trade Practices

Defendants' conduct also violates the Connecticut Unfair Trade Practices Act ("CUTPA").  Defendants enriched themselves at the expense of Genworth in four ways: (1) they stole client information and used it to loot Genworth's business and transfer a large portion of it to themselves; (2) they used their trusted positions within Genworth to convince Mr. Brinker to abandon the exclusivity of his advisory contract with Genworth and enter a contract with TJT; (3) they misrepresented to Genworth's clients that Genworth did not have an agreement with Mr. Brinker to induce them to leave for TJT; and (4) they fomented the Class Action against

Genworth, fed class counsel Genworth's proprietary information, and then used the Class Action complaint as a marketing piece to induce clients to switch to TJT.

CUTPA states that "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Here, the actions of the Defendants were both deceptive and unfair.

### A.     The Defendants Acted Unfairly and Deceptively Because they Abused their Positions of Trust and Confidence at Genworth to Steal its Information and Transfer its Business to Themselves

In evaluating whether an act violates CUTPA, a defendant's conduct must meet one of the three following tests: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen] ... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."  *Naples v. Keystone Bldg. & Development Corp.*, 295 Conn. 214, 227 (2010).  All three are satisfied here.

### 1.     Defendants' Theft Offends Public Policy

Where an employee steals information that is the property of his or her employer, that theft offends public policy and violates CUTPA, even if the stolen information is not a trade secret.  *See Blue Cross*, 1991 WL 127094 at *5 (where Defendant "attempted to use the information taken from [plaintiff's] computer systems in an effort to secure financial gain by offering the information to various agents, his acts constitute unfair and deceptive practices as unlawful, unethical and violative of public policy.") (citing *Web Press Service Corp. v. New*

*London Motors, Inc.*, 203 Conn. 342, 355 (1987); *Sportsman Boating Corp. v. Hensely*, 192

Conn. 747, 756 (1984)); *AGC, Inc. v. Baillargeon*, 2011 WL 1176141 at 24 (Conn. Super. Mar.

9, 2011)) (employee's theft of plans for a manufacturing process offended public policy even

though those plans were not trade secrets).  The court in *AGC* explained:

> "[N]ot only is there a public policy against theft generally; see, e.g., General
> Statutes § 52–564; there is a specific public policy that protects property of an
> employer from theft and misuse by a former employee. Under common-law
> principles, '[a]n agent has a duty ... not to use property of the principal for the
> agent's own purposes or those of a third party and ... not to use or communicate
> confidential information of the principal for the agent's own purposes or those of
> a third party .' 2 Restatement (Third), Agency § 8.05, p. 314 (2006). Importantly,
> '[t]ermination of [the] agency relationship does not end an agent's duties
> regarding property of the principal.'"

2011 WL 1176141 at *24.

### 2.    Defendants' Theft was Immoral, Unethical and Unscrupulous

Not surprisingly, Connecticut courts also hold that theft and misuse of another's property

constitutes "immoral, unethical, oppressive, or unscrupulous" conduct.  *Blue Cross*, 1991 WL

127094 at *5; *AGC, Inc.*, 2011 WL 1176141 at 25 (*citing Votto v. American Car Rental, Inc.*,

273 Conn. 478, 485, 871 A.2d 981 (2005); *Blackwell v. Mahmood*, 120 Conn.App. 690, 704, 992

A.2d 1219 (2010); *Utzler v. Braca*, 115 Conn. App. 261, 279–81, 972 A.2d 743 (2009)).

### 3.    Defendants Caused Substantial Injury to Genworth

Defendants have taken over one hundred of Genworth's clients and with them more than

$100 million of its assets under management and a revenue stream of over $1.2 million per year.

(Ex. MM)  Many of these clients had been with Genworth and its predecessors for years or

decades.  The departure of clients represents an ongoing loss of millions dollars of profit for the

PCG.  In addition, Defendants' deceptive acts have caused significant harm to the goodwill

Genworth enjoys with its current, former and prospective clients.  This goodwill took years to

build and was damaged virtually overnight through Defendants' misleading and deceptive

practices.

### 4. Defendants Acted Deceptively in Soliciting the Brinker Relationship for Themselves, Misrepresenting Genworth's Relationship with Mr. Brinker and Fomenting the Class Action

Defendants also acted deceptively by using their positions at Genworth to solicit an agreement between Mr. Brinker and TJT, misrepresenting to Genworth clients that Genworth did not have a relationship with Brinker, and fomenting a Class Action to discredit Genworth without disclosing their roles.

First, Mr. McMullan used his position of trust with Genworth to convince Mr. Brinker to abandon the exclusivity of his advisory contract with Genworth and sign an agreement with TJT.

Next, the Defendants made statements to Genworth's clients regarding Genworth's relationship with Mr. Brinker that were either intentionally misleading or outright falsehoods, giving the impression that Genworth no longer had an advisory contract with Mr. Brinker.

Finally, as Judge Bryant found, "McMullan not only directed former Genworth clients to speak with [class counsel] Brown, but provided proprietary Genworth information regarding asset allocation directly to Brown in order to initiate the class action," such that information provided by Mr. McMullan to class counsel "pervades the class action complaint." (Doc. No. 101) Defendants even requested wording changes to the class action notice to give it "more bite." (Ex. NN) They then marketed TJT by sending that notice to Genworth's clients, not disclosing their own role in crafting it or fomenting the underlying action, but instead stating that they "felt an obligation" to make Genworth's clients aware of the class action. (Ex. GG) These actions were both "unfair" and "deceptive" in violation of CUTPA.

## V. Defendants Tortiously Interfered with Genworth's Contracts and Relationships

Defendants' misrepresentations of Genworth's relationship with Mr. Brinker, and their creation and marketing of the Class Action also constitutes tortious interference with the

contracts and beneficial relationships Genworth had with a substantial number of clients who left Genworth due to Defendants' actions.  A claim for intentional interference with contractual [or business] relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caus[ed] by the defendant's tortious conduct." *Rioux v. Barry*, 283 Conn. 338, 351, 927 A.2d. 304, 311-12 (2007).

### A.      Genworth Had Contracts And Beneficial Relationships

Genworth had investment agreements with all of its clients to provide investment management services to them in exchange for fees.  (Joseph Decl. at ¶ 3)  These fees constitute substantial revenue earned by the PCG.  Many of Genworth's client relationships were long-standing, and the Defendants' interference with the contracts and the relationships that were embodied in them has deprived Genworth of the value of these relationships.

### B.      Defendants Had Knowledge of Genworth's Contracts and Relationships

Defendants were employed to maintain Genworth's relationship with its clients, and there is no dispute that they had knowledge of Genworth's client contracts and client relationships.

### C.      Defendants Intended to Interfere with Those Contracts and Relationships

Defendants' business model relied on interference with Genworth's client contracts and relationships.  The vast majority of TJT's clients, upwards of 95% of them, are former Genworth clients that Defendants convinced to leave Genworth for TJT.  (Ex. E at 332:17-25; 333:1-2)  Defendants' business plan, submitted to Schwab to secure a line of credit for TJT, makes this clear (*see supra*, regarding "Transition our existing client base.")  (Ex. J)  Even prior to Schwab producing smoking-gun evidence, Mr. Cook testified that he intended to transfer every client from Genworth that he could remember.  (Ex. DD at 88:8-11)

### D.   The Defendants' Interference was Tortious

Interference is tortious where it can be shown "that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *Blake v. Levy*, 191 Conn. 257, 260 (1983).  In this case, as detailed above, Defendants embarked on a campaign of misrepresentation after their departures by (1) misleading clients as to Genworth's relationship with Mr. Brinker, and (2) inciting the Class Action against Genworth and then using it as a marketing piece.  Thus this Court found that the Defendants acted to impair the value of Genworth's client list and discredit the services provided by the PCG:

> Here, the evidence shows that the individual Defendants, as the founders of TJT Capital not only used proprietary client list information to establish a competing entity, but to in fact to impair the value of the client list information by using information regarding the company's operations and relationship with Brinker to discredit the utility of services provided by Genworth's PCG group.

(Doc. No. 101, at 13-14)  The Court also found that Defendants misused Genworth's information in an "unabashed attempt to destroy Genworth's goodwill and customer relations," and this could only be done with malice.  (*Id.* at 16-17)  There is no evidence in this case to the contrary.  Given the misleading and deceptive practices Defendants used to interfere with Genworth's client relations and contracts, it is clear that Defendants tortiously interfered with both.

### VI.   Defendants Violated the Computer Fraud and Abuse Act by Exceeding the Authorization Genworth Gave them to Access Its Computer Systems, and Instead Obtained Genworth's Confidential Information to Start a Competing Business

By accessing Genworth's TNET system to gather or "cross-check" client information, Defendants were acting outside the scope of the authorization that Genworth had given them to access its systems only in the performance of their duties, and thus violated the Computer Fraud and Abuse Act (18 U.S.C. §1030).  Defendant McFadden further violated this Act when he accessed Genworth's password-protected databases after his departure.  (Doc. No. 70-8 at 3)

A person is liable under this Act if he "intentionally accesses a computer without

authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." § 1030(a)(2).  A "protected computer" is one "which is used in or affecting interstate or foreign commerce or communication." § 1030(e)(2)  "The term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." § 1030(e)(6)

Here, Defendants admit that they obtained information from Genworth's protected computer system for use in creating a competing entity, and it is clear that they exceeded their authorization when they did so, violating Genworth's policies and breaching their agreements not to misappropriate this information.  Defendants are therefore liable under 18 U.S.C. § 1030.

## VII.  Plaintiff is Entitled to Both an Injunction and Damages

### A.  Permanent Injunctive Relief is Necessary to Deter and Prevent Continued Misconduct and Intentional Impairment of Genworth's Business

A Preliminary Injunction was entered by this Court after full briefing and a two-day evidentiary hearing, at which the Court found that the Defendants misappropriated Genworth's confidential information in an "unabashed attempt to destroy Genworth's goodwill and customer relations." (Doc. 101 at 16-17)  Judge Bryant further concluded that Mr. McMullan had "falsely testified before the court" and that Defendants as a group had made assertions before this court that were "utterly incredulous." (Doc. No. 100 at 9)  Defendants were found to have engaged in "apparent deceit" having destroyed both "incriminating evidence" and "relevant information" that they should have preserved.  (*Id.* at 10, 11)  Moreover, this Court found that Defendants' own conduct showed that they disposed of evidence with "consciousness of wrongdoing."  (*Id.* at 9)  In other words, Defendants spoliated evidence because they knew that they unlawfully misappropriated Genworth's confidential information.

The evidence against Defendants has only grown, with additional lies, additional spoliation, and most shockingly, admissions that they knowingly violated this Court's

preliminary injunction by continuing solicitation of Genworth's clients as recently as March 2011.  (Ex. G at 207:1-222:9)  The Court should make the injunction permanent to prevent Defendants from further damaging Genworth's business.

The standard for injunctive relief is the same whether a party seeks a preliminary or a permanent injunction, except that in seeking a permanent injunction, actual success on the merits *as opposed* to a likelihood of success must be shown.  *U.S. v. Buddhu*, 2009 WL 1346607 at  *5 (D. Conn., May 12, 2009).  "A party seeking injunctive relief has the burden of alleging and proving (i) irreparable harm and (ii) lack of an adequate remedy at law."  *Brennan v. Brennan Associates*, 293 Conn. 60, 86, 977 A.2d 107, 123 (Conn. 2009).  Both elements are satisfied here.

This Court repeatedly has recognized that a company's threatened loss of goodwill and customers, as is the case here, supports a finding of irreparable harm that is not rectifiable by money damages.  Doc. No. 101 at 11-15; *Elizabeth Grady Face First, Inc. v. Escavich,* 321 F. Supp.2d 420, 423 (D.Conn. 2004) (citing *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438, 444-45 (2d Cir. 1977)).  The evidence here is undisputed that Defendants are embarked on an unabashed attempt to destroy Genworth's goodwill and customer relations and to discredit the utility of services provided by Genworth's PCG group, in addition to continuing efforts to convert Genworth customers to TJT.

As Judge Bryant found, Mr. McMullan disclosed Genworth's proprietary information to class counsel in *Goodman* because he "is motivated to further impair both the value of Genworth's reputation and the exclusivity of the information in question." (Doc. No. 101 at 15)  That motivation remains today.  Defendants have not only shown their disregard of the law by violating the injunction, but they stand ready to spread additional ill will toward Genworth.

In fact, faced with subpoenas to produce documents and testify in the Class Action, Defendants -- rather than seek to properly limit the scope of testimony they may give to abide by

this Court's injunction order -- instead have sought by separate motion to be *relieved* of this Court's injunction so they can testify freely in that case, in furtherance of their "unabashed attempt to destroy Genworth's goodwill and customer relations."  (Doc. No. 101 at 16-17; Doc. No. 177)  As Judge Bryant observed, until the initial injunction was issued, Defendants had "continued to disseminate confidential information by providing Genworth information to the counsel for the class action, as well as analysis of that information for inclusion in the class action complaint."  (Doc. No. 101 at 14)  Absent permanent injunction, Defendants will no doubt continue disseminating this information in an attempt to harm Genworth.

Of course, loss of trade secrets is itself presumptive irreparable harm: such loss "cannot be measured in money damages because [a] trade secret once lost is, of course, lost forever." *Sequoia Sciences, Inc. v. Wood*, 2006 U.S. LEXIS 14921 at *3 (D. Conn. 2006)*; see also Minnesota Mining and Manuf. Co. v. Francvilla*, 191 F. Supp.2d at 278 (D. Conn. 2002). Connecticut courts find irreparable harm where defendants retain confidential information post-employment, resulting in unfair competition with a former employer.  *See Kitchens of Bedford, Inc.*, 1997 Conn. Super. LEXIS 1673 at *7.  CUTSA acknowledges that a "damage remedy alone is not sufficient," and therefore, an injunction is appropriate for "[a]ctual or threatened misappropriation."  Conn. Gen. Stat. § 35-52; *General Reins. Corp. v. Arch Capital Grp., Ltd.*, 2007 WL 3121766 at *11 (Conn. Super. Ct. 2007).

Defendants have never returned the materials containing client information that they sent to class counsel (despite Judge Bryant's order requiring them to do so).  Throughout this case the Defendants have been consistently untruthful concerning the removal and destruction of documents, and there is no reason to believe they have changed their ways.

Although Genworth seeks an award of money damages against TJT, it is unlikely to be able to pay any substantial judgment.  Judge Bryant found that "evidence adduced at the hearing

suggested that the Defendants had no appreciable resources other than fees generated through the sale of financial advice to the customers that Genworth alleges that the Defendants pirated through the misappropriation of trade secrets." (Doc. No. 101 at 16)  Indeed, according to TJT's most current financials, it has a negative net equity of $212,207.10, not including an unreported, past-due liability of $300,000 to Mr. Brinker.  (Ex. OO at 33:9-17; 49:8-16; Ex. E at 305:9-12).

Moreover, even if full monetary damages were recovered, there is no compensation sufficient to protect the ongoing damage to reputation that Defendants are poised and ready to continue. In such situations, courts may grant injunctions in conjunction with both compensatory and punitive damages. *E.g., Elm City Cheese*, 251 Conn. 59  (affirming trial court award of injunction, compensatory and punitive damages and attorneys' fees against former employee who misappropriated employer's customer list).  For all of these reasons, a permanent injunction is necessary to protect Genworth from further injury by the Defendants.

### B.     Genworth is Entitled to Monetary Damages in the Amount of its Lost Revenue, As Well As Punitive Damages and Attorneys' Fees

Both CUTSA and CUTPA provide that, in addition to injunctive relief, a plaintiff may also recover monetary damages.  Under CUTSA, the "plaintiff must prove that it sustained actual loss, or that the defendant was unjustly enriched, as a result of its misappropriation." Conn. Gen. Stat. § 35-53(a).  "Actual loss in this context means the amount of money that the plaintiff lost from the defendant's misappropriation; it is measured by how much better off the plaintiff would have been before the defendant's misappropriation." *Dunsmore & Assoc., Ltd.*, 2000 WL 124995 at *10.  Likewise, CUTPA allows for actual damages for any person who suffers loss under the sections applicable here.  *See* § 42-110(g); *Conaway v. Prestia*, 191 Conn. 484, 494 (1983).  Damages are also available on Plaintiffs' tort claims.

CUTSA and CUTPA each also authorize punitive damages and attorneys' fees.  Under

CUTSA, punitive damages up to twice the compensatory award are proper "if the court finds willful and malicious misappropriation." § 35-53(b).  The same provision allows for attorneys fees to the prevailing party, without a cap.  CUTPA similarly allows for punitive damages and attorneys' fees. § 42-110g(a); § 42-110g(d).  Punitive damages may be awarded where the evidence "reveal[s] a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Gargano v. Heyman*, 203 Conn. 616, 622, 525 A.2d 1343 (1987).

Genworth submitted an unrebutted expert report by Forrest A. Vickery of Sanli Pastore & Hill, Inc.  (Ex. MM)  Mr. Vickery employed two well-accepted methods to calculate PCG's lost profits, taking into account not only the revenue streams reported by both Genworth and TJT from the client base at issue (which are essentially equivalent), but expected client attrition as well as client distributions over time.  He concluded that the total amount of lost profit damages accruing to Genworth was between $7,775,000 to $11,965,000, of which $1.5 million is already incurred.  Genworth's expert's figures are entirely consistent with the data reported by TJT regarding its own fee revenue stream from the Genworth client base.[4]

Genworth is also entitled to both punitive damages and attorneys' fees based on Defendants' wrongful misconduct, intentional spoliation of evidence, repeated perjury, violations of this Court's Orders including its unambiguous injunction, and blatant intent to destroy Genworth's business.  It is hard to imagine a case of theft of trade secrets where punitive damages and attorneys fees are more justified than here.

## CONCLUSION

For the foregoing reasons, Genworth respectfully requests that the Court grant this Motion for Summary Judgment on liability, and such other relief as the Court deems proper.

Dated:  Hartford, Connecticut
            June 30, 2011

Respectfully Submitted,

/s/ _____

Eric W. Wiechmann (CT 04331)
Elizabeth M. Smith (CT 19808)
ewiechmann@mccarter.com
esmith@mccarter.com
McCARTER & ENGLISH, LLP
City Place I, 185 Asylum Street
Hartford, Connecticut 06103-3495
Tele: 860-275-6763
Fax: 860-560-5970

SNR DENTON US LLP
Reid L. Ashinoff  *(admitted phv)*
Sandra D. Hauser *(admitted phv)*
Brendan E. Zahner *(admitted phv)*
1221 Avenue of the Americas
New York, NY 10020
reid.ashinoff@snrdenton.com
sandra.hauser@snrdenton.com
brendan.zahner@snrdenton.com
Tele: (212) 768-6700
Fax: (212) 768-6800

*Counsel for Plaintiff Genworth Financial Wealth
Management, Inc. and Third-Party Defendant Gurinder
Ahluwalia*

---

(...continued)

[4]  Total revenue generated by TJT in 2010 was approximately $1.2 million. Assuming TJT had a full year of revenues, the total revenue generated by TJT would range from approximately $1.46 million to $1.77 million in 2010 (Ex. MM Schedule 13), with between $1.31 million to $1.68 million from former PCG clients.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that I have caused to be served a true and correct copy of the foregoing document on this 30th day of June 2011 via electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

/s/ _____

Elizabeth M. Smith (CT 19808)

17724294

- 42 -