UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA AND TJT CAPITAL GROUP, LLC | ) ) ) ) ) | Civil Action No. 3:09-CV-01521-PCD |
| Defendants. | ) ) ) | |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, AND TJT CAPITAL GROUP, LLC | ) ) ) ) | |
| Third-Party Plaintiffs, | ) ) | AUGUST 3, 2011 |
| vs. | ) ) | |
| GURINDER AHLUWALIA | ) ) | |
| Third-Party Defendant. | ) | |

LOCAL RULE 56(A)2 STATEMENT
IN RESPONSE TO PLAINTIFF'S AND THIRD-PARTY DEFENDANT'S SUMMARY
JUDGMENT MOTION ON COUNTERCLAIMS

Pursuant to Local Rule of Civil Procedure 56(a)2, Defendants and Third-Party

Counterclaimants Timothy McMullan, James Cook, Timothy McFadden, Karen Bazon,

Tamara Rivera, and TJT Capital Group, LLC. (collectively "Defendants"), respond to

Plaintiff's and Third-Party Defendant's Local Rule 56(a)(1) Statement in support of their Motion for Summary Judgment on the Counterclaims as follows.

**Response to Plaintiff's and Third-Party Defendant's Local Rule 56(a)1 Statement**

Headings[1]

1. Admitted

2. Admitted, except to clarify that there was a break between agreements during July 31, 2004 to October 2004, when there was no agreement. Moreover, agreements from 2004 through 2009 had a non-exclusive component to them. (Ex. 17)[2]

3. Admitted, except to clarify that McMullan's responsibilities were to negotiate extensions with Brinker only after Ahluwalia allowed the agreement with Brinker to expire on 7/31/04. It was due to the complaints to Human Resources by Cook, McFadden, and McMulland that led to McMullan being involved in rescuing the agreement with Brinker. (McMullan Decl. at ¶ 33; Cook Decl. at ¶ 36; McFadden Decl. at ¶ 43)

4. Denied. Both Brinker and Zandy testified that Defendants did not interfere with Genworth's exclusive agreement. Brinker testified that he was working on a new business model and Zandy testified that she persuaded Bob. Defendants further contest

---

[1] Plaintiff and Third-Party Defendant set forth numerous headings prior to setting forth the numbered facts. Because these headings are argumentative, conclusory, and unsupported (except to the extent a heading is supported by the undisputed facts set forth below it), Defendants and Third-Party Counterclaimants will not set forth a response to the headings, which are not facts and are not admissible as evidence. To the extent a response is needed, all the headings are denied to the extent they are characterizations of the facts, are argumentative, and are conclusions.

[2] All Exhibits refer to the exhibits attached to the Appendix.

the statement that they "poached" any alleged and unspecified confidential information.  (Zandy Depo. at 46, 51-52; Brinker Depo. at 83-85)

5. Denied.  Zandy testified that Zandy and Brinker "felt it was important to hear what Genworth had to say first, and to execute that agreement first." (Zandy Depo. at 62) Moreover, it was Brinker's decision to enter into a non-exclusive agreement with Genworth because he was "working on a new business model" which would open the product up to anyone. (Brinker Depo. at 83-87)

6. Denied to the extent that Defendants cannot admit or deny this allegation, as the timeframe is vague.  Moreover, Defendants cannot admit or deny allegations regarding Genworth's awareness beyond documents available.

7. Admitted

8. Admitted

9. Admitted, except to clarify that, to Defendants' knowledge, no other agreement with any other firm existed at the time Genworth negotiated their extension.

10. Denied, as Defendants did not inform Genworth clients that Genworth did not have an agreement with Brinker.  (Ex. 23)  Admitted to the extent that Cordes had a meeting with Ms. Zandy at her office.

11. Denied to the extent that the allegation's characterization of the meeting is inaccurate.  Cordes in fact threatened and abused Zandy during the meeting, rather than "explain[ing] the situation."  Zandy Depo. at 62, 87-88, 96-99, 117; Brinker Depo. at 124-27, 130

12. Denied as to the characterization, as Cordes demanded confirmation in writing from Brinker, which it never received. Admitted to the extent that Zandy sent an email to Cordes immediately after their meeting. (Ex. 19)

13. Denied. Brinker did not have a "potential" contract with TJT; Brinker indeed had a contract with TJT already in place. (Ex. 16) Moreover, denied as to the mischaracterization of Brinker's testimony, which does not support the allegation. Brinker Depo. at 128-36. Further deny that Genworth "had no knowledge of [the contract] at the time," as there is ample evidence showing that Genworth did, in fact, have such knowledge. Zandy Depo. at 96, 99; Plaintiff's and Third-Party Defendant's 56(a)1 Statement at ¶ 10; Cordes Decl. at ¶ 5.

14. Admitted except to clarify that the email and letter went out to Cook's and McFadden's clients, and not to "Genworth's clients." Cook Decl. at 4, 6-13, 18, 20, 23-24; McFadden Decl. at 4, 5, 7, 9, 10, 22, 27, 29)

15. Admitted to the extent that the allegation quotes an email. Denied as to any inference that Plaintiff draws from it.

16. Admitted to the extent that the allegation quotes an email. Denied as to the facts asserted in said email and any inference that Plaintiff seeks to draw from the email.

17. Admitted to the extent that the allegation quotes an email. Denied as to any inference that Plaintiff draws from it.

18. Admitted to the extent that a meeting took place and Genworth's counsel was handed a copy of the agreement. However, Genworth's counsel, Victoria Cundiff, was given a copy of the signed agreement (consisting of two paragraphs), the contents of which she

wrote down in front of Tom Lewis, counsel for TJT, and Tim McMullan. (McMullan Decl. at 30; Lewis Decl. at ¶ 8)

19. Admitted

20. Admitted. Genworth signed a non-exclusive agreement with Mr. Brinker.

21. Denied, as Joseph revised <u>some</u> of the marketing materials to remove the word "exclusive." Denied that Joseph removed all such instances. (Joseph Decl. at ¶ 4; Ex. 10)

22. Defendants cannot admit or deny this allegation.

23. Defendants cannot admit or deny this allegation. However, Defendants clarify that any review was conducted on or about October 27, 2009, <u>after</u> Defendants had brought the Counterclaims/Third-Party Complaint against Genworth and Ahluwalia. <u>See</u> Plaintiff's and Third-Party Defendant's Memo at 7-8; Doc. 7. (Ex. 10 (screenshots from 10/27/09 and 10/28/09)

24. Admitted that Genworth found two pages that referenced the "exclusive" nature of the relationship.

25. Denied to the extent that there is a "site map" link at the bottom of every PCG web page that every visitor could have clicked on to see the "exclusive" statement. (Ex. 28 (Genworth Site Map Page))

26. Denied. Defendants contend that the failure was not a mere "unintentional oversight," particularly given that Genworth did not remove other misleading and false statements in its website, including references to Genworth's agreement with Carlson. (Ex. 28; McKinley Depo. at 86-87)

27. Admitted to the extent that the word was subsequently removed and with the reservations set forth in response to ¶ 26.

28. Admitted to the extent that Genworth brought claims against Defendants. Deny the alleged truth of any and all allegations raised against Defendants. (Doc. No. 7)

29. Admitted

30. Denied as to the characterization of the document. The claims raised are apparent from the document. Denied that Genworth sent the letter before it knew of the existence of said agreement. Zandy Depo. at 96, 99; Plaintiff's and Third-Party Defendant's 56(a)1 Statement at ¶ 10; Cordes Decl. at ¶ 5.

31. Denied as to the characterization of the document. (Plaintiff's Ex. O)

32. Denied, as the allegation mischaracterizes the testimony cited and the testimony does not support the allegation. Client accounts went to the custodian, Schwab Institutional, not to TJT. Neither Cook nor anybody else suggested that TJT would have transferred between 60,000 and 100,000 accounts from Genworth totaling roughly $12 billion dollars. Cook was referring to transferring all of his clients' accounts. (Cook Depo. at 186; Murray Depo. at 175)

33. Denied as to the characterization of the testimony. The business plan McMullan referred to as a puff piece was the business plan for Fairfield Designs, and not for TJT. (McMullan Decl. at ¶ 34)

34. Admitted. Defendants do not dispute Genworth's right to reduce fees. Defendants do dispute Genworth's right to reduce fees at the same time they claimed in writing that TJT did not have an agreement with Brinker.

35. Denied, as a client viewed the website and questioned the term "exclusive". (Ex. 29)

36.     Denied as to the characterization of the testimony.  (Cook Depo. at 183)

**Disputed Issues of Material Fact**

1.     **Whether Mr. Brinker Entered into Agreements with TJT and Genworth for His Own Reasons**

a.     The agreement between Mr. Brinker and TJT had come about because Ms. Zandy, Mr. Brinker's assistant, came up with the idea of working with Mr. McMullan, and "persuaded" Mr. Brinker to enter into a relationship with Mr. McMullan.  Zandy Depo. at 46, 67.

b.     Mr. Brinker decided to enter into a non-exclusive agreement with Genworth because he was "working on a new business model" which would open the product up to anyone.  Brinker Depo. at 83-87.

2.     **Whether Genworth Knew of the Agreement Between TJT and Mr. Brinker**

a.     Well aware that Mr. Brinker had signed an agreement with TJT, Ronald Cordes, Genworth's agent and co-chairman, sent Ms. Zandy an email on August 19, 2009, demanding a meeting with Ms. Zandy because of Genworth's concern "about Mr. Brinker's possible relationship with another money manager."  Zandy Depo. at 87-88.

b.     On August 31, 2009, Genworth's counsel met with TJT and its counsel.  (Plaintiff's Ex. N); McMullan Decl. at ¶ 30.  A copy of TJT's agreement with Mr. Brinker was shown to Genworth's counsel, Victoria Cundiff.  (Cordes Decl. at ¶ 10)  Genworth's counsel wrote down the contents of the agreement.  (McMullan Decl. at ¶ 30; Lewis Decl. at ¶ 8)

c.     After receiving an email from Ms. Zandy, Genworth did not consider the prior response to be sufficient given its knowledge of an actual agreement between TJT

and Mr. Brinker – knowledge which can easily be inferred from Mr. Cordes' email specifically referencing TJT.  Ex. 19.

      3.    **Whether Genworth Sought to Tortiously Interfere with TJT's Agreement with Mr. Brinker**

          a.    During the August 21, 2009, meeting between Mr. Cordes and Ms. Zandy, Mr. Cordes expressed his outrage that Mr. Brinker had a business relationship with another money manager, demanded that Mr. Brinker and Ms. Zandy breach and disavow that relationship, and repeatedly threatened Ms. Zandy and Mr. Brinker with a lawsuit by Genworth if they did not do as he requested.  Zandy Depo. at 62, 87-88, 96-99, 117; Brinker Depo. at 125-26.

          b.    Mr. Cordes made it clear during the meeting that he knew that it was TJT that had the contract with Mr. Brinker by informing Ms. Zandy that Mr. McMullan had stolen some records from Genworth and noting that there had been prior discussions between Mr. McMullan and Mr. Brinker.  Zandy Depo. at at 96, 99.

          c.    During the meeting, Mr. Cordes accused Ms. Zandy and Mr. Brinker of "destroying [Cordes'] business", and alleged that they had "[c]onspired to destroy [Cordes'] business."  Zandy Depo. at 96, 99.  Mr. Cordes behaved "in an extremely unprofessional manner" and "abused" Ms. Zandy, leaving her "extremely upset," "shocked," "very concerned," and feeling that she "needed to extricate [Mr. Brinker] immediately" from any potential lawsuit by Genworth.  Zandy Depo. at 95, 113, 117; Brinker Depo. at 124, 127, 130.

          d.    Mr. Cordes repeatedly threatened Ms. Zandy that Genworth's lawyers "were about to issue subpoenas and litigation against [Ms. Zandy] and Bob Brinker," and that "he was minutes from authorizing his lawyers to sue" them.  Zandy Depo. at 97-98.

Mr. Cordes went as far as threatening Ms. Zandy that Genworth and its attorneys "had concluded that there was reason to sue Bob Brinker and [Ms. Zandy]," and that Mr. Cordes "was trying to hold his lawyers back," but that "[h]e thought it was too late." Zandy Depo. at 98, 117. Mr. Cordes warned Ms. Zandy "that [Mr. Brinker and her] were within minutes of being sued." Zandy Depo. at 117.

      e.    Mr. Cordes informed Ms. Zandy that Ms. Zandy would need to take action in return for his attempt to "see if [he] can stop [his] lawyers," and "[t]o prevent him from proceeding with legal suits" and to "avert the legal suits that were about to be lobbed at [her]." Zandy Depo. at 106, 113, 117.

      f.    Mr. Cordes demanded confirmation, in writing, that Mr. Brinker had no business relationships with TJT or other money managers. Zandy Depo. at 123.

      g.    In reaction to Mr. Cordes' threats, and in order to give Cordes what he demanded, Ms. Zandy sent a one-sentence email to Mr. Cordes immediately following the August 21, 2009, meeting in which she stated that Mr. Brinker did not have an agreement with any other management firm, knowing full well that such statement was inaccurate. Ex. 18; Zandy Depo. at 129. Moreover, immediately following Mr. Cordes' threats and intimidation, Ms. Zandy reached out to TJT in a desperate attempt to persuade TJT to tear up the agreement that TJT had with Mr. Brinker. Ex. 19; Brinker Depo. at 129.

      h.    Ms. Zandy took these actions to appease Mr. Cordes because she admittedly "did not want to be sued" and she "needed to extricate [Mr. Brinker] immediately" from any possible lawsuit. Zandy Depo. at 117, 122, 129.

      i.    After receiving an email from Ms. Zandy, Genworth did not consider the prior response to be sufficient given its knowledge of an actual agreement between TJT

and Mr. Brinker – knowledge which can easily be inferred from Mr. Cordes' email specifically referencing TJT. Ex. 19.

      j.      Ms. Zandy never provided Mr. Cordes with the confirmation that Mr. Cordes had demanded. Genworth never received such official writing from Mr. Brinker because Mr. Brinker <u>did</u> have an agreement with TJT that TJT was not willing to rescind. Ex. 21.

      4.      **Whether Genworth Intentionally or Negligently Sent Out False and Defamatory Letters and Emails**

      a.      On August 24, 2009, despite not having received the writing that Genworth's agent had demanded to confirm whether there was an agreement between TJT and Mr. Brinker, Genworth and Ahluwalia proceeded and disseminated letters and emails to clients of Mr. Cook and Mr. McFadden falsely informing them that TJT was not affiliated with Brinker. Ex. 21.

      b.      Genworth and Ahluwalia had no reasonable basis for believing the statement was true, given that they had not received definitive confirmation that such was the case – confirmation that Genworth itself had demanded but seemed content to dispense with when it sent out the letters and emails. Ex. 19

      c.      Genworth's and Ahluwalia's clear disregard for the truth is demonstrated by the fact that, on August 25, 2009, (the day <u>after</u> the defamatory letter went out) Mr. Cordes again emailed Ms. Zandy asking if there was "[a]ny response from Bob [Brinker]" on the matter. Ex. 19.

      d.      On August 26, 2009, Ms. Zandy unquestionably confirmed the existence of an agreement between Mr. Brinker and TJT when she followed up on Mr. Cordes' email,

stating that, in response to Mr. Cordes' actions and demands, she had contacted Mr. McMullan to request that TJT "rescind the paragraph agreement" that TJT had with Mr. Brinker. Ex. 19.

     5.    **Whether Genworth Intentionally or Negligently Failed to Retract the False and Defamatory Letters and Emails They had Sent Out**

          a.    Demonstrative of Genworth's malicious intent is the fact that, despite being informed that Mr. Brinker did in fact have a business relationship with TJT (one that TJT was not willing to rescind) – and thereby rendering the statements in their letters false – Genworth and Ahluwalia did not send out a retraction of their letters. McMullan Decl. at ¶ 31.

          b.    To date, Genworth and Ahluwalia <u>still</u> have not sent out a correction of the false statements in the letters to the clients who had received the defamatory statements, despite being keenly aware that those statements were false.

     6.    **Whether Genworth Intentionally or Negligently Sought to Continue Defaming Defendants/Third-Party Plaintiffs**

          a.    After it discovered that Mr. Brinker and TJT had a contractual relationship, Genworth did not even inform its own employees of the fact, and, for weeks, Genworth's employees continued to provide Mr. Cook's and Mr. McFadden's clients with the same misinformation and false statements. <u>See</u> Ex. 22.

          b.    Genworth's employees misled clients in phone conversations long after Genworth was clearly aware of TJT's agreement with Mr. Brinker – or, at the very least, would have had a reasonable belief that such an agreement existed. <u>See</u> Ex. 22. For example, Lisa Lagosh, a Genworth employee, on September 9, 2009, noted in an entry on ACT that a client "[a]sked me if the other firm was affiliated, I stated as far as we know they are not." <u>See</u> Ex. 22. Likewise, on August 26, 2009, at 3:23 p.m. (Ms. Zandy's email confirming an

agreement between Mr. Brinker and TJT had been sent that morning at 8:18 a.m. CT), Genworth's employee Todd D'Agostino falsely informed a client that Genworth "spoke with [Mr. Brinker] and his legal team and they have informed [Genworth] they have no agreement with any other firm."  See Ex. 23.  Likewise, Jeff Joseph, of Genworth, informed a client on or before August 27, 2009, that, "when Bob Brinker was asked (with lawyers in the room) if he was affiliated with anyone else, Mr. Joseph said Mr. Brinker responded absolutely not."  See Ex. 24.

        c.        Despite no longer having an exclusivity agreement with Mr. Brinker, Genworth, a Fortune 250 company with an enormous staff of attorneys and marketing people, did not remove all the "exclusive" statements with regard to its relationship with Mr. Brinker from its website until October 27, 2009 – after Defendants had brought the Counterclaims/-Third-Party Complaint against Genworth and Ahluwalia.  See Plaintiff's and Third-Party Defendant's Memo at 7-8; Doc. 7; Ex. 10.

        7.        **Whether Defendants Suffered an Actual Loss as a Result of the Tortious Interference**

        a.        At least one client committed to going to TJT and even signed the paper work only to change course after learning from Genworth that TJT supposedly had no agreement with Brinker and that Genworth supposedly had an exclusive relationship with Brinker.  Ex. 27; McFadden Decl. at ¶ 42.

        b.        But for Genworth's interference, threats, and intimidation, there was a reasonable probability that Brinker would have subsequently renewed and continued the business relationship with TJT.   (McMullan Decl. at ¶ 32; Zandy Depo at 55-56)

Respectfully submitted,

DEFENDANTS TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA AND TJT CAPITAL GROUP, LLC

THIRD-PARTY PLAINTIFFS TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN AND TJT CAPITAL GROUP, LLC

By: */s/ Paul A. Lieberman*
Paul A. Lieberman (PHV No. 04079)
Stark & Stark, PC
993 Lenox Drive, Bldg. 2
Post Office Box 5315
Princeton, New Jersey 08543-5315
Phone: 609-895-7277
Fax: 609-895-7395
plieberman@stark-stark.com

and

By: */s/ David P. Friedman*
David P. Friedman (ct03558)
Murtha Cullina, LLP
177 Broad Street
Stamford, Connecticut 06901
Phone: 203-653-5438
Fax: 860-240-5925
dfriedman@murthalaw.com

<u>CERTIFICATION</u>

  I hereby certify that on August 3, 2011, a copy of the foregoing Local Rule 56(a)2 Statement was electronically filed.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing though the Court's CM/ECF System.

            By  */s/ David P. Friedman*
                David P. Friedman (ct03558)