UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA and TJT CAPITAL GROUP, LLC, <br><br> Defendants. | Civil Action No. 3:09-CV-1521-(PCD) |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, AND TJT CAPITAL GROUP, LLC, <br><br> Third-Party Plaintiffs, <br><br> v. <br><br> GURINDER AHLUWALIA, <br><br> Third-Party Defendant. | September 12, 2011 |

**GENWORTH'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE CLAIMS**

SNR DENTON US LLP
1221 Avenue of the Americas
New York, NY 10020
Reid L. Ashinoff  *(admitted phv)*
Sandra D. Hauser *(admitted phv)*
Brendan E. Zahner *(admitted phv)*
Tele: 212.768.6700
Fax:  212.768.6800

McCARTER & ENGLISH, LLP
City Place I, 185 Asylum Street
Hartford, Connecticut 06103-3495
Eric Watt Wiechmann (CT 04331)
Elizabeth M. Smith (CT 19808)
Tele: 860.275.6763
Fax: 860.560.5970

# TABLE OF CONTENTS

**Page**

Summary of Reply ................................................................................................ 1

Undisputed Facts ................................................................................................. 3

I.     Defendants Do Not Dispute the Material Facts at Issue in This Case ............................. 3

      A.     Defendants Candidly Admit They Took Genworth's Client Information Repeatedly and in Various Forms, and Used It to Start a Competing Business ................................................................................................. 3

      B.     Defendants' Rule 56 Response fails to "Provide Specific Citations to Evidence in the Record" to Substantiate the Defendants' Denials as Required Under Local Rule 56(a)(3), and Must Be Disregarded ......................... 5

Argument ............................................................................................................ 9

II.    The Individual Defendants Signed Enforceable Contracts with Genworth, Which They Breached ...................................................................................................... 9

      A.     The PIIA Is an Enforceable Contract that Unambiguously Prohibits Defendants' Conduct ..................................................................................... 9

      B.     Integrity First Is Also Unambiguous and Enforceable ......................................... 11

      C.     The Cases Cited by Defendants are Inapposite ................................................... 12

III.   The Misappropriated Information Constitutes Protected Trade Secrets, and Defendants Are Liable Under the Connecticut Uniform Trade Secrets Act .................. 13

      A.     Defendants Fail to Refute or Even Discuss Genworth's Caselaw ........................ 13

      B.     Defendants Attempt to Defend their Actions with Nonsensical Arguments ....... 14

IV.   Defendants Are Liable for (1) Engaging in Unfair and Deceptive Trade Practices; (2) Tortiously Interfering with Genworth's Contracts and Beneficial Relationships; and (3) Violating the Computer Fraud and Abuse Act ........................... 18

Conclusion .......................................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*American Nat. Property & Cas. Co. v. Graham*,
370 F. Supp. 2d 819 (E.D. Wis. 2005)...................................................................14

*Corroon & Black-Rutters & Roberts, Inc. v. Hosch*
109 Wis. 2d 290, 325 N.W. 2d 883 (1982).............................................................14

*D'Antuono v. Service Road Corp.*,
2011 WL 2175932 (D. Conn. May 25, 2011)..........................................................10

*Goodman v. Genworth Financial Wealth Management, Inc.*,
No. 2:09-cv-05603-LDW-ARL (E.D.N.Y. 2009)....................................................4

*John M. Glover Agency v. RDB Bldg., LLC*,
60 Conn. App. 640 (Conn. App. 2000)...................................................................10

*Minuteman, Inc. v. Alexander*,
147 Wis. 2d 842, 434 N.W. 2d 773 (Wis. 1989) ....................................................14

*Nationwide Mut. Ins. Co. v. Mortensen*,
606 F.3d 22 (2d Cir. 2010).....................................................................................13

*Nationwide Mut. Ins. Co. v. Stenger*,
695 F. Supp. 688 (D. Conn. 1988) .........................................................................13

*Softchoice Corp. v. MacKenzie*
636 F. Supp. 2d 927 (D. Neb. 2009) ......................................................................13

*Ursini v. Goldman*,
118 Conn. 554, 173 A. 789 (1934) ...........................................................................9

STATUTES

Conn. Gen. Stat. § 36a-701b(a) ...................................................................................15

OTHER AUTHORITIES

FINRA Rule 30 ...........................................................................................................15

Local Rule 56(a) .................................................................................................. passim

## SUMMARY OF REPLY

Defendants' Opposition papers to Genworth Financial Wealth Management, Inc. ("Genworth")'s motion for summary judgment fail to raise a "genuine" issue of "material" disputed fact.  Instead Defendants do not contest here, and have admitted in open court and in their prior declarations, the facts detailing each of their actions in taking and utilizing Genworth's customer information, both during and after their Genworth employment, to start their own business and take Genworth's clients.

Defendants each swear they "do not recall" acknowledging, reading and agreeing in writing to abide by Genworth's Proprietary Information and Inventions Agreement ("PIIA") and its Integrity First policies, as a condition of their continuing employment with Genworth.  But their self-serving failures to recall these binding agreements do not create a genuine issue of material disputed fact, in the face of their signed and dated acknowledgment, that they both read and agreed to abide by these agreements.  By their plain terms, these agreements prevented Defendants' personal use of any Genworth customer information both during and after their employment with Genworth, and they cannot avoid these agreements by failing to remember that they exist.

Defendants also argue that Genworth's customer information is not entitled to CUTSA trade secret protection.  Their argument essentially boils down to the fact that because Genworth's PCG client service employees -- a small fraction of all of Genworth's employees -- had ready (though password protected) access to Genworth's customer information in order to do their jobs, this information was not protectable under CUTSA.  However, no law requires that confidential information be withheld from the employees who need that information to do their job, in order to be afforded trade secret status.  Defendants' arguments ignore the numerous Connecticut CUTSA cases cited by Genworth in its motion which: (1) protect the identical

- 1 -

customer information as trade secrets, and (2) find password protections and confidentiality agreements akin to Genworth's to be reasonable efforts (the CUTSA standard) to protect this valuable information.  The few cases Defendants put forward are all clearly inapposite.  They deal either with independent contractor -- not employee -- defendants who had independent legal rights to possess, own and use information, or with older non-CUTSA definitions of trade secrets superseded by CUTSA.

Additionally, Defendants conclusorily allege that Genworth's claims of tortious interference and violation of the Connecticut Unfair Trade Practices Act are derivative of Genworth's other claims, without addressing the facts or the clear law cited by Genworth establishing that these claims provide an independent basis for liability.

As Genworth's motion and this reply point out, a close reading of Defendants' Rule 56(a)(2) Statement ("Defs. Rule 56 Response") (Doc. No. 210) reveals that Defendants either do not deny the genuine material facts supporting Genworth's affirmative claims, or, misstate the evidence by making statements in their Rule 56 Response and legal memorandum unsupported by any of the evidence they cite.  The extent of Defendants' Rule 56 Response misstatements render that entire filing violative of Local Rule 56(a)(3), as explained below and as highlighted in the attached Exhibit A.  Moreover, the numerous non-material facts cited by Defendants, upon which they dwell, are addressed in Genworth's opposition memorandum (Doc. No. 213) and Rule 56(a)(2) Response (Doc. No. 214) filed in response to Defendants' own summary judgment motion, and incorporated herein rather than repeated by Genworth.

## UNDISPUTED FACTS

I.   **Defendants Do Not Dispute the Material Facts at Issue in This Case**

   A.   **Defendants Candidly Admit They Took Genworth's Client Information Repeatedly and in Various Forms, and Used It to Start a Competing Business**

Defendants never have denied that they took Genworth's client information and used it to solicit clients for their competing venture, TJT. They have admitted multiple times throughout this case to doing just that, most recently in their Opposition to Genworth's Motion for Summary Judgment (Doc. No. 209) ("Defendants' Opposition"). The key admissions that now bind Defendants include the following dispositive facts:

1.   The clients who have accounts with the PCG are a very specific subset of investors interested in following the asset strategies of Robert Brinker, and there is no public source to learn who these clients are. (Defs. Rule 56 Response[1] at p. 2 and at ¶ 55; Doc. No. 197-9 at 69:8-22; Doc. No. 197-11 at 97:16-22) The identities of the individual investors who wish to follow Mr. Brinker's asset allocation advice are not publicly known, because Mr. Brinker has not and would not circulate or sell his list of subscribers to any other money management firm. (Defs. Rule 56 Response at ¶ 8; Doc. No. 197-7 at 35:7-21)

2.   Genworth and its predecessors bought Mr. Brinker's business, the BJ Group, including its clients and their respective assets under management, for $12 million, and paid Mr. Brinker an additional $5 million for his advice, client leads and mentions in his newsletter and on his website from 2000 to 2009. (Defs. Rule 56 Response at ¶¶ 1, 13; Doc. Nos. 197-7 at 15:7-25;161-3; 197-10)

3.   "Prior to resigning from Genworth, [Defendant] McMullan downloaded the client management system ACT, along with other items with which to create client lists. . . ." (Defs. Rule 56 Response at p. 2; Doc. No. 197-28 at p.16)

4.   While employed by Genworth in July of 2009, Defendant Cook memorized client information from Genworth's TNET system for approximately 20% of the clients he serviced. (Defs. Rule 56 Response at p. 2; Declaration of James Cook, Doc. No. 82 at 2) He proceeded to "input the memorized information into excel spreadsheets." (*Id.*) For some of those clients, he also "cross-referenced the excel spreadsheets with documents that were present in [his] home in order for [him] to conduct business on behalf of Genworth." (*Id.*) After Cook resigned, he sent the spreadsheets to Charles Schwab ("Schwab"). (*Id.*)

---

[1] As detailed in Section I.B. below, Defendants often deny only a single word or small portion of an entry in Genworth's Rule 56(a)(1) Statement. In such cases, Genworth has treated the rest of the entry as admitted.

5.      "During the final months of [Defendant McFadden's] employment at Genworth," he too used TNET to cross-reference the names of the clients he serviced for Genworth.  (Defs. Rule 56 Response at p. 2; Declaration of Timothy McFadden, Doc. No. 82-1 at 2)  He also created excel spreadsheets and then sent them to Schwab.  (*Id.*)

6.      On May 19, 2009, Defendant McMullan sent Schwab a complete list of every asset held by clients of the PCG serviced by Defendants Cook and McFadden.  (Doc. No. 197-9 at 106:2-12)  Genworth's TNET system was the source of this data, which included what securities clients were invested in.  (Defs. Rule 56 Response at p. 3; *Id.* at 107:16-20)

7.      Before Defendants sent spreadsheets to Schwab containing client information, their counsel advised that they could not use or retain this information.  (Defs. Rule 56 Response at p. 3; Defendants' Response to Plaintiff's Interrogatory 9 (Doc. No. 197-28))

8.      Defendants received a warning letter hand delivered by Genworth's outside counsel on August 19 or 20, 2009, which stated that Genworth considered its client lists proprietary information and demanded that Defendants preserve and not destroy all hardcopy and electronic documents relating to this matter.  (Defs. Rule 56 Response at p. 3; Doc. No. 197-9 at 431:21-24; Doc. No. 197-11 at 264:21-265:4)  Defendant McMullan received this letter no later than August 20, 2009, potentially before he discarded his own computer.  (Defs. Rule 56 Response at p. 3; Doc. No. 197-9 at 431:21-24; Doc. No. 197-19 at 74:11-78:25)

9.      After Defendants resigned they repeatedly sent spreadsheets of the names, addresses and account types of clients who had accounts with Genworth to Schwab.  (Defs. Rule 56 Response at p. 3; Declaration of Timothy McMullan, Doc. No. 70-6 at 21)

10.     Defendant McFadden accessed "Genworth's non-public website" and "the Charles Schwab website" using a Genworth password and login after he resigned.  (Defs. Rule 56 Response at p. 3; Declaration of Timothy McFadden, Doc. No. 70-8 at 8-9)

11.     Defendant McMullan gathered and provided information to class counsel in the action *Goodman v. Genworth Financial Wealth Management, Inc.*, No. 2:09-cv-05603-LDW-ARL (E.D.N.Y. 2009), reviewed and edited the class securities fraud Complaint and notice, and informed clients about the class action to both solicit them to join and to move accounts away from Genworth.  (Defs. Rule 56 Response at p. 3; Doc. No. 197-9 at 407:10-410:5)

12.     Defendant Cook intended to transfer every client from Genworth that he could remember. (January 18, 2010 Deposition of James Cook (Defs. Rule 56 Response at p. 4; Doc. No. 197-34 at 88:8-11)

13.     The vast majority of TJT's clients, upwards of 95% of them, are clients who formerly had accounts with Genworth, whom Defendants convinced to move to TJT.  (Defs. Rule 56 Response at p. 4; Doc. No. 197-9 at 332:17-333:2)

        On these facts, Genworth is entitled to summary judgment.

**B.** **Defendants' Rule 56 Response fails to "Provide Specific Citations to Evidence in the Record" to Substantiate the Defendants' Denials as Required Under Local Rule 56(a)(3), and Must Be Disregarded**

Defendants attempt to create the appearance of disputed facts by purporting to deny in their Rule 56 Response certain facts from Genworth's Rule 56(a)(1) statement. These denials cannot withstand scrutiny, however, because Defendants have failed to support "each denial . . . by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial" as required by Local Rule 56(a)(3). Accordingly, Genworth hereby requests that the Court deem the corresponding facts in Genworth's Rule 56(a)(1) statement admitted.[2]

Specifically, Defendants employ four misleading tactics:

**First**, Defendants repeatedly engage in semantic quibbling to deny some peripheral aspect of a Rule 56(a)(1) paragraph, thereby purporting to deny the paragraph as a whole, but present no evidence to contradict the material facts of the particular paragraph. For example:

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| 53 | On at least 36 separate occasions following Defendants' resignations from Genworth Defendants sent detailed spreadsheets with Genworth's client names, addresses and account types to Charles Schwab (Ex. S, T) | Deny, the clients were not "Genworth's clients", and were instead deemed to be Cook's clients and McFadden's clients, as set forth in annual performance reviews for many years by both GE and Genworth. (McFadden Decl. at 33; Cook Decl. at 30; Ex. 28) |

The Rule 56 Response submitted by Defendants repeatedly denies the allegations concerning their misconduct solely by denying that the clients at issue were Genworth's clients -- as each client **was** prior to moving to defendant TJT --  and then making no effort to contest the

---

[2] "[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1 or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law." Local Rule 56(a)(3).

evidence about their own conduct.  (*See also* Doc. No. 210 at p. 2-3 and ¶¶ 7, 12, 13, 15, 18, 22, 33, 36, 45, 53, 56, 57, 85, 151-54, 183, 185)

**Second**, in many of their Rule 56 Responses, and in their Opposition brief, Defendants cite to evidence that *does not support* their own responses.  Examples include:

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| 82 | The PIIA gives specific examples of secret or confidential information, including information or materials concerning Genworth's "customer relationships."  (Ex. U at (a)) | Admitted only to the extent that Plaintiff quotes an attached exhibit.  However, Defendants contend that, in the Genworth world, the "customer" was the advisor, and not the end "client".  Genworth's employee state [sic] that the core business was maintaining data about advisors and not clients.  Genworth (and GE) did not deal directly with clients.  Therefore, the "customer" was always the intermediary.  (Ex. 40 (Genworth's website); Ex. 28; Murray Depo. at 240-41) |

This astounding statement is directly contradicted by the evidence cited by Defendants. Exhibit 40 is a set of screen captures from Genworth's website describing the services it offers "specifically for independent financial advisors," not for its own employees.  Exhibit 28 is a performance evaluation for Defendant McFadden states that McFadden "**helped GEPAM** [GE Private Asset Management (a Genworth predecessor)] retain a 700K client who was contemplating leaving **us**."  (Doc No. 209-29 at 3)(emphasis added)  Finally, the portion of Mr. Murray's deposition cited by Defendants mentions only that the PCG accesses Genworth's salesforce.com software in much the same way as the independent financial advisors who work with Genworth.  Mr. Murray *does not say* that Genworth's employees were considered either "customers" of the company, or independent third party advisors.  (*See also* Doc. No. 210 at p. 2, 4 and ¶¶ 12, 13, 15, 33, 45, 77, 79, 82, 85, 116, 148)

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| 116 | After signing into the network, access to the ACT database also required an additional unique username and password. (Murray Decl. at ¶ 8; Deposition of Jeffrey Joseph ("Ex. PP") at 66:6-12) | Denied. ACT required no independent password, even on Genworth's system. (O'Brien Depo. at 34, 41-45, 62-63) |

Here, Genworth's statement is a direct quotation from the affidavit filed by its Chief Information Officer. (Doc. No. 197-4 at ¶ 8) By contrast, the O'Brien deposition testimony cited by Defendants does not even discuss whether an independent password was required to access the ACT database, let alone support the contention that "ACT required no independent password." (Doc. No. 209-6 at 34, 41-45, 62-63)

**Third**, Defendants deny aspects of Genworth's Rule 56(a)(1) Statement without citing any evidence at all:

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| 142 | Mr. McFadden also swore he "did not retain, nor did he utilize, any records, documents or tangible client information of any kind whether original, copied, computerized or handwritten, that were obtained by or created by McFadden during or in connection with his employment by Genworth which pertain to any Genworth clients that he serviced or whose names he learned while employed at Genworth." (Ex. X) | Admitted to the extent the allegation quotes from Defendants' response to Interrogatories. McFadden had his client information that dated back to The BJ Group, Centurion, and G.E. McFadden did not retain, or utilize, documents labeled "Confidential." |

Here, Genworth's statement is a direct quotation from Defendant McFadden's sworn Interrogatory Responses. Defendants' unsworn response attempts to change Mr. McFadden's sworn statement, while providing no citation to any evidence in support of this change.

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| 16 | Outside of Brinker leads and referrals, Mr. McMullan and Mr. McFadden could each name only one client that he had ever brought to the PCG in more than a decade. (Ex. G at | Deny. McMullan was not responsible for client accounts and had no clients. |

| | |
|---|---|
| 100:12-101:14; Ex. E at 33:10-22). | |

Here, not only do Defendants fail to cite any evidence in support of their contention, they again fail to discuss the merits of Genworth's statement, which is that Mr. McMullan and Mr. McFadden had each introduced only one client to the PCG, with all the rest of these clients coming not from their independent prospecting, but from Brinker leads and referrals from existing clients.  (*See also* Doc. No. 210 at ¶¶ 13, 15, 16, 26-30, 83, 84, 129, 141-43, 145, 162, 169)

**Fourth**, in the face of damning evidence, Defendants again do what they have done so often in this case - submit yet more self-serving declarations, that contradict both the documentary evidentiary record and their own prior sworn admissions.  For example:

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| 148 | When Mr. McMullan took Genworth's material for his "personal pecuniary benefit" (Ex. O at 44:1-3), he simply "assumed" that Genworth was a signatory [of the Broker Protocol], without trying to learn whether that was true.  (Ex. O at 45:4-5) | Admitted to the extent that McMullan assumed that Genworth was a signatory. Defendants deny the remainder of this paragraph, including the allegation that McMullan "took Genworth's material for his 'personal pecuniary benefit.'" (McMullan Decl. at ¶¶ 17-19) |

A careful reading of Mr. McMullan's latest declaration shows that the paragraphs cited (¶¶17-19) do not even support this proposition.  (*See also* Doc. No. 210 at p. 2, 4 and ¶¶ 20, 38, 110, 148, 171, 172)

A comprehensive comparison of Genworth's and Defendants' Rule 56 statements is attached to this brief as Exhibit A.  Given that Defendants have not substantiated many of their denials as required by Local Rule 56(a)(3), their Rule 56 Response, and particularly their unsubstantiated denials, should be disregarded, and the facts as presented by Genworth should be deemed admitted.

## ARGUMENT

Large portions of Defendants' Opposition Brief are identical to Defendants' Memorandum in Support of their Motion for Summary Judgment addressing Genworth's claims. (Doc. No. 202).  As Genworth has already filed an opposition to Defendants' motion (Doc. No. 213) ("Genworth's Opposition"), it incorporates that opposition herein by reference, and will not burden the Court by repeating the arguments it made in that brief at length here.

## II.     The Individual Defendants Signed Enforceable Contracts with Genworth, Which They Breached

The documentary evidence in this case is unequivocal that each Defendant entered into a binding agreement with Genworth to abide by the Proprietary Innovation and Inventions Agreement (the "PIIA") and Genworth's Integrity First code of ethics.  In exchange for obtaining and continuing their employment with Genworth, Defendants agreed to safeguard Genworth's business information – including "customer information" – and to use that confidential information only to further Genworth's business.  This evidence is further detailed both in Genworth's moving brief (Doc. No. 196 at 12-14), and in Genworth's Opposition to Defendants' Motion for Summary Judgment (Doc. No. 213 at 9-13).

### A.     The PIIA Is an Enforceable Contract that Unambiguously Prohibits Defendants' Conduct

Defendant's self-serving claims that "none of them recall" having seen the PIIA that Genworth produced (Defs. Opp. Br. at 8) does not create a genuine issue of material fact.  Their signatures on their respective CEAs, stating they had received, reviewed and agreed to be bound by the PIIA, are dispositive here.  *Ursini v. Goldman*, 118 Conn. 554, 562, 173 A. 789, 792 (1934) ("Where a person of mature years, who can read and write, signs or accepts an agreement, it is his duty to read it, and notice of its contents will be imputed to him even if he fails to do

so."); *D'Antuono v. Service Road Corp.*, 2011 WL 2175932, 11 (D. Conn. May 25, 2011)

(same). Specifically, each Defendant's CEA stated:

> 1. I acknowledge that my continued employment with Genworth Financial, Inc.
> and its affiliates . . . is contingent upon my meeting all employment requirements,
> which include, but are not limited to, my review and agreement to the
> "Proprietary Information and Inventions Agreement." . . .

> I accept the conditions of employment described above. My signature and return
> of this Acknowledgment signifies my receipt of the documents referenced in this
> Acknowledgment and my personal commitment to comply with its policies.

(Doc. No. 214-17) Simon Bartle, Genworth's 30(b)(6) witness, testified unequivocally that the

"Proprietary Information and Inventions Agreement" referenced in this document when

Defendants agreed to it in 2005 is the specific PIIA marked as Bartle Exhibit 3, and Defendants

have offered no evidence to the contrary. (Doc. No. 214-12 at 42:5-6)

> Through the PIIA, each defendant agreed:

> Not to use, publish or otherwise disclose (except as authorized when my
> Company duties may require) **either during or subsequent** to my employment,
> any secret or confidential information or materials of the Company . . .

> Examples include, but are not limited to, information or materials concerning . . .
> **customer relationships** . . .

(Doc. No. 214-15) (emphasis added) Thus, contrary to Defendants' assertions on page 37 of

their Opposition Brief, the PIIA expressly prohibits both pre and post-employment misuse of

Genworth's customer information. Although Defendants claim that the term "customer

relationships" is ambiguous, and cite the addition of the term "client lists" to a newer version of

the PIIA, Defendants do not explain what is ambiguous about this term. (Defs. Opp. Br. at 9, n.

2) Whatever ambiguity Defendants claim, the above language, at a minimum clearly and

unequivocally prohibits current and former employees from taking Genworth's customer

information, transmitting it to third parties, and using it for personal gain. *See John M. Glover*

*Agency v. RDB Bldg., LLC,* 60 Conn. App. 640, 645 (Conn. App. 2000) ("A court will not

torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings.").

### B.    Integrity First Is Also Unambiguous and Enforceable

Defendants have failed to raise a genuine issue of material fact as to the binding nature of Integrity First as well.  Defendants' argument that "Genworth's code of ethics by its express terms, disclaims any notion that it is or could be construed to be a contract," is yet another unsupported misstatement.  The document Defendants cite to is not a Genworth document at all, it is a code of ethics issued by Genworth's predecessor GE, titled, "Integrity: The Spirit & Letter."  (Defendants' Ex. 13, Doc. No. 209-14)  That document does contain a disclaimer, which tellingly states, "**GE** does not create any contractual rights by issuing the guide or the policies."  (Defs. Opp. Br. at 8; Defendants' Ex. 13) (emphasis added)

Once at Genworth, however, Defendants each signed "Conditions of Employment Acknowledgments" ("CEA") agreeing that "I acknowledge that I have received and reviewed the guide to the **Genworth** Code of Ethics, **with which I must comply as a Genworth associate**."  (Doc. No. 214-177) (emphasis added)  The Genworth code of ethics in effect at that time, titled "Integrity First," is attached to this brief as Ex. B, and contains no such disclaimer.  (Doc. No. 214-12 at 15:24-16:5; Declaration of Simon Bartle ("Bartle Dec.") (Ex. C) at ¶2)

Defendants claim that "there are no documents indicating that Mr. Cook, Mr. McFadden, or Mr. McMullan received the latter version entitled Integrity First," because the copy of Integrity First attached to Genworth's moving brief contains a date stamp of 05/06, a year after Defendants signed their CEAs.  However, the unrebutted documentary evidence in this case shows that Defendants reaffirmed their commitment to abide by the Integrity First code of ethics *each year* that they were employed by Genworth, including affirmations on October 8, 2006,

- 11 -

when the version of Integrity First marked 05/06 was in effect.[3]  (Ex. D; Ex. E at 17:12-17,

49:22-50:8; Bartle. Dec.(Ex. C) at ¶3)  Further, Mr. Bartle verified at his deposition that the

relevant language in this document is identical to the version of Integrity First in effect at the

time that the Defendants signed their CEAs.  (Ex. E at 68:5-70:22)  A comparison of the version

of Integrity First that was provided to Defendants at the time they signed their CEAs to the

document stamped 05/06 shows that neither contains a disclaimer.  (*compare* Ex. B with Doc.

No. 197-27)

 Integrity First, like the PIIA, unambiguously prohibits Defendants' conduct here.  It

requires that employees "Avoid actions or relationships that might conflict or appear to conflict

with your job responsibilities or the interests of Genworth" and "not misuse Genworth resources,

intellectual property, time or facilities for personal gain, including office equipment, e-mail and

computer applications."  (Ex. B; Doc. Nos. 197-27 at 36, 197-12 at 224:5-13)

  **C. The Cases Cited by Defendants are Inapposite**

 The cases cited by Defendants at pages 34-35 of their Opposition brief  stand for only one

proposition which does not apply to the facts here – where an employee handbook contains a

<u>disclaimer</u> stating that the handbook creates no implied contract, that disclaimer means what it

says and the handbook by law creates no implied contract.  Because neither Genworth's Integrity

First agreement nor Genworth's PIIA contains such a disclaimer, these cases are irrelevant.

 Further, Defendants' argument that the "at-will" nature of Defendants employment made

the PIIA and Integrity First unenforceable is a red herring, and makes no sense.  (Defs. Opp. Br.

at 31)  An employee may enter into enforceable contracts with his employer, whether his term of

employment is "at will" or for a period certain.  Defendants cite no law supporting their position.

---

[3] All individual Defendants other than Ms. Rivera reaffirmed their commitment to Integrity First in 2006 and each year thereafter.  (Ex. D)  Ms. Rivera was hired in 2008 and therefore affirmed her commit in 2008 and 2009.  (*Id.*)

**III.     The Misappropriated Information Constitutes Protected Trade Secrets, and Defendants Are Liable Under the Connecticut Uniform Trade Secrets Act**

**A.     Defendants Fail to Refute or Even Discuss Genworth's Caselaw**

Defendants observe that, generally speaking, customer lists "lie 'on the periphery' of trade secrets law," yet they ignore both the context and all of the seven cases cited by Genworth in which courts have found customer lists to be trade secrets in circumstances nearly identical to those here.  (*compare* Defs. Opp. Br. at 19; P. Moving Br. at 29-30)

The few cases Defendants do cite are entirely distinguishable.  In both *Nationwide Mut. Ins. Co. v. Mortensen*, 606 F.3d 22 (2d Cir. 2010) and *Nationwide Mut. Ins. Co. v. Stenger*, 695 F. Supp. 688 (D. Conn. 1988), the defendant insurance agents were not employees but "independent contractors" who operated individual businesses, and thus legitimately maintained their own files containing information regarding the policyholders they serviced.  These independent contractors therefore had an independent right to the very information that Nationwide asserted was a trade secret.  *Mortensen*, 606 F.3d at 25; *Stenger*, 695 F. Supp. at 692.  Additionally, in *Mortensen*, the court found that Nationwide had "effectively abandoned . . . on appeal" its challenge to the agents' misuse of Nationwide's client information "prior to" leaving Nationwide.  606 F.3d at 30.  The court also found that "Nationwide points to no evidence that the agents' pre-termination actions caused it to lose customers," (*Id.* at 31), while in *Stenger*, the court did not even discuss what, if any protections Nationwide had implemented to protect its data.  695 F. Supp. at 691. Genworth's full discussion of why the Second Circuit's *Mortensen* decision affords Defendants no help here is contained in Genworth's Opposition Brief (Doc. No. 213) at pages 32-33.

In *Softchoice Corp. v. MacKenzie*, unlike here, the data that plaintiff claimed was a trade secret was readily available from the internet and other public sources, and there was no evidence that the defendant there even misappropriated or used any of Softchoice's data.  636 F. Supp. 2d 927, 939-40 (D. Neb. 2009).  The *Corroon & Black-Rutters & Roberts, Inc. v. Hosch*

- 13 -

case was decided before the relevant jurisdiction, Wisconsin, even had a uniform trade secrets statute. 109 Wis. 2d 290, 325 N.W. 2d 883 (1982). Subsequent cases decided after Wisconsin adopted such a statute, unanimously have found that the test applied in *Corroon* is no longer valid. *E.g.*, *Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 857, 434 N.W. 2d 773, 779 (Wis. 1989) ("[T]he Corroon test no longer embodies the definition of trade secret."); *American Nat. Property & Cas. Co. v. Graham*, 370 F. Supp. 2d 819, 823 (E.D. Wis. 2005) (same).

All of these decisions stand in stark contrast to the undisputed facts here, where the defendant <u>employees</u> admit to having used Genworth's customer data prior to and after leaving Genworth, causing Genworth to lose hundreds of customer accounts and suffer millions of dollars in damages. These four clearly distinguishable and inapposite decisions are evidence of the weakness of Defendants' legal position.

**B.      Defendants Attempt to Defend their Actions with Nonsensical Arguments**

Perhaps sensing this weakness, Defendants have crafted nonsensical arguments to explain why Genworth's customer information should not be granted trade secret protection. None of these arguments enable them to escape the central facts that Defendants took valuable non-public information from Genworth, used it to set up a competing business, and took great pains to hide their actions because they knew they could not use this information.[4]

**1.      Genworth's Information Does Not Lose Its Trade Secret Status Merely Because Genworth Gives Employees Access to Perform their Jobs**

Defendants claim that because the information contained in Genworth's password-protected databases was also available to PCG **<u>employees</u>** in physical form and on CDs, and could be used in their homes or while traveling, that it was not reasonably protected. (Defs. Opp.

---

[4] Defendant McFadden notes that he was "amazed" to be able to use his password to log into the Genworth website shortly after he resigned, which is essentially an admission that he knew he was accessing protected information.

Br. at 22-23)  But this too is a red herring.  A piece of information is entitled to trade secret

protection if it can only be obtained by those <u>outside</u> the company through "improper means."

(*See* Doc. No. 213 at 29-34)  Defendants admit that Genworth's customer identities and other

information was neither generally nor publicly known, nor readily available to outside third

parties.  Defendants do not dispute, because they admitted under oath, that there is no public

source to learn who Genworth's clients are.  (*E.g.*, Doc. No. 197-9 at 69:8-22; Doc. No. 197-11

at 97:16-22)  In such cases, courts – including the Court in this case – consistently hold that

customer lists are trade secrets.  (See Doc. No. 196 at 35-36). [5]

Information need not be hidden from employees of the business, who must use the

information to perform their duties, in order to afford that information trade secret protection.

Genworth's account executives needed access to this information to perform their duties for

Genworth.  The job of an account executive is to use Genworth's information to contact clients on

Genworth's behalf.  Of course Genworth made its client information available to them.

The passwords required to access Genworth's databases and websites, the keycards

required to enter its offices, and the VPN tokens required to access its network remotely, were all

implemented to keep Genworth's information out of the hands of third parties and employees who

did not need access to do Genworth's business.  Genworth's protections were extensive, and

surpassed the level of protection found reasonable in other cases in which customer lists were

---

[5] Defendants claim that Genworth used a single shared username and password to access the Schwab website,  in
violation of FINRA Rule 30.  (Def. Opp. Br. at 14, 27-28)  This allegation is conclusory and irrelevant.  Not only
does this fail to show that Genworth's client information was available from any public source, but the password in
question was defendant Cook's password, which the evidence shows <u>he</u> shared with co-Defendant McFadden.  Non-
defendant PCG account executives have consistently testified to using their own passwords.  (Doc. No. 197-5 at
184:13-24; Doc. No. 197-6 at 223:25-224:3; Doc. No. 197-46 at 84:23-85: 8)  Likewise, Defendants' argument that
"Genworth never informed any clients that any "confidential information" had been stolen or accessed without
authorization, as required by state law," is irrelevant and conclusory.  (Defs. Opp. at 26)  The statute Defendants cite
does not apply to the information they stole.  *See* Conn. Gen. Stat. § 36a-701b(a).

found to be trade secrets.  (*See* Doc. No. 196 at 29-30)  These protections are detailed in Section III of Genworth's opposition to Defendants' Motion for Summary Judgment.  (Doc. No. 213 at 13-21)

Genworth's primary method of protecting its data from theft by its employees was not to deprive them of ready access to information necessary to perform their jobs; it was to enter into contracts with them in which all employees, including all individual Defendants, agreed not to misappropriate this information.  Indeed, no other Genworth employees ever did misappropriate this information.[6]

### 2. Although Clients Know Their Own Names, Addresses and Account Information, that Information Does Not Lose its Trade Secret Status

Defendants next claim that Genworth's client information is not a trade secret because "the customer information was known by the customers themselves."  (Defs. Opp. Br. at 27)  Yet it is true in *every* trade secrets case involving a customer list that the customers on that list had access to *their own* information, their own names, their own addresses, their own phone numbers.  This does not make this information public information, as the cases cited in Section III.C of Genworth's moving brief show.  (Doc. No. 196 at 29-30)

### 3. The Existence of the Broker Protocol, to which Genworth Was <u>Not</u> a Signatory, Does Not Make Genworth's Client Information Any Less Confidential

Defendants next argue that the information they took was not confidential because it is "essentially identical to that which is permitted to be removed under the Protocol for Broker Recruiting (the 'Protocol')." (Defs. Opp. Br. at 29)  Yet as Defendants correctly point out, (1) Genworth "is not a Protocol member," and (2) "The Protocol is, essentially, a <u>forbearance</u> agreement through which securities firms have agreed, if the Protocol is adhered to and if only

---

[6] Defendants claim that "former PCG leader Dan Kraninger left with information that he obtained while at GE/Genworth on Investor's Business Daily and built a sizeable business," but as the deposition testimony to which

certain information is removed, that when a financial advisor transitions between securities firms, the financial advisor can use that customer information to contact and solicit clients on behalf of his new firm."  (*Id.* at n. 7) (emphasis added).  Defendants also never deny that, whether or not the Protocol applies or indicates industry practice, the Protocol was not followed by Defendants here.  (See Doc No. 196 at 16-17)

Defendants' argument that Genworth's customers information is not protectable because so many *other* advisors -- but not Genworth -- signed the Protocol is non-sensical.  As Genworth is not a signatory to the Protocol, it is clear that Genworth considered its unique client information confidential, e.g. the product of leads directly from Mr. Brinker, and the BJ Group's client list, both of which Genworth and its predecessors paid millions of dollars to acquire.

### 4. Genworth's Client Information Undoubtedly has Value to Genworth and Its Competitors, Including the Defendants

Finally, Defendants "dispute the value Genworth attributes to the client relationships it allegedly purchased from Mr. Brinker, given that the principal assets purchased from Brinker were the assets under management, rather than any client relationships."  (Defs. Opp. Br. at 30) (citing Mr. Brinker's testimony that "assets under management would have been the most valuable asset" purchased from the BJ Group.)  Defendants are attempting to draw a non-existent distinction between "assets under management" and "client relationships."  The PCG's assets under management are the assets that PCG's clients hold in their accounts.  When the PCG loses a client, it loses the assets under management in that client's account.  (Doc. No. 197-43 at 5-6)

Defendants also argue that "the value of the information to TJT was minimal," (Defs. Opp. at 28) but this merely begs the question of why Defendants went to such great lengths to

---

they cite makes clear, Genworth had disclaimed an interest in this information when it decided not to do a deal with Investor's Business Daily.  (Defs. Opp. at 32 n. 10)

take this information, form it into client lists, send it to Schwab, and cover up their actions.  It also ignores the very obvious fact that TJT has already realized well over a million dollars in revenue from the client relationships it took from Genworth using this information.  (*Id*. at 21)

## IV.   Defendants Are Liable for (1) Engaging in Unfair and Deceptive Trade Practices; (2) Tortiously Interfering with Genworth's Contracts and Beneficial Relationships; and (3) Violating the Computer Fraud and Abuse Act

Defendants' claim conclusorily that Genworth's claims of tortious interference and violation of the Connecticut Unfair Trade Practices Act ("CUTPA") are derivative of Genworth's other claims.  Defs. Opp. Br. at 37-38.  This is the same unsupported argument Defendants made in their Motion for Summary Judgment (Doc. No. 202 at 33-35), and Genworth's response is detailed in its opposition to that motion (Doc. No. 213 at 34-36).

Defendants also repeat their claim that Genworth has not established "that it has incurred damages relating to their investigation of computer damage or remediation costs."  (Defs. Opp. Br. at 39)  Yet Genworth spent well in excess of $5,000 investigating the breach of its computer system, as discussed in its opposition to Defendants Motion for Summary Judgment.  (Doc. No. 213 at 38; *see also* Doc. No. 214-2)

Summary judgment is therefore appropriate on all three counts.

## <u>CONCLUSION</u>

For the foregoing reasons, and those in Genworth's moving papers (Doc. Nos. 195-197) and opposition brief (Doc. No. 213), Genworth respectfully requests that the Court grant its Motion for Summary Judgment on liability in its entirety, and such other relief as the Court deems proper.

Dated:  Hartford, Connecticut
        September 12, 2011

                         Respectfully Submitted,

                        /s/ _____

                            Eric W. Wiechmann (CT 04331)
                            Elizabeth M. Smith (CT 19808)
                            ewiechmann@mccarter.com
                            esmith@mccarter.com
                            McCARTER & ENGLISH, LLP
                            City Place I, 185 Asylum Street
                            Hartford, Connecticut 06103-3495
                            Tele: 860-275-6763
                            Fax: 860-560-5970

                            SNR DENTON US LLP
                            Reid L. Ashinoff  *(admitted phv)*
                            Sandra D. Hauser *(admitted phv)*
                            Brendan E. Zahner *(admitted phv)*
                            1221 Avenue of the Americas
                            New York, NY 10020
                            reid.ashinoff@snrdenton.com
                            sandra.hauser@snrdenton.com
                            brendan.zahner@snrdenton.com
                            Tele: (212) 768-6700
                            Fax: (212) 768-6800

                            *Counsel for Plaintiff Genworth Financial Wealth*
                            *Management, Inc. and Third-Party Defendant Gurinder*
                            *Ahluwalia*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that I have caused to be served a true and correct copy of the foregoing document on this 12th day of September, 2011 via electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

/s/ _____
                Brendan E. Zahner