# EXHIBIT A

### DEFICIENCIES IN DEFENDANTS' RULE 56(A)(2) RESPONSE

1. **Defendants engage in semantic quibbling to deny some peripheral aspect of the following Rule 56(a)(1) paragraphs, thereby purporting to deny the paragraphs as a whole, whereas they present no genuine evidence to contradict substantially all of the particular paragraph:**

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| Bullet 1 | Genworth's clients are a very specific subset of investors interested in following the asset strategies of Robert Brinker, and there is no public source to learn who these clients are. (Deposition of Timothy McMullan ("Ex. E") at 69:8-22; Deposition of Timothy McFadden ("Ex. G") at 97:16-22) | Denied. The clients were not Genworth's clients but Jim Cook and Tim McFadden's clients. Genworth has 100,000 accounts totaling $10-$12 billion in assets. (Murray Depo. at 175; Ex. 28 (McFadden 2002 Performance Review)) |
| Bullet 2 | Genworth's client information was only shared with Defendants prior to their resignation as employees of Genworth because they held a position of trust and confidence within Genworth, servicing Genworth's clients. (March 25, 2011 Deposition of James Cook ("Ex. H") at 71:17-21; 80:6-10) | Denied. The clients were not Genworth's clients but Cook and McFadden's clients, who had information on their clients going back to The BJ Group days – pre-Genworth (McFadden Decl. at ¶ 33; Cook Decl. at ¶ 30; Ex. 28; Ex. 29 (Cook Performance Review)) |
| Bullet 6 | On May 19, 2009, Defendant McMullan sent Schwab a complete list of every asset held by clients of the PCG serviced by Defendants Cook and McFadden. (Ex. E at 106:2-12) Genworth's confidential TNET system was the source of this data, which included what securities clients were invested in. (Id. at 107:16-20) This was confidential non-public information. (Id. at 204:14-25; 205:1-13) | Defendants admit that McMullan sent Schwab non-confidential and non-material Committee on Uniform Security Identification Procedures ("CUSIP") numbers. Defendants therefore deny that this information was confidential as a CUSIP numbers are uniform throughout the securities industry. (D'Agostino Depo. at 32, 202; Joseph Depo. at 188-89; Ex. 30 (Trujillo Decl. at ¶ 8) |
| ¶ 7 | Mr. Brinker's agreement not to solicit his former clients was renewed in connection with multiple extensions of Mr. Brinker's relationship with Centurion, GE and Genworth, and a provision to this effect remains in place up to the present day. (Agreement Between Brinker and Centurion and Amendments ("Ex. F")) | Denied. Brinker did not have "former clients," and he did not know who the clients were. (Brinker Depo. at 20) |

- 1 -

1. Defendants engage in semantic quibbling.  (Cont.)

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| ¶ 12 | Mr. Brinker provided leads to Centurion and its successors (including Genworth) by: 1) providing them with the contact information of people who wanted a professional money manager to help them follow Mr. Brinker's asset allocation strategies; and 2) mentioning them in the Marketimer newsletter.  (Ex. F) | Denied.  Mr. Brinker did not provide leads.  There was a link on www.bobbrinker.com that prospects could click and request information.  There was also an advertisement or a blurb in the Marketimer newsletter with an 800 phone number to call, if interested.  Mr. Brinker did not physically call or send to Genworth or its predecessors leads.  They were generated by the prospect.  (Ex. 36 (Website link and Marketimer blurb)) |
| ¶ 13 | Genworth and its predecessors paid Mr. Brinker a total of $5 million for his advice and the leads and mentions from 2000 to 2009.  (Ex. F) | Admitted, except to deny that Brinker provided leads. |
| ¶ 15 | Almost every new client came to PCG from either these leads or from referrals by existing clients.  (Ex. G 21:9-22; 46:13-47:4; 126:7-129:3) | Admitted, except to deny that Brinker provided leads. |
| ¶ 18 | Up to 95% of TJT's clients are former Genworth clients, not clients originated by Mr. McMullan, Mr. McFadden or Mr. Cook.  (Ex. E at 332:17-25; 333:1-2) | Denied as phrased.  Clients became clients of The BJ Group, Centurion, GE and Genworth from generally a phone number.  Mr. McFadden was responsible for "originating" many of those client accounts, some of which go back 15 years.  (McFadden Decl. at ¶ 36; Cook Decl. at ¶ 31) |
| ¶ 22 | Mr. Cook and Mr. McFadden did not purchase Mr. Brinker's business, Centurion and its successor did.  (Ex. E at 124:23-25; 124:1-12) | Admitted to the extent Cook and McFadden did not purchase Mr. Brinker's business.  However, denied in that Centurion did not purchase "Mr. Brinker's business."  Centurion purchased The BJ Group, which was Brinker and Jacobs business.  (McFadden Decl. at ¶ 39; Cook Decl. at ¶ 34; Brinker Depo. at 16) |
| ¶ 33 | The ACT database contained the client leads that Genworth purchased from Mr. Brinker.  (Ex. A at 80:13-14) | Denied.  Genworth paid Brinker for a website link and an advertisement in the newsletter four-times a year, in addition to money management.  Genworth did not |

- 2 -

1. Defendants engage in semantic quibbling. (Cont.)

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| | | purchase individual leads. (Ex. 36) |
| ¶ 36 | If Genworth clients also had open accounts at Charles Schwab, TJT would not need account applications completed to transfer clients. (Ex. L at 32:15-18) | Denied. To transfer clients would need a signed limited power of attorney and transfer forms. (D'Angelo Depo. at 32) |
| ¶ 45 | Mr. McMullan admits that he made a copy of the ACT database -- the principal system through which Genworth maintained detailed client contact information, lists of prospects and leads, and portfolio management notes used to handle the relationships -- with the intent of creating his own client list. (See Doc. Nos. 47-5, 47-21 and 47-22) | Denied. McMullan did not create his own client list as he did not have clients. Genworth did not put detailed portfolio management notes in ACT. ACT was not the principal system which Genworth maintained detailed client information – Oracle and Salesforce.com were. (Murray Depo. at 240-41) |
| ¶ 53 | On at least 36 separate occasions following Defendants' resignations from Genworth Defendants sent detailed spreadsheets with Genworth's client names, addresses and account types to Charles Schwab (Ex. S, T) | Deny, the clients were not "Genworth's clients", and were instead deemed to be Cook's clients and McFadden's clients, as set forth in annual performance reviews for many years by both GE and Genworth. (McFadden Decl. at ¶ 33; Cook Decl. at ¶ 30; Ex. 28) |
| ¶ 56 | These emails from Defendants Cook, McFadden and McMullan to Schwab containing Genworth's client names, addresses and account types started on August 3, 2009, well after the Defendants knew they were not allowed take the names and addresses of Genworth's clients. (Ex. E 228:19-23) | Denied. The clients were not "Genworth's clients" but Cook and McFadden's clients. Cook and McFadden did not "take" the names and addresses, and had no reason to "know" they could not use the names and addresses. (McFadden Decl. at ¶ 33; Cook Decl. at ¶ 30; Ex. 28) |
| ¶ 57 | All of the spreadsheets with Genworth's client names, addresses and account types sent to Charles Schwab were sent using the Defendants' personal home email addresses. (Ex. S, T) | Denied. The clients were not "Genworth's clients," but rather Cook's and McFadden's clients. Cook and McFadden had no non-solicitation or non-compete agreements. (McFadden Decl. at ¶¶ 11, 33; Cook Decl. at ¶¶ 14, 30; Bartle Depo. at 46; Ex. 28) |
| ¶ 85 | Through Genworth's Integrity First program, all Genworth employees are trained on a regular basis regarding the need to protect Genworth's valuable | Denied, as Defendants did not receive training on a regular basis. There were no annual compliance meeting. (McKinley Depo. at 152; Overkamp Depo. at 68; |

1. Defendants engage in semantic quibbling. (Cont.)

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
|  | intellectual property, and they affirm their agreement to this policy on an annual basis. (Ex. V at 17:13-17) | O'Brien Depo. at 6; D'Agostino Depo. at 15-16) |
| ¶ 151 | Mr. McMullan was aware that removing client information from an employer required him to conduct himself completely properly, because he was personally involved in just such a lawsuit with a previous employer. (Ex. E at 4:21-25; 5:1-3) | Deny. The lawsuit that McMullan was involved with was initiated by the company McMullan was joining – not leaving. Merrill countersued. This back and forth was what led to the industry to adopt the Broker Protocol. (McMullan Decl. at ¶ 27) |
| ¶ 152 | Documents from Charles Schwab prove that the Defendants repeatedly sent spreadsheets containing information concerning Genworth's clients in August of 2009. (Ex. S, T) | Deny, as Defendants dispute the definition and reference to "Genworth's clients" as they were always deemed to be the clients of the advisor, as evidenced by the annual performance reviews which were approved by senior management and human Resources for years. (Ex. 28) |
| ¶ 154 | Contrary to their interrogatory responses, it is untrue that the Defendants at no time used any Genworth information to contact or solicit clients. (Doc. Nos. 82, 82-1, 82-2) | Denied, as Defendants provided the clients' information on their clients, and not the undefined "Genworth information". (Ex. 28; O'Brien Depo. at 43-44, 61, 64-65) |
| ¶ 183 | Defendant McFadden admits that only a month after the injunction was issued, he violated it on behalf of TJT by communicating with Genworth's client Jerome George. (Ex. G at 207:1-222:9) | Denied, with the clarification that Jerome George, who had power of attorney for William C. Clay, contacted McFadden. No one from Genworth had contact with Mr. Clay between the time McFadden left Genworth and the time Mr. George contacted McFadden on behalf of Mr. Clay. (McFadden Decl. at ¶ 35) |
| ¶ 185 | Mr. McFadden admits that that he successfully solicited two more of Genworth's clients in the ensuing months, William Clay and Bylsma Allen, with the full knowledge of Mr. Cook and Mr. McMullan. (Ex. G at 207:1-222:9) | Denied, as McFadden did not solicit either clients, and Dr. Allen switched to TJT for a couple of unrelated reasons, namely, to have Carlson as manager and to use Schwab as broker. (Ex. 44 (Emails from Dr. Allen)) |

2. **Defendants cite to evidence that does not support their responses to the following Rule 56(a)(1) paragraphs:**

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| Bullet 13 | Defendant Cook intended to transfer every client from Genworth that he could remember. (January 18, 2010 Deposition of James Cook ("Ex. DD") at 88:8-11) | Denied because of the characterization, as Cook did not intend to transfer "every client from Genworth" he could remember – only every one of his clients that he could remember. (Cook Depo. at 88) |
| ¶ 12 | Mr. Brinker provided leads to Centurion and its successors (including Genworth) by: 1) providing them with the contact information of people who wanted a professional money manager to help them follow Mr. Brinker's asset allocation strategies; and 2) mentioning them in the Marketimer newsletter. (Ex. F) | Denied. Mr. Brinker did not provide leads. There was a link on www.bobbrinker.com that prospects could click and request information. There was also an advertisement or a blurb in the Marketimer newsletter with an 800 phone number to call, if interested. Mr. Brinker did not physically call or send to Genworth or its predecessors leads. They were generated by the prospect. (Ex. 36 (Website link and Marketimer blurb)) |
| ¶ 33 | The ACT database contained the client leads that Genworth purchased from Mr. Brinker. (Ex. A at 80:13-14) | Denied. Genworth paid Brinker for a website link and an advertisement in the newsletter four-times a year, in addition to money management. Genworth did not purchase individual leads. (Ex. 36) |
| ¶ 45 | Mr. McMullan admits that he made a copy of the ACT database -- the principal system through which Genworth maintained detailed client contact information, lists of prospects and leads, and portfolio management notes used to handle the relationships -- with the intent of creating his own client list. (See Doc. Nos. 47-5, 47-21 and 47-22) | Denied. McMullan did not create his own client list as he did not have clients. Genworth did not put detailed portfolio management notes in ACT. ACT was not the principal system which Genworth maintained detailed client information – Oracle and Salesforce.com were. (Murray Depo. at 240-41) |
| ¶ 77 | The Defendants admit that their own counsel told them in early July that they could not use Genworth's information or material. (Ex. X) | Denied. Defendants were told they could not use Genworth information for protocol process. (Cook Depo. at 126-28) |
| ¶ 79 | Every Defendant here agreed to the terms of the PIIA. (Ex. U) | Denied to the extent that the paragraph sets forth a legal conclusion and to the extent that it is unclear and ambiguous as to which PIIA Plaintiff refers. Defendants did not |

- 5 -

2. Defendants cite to evidence that does not support their responses. (Cont.)

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| | | sign the PIIA in Plaintiff's Exhibit U, which contains no signature line. Plaintiff's Exhibit U contains separate documents which have been attached together by Plaintiff to insinuate that they are one document. (Bartle Depo. at 39) |
| ¶ 82 | The PIIA gives specific examples of secret or confidential information, including information or materials concerning Genworth's "customer relationships." (Ex. U at (a)) | Admitted only to the extent that Plaintiff quotes an attached exhibit. However, Defendants contend that, in the Genworth world, the "customer" was the advisor, and not the end "client". Genworth's employee state that the core business was maintaining data about advisors and not clients. Genworth (and GE) did not deal directly with clients. Therefore, the "customer" was always the intermediary. (Ex. 40 (Genworth's website); Ex. 28; Murray Depo. at 240-41) |
| ¶ 85 | Through Genworth's Integrity First program, all Genworth employees are trained on a regular basis regarding the need to protect Genworth's valuable intellectual property, and they affirm their agreement to this policy on an annual basis. (Ex. V at 17:13-17) | Denied, as Defendants did not receive training on a regular basis. There were no annual compliance meeting. (McKinley Depo. at 152; Overkamp Depo. at 68; O'Brien Depo. at 6; D'Agostino Depo. at 15-16) |
| ¶ 116 | After signing into the network, access to the ACT database also required an additional unique username and password. (Murray Decl. at ¶ 8; Deposition of Jeffrey Joseph ("Ex. PP") at 66:6-12) | Denied. ACT required no independent password, even on Genworth's system. (O'Brien Depo. at 34, 41-45, 62-63) |

3. **Defendants cite no evidence to support their responses to the following Rule 56(a)(1) paragraphs:**

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| ¶ 16 | Outside of Brinker leads and referrals, Mr. McMullan and Mr. McFadden could each name only one client that he had ever brought to the PCG in more than a decade. (Ex. G at 100:12-101:14; Ex. E at 33:10-22). | Deny. McMullan was not responsible for client accounts and had no clients. |
| ¶ 83 | Through the PIIA the Defendants agreed that if there was any doubt as to whether information or materials are confidential, they would assume that they were confidential unless and until determined otherwise after consulting with a supervisor or Genworth's legal counsel. (Ex. U at (a)) | Denied to the extent that Defendants did not sign the PIIA, which contains no signature line, and to the extent Plaintiff characterizes and/or interprets a document that it has attached as an exhibit. |
| ¶ 84 | The PIIA expressly requires the return of secret or confidential materials to Genworth upon the termination of employment:<br><br>At the Company's request, or upon any termination of my employment to deliver to the Company promptly all items that belong to the Company or that by their nature are for the use of Company employees only, including, without limitation, all written and other materials that are of a secret or confidential nature relating to the business of the Company.<br><br>(Ex. U at (h)) | Denied to the extent that Defendants did not sign the PIIA, which contains no signature line, or sign or reaffirm a commitment to the PIIA on an employee exit questionnaire, and to the extent Plaintiff characterizes and/or interprets a document that it has attached as an exhibit. Moreover, Defendants dispute the meaning inferred by Plaintiff on the words "confidential" and "secret". |
| ¶ 141 | Mr. McFadden, like Mr. Cook, swore that he knew as of early July 2009 that he could not use Genworth's information or material and that he "immediately" deleted or destroyed any such information or material he possessed. (Ex. X) | Admitted to the extent that McFadden deleted or destroyed any Genworth information that was labeled "Confidential." |

3. Defendants cite no evidence to support their responses. (Cont.)

| ¶ | **Genworth's Rule 56(a)(1) Statement** | **Defendants' Rule 56(a)(2) Response** |
|---|---|---|
| ¶ 142 | Mr. McFadden also swore he "did not retain, nor did he utilize, any records, documents or tangible client information of any kind whether original, copied, computerized or handwritten, that were obtained by or created by McFadden during or in connection with his employment by Genworth which pertain to any Genworth clients that he serviced or whose names he learned while employed at Genworth."  (Ex. X) | Admitted to the extent the allegation quotes from Defendants' response to Interrogatories. McFadden had his client information that dated back to The BJ Group, Centurion, and G.E. McFadden did not retain, or utilize, documents labeled "Confidential." |
| ¶ 143 | Mr. McFadden also swore that at no time did he use any Genworth information to contact or solicit clients. (Ex. X) | Admitted that McFadden did not use any Genworth information labeled "Confidential." |

- 8 -

**4. Defendants cite only their own self-serving declarations, which are contradicted by the documentary record in this case and Defendants' own prior sworn admissions, to support their responses to the following Rule 56(a)(1) paragraphs:**

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| Bullet 3 | "Prior to resigning from Genworth, [Defendant] McMullan downloaded the client management system ACT, along with other items with which to create client lists. . ." (Ex. X) McMullan took Genworth's material for his "personal pecuniary benefit." (April 8, 2010 Hearing ("Ex. O") at 44:1-3) | Defendants admit the first part of this bullet point which states that McMullan downloaded the client management system ACT, but contest the context of the quote. Defendants deny the remainder of this paragraph, including the allegation that McMullan "took Genworth's material for his 'personal pecuniary benefit.'" (McMullan Decl. at ¶¶ 17-19) |
| Bullet 14 | Defendants violated this Court's order by continuing to communicate with Genworth's clients. (Ex. G at 207:1-222:9). These clients have since left Genworth and become clients of TJT. (Id.) | Denied, except that Defendant McFadden was contacted by Jerome George who had committed to becoming a client of TJT before the Court order. (McFadden Decl. at ¶ 35) |
| ¶ 20 | Defendants Cook and McFadden did not have the right to keep the accounts they serviced, and from time to time, their manager would involuntarily re-assign the clients they serviced to another investment advisor. (Ex. G at 53:1-8; 54:12-17) | Denied. Cook's clients were never re-assigned. (Cook Decl. at ¶ 32) McFadden's accounts were re-assigned by McFadden to the advisors; the manager did not reassign the accounts. McFadden's book grew too large and he was told he needed to relinquish a portion of it. He did and he chose which investment advisor received his client. (McFadden Decl. at ¶ 37) |
| ¶ 38 | Charles Schwab typically does not receive account numbers from advisers prior to them resigning, because that data is owned by another firm. (Ex. M at 97:11-25; 98:1-2) | Denied, as the account numbers were Schwab account numbers, having originated at Schwab. Schwab was an approved Genworth custodian, and Schwab already had the information. (McMullan Decl. at ¶ 24) |
| ¶ 110 | Access to TNET requires its own separate password, and this password must be changed every 90 days like the SSO password. (Murray Decl. at ¶ 6) | Defendants are unable to admit or deny this allegation. Stamford, CT, offices had a different version of TNET, and Defendants did not have to change the password every 90 days. (McMullan Decl. at ¶ 25; Cook Decl. at 37, McFadden Decl. at 44) |

- 9 -

4. Defendants cite only their own contradicted, self-serving declarations. (Cont.)

| ¶ | Genworth's Rule 56(a)(1) Statement | Defendants' Rule 56(a)(2) Response |
|---|---|---|
| ¶ 148 | When Mr. McMullan took Genworth's material for his "personal pecuniary benefit" (Ex. O at 44:1-3), he simply "assumed" that Genworth was a signatory, without trying to learn whether that was true. (Ex. O at 45:4-5) | Admitted to the extent that McMullan assumed that Genworth was a signatory. Defendants deny the remainder of this paragraph, including the allegation that McMullan "took Genworth's material for his 'personal pecuniary benefit.'" (McMullan Decl. at ¶¶ 17-19) |
| ¶ 171 | Defendant McMullan provided confidential information to class counsel, reviewed and edited the class securities fraud Complaint and notice, and informed clients about the class action to both solicit them to join that lawsuit and to move accounts away from Genworth. (Doc. No. 101 at 14, Ex. E at 407:10-410:5) | Denied. McMullan did not provide confidential information. (McMullan Decl. at ¶ 22) |
| ¶ 172 | Defendants used the notice of class action as a marketing tool to impair Genworth's reputation and its relationships with its clients, and then solicit those clients and their fee revenue to TJT. (Ex. EE, FF, GG) | Denied. The notice was not used as a "marketing tool," as a majority of TJT clients were already with TJT prior to the class action being filed in late December 2009. (McMullan Decl. at ¶ 22) |