UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA and TJT CAPITAL GROUP, LLC, <br><br> Defendants. | Civil Action No. 3:09-CV-1521-(PCD) |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, AND TJT CAPITAL GROUP, LLC, <br><br> Third-Party Plaintiffs, <br><br> v. <br><br> GURINDER AHLUWALIA, <br><br> Third-Party Defendant. | September 23, 2011 |

**PLAINTIFF'S AND THIRD-PARTY DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR  SUMMARY JUDGMENT DISMISSING THE COUNTERCLAIMS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

SUMMARY OF POSITION ................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.      Genworth's Statement That TJT Was Not Affiliated with Mr. Brinker Was Not
        Negligent .................................................................................................................. 2

        A.      Genworth Had No Knowledge of TJT's Agreement ................................... 2
        B.      Genworth Never Demanded That Mr. Brinker Breach or Disavow Any
                Agreement .................................................................................................. 3
        C.      Genworth Reasonably Accepted Ms. Zandy's Unequivocal Statement That
                Mr. Brinker Had No Agreement with Any Other Money Manager ............ 4

II.     The Failure to Retract a Statement Does not Create Defamation ............................ 5

III.    TJT has no Damages ................................................................................................. 6

        A.      The McFadden Declaration Provides no Support and is Hearsay .............. 6
        B.      The McMullan Declaration is Hearsay that Contradicts Mr. McMullan's
                Prior Deposition Testimony ....................................................................... 7

IV.     TJT does not Allege Defamation Per Se .................................................................. 8

CONCLUSION .................................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abdul-Salaam v. Lobo-Wadley*,
   665 F. Supp. 2d 96 (D. Conn. 2009).........................................................................................9

*Butler v. Raytel Medical Corp.*,
   Docket No. 04-5233-CV, 2005 WL 2365340 (2d Cir. Sept. 27, 2005)....................................8

*Ceslik v. Miller Ford, Inc.*
   584 F. Supp. 2d 433 (D.Ct. 2008)............................................................................................7

*Marshall v. Webster Bank, N.A.*,
   No. 3:10-cv-908(JCH), 2011 WL 219693 (D. Conn. Jan. 21, 2011)........................................9

*Morin v. Nationwide Fed. Credit Union*,
   No. 3:03-cv-277(CFD), 2008 WL 5157740 (D. Conn. Dec. 8, 2008).......................................9

OTHER AUTHORITIES

Federal Rule of Civil Procedure 26 .................................................................................................6

Federal Rule of Evidence 801.........................................................................................................7

## SUMMARY OF POSITION

The Defendants' opposition is an unfortunate work of creative fiction, repeatedly making three central factual assertions for which there is <u>no</u> evidentiary support.  Specifically, the Defendants repeatedly assert (1) that Genworth was "well aware" and "knew" that there was an agreement between TJT and Mr. Brinker when Mr. Cordes met with Mary Jo Zandy on August 21 and thereafter wrote to its clients on August 24, 2009, (2) that Genworth, through Mr. Cordes, on August 21 demanded that Mr. Brinker "disavow" or "breach" his agreement with the Defendants, and (3) that Genworth demanded that Mr. Brinker "take action" to avoid being sued. These claims are false, and have absolutely no support in -- and are each contradicted by -- the evidentiary record of actual documents, Ms. Zandy's deposition testimony, and Mr. Cordes's uncontested declaration.

Instead, the uncontroverted evidence shows that on August 21, Mr. Cordes met Ms. Zandy <u>to ask whether or not</u> TJT had an agreement with Mr. Brinker.  All the documentary evidence, and Ms. Zandy's testimony, is consistent with the declaration submitted by Ronald Cordes on this point.  Likewise, the material cited as evidence that Genworth asked Mr. Brinker to disavow or breach any agreement with TJT, or told Mr. Brinker (through Ms. Zandy) that he had to "take action" to avoid being sued, simply does not support those allegations.

The evidence is clear that on August 21 Mr. Brinker's agent, Mary Jo Zandy, unequivocally told Genworth that Mr. Brinker had no relationship with any other money manager, and in reliance on that statement Genworth told its clients the same thing on the next business day, August 24.  That was wholly reasonable and non-negligent.

Defendants also claim that Genworth had some "duty" to them to correct this statement when Genworth finally learned the truth, and that Genworth's statement that TJT had no agreement with Brinker was defamation per se.  Neither assertion is supported by law.

1

**ARGUMENT**

**I.**   **Genworth's Statement That TJT Was Not Affiliated with Mr. Brinker Was Not Negligent**

Genworth's statement that TJT was not affiliated with Mr. Brinker was based upon the absolutely unequivocal statement by Mr. Brinker's agent, in an August 21, 2009 email titled "No Agreement," that "Bob Brinker does not have an agreement with any other money management firm." (Doc. No. 200-1 at ¶ 6; Doc. No. 200-11)  Ms. Zandy repeatedly confirmed in her deposition that she intended to convey to Genworth that Mr. Brinker had no agreement with TJT. (*See, e.g.,* Ex. Q at 121:6-8; 122:4-9; 131:5-9)  There is no evidence that Genworth had any reason to suspect that this was not accurate, or that it was unreasonable or negligent to accept this definitive statement by Mr. Brinker's agent.

To avoid dismissal of their claims, the Defendants rely almost exclusively on unsupported allegations that despite Ms. Zandy's statement, prior to August 24, when Genworth wrote to its clients: (1) Genworth had actual knowledge that an agreement existed between TJT and Mr. Brinker; (2) Genworth demanded that Mr. Brinker breach or disavow that agreement; and (3) Genworth itself did not believe the statement by Ms. Zandy that there was no agreement. None of the foregoing assertions are supported by any evidence whatsoever.

**A.**   Genworth Had No Knowledge of TJT's Agreement

Genworth does not deny that it had heard from its clients that TJT claimed to have an advisory agreement with Mr. Brinker.  (Doc. No. 200-1 at ¶ 2)  As Mr. Cordes stated in his declaration, he visited Ms. Zandy to determine whether or not that was accurate.  (Id. at ¶ 4)

But from Mr. Cordes asking Ms. Zandy <u>whether</u> there was an agreement between Mr. Brinker and TJT, the Defendants leap to the completely unsupported assumption that this means Genworth <u>had actual knowledge of such an agreement</u>.  The Defendants are fallaciously arguing that because a question was asked, the answer was therefore clearly already known.  Beyond the

2

absolute illogic of this premise, the allegation is simply false, and there is <u>no evidence</u> that

Genworth knew whether or not TJT actually had an agreement with Mr. Brinker when Mr.

Cordes visited Mrs. Zandy.[1]

Moreover, the inferences the Defendants seek to draw from Ms. Zandy's answer are

baseless. For example, the Defendants argue that the "brevity and hastiness" of the statement

"Bob Brinker does not have an agreement with any other money management firm" indicates

that it is not trustworthy. (Doc. No. 206 Br. at p. 20) In other words, because the statement by

Ms. Zandy was brief, clear and unequivocal, it should not have been trusted; it is unclear why the

Defendants believe something longer, rambling and hedging would have been more reliable.

B.    Genworth Never Demanded That Mr. Brinker Breach or Disavow Any
      Agreement

The Defendants also have no evidence supporting their assertions that Genworth was

motivated or intended to have Mr. Brinker disavow or breach his agreement with TJT, or that

Genworth demanded that course of action. As already stated, the evidence shows that Genworth

was unaware whether such an agreement even existed, and TJT is merely speculating as to what

Genworth "intended" or what Mr. Cordes's motivations were.

Nonetheless, throughout their brief the Defendants also repeatedly claim that when Mr.

Cordes met with Ms. Zandy, he demanded that Mr. Brinker disavow or breach his agreement

with TJT. (Doc. No. 206 at pp. 5, 7, 13, 16) But the Defendants' citations to Ms. Zandy's

deposition simply do not say that. (*See* Ex. Q at pp. 62, 87-88, 96-99, 117; Ex. R at pp. 125-126)

Neither Ms. Zandy nor Mr. Brinker testified that Mr. Cordes, or anyone else at Genworth,

demanded that Mr. Brinker disavow or breach his agreement with TJT. The Defendants also

---

[1]  The Defendants harp on the claim that Mr. Cordes emailed Ms. Zandy about a "possible relationship with another money manager," but fail to note that the actual August 19, 2009 email from Mr. Cordes (Ex. S) says no such thing, and that Ms. Zandy also denied recalling or receiving any email to that effect. (Doc. No. 206 at pp. 5, 13, 15; Ex. Q at 87:23-7) In any event, Mr. Cordes acknowledges he had heard that TJT was claiming to have an agreement with Mr. Brinker; he wanted to know from Mr. Brinker and Ms. Zandy whether this was true.

3

argue that Mr. Cordes told Ms. Zandy that she "would need to take action" to avoid being sued,

but again the citations provided do not support that allegation either.  (*See* Doc. No. 206 at 6, 7;

Ex. Q at pp. 106, 113, 117)

> C.     Genworth Reasonably Accepted Ms. Zandy's Unequivocal Statement That Mr.
>        Brinker Had No Agreement with Any Other Money Manager

The Defendants also incorrectly claim that Genworth did not believe Ms. Zandy's clear

statement that Mr. Brinker had no agreement with any other money manager.  As an initial

matter, the Defendants' musings concerning what Genworth believed are nothing more than

speculation.  Moreover, the only evidence the Defendants cite is a follow-up email from Mr.

Cordes to Ms. Zandy sent the afternoon of August 21, coupled with Ms. Zandy's alleged failure

to respond to Mr. Cordes.  (Doc. No. at p. 8)  For several reasons, this evidence does not support

any inference that Genworth had any reason to know that Ms. Zandy was lying when she

unequivocally told Genworth that Mr. Brinker had no agreement with any other money manager.

The first reason is that, contrary to the Defendants' insinuations, Ms. Zandy promptly

replied to Mr. Cordes that his email "looks okay but I will send to Bob before responding

officially."  (Ex. T at GEN0003456)  So Ms. Zandy did more than respond that she had to check

with Mr. Brinker, she clearly stated that Mr. Cordes's email looked accurate to her, and notably,

the email almost entirely concerned statements that Ms. Zandy herself had already made.

Equally clear is that Mr. Cordes's email was not simply asking for a re-affirmation of Ms.

Zandy's earlier email that Mr. Brinker had no relationship with any other money manager.  Ms.

Zandy's email to Mr. Cordes earlier that day had already confirmed this to Mr. Cordes

unequivocally in writing.  Instead, Mr. Cordes's email sought confirmation that: (1) Mr. Brinker

had no current intention to enter into any advisory agreement with TJT or any other money

management firm; (2) Ms. Zandy had advised Mr. McMullan not to tell any clients or prospects

that TJT had a relationship with Mr. Brinker; and (3) Mr. Brinker would notify Genworth as a

courtesy prior to entering into an advisory agreement with any other firm.  (Ex. T)  Clearly, Mr.

Cordes's email sought far more than re-confirmation of what Ms. Zandy had already told Mr.

Cordes in writing.  As Ms. Zandy subsequently told Mr. McMullan, she did not confirm Mr.

Cordes's email because "it went far beyond my communication with him."  (Ex. U)  But she had

already confirmed in writing that Mr. Brinker had no agreement with any other money

management firm.

In short, the follow-up email from Mr. Cordes does not indicate in any way that

Genworth did not accept Ms. Zandy's prior statement, and Ms. Zandy confirmed that the follow-

up looked accurate to her.  There was no discussion of any TJT agreement that had been or

needed to be ripped up or voided until several days after Genworth sent its letter to its clients.  It

simply cannot reasonably be inferred from the August 21 emails or any other evidence that

Genworth knew or should have known that Ms. Zandy was being untruthful, and that contrary to

Ms. Zandy's prior statement, an agreement existed between Mr. Brinker and TJT.[2]

## II.     The Failure to Retract a Statement Does not Create Defamation

The Defendants repeatedly complain that Genworth did not retract the statement that TJT

was not affiliated with Mr. Brinker.  They even misleadingly claim that Genworth refused to

issue a correction, falsely implying that a request was made. (Doc. No. 206 at p. 9)  However, no

request for a retraction was ever sent to Genworth by the Defendants, and no evidence of one is

presented in their opposition papers.  The Defendants further complain that Genworth has not

retracted this statement "to date," even though Defendants' affiliation with Mr. Brinker ended

---

[2]  The Defendants also misrepresent that Genworth "admitted" that it did not know the truth in August of 2009 and
that Genworth was "unclear" about the truth when it sent its August 24th letter.  (Doc. No. 206 at p. 23)  The
evidence cited in Genworth's brief makes clear that Ms. Zandy first mentioned a Brinker/TJT agreement, that she
said was being rescinded, on August 26, 2009, two days after Genworth's letter had been sent. (Ex. T at
GEN0003455)  Mr. Cordes responded the next day, noting that Ms. Zandy had confirmed in their meeting and in
subsequent emails that no agreements existed between Mr. Brinker and TJT, and asked how those statements could
be reconciled with her new statement that a "paragraph agreement" did exist.  (Exhibit V)

more than a year ago when they failed to pay Mr. Brinker hundreds of thousands of dollars.

Legally, Defendants' retraction argument is a red herring.  The Defendants cite no legal

support for the idea that where the retraction of a non-negligent statement is neither sought nor

voluntarily undertaken, the legal standard for defamation is somehow altered.  Genworth is

unaware of any case holding that an innocent misstatement is actionable simply because a

retraction is not voluntarily offered.  Instead, at a minimum, negligence at the time of the

misstatement is required to show defamation.

**III.     TJT has no Damages**

The damages in this case have been exclusively suffered by Genworth, and the

Defendants are completely unable to support any damages claim.  In their opposition, the

Defendants seek to shore up this deficiency through declarations from Mr. McMullan and Mr.

McFadden, both of which are woefully inadequate.

A.       The McFadden Declaration Provides no Support and is Hearsay

Mr. McFadden's declaration claims that an unnamed client completed paperwork to

switch his account to TJT, and then changed his mind after learning from Genworth that TJT

supposedly had no agreement with Mr. Brinker.  No such individual was identified in the

Defendants' Rule 26 disclosures or during discovery as someone with relevant information, and

Genworth has not had the opportunity to question this version of events by Mr. McFadden.

This "evidence" is also impermissibly vague, failing to even identify the client at issue, or

what if anything that individual actually said to Mr. McFadden.[3]  Mr. McFadden's declaration is

also pure hearsay as to this unnamed individual's state of mind and reasons for his decision not

to move to TJT.  (Doc. No. 209-4 at ¶ 42)  This declaration is precisely the kind of self-serving

---

[3] Given the Defendants' history of submitting incomplete and misleading declarations in this action, they should not be given any benefit of the doubt in this regard.

statement that the hearsay rule is meant to bar. (Federal Rule of Evidence 801)  The Defendants

cannot use those alleged, unsworn, out of Court statements as evidence.  This case has seen the

Defendants (including Mr. McFadden) repeatedly forced to change their sworn statements as the

evidence they destroyed came to light through non-parties.  Particularly in light of that history,

this Court should disregard Mr. McFadden's vague hearsay declaration.

B.      The McMullan Declaration is Hearsay that Contradicts Mr. McMullan's Prior
        Deposition Testimony

Mr. McMullan's declaration that Mr. Brinker told him that he would not renew his

agreement with TJT because of this lawsuit is likewise hearsay. (Doc. No. 209-2 at ¶ 32)  Mr.

Brinker was deposed, and the Defendants had the opportunity to obtain this evidence in

admissible form if they desired.  They did not do so, and Mr. McMullan's hearsay statements

concerning what Mr. Brinker told him should be disregarded.

In addition, it should be noted that parties to judicial proceedings are entitled to absolute

immunity for statements made in connection with the proceedings, and therefore even if it were

true that Mr. Brinker did not renew his agreement with TJT because of the allegations in this

lawsuit, that could not be the basis for a claim by TJT against Genworth.  *See, e.g., Ceslik v.*

*Miller Ford, Inc.* 584 F. Supp. 2d 433, 445 (D.Ct. 2008)

Furthermore, Mr. McMullan's declaration should be disregarded under the "sham

affidavit" rule, because Mr. McMullan was directly asked whether he had discussed renewing

TJT's contract with Mr. Brinker, and testified that he did not:

Q.      Did you talk to [Brinker] about extending the relationship beyond July 30, 2010?

A.      I don't believe I did.

(Ex. W at 305:20-22)  Now Mr. McMullan has revised his story and claims that there was such a

discussion, and such discussion substantiates a damages claim against Genworth.  Under the

"sham affidavit" rule, a party is prevented from introducing affidavits in opposition to summary

7

judgment where, as here, the affidavit contradicts the party's own deposition testimony. *Butler*

*v. Raytel Medical Corp.*, Docket No. 04-5233-CV, 2005 WL 2365340 (2d Cir. Sept. 27, 2005)  If

Mr. McMullan was told by Mr. Brinker in the Fall of 2009 that Mr. Brinker would not renew

TJT's agreement because of this lawsuit, then Mr. McMullan should have testified to that when

asked at his deposition in March of 2011.  The sham affidavit from August 2011 should be

disregarded.

Finally, it is clear as a matter of law that TJT had absolutely no reasonable expectancy of

a renewed agreement[4] with Mr. Brinker for a very simple reason: TJT failed to pay Mr. Brinker

the $303,630 advisory fee due under the TJT-Brinker agreement.  (Ex. W at 305:9-12)

According to Mr. McMullan, he last spoke with Mr. Brinker in the Fall of 2010 and requested a

restructuring of the payment due to Mr. Brinker.  (*Id*. at 306:20-3)  Mr. Brinker never agreed,

and Mr. McMullan believes the ball is in Mr. Brinker's court.  (*Id*. at 306:9-11; 307:9-19)

Simply put, given that TJT has failed to pay Mr. Brinker hundreds of thousands of dollars that it

owes him, it would be utterly unreasonable to expect that Mr. Brinker would agree to renew his

agreement and continue to provide his advisory services for free.  The Defendants are unable to

show that they suffered any damages at all on their claims against Genworth.

**IV.     TJT does not Allege Defamation Per Se**

Because they have suffered no damages, the Defendants seek to cast their defamation

claims as defamation per se, but that is not the case.  Defamation per se exists where the

statement is defamatory on its face or when it charges "improper conduct or lack of skill or

integrity in one's profession or business and are calculated to cause injury to one in his

---

[4]  The Defendants also appear to argue that Genworth interfered with their business expectancy to originally sign a
contract with Mr. Brinker (Doc. No. 206 at p. 14), but that agreement was clearly executed prior to the August 21,
2009 meeting between Mr. Cordes and Ms. Zandy, remained in place for its entire term and therefore cannot be the
basis for an interference claim.  (Doc. No. 208-16)

profession or business."  *Morin v. Nationwide Fed. Credit Union*, No. 3:03-cv-277(CFD), 2008

WL 5157740 *4 (D. Conn. Dec. 8, 2008)(citations omitted)  Put differently, to state a claim for

libel per se, a plaintiff must show "that the libel, on its face, either charged some impropriety in

the plaintiff's business or profession or that it charged a crime of moral turpitude." *Marshall v.*

*Webster Bank, N.A.*, No. 3:10-cv-908(JCH), 2011 WL 219693 *11 (D. Conn. Jan. 21, 2011).

Here, the supposed defamation was the statement that TJT was not affiliated with Mr.

Brinker.  On its face, that statement does not charge improper conduct, skill or lack of integrity

in the Defendant's profession or business.  It is not as if Genworth claimed that the Defendants

were unlicensed or had stolen client funds.  Genworth simply conveyed, as it had been told by

Ms. Zandy, that Mr. Brinker was not affiliated with its former employees, and this cannot be

construed as charging improper conduct in connection with the Defendants' business because

there is nothing inherently improper with not being affiliated with Mr. Brinker.

In addition, the supposed new defamatory statement that Mr. McMullan took records

from Genworth cannot support a defamation claim because, among other things, truth is an

absolute defense to defamation.  *Abdul-Salaam v. Lobo-Wadley*, 665 F. Supp. 2d 96, 101 (D.

Conn. 2009) (citing *Woodcock v. Journal Publishing Co.*, 230 Conn. 525, 553-54, (1994). Mr.

McMullan has repeatedly admitted that he improperly took Genworth's client data.  As to

whether client data was taken, Mr. McMullan testified before Judge Bryant in this regard,

admitted that he created a CD containing all of the assets held by Genworth's PCG clients,

brought that CD home, and then emailed the data to Charles Schwab.  (Ex. X at 61:7-18; 63:9-

17)  In addition to that specific admission, Mr. McMullan also admitted that while employed at

Genworth, for his own "personal pecuniary benefit," he created CDs containing "client

information, some research, ACT database, which was a contact management system, some asset

lists, things of that nature" and of the CDs, "most" he left at the office. (Id. at 43:17-22; 44:1-3;

44:7-16)  In short, Mr. McMullan admitted under oath that he created CDs containing

Genworth's client information, and at least some of those CDs were removed from Genworth's

premises.

As to whether this was improper, Mr. McMullan testified that his attorneys at Stark &

Stark told him in early July 2009 that he could not take this information.  (Id. at 45:9-21; 46:2-7)

So there is no dispute concerning whether or not Mr. McMullan was entitled to take this

information for his own use (regardless of whether or not he knew it was wrong at the time).

While Mr. McMullan claims that he promptly destroyed all of this data (even though he was

caught sending it to Charles Schwab in August 2009), that does not change the undisputed fact

that he improperly took Genworth client records for his own personal pecuniary benefit.

## CONCLUSION

For the foregoing reasons, Genworth and Mr. Ahluwalia respectfully request that this

Court grant their Motion for Summary Judgment dismissing each of the third party and

counterclaims in its entirety.

10

Dated:  Hartford, Connecticut
        September 23, 2011

Respectfully Submitted,

/s/ _____

   Eric W. Wiechmann (CT 04331)
   Elizabeth M. Smith (CT 19808)
   ewiechmann@mccarter.com
   esmith@mccarter.com
   McCARTER & ENGLISH, LLP
   City Place I, 185 Asylum Street
   Hartford, Connecticut 06103-3495
   Tele: 860-275-6763
   Fax: 860-560-5970

   SNR DENTON US LLP
   Reid L. Ashinoff *(admitted phv)*
   Sandra D. Hauser *(admitted phv)*
   Brendan E. Zahner *(admitted phv)*
   1221 Avenue of the Americas
   New York, NY 10020
   reid.ashinoff@snrdenton.com
   sandra.hauser@snrdenton.com
   brendan.zahner@snrdenton.com

   Tele: (212) 768-6700
   Fax: (212) 768-6800

   *Counsel for Plaintiff Genworth Financial Wealth Management, Inc. and Third-Party Defendant Gurinder Ahluwalia*

11

12

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that I have caused to be served a true and correct copy of the foregoing document on this 23rd day of September 2011 via electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

/s/ _____

Brendan E. Zahner

12