# EXHIBIT Q

1

1

2 UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

3 --------------------------------------------------x

4 GENWORTH FINANCIAL WEALTH MANAGEMENT, INC.,

5                                    Plaintiff,

6                                    Civil Action No.

                                     3:09-cv-01521-VLB

7      - against -

8 TIMOTHY McMULLAN, JAMES COOK, TIMOTHY McFADDEN,

KAREN BAZON, TAMARA RIVERA and TJT CAPITAL

9 GROUP, LLC,

10                                   Defendants.

--------------------------------------------------x

11 TIMOTHY McMULLAN, JAMES COOK, TIMOTHY McFADDEN,

KAREN BAZON, TAMARA RIVERA and TJT CAPITAL

12 GROUP, LLC,

13              Third-Party Plaintiffs,

14      - against -

15 GURINDER AHLUWALIA,

16              Third-Party Defendants.

--------------------------------------------------x

17

18           DEPOSITION OF MARY JO ZANDY, held at the

19 offices of Sonnenschein Nath & Rosenthal LLP, 1221

20 Avenue of the Americas, New York, New York 10020, on

21 the 17th day of March 2010, commencing at 9:10 a.m.,

22 before Shirley Tannenbaum, a Registered Professional

23 Reporter and Notary Public of the State of New York,

24 pursuant to Subpoena.

25

62

1                         M. Zandy

2       A      Well, "I think Bob has decided."

3       Q      Okay.  So you were not certain of

4   Mr. Brinker's decision yet --

5       A      Right.

6       Q       -- as of this time?

7              Okay.  So now --

8       A      The -- to add on to that, we felt it was

9   important to hear what Genworth had to say first, and

10   to execute that agreement first.

11      Q      So who is Ron Cordes?

12      A      A very rude man.

13      Q      Other than your opinion that he may have

14   been rude to you, who is he?

15      A      He works for Genworth.

16      Q      In what capacity?

17      A      I don't know.

18      Q      And why do you have the opinion that he is

19   a rude man?

20      A      Because he threatened to sue me and Bob

21   Brinker.

22      Q      Okay.  This July 20 e-mail between

23   Mr. Cordes and you, is that the first time that you

24   had any contact with Mr. Cordes?

25      A      I don't recall.

87

M. Zandy

1      Mr. McMullan?

3          A      I do not.

4          Q      Do you know why you would have asked

5      Mr. McMullan as to why -- how things were proceeding?

6                 MR. MacDONALD:  Form objection.

7          A      I -- that's why I'm having trouble putting

8      this in context.  I don't.

9          Q      You have no memory of --

10         A      No.

11         Q      Let me ask you this.  When it says "how

12     are things proceeding," are you referring to the

13     business?

14         A      I don't know.

15         Q      Are you asking about his personal life?

16         A      I have -- no.

17         Q      What could you have possibly been

18     referring to?

19         A      You know, it's very unusual --

20                MR. MacDONALD:  Form objection.

21         A       -- for me to send an e-mail to Tim

22     without a purpose.  So I just don't recall.

23         Q      Now, on August 19 -- and I don't have the

24     e-mail right now but I'll have it in a few moments --

25     Mr. Cordes sent an e-mail to you requesting a meeting

88

M. Zandy

1  and indicating some concern that he had about

2  Mr. Brinker's possible relationship with another

3  money manager.

4      A     I'd like to see that e-mail.

5      Q     Sure.

6      A     I don't recall that e-mail.

7      Q     We'll have that in a moment.

8            Do you recall if such an e-mail might have

9  prompted you to send an e-mail to Mr. McMullan?

10     A     No.

11     Q     Did Mr. Brinker ask you to check with

12 Mr. McMullan as to --

13     A     Definitely not.

14     Q     Are you surprised sitting here today that

15 you sent an e-mail to Mr. McMullan?

16     A     Right.

17     Q     You are?

18     A     Yeah.

19     Q     What surprises you?

20     A     Because I normally didn't e-mail Tim

21 without a reason.  So I don't know what this was

22 about.

23     Q     You wrote, "I hope well."

24     A     Right.

96

M. Zandy

1

2     A     The purpose was to make allegations that
3  we were destroying his business.

4     Q     When you say "we" were destroying the
5  business --

6     A     Myself and Bob Brinker.

7     Q     I see.

8           Were you surprised about -- did he make
9  any allegations about Mr. McMullan?

10    A     Yeah.  I -- yes, he did.

11    Q     And what were those allegations?

12    A     He said he took things with him.

13    Q     What did he say that he took?

14    A     Records.

15    Q     What kind of records?

16    A     Client records.

17    Q     What did those records contain?

18    A     I didn't ask.

19    Q     What did you understand that to mean?

20    A     I thought it was serious, but I --

21    Q     Why did you think it was serious?

22    A     Because it is a war.

23    Q     Did you think it would be a serious thing
24  for someone to remove client records?

25    A     I have no idea.  I have no idea.  I am not

                        M. Zandy

1
2  in money management.  I don't know what the records
3  would enable somebody to -- to get an advantage.  I
4  just didn't focus on that.  But Mr. Cordes was
5  extraordinarily upset.
6          Q    Well, you sold Mr. Brinker's business --
7          A    Right, in 2000.
8          Q    -- in 2000.  So you have some familiarity
9  with the money management business?
10         A    Right.
11         Q    And I don't -- it's not exactly a state
12 secret, is it, that client -- records of client
13 addresses and people who might be interested in
14 Mr. Brinker's advice and account numbers would be of
15 some value to somebody else in the money management
16 business?
17         A    He didn't say specifically those were the
18 records.
19              MR. MacDONALD:  Note my objection.
20         Q    Well, what did you understand the records
21 to be?
22         A    I really didn't think it through.
23              I was so intimidated by his -- Mr. Cordes
24 said that he had to hold his lawyers back because
25 they were about to issue subpoenas and litigation

M. Zandy

2  against Bob Brinker and myself.  So I mean, that

3  totally -- I did not focus on the details of anything

4  else after he lobbed me that.

5        Q      Can you tell me what you recall specific

6  words that Mr. Cordes used in that meeting?

7        A      Regarding what?

8        Q      Regarding anything.

9               How long was the meeting?

10       A      Oh, about an hour.

11       Q      And what specifically do you recall

12  Mr. Cordes saying over the course of that hour?

13       A      I thought he was minutes from authorizing

14  his lawyers to sue Bob Brinker and myself.

15       Q      Did he say that he was within minutes

16  of --

17       A      Right.

18       Q      That was a phrase he used?

19       A      He said that he was trying to hold his

20  lawyers back.  He thought it was too late.

21       Q      And he was trying to hold his lawyers back

22  from what?

23       A      That they had concluded that there was

24  reason to sue Bob Brinker and myself.

25       Q      Is it possible that he was actually saying

99

M. Zandy

1  to sue Mr. McMullan?

3      A     No, he did not say anything about

4  McMullan.  He said Brinker and myself.

5      Q     But he told you that he believed

6  Mr. McMullan had stolen some records?

7            MR. MacDONALD:  Objection to form.

8      A     Right.

9      Q     And what did he tell you he thought you

10  had done?

11      A     Conspired to destroy his business.

12      Q     Why did he -- what did he --

13      A     He mentioned some phone records, cell

14  phone records.

15      Q     Did he indicate cell phone records between

16  Mr. Brinker and Mr. McMullan?

17      A     Right.

18      Q     Showing that they had spoken?

19      A     Right.

20      Q     And as we discussed, there were some

21  discussions in April and June --

22      A     Right.

23      Q      -- between Mr. McMullan and Mr. Brinker?

24      A     That's what he said.

25      Q     And in fact, those conversations that were

106

                                M. Zandy

1

2    letter agreement that Tim had sent or not at that

3    point in time.

4         Q    Did you tell Mr. Cordes that you would

5    endeavor to learn that information?

6         A    Yes.

7         Q    What did you say?

8         A    To prevent him from proceeding with legal

9    suits, I told him that I would attempt to persuade

10   Bob not to sign the agreement if he had not already

11   executed it.

12             MR. BAUM:  Can you read that answer to me

13   again?

14             (The answer was read back.)

15        Q    Well, was it really just to prevent legal

16   suits?  Or -- let me take a step back.

17             Mr. Brinker had had a relationship at this

18   point with Genworth or its predecessor, Centurion,

19   for almost a decade.  Right?

20        A    Yes.

21        Q    And you were aware from at the very least

22   Mr. Cordes's conversation with you that that

23   relationship was important to Genworth, right?

24             MR. MacDONALD:  Form objection.

25        A    I don't recall him saying that.  I think

1                          M. Zandy

2    was no agreement between --

3         A    The effect of this would be that there

4    would be no agreement.  Because Tim had agreed to it.

5    And therefore I would avert the legal suits that were

6    about to be lobbed at me.

7         Q    Why did Mr. McMullan agree to tear it up?

8              MR. MacDONALD:  Objection.

9         A    Because I was very upset.  And I --

10        Q    So it was --

11        A    Pardon?

12        Q    I'll let you finish.  I didn't mean to

13   interrupt you.

14        A    And I had called Bob Brinker in the

15   interim.  He was on the golf course with his son in a

16   father-son -- and he was very upset.

17        Q    Did you talk to Mr. Brinker before or

18   after you spoke to Mr. McMullan?

19        A    Before.

20        Q    And what did Mr. Brinker tell you?

21        A    We both agreed that Tim should tear up the

22   agreement.

23        Q    Did you convey to Mr. McMullan that

24   Mr. Brinker --

25        A    Bob Brinker wasn't sure that the agreement

M. Zandy

2    A    Because I needed to get that out before

3    he -- he told me that we were within minutes of being

4    sued.

5         And he said okay, I'll see if I can stop

6    my lawyers.

7    Q    So --

8    A    I guess I wasn't -- I was very concerned,

9    because I felt that Bob Brinker's reputation is most

10   important to him and that somehow or another I had

11   gotten him involved in this mess and needed to

12   extricate him immediately.

13   Q    What do you mean by you had gotten him

14   involved in this mess?

15   A    Well, you know, I was involved with the

16   agreements with Genworth and Tim.

17   Q    And for that reason you felt somewhat

18   responsible?

19   A    Yes.  I felt very responsible.

20   Q    Did you feel very responsible because you

21   had tried to convince Mr. Brinker into going into his

22   agreement with --

23   A    Yes.

24   Q    -- Mr. McMullan?

25        And did you feel responsible because you

121

M. Zandy

1

2          MR. MacDONALD:  Form.  Foundation.

3     A     It would be me.

4     Q     The only person would be you?

5     A     Right.

6     Q     And you had told him there was no money

7  management agreement?

8     A     Right.

9     Q     So I just ask you again, was it fair for

10 Mr. Cordes to understand as of the close of business

11 on 21 of August that in fact there was no agreement

12 in place between Mr. Brinker and any other money

13 manager?

14         MR. MacDONALD:  Form.

15    A     It would depend on whether or not my

16 recollection of the telephone conversation was

17 correct.  You're telling me it was not.

18    Q     So even if it was correct, you told him

19 the agreement was torn up -- it no longer existed?

20    A     Right.

21    Q     So even in that event there would still be

22 no agreement?

23         MR. MacDONALD:  Objection.

24    A     If it had been torn up, yes.

25    Q     So certainly you were intending to

122

1                           M. Zandy

2      indicate to Mr. Cordes --

3           A     Right.  I did not want to be sued.

4           Q     My question is a little bit more precise.

5                 Your intention behind your communication

6      with Mr. Cordes was to communicate that in fact there

7      was no currently existing agreement between

8      Mr. Brinker and Mr. McMullan?

9           A     Right.

10                MR. MacDONALD:  Form.

11                (Mr. Ashinoff left the room at this time.)

12                MR. BAUM:  I have no idea what number

13     we're at.

14                (Zandy Exhibit 21 marked for

15     identification.)

16          Q     I'm showing you an e-mail that was

17     produced by the defendants.  It is an e-mail between

18     you and Mr. McMullan as of -- an exchange also on

19     August 21, commencing with an e-mail from you to

20     Mr. McMullan, copying Mr. Brinker.

21                Do you recognize this e-mail?

22                (Witness peruses document.)

23          A     Yes.

24          Q     Do you recall having sent and received

25     this exchange of e-mails?

131

M. Zandy

1     of 1:15 p.m. that Mr. McMullan was tearing up the

2     agreement.

3     

4          A     Right.

5          Q     So actually it was accurate that in your

6     mind there was no other agreement with any other

7     money management firm.  In fact you had sent a prior

8     e-mail confirming that.

9          A     Right.

10         Q     So what part of the first paragraph of

11    Mr. Cordes's e-mail is inaccurate?

12         A     "Per your conversation with Bob Brinker he

13    does not have any agreements."  Bob was not the

14    source.

15         Q     I understand.  Okay.

16              So what was inaccurate was the fact that

17    Mr. Brinker was not the source.  Had that element of

18    that paragraph not been in there, the fact that

19    Mr. Brinker was the source, the remainder of that

20    paragraph was accurate; namely, quote -- or namely

21    that, quote, Bob Brinker "does not have any

22    agreements in place to provide investment advice or

23    portfolio management services to TJT Capital or any

24    other investment advisory firm, and has no current

25    intention to enter into any such agreements."