**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GENWORTH FINANCIAL WEALTH | : | |
| MANAGEMENT, INC., | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:09-CV-1521(JCH) |
| | : | |
| v. | : | |
| | : | |
| TIMOTHY MCMULLAN; | : | |
| JAMES COOK; | : | MARCH 30, 2012 |
| TIMOTHY MCFADDEN; | : | |
| KAREN BAZON; | : | |
| TAMARA RIVERA; | : | |
| and TJT CAPITAL GROUP, | : | |
| Defendants. | : | |

| | |
|---|---|
| TIMOTHY MCMULLAN; | : |
| JAMES COOK; | : |
| TIMOTHY MCFADDEN; | : |
| and TJT CAPITAL GROUP, | : |
| Counter-Claimants and | : |
| Third-Party Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| GENWORTH FINANCIAL WEALTH | : |
| MANAGEMENT, INC., | : |
| Counter-Claim Defendant, | : |
| | : |
| GURINDER AHLUWALIA, | : |
| Third-Party Defendant. | : |
| | : |

**CONSOLIDATED RULING ON THE PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT (Doc. No. 195); PLAINTIFF'S AND THIRD-PARTY DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. No. 198); and DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (Doc. No. 201)**

The plaintiff, Genworth Financial Wealth Management, Inc. ("Genworth") brought

this action for injunctive relief and damages against several of its former high-level

employees, Timothy McMullan, James Cook, Timothy McFadden, and the business the three men formed after they left Genworth, TJT Capital Group, LLC ("TJT") (collectively, the "Principal Defendants"), as well as claims against two former Genworth employees who went to work at TJT in administrative jobs, Karen Bazon, and Tamara Rivera (collectively, the "Defendants").  The Principal Defendants counterclaimed against Genworth and brought a third-party complaint against Genworth's President and CEO, Gurinder Ahluwalia, seeking injunctive relief and damages.  Pursuant to Federal Rule of Civil Procedure 56, both Genworth (Doc. No. 195) and the Defendants (Doc. No. 201) move for summary judgment on Genworth's claims, and Genworth and Ahluwalia move for summary judgment on the counterclaims and third-party claims (Doc. No. 198).

For the reasons stated herein, Genworth's Motion (Doc. No. 195) is **denied**, Genworth's and Ahluwalia's Motion (Doc. No. 198) is **granted in part** with respect to the tortious interference with contractual relations claim and **denied in part** as to all other claims; and the defendants' Motion (Doc. No. 201) is **denied**.

## I.    BACKGROUND[1]

This action arises out of the manner in which the Individual Defendants left the employ of Genworth in the summer of 2009.  After doing so and establishing TJT, TJT began aggressively soliciting Genworth clients with whom they had worked while still at Genworth.  Genworth mounted an aggressive campaign to retain those clients. Acrimony between the Principal Defendants and Genworth escalated, and Genworth commenced this lawsuit in September 2009.

---

[1] Unless otherwise noted, the following facts are uncontested.  This Ruling principally discusses the many disputed facts in this matter alongside the analysis of the merits of the parties' claims.

A.      The Individual Defendants' contractual relationships with Genworth

The Individual Defendants all worked for the Private Client Group ("PCG") at

Genworth.  The PCG originally began as a money management business called the BJ

Group, which was owned in part by Bob Brinker.  Genworth's L.R. 56(a)(1) Stmt. (Doc.

No. 200) ¶ 1.  Centurion Capital Management Corp. bought the BJ Group in 2000, and

General Electric ("GE") bought Centurion in 2001, at which time the PCG was known as

General Electric Private Asset Management.  Id. ¶ 2.  At some point in 2004 or 2005,

GE spun off Genworth.  Id. ¶ 3; Def.'s L.R. 56(a)(2) Stmt. (Doc. No. 210) ¶ 3.

McFadden and Cook had started working with the BJ Group in 1996 and 1999, Def.'s

L.R. 56(a)(1) Stmt (Doc. No. 203) ¶ 4, and McMullan served as head of the PCG

between 2004 and 2009, Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) ¶ 3.

After the spinoff, all five of the Individual Defendants signed a document entitled

"Conditions of Employment Acknowledgment" (the "Contract").  The Contract conditions

the employee's continued employment with Genworth on the employee reading and

agreeing to three additional documents: (1) the "Proprietary Information and Inventions

Agreement" (the "Confidentiality Agreement"), (2) the "Genworth Code of Ethics" (the

"Code"), and the "Resolve Guidelines" and "Resolve Program Handbook" (collectively,

the "Arbitration Agreement").  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex. U, at

4-8 (the Contract signed by all the Individual Defendants).  The Contract therefore

unambiguously states that some of its relevant terms, namely those that appear in the

Confidentiality Agreement, the Code, and the Arbitration Agreement, do not appear

within its four corners.  See id.  The record does not contain copies of the

Confidentiality Agreement, the Code, or the Arbitration Agreement signed and dated by

3

any of the Individual Defendants.

According to a Genworth employee, the Confidentiality Agreement as it existed in 2005 when the individual defendants signed the Contract expressly prohibited "use, publi[cation] or . . . disclos[ure] . . . [of] confidential information," including, by way of example, "information or materials concerning [Genworth]'s . . . customer relationships." Bartle Aff. (Doc. No. 214-1) ¶ 2, Ex. A.  But the same employee testified that this language specifically identifying customer information as confidential was not added to the agreement until 2006 and did not apply to employees who signed the earlier version.  Def.'s L.R. 56(a)(1) Stmt (Doc. No. 203) Ex. 8 (the "Bartle Dep."), at 41:1-42:17.  The Principal Defendants claim that they have never seen this version of the Confidentiality Agreement.  Def.'s L.R. 56(a)(1) Stmt. (Doc. No. 203) Ex. 1 (the "July 8 Cook Decl."), ¶ 14, Ex. 2 (the "July 8 McFadden Decl."), ¶ 11, Ex. 3 (the "July 8 McMullan Decl."), ¶ 21.  Instead, each claims that he signed a different confidentiality agreement which, although it did prohibit disclosure of confidential information, did not specifically mention customer information as confidential.  July 8 Cook Decl. Ex. A; July 8 McFadden Decl. Ex. A; July 8 McMullan Decl. Ex. A.  Although Cook and McFadden appear to claim that they signed the same earlier confidentiality agreement, July 8 Cook Decl. Ex. A; July 8 McFadden Decl. Ex. A, McMullan claims that he signed yet another version of the confidentiality agreement, July 8 McMullan Decl. Ex. A.  Bazon and Rivera do not contest that the Confidentiality Agreement proffered by Genworth binds them.

In addition, Genworth submitted a version of the Code dated 2006, after all the Individual Defendants except Rivera signed the Contract.  Genworth's L.R. 56(a)(1)

4

Stmt. (Doc. No. 200) Ex. W (the "2006 Code"), at 1, 44.[2]  This version of the Code does not contain a disclaimer of any contractual rights.  See generally id.  The Defendants submitted as evidence a version of the Code dated 2004, when Genworth was still part of GE, which states: "GE does not create any contractual rights by issuing the [Code]."[3]  Def.'s L.R. 56(a)(1) Stmt. (Doc. No. 203) Ex. 9 (the "2004 Code"), at 2.  A Genworth employee testified that employees are trained on updated versions of the Code and must reaffirm their commitment to its principles, Bartle Dep. at 17:3-20, but no written reaffirmations or copies of training materials appear in the record.

Both versions of the Code have extremely similar sections discussing the need for employees to protect confidential and proprietary information and avoid conflicts of interest.  2004 Code at 26, 29-30; 2006 Code at 29-30, 36-37.  McMullan testified that he "perhaps" did not comply with the Code's intellectual property provisions, Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex. E (the "McMullan Dep."), at 221:7-222:16, and Cook testified that he had violated the Code's conflict of interest provisions, Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex. H (the "Cook Dep."), at 224:15-24.

B.     Individual Defendants' Departure From Genworth

As of December 2008, McMullan began planning to leave Genworth and start his own money management firm; as of January 2009, Cook and McFadden had agreed to join him.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 197) ¶¶ 23, 25.  In April 2009,

---

[2] These page numbers refer to pages 1 and 44 of Exhibit W, the unnumbered front and back covers of the 2006 Code.

[3] In response to the Defendants' submission of the 2004 Code, Genworth submitted an undated version of the Code, which does not contain this disclaimer.  Genworth's Reply Br. in Supp. of its Mot. for Summ. J. on its Affirmative Claims, Ex. B (the "Undated Code").

McMullan, Cook, and McFadden created a business strategy document for the proposed new enterprise; the document identified the proposed business' strategy as persuading Genworth clients with whom McMullan, Cook, and McFadden worked to move their money management business to TJT.  See id. ¶¶ 26, 28-29.

In furtherance of this plan and while still employed at Genworth, McMullan began removing information about the targeted clients from Genworth client databases and sending it to TJT's eventual custodian, Charles Schwab.  Id. ¶¶ 40, 42.  Cook and McFadden also sent client contact information to Charles Schwab.  Id. ¶ 54.  McMullan also solicited Brinker, who had remained in an advisory role in the PCG's various incarnations, to end his relationship with Genworth and begin a new one with TJT.  Id. ¶¶ 47-50.  Brinker ultimately elected to contract with TJT on a non-exclusive basis and continue working with Genworth as well.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex. F.

C.      Genworth's Reaction to the Defendants' Activities

During July 2009, after McMullan's departure from Genworth, Genworth's co-chairman, Ronald Cordes, negotiated an extension of Genworth's advisory agreement with Brinker in which Brinker would provide non-exclusive advisory services to Genworth.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) ¶¶ 7-9.  Upon learning from Genworth clients that the Principal Defendants also claimed to have an agreement with Brinker, Cordes met with Mary Jo Zandy, Brinker's authorized agent, on August 21, 2009.  Id. ¶ 10.

The accounts of the meeting vary.  According to Zandy, Cordes stated that McMullan had stolen client records, Genworth's Reply Mem. in Supp. of Mot. for Summ.

6

J. (Doc. No. 232) Ex. Q (the "Zandy Dep."), at 96:8-16, and accused Zandy and Brinker of destroying Genworth's business, id. at 96:2-6.  Zandy also stated that Cordes further threatened imminent legal action, including subpoenas and lawsuits, against Zandy and Brinker.  Id. at 97:23-99:4.  Zandy also stated that, in response to Cordes' threats, she decided to attempt to persuade Brinker to rescind his agreement with TJT, id. at 106:7-11, and that Brinker agreed, id. at 113:20-22.  Zandy later sent an e-mail to Cordes stating that no agreement existed.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex. I.

Cordes, in contrast, states that, "I informed Ms. Zandy that the Defendants had been representing to Genworth's clients that TJT had an advisory agreement with Mr. Brinker, and Ms. Zandy agreed to check with Mr. Brinker to confirm that no such agreement existed."  Cordes Decl. (Doc. No. 200-1) ¶ 5.

After the meeting and several telephone conversations, Cordes wrote an e-mail to Zandy in which he requested that Zandy confirm in writing that Zandy had communicated to McMullan that Brinker did not have an agreement with TJT.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex. L, at 2.  Zandy did not reply until August 26, at which time she notified Cordes that she could not so confirm in writing.  Id. at 1.

In the meantime, Genworth sent a letter and duplicate e-mail, over Ahluwalia's signature, to Genworth clients with whom Cook and McFadden had prior relationships.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) ¶ 14.  In the letter, Ahluwalia wrote: "We were surprised to learn that you may have been solicited recently by someone no longer employed with our firm.  If you were contacted, we apologize and hope he did not cause you any inconvenience or concern.  If you are contacted in the future, please

7

know that this individual and the firm he represents are not affiliated with us, Bob

Brinker, or The BJ Group Services."  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex.

J (the "Ahluwalia Letter").

       D.    <u>This Lawsuit</u>

On September 25, 2009, Genworth filed this action.  Genworth alleged that (1)

Cook, McFadden, and TJT violated the Computer Fraud and Abuse Act ("CFAA"), 18

U.S.C. § 1030; (2) all the Defendants violated the Connecticut Unfair Trade Secrets Act

("CUTSA"), Conn. Gen. Stat. Ann. § 35-50 <u>et seq.</u>; (3) the Individual Defendants

breached contracts with Genworth; (4) all Defendants violated the Connecticut Unfair

Trade Practices Act ("CUTPA"), Conn. Gen. Stat. Ann. § 42-110 <u>et seq.</u>; (5) all

Defendants violated the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 <u>et seq.</u>;

and (6) all Defendants tortiously interfered with Genworth's contractual relations and/or

business expectancies.

On October 21, 2009, the Defendants answered and brought a counterclaim

against Genworth and a third-party claim against Ahluwalia.  The Defendants claimed

that Genworth and Ahluwalia are liable for (1) defamation; (2) disparagement; (3)

tortious interference with advantageous business relations, (4) CUTPA violations, and

(5) common law unfair competition.

       E.    <u>The Class Action in the Eastern District of New York</u>

On December 22, 2009, a putative class action made up of Genworth clients was

filed in the United States District Court for the Eastern District of New York.  <u>Goodman</u>

<u>v. Genworth Fin. Wealth Mgmt., Inc.</u>, No. 2:09-cv-5603 (LDW), ECF No. 1 (E.D.N.Y.

8

Dec. 22, 2009).[4]  McMullan provided material support to counsel for the plaintiffs in the

class action by reviewing and editing the operative legal documents.  Genworth's L.R.

56(a)(1) Stmt. (Doc. No. 197) Ex. E, at 407:10-410:5, Ex. EE (e-mail communications

between McMullan and class counsel about draft documents in the class action, about

which McMullan recommended changes "to have more bite."), Ex. FF (e-mail from

McMullan to class counsel discussing analysis McMullan performed on a potential

plaintiff's Genworth investments), Ex. GG (unsolicited communication to Genworth

client about class action enclosing press release issued by class counsel).  McMullan

also apparently helped counsel for the class action plaintiffs to solicit Genworth clients

to speak to them and potentially join the lawsuit.  See Baum Aff. (Doc. No. 76), Ex. E.[5]

That lawsuit is pending.

     F.    The Preliminary Injunction

     After Genworth became aware that TJT was continuing to solicit business from

Genworth clients, Genworth moved for a temporary restraining order and a preliminary

injunction.  After a two-day evidentiary hearing, this court (Bryant, J.) made detailed

findings of fact and issued a preliminary injunction.  See generally Ruling on Motion for

Preliminary Injunction (Doc. No. 101).  The injunction forbids the Defendants from,

---

    [4] This court takes judicial notice of the docket entries in the class action.  See Anderson v.
Rochester-Genesee Reg'l Transp. Auth., 337 F.3d 201, 205 n.4 (2d Cir. 2003).

    [5] For reasons that are not immediately clear, Genworth did not submit this exhibit as part of the
summary judgment briefing process.  Because they have already been submitted in this litigation and
Judge Bryant relied upon them in her preliminary injunction ruling, this court may consider them here.  See
Clinkscales v. Chevron U.S.A., 831 F.2d 1565, 1570 (11th Cir. 1987) ("The affidavits appended to
appellant's motion for a preliminary injunction were, however, part of the written record before the district
judge at the time he ruled on the summary judgment motions. These affidavits were therefore properly
before the district court.").

among other things, soliciting business from Genworth clients, using Genworth client

lists, or using Genworth's proprietary information for their own benefit or for the benefit

of a third-party.  Id. at 18-20.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  No genuine disputes as to any material fact exist,

and summary judgment is therefore appropriate, when "the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A material fact is one

which "might affect the outcome of the suit under the governing law," and an issue is

genuine when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

However, "[c]onclusory allegations will not suffice to create a genuine issue."  Delaware

& Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990).

On cross-motions for summary judgment, the same standard applies.  See

Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  "The court

must consider each motion independently of the other and, when evaluating each, the

court must consider the facts in the light most favorable to the non-moving party."

Natural Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003) (citing

Morales, 249 F.3d at 121); see also Pabon v. Wright, 459 F.3d 241, 247 (2d Cir. 2006).

In light of this command, and in light of the unique procedural posture of a motion for a

preliminary injunction, the findings of fact and conclusions of law made at the time the

10

injunction issued do not bind the court when considering a motion for summary judgment.  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."); Everitt v. DeMarco, 704 F. Supp. 2d 122, 133 (D. Conn. 2010) ("[A]lthough it may consider the findings of fact and conclusions of law made on the Plaintiffs' motion for an emergency order, those findings and conclusions are not binding on the Court when deciding a motion for summary judgment.").

## III.   DISCUSSION

### A.   Genworth's Claims

#### 1.   The Principal Defendants

##### a.   Breach of Contract

Genworth argues that no genuine factual dispute exists on its breach of contract claim because the Principal Defendants[6] all violated the Contract, the Confidentiality Agreement, and the Code by (1) disclosing or misusing confidential information, specifically Genworth's customer lists, and (2) taking steps to build TJT while still employed at Genworth, creating a conflict of interest.  The Principal Defendants argue that summary judgment in their favor is appropriate because no enforceable contract exists between Genworth and the Principal Defendants; in the alternative, they argue that the terms of any such contract are ambiguous such that summary judgment is improper.  Because triable issues exist about what the binding terms of the Contract,

---

[6] Although Genworth casts its argument on all of the claims in terms of all the Individual Defendants, including Bazon and Rivera, this court considers the claims against the Principal Defendants separately from the claims against Bazon and Rivera.

the Confidentiality Agreement, and the Code are, summary judgment is not proper for any party on the breach of contract claim.

In Connecticut, a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages directly and proximately caused by the breach. McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc., 93 Conn. App. 486, 503-04 (2006).  The plaintiff has the burden "to prove a meeting of the minds to establish its version of the claimed contract."  Bridgeport Pipe Eng'g Co. v. DeMatteo Constr. Co., 159 Conn. 242, 246 (1970).  Although typically this proof is limited to the terms of the contract itself, the parties may use extrinsic evidence to establish, among other things, the content of a missing contract term in a document "which indicates on its face that it does not set forth the complete agreement."  TIE Commc'ns, Inc. v. Kopp, 218 Conn. 281, 289 (1991) (internal quotation omitted).

As a threshold matter, the Principal Defendants' argument that no enforceable contract exists between them and Genworth lacks merit.  All employment relationships involve binding contracts, "otherwise, the employee would not be working."  Torosyan v. Boehringer Ingelheim Pharm., Inc., 234 Conn. 1, 13 (1995) (internal quotation omitted). Moreover, here, all the Defendants signed the Contract, which recites that the employee's agreement to its terms is in consideration of continued employment at Genworth, then recites the terms of the employment relationship, including acknowledgment that the employment term is at will.  Genworth's L.R. 56(a)(1) Stmt. Ex. U, at 4-8.  This document has all the necessary elements of a valid contract, and its express terms govern.

Although the parties here agreed to an express contract, material factual disputes remain about the terms of that contract.  Because some of the Contract's relevant terms, namely those that appear in the Confidentiality Agreement, the Code, and the Arbitration Agreement, do not appear within its four corners, see id., this court therefore must look to extrinsic evidence to determine the content of the Contract, see TIE Commc'ns, Inc., 218 Conn. at 289.  This court concludes, based on substantial questions about which of several successive versions of the Confidentiality Agreement and Code apply to each of the Principal Defendants and conflicting extrinsic evidence about Genworth's definition of and practices governing confidential information, that triable issues exist as to what, exactly, the parties agreed to in the Contract, the Confidentiality Agreement, and the Code.[7]

First, evidence in the record supports Genworth's claim that the Principal Defendants expressly agreed to a version of the Confidentiality Agreement which identifies customer information as protected.  Bartle Aff. ¶ 2, Ex. A.  Other evidence in the record supports the Principal Defendants' assertion that the version of the Confidentiality Agreement the Principal Defendants signed and agreed to did not specifically identify customer information as protected. Bartle Dep. at 41:1-42:17. Whether viewed in the light most favorable to Genworth or the Principal Defendants, it

---

[7] An question exists about how, if at all, modifications to the Confidentiality Agreement could bind the Principal Defendants in the absence of additional consideration, see Thermoglaze, Inc. v. Morningside Gardens Co., 23 Conn. App. 741, 745 (1991) ("A modification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do."), and whether the parties intended to modify the agreements, Three S. Dev. Co. v. Santore, 193 Conn. 174, 177-78 (1984) ("Whether the parties intended to modify their contract is a question of fact.").  Absent meaningful briefing on this issue by the parties, this court does not address this question further.

is not at all clear what terms the parties agreed to incorporate into the Contract by means of the Confidentiality Agreement, and a triable issue exists as to what the terms of the Contract are with respect to confidentiality.

In addition, given that the Contract indicates on its face that it does not set forth the parties' complete agreement, the parties may rely on extrinsic evidence to determine the terms of each version of the Confidentiality Agreement in the record, including evidence of the treatment of such information at Genworth.  See TIE Communications, Inc., 218 Conn. at 289.  Conflicting evidence exists in the record about how Genworth defined confidential material in practice.  Compare McMullan Dep. at 221:7-222:16; July 8 Cook Decl. ¶¶ 13, 21-22 (client information not labeled confidential, no training on what constitutes confidential materials), with Genworth's L.R. 56(a)(2) Stmt. (Doc. 214) Ex. 10 (the "Overkamp Dep."), at 69:20-70:16 (regular training conducted on confidential information and practices conformed to training); Genworth's L.R. 56(a)(2) Stmt. (Doc. 214) Ex. 11 (the "D'Agostino Dep."), at 17:3-12 (all information designed for client use is confidential client information).  This conflicting evidence also creates a triable issue with respect to the coverage of the Confidentiality Agreements.

Second, evidence in the record supports Genworth's claims that the Principal Defendants agreed to a version of the Code which could give rise to a binding contractual obligation to abide by its terms.  Bartle Dep. at 17:3-20; 2006 Code at 29-30, 36-37.  Other evidence in the record supports the Principal Defendants' contention

that the version of the Code they agreed to does not create any binding obligations.[8]
2004 Code at 2, 26, 29-30.  Accordingly, whether viewed in the light most favorable to
either party, a factual dispute remains about whether the parties intended that the
Code's terms make up part of the Principal Defendants' binding contractual obligations
under the Contract.

      b.    CUTSA

      Genworth asserts that summary judgment is proper on its CUTSA claim because
the record demonstrates that there is no genuine dispute that the customer information
the Principal Defendants extracted from Genworth is a "trade secret" as defined by
Conn. Gen. Stat. Ann. § 35-51(d).[9]  The Principal Defendants counter that summary
judgment in their favor is appropriate because any information they removed from
Genworth is not a "trade secret" as a matter of law.  Whether viewed in the light most
favorable to Genworth or the Principal Defendants, a reasonable juror could come to
either conclusion on this record, and summary judgment is not warranted.

      CUTSA, Conn. Gen. Stat. Ann. § 35-51 et seq., proscribes the misappropriation
of trade secrets through improper means:

---

[8] Even assuming that the Undated Code, lacking the disclaimer of the 2004 Code, is properly
before the court, Genworth's attempt to rely on both the 2006 Code and the Undated Code, especially
without any evidence concerning how versions of the Code were substituted for one another, how or in
what form the Principal Defendants supposedly agreed to new versions, or how such modifications were
permissible absent indicia of additional consideration or mutual assent, creates more disputed factual
issues than it resolves.  The validity and applicability of the now-three-competing versions of the Code is a
matter for trial.

[9] CUTSA defines a "trade secret" as "information, including a formula, pattern, compilation,
program, device, method, technique, process, drawing, cost data or customer list that: (1) derives
independent economic value, actual or potential, from not being generally known to, and not being readily
ascertainable by proper means by, other persons who can obtain economic value from its disclosure or
use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
Conn. Gen. Stat. Ann. § 35-51(d).

> The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry.  What may be adequate under the peculiar facts of one case might be considered inadequate under the facts of another.  According to § 35–51(d)(2), the efforts need only be reasonable under the circumstances.

Elm City Cheese Co. v. Federico, 251 Conn. 59, 80 (1999) (internal citation omitted).

Ordinarily, "whether the measures taken by a trade secret owner are sufficient to satisfy the [Illinois Trade Secrets] Act's reasonableness standard . . . is a question of fact for the jury."  Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 725 (7th Cir. 2003) (applying "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality" language used in the Illinois Trade Secrets Act).

Assuming without deciding that Genworth's evidence leaves no disputed factual issues with respect to the other elements of CUTSA liability, this court concludes that disputed factual issues about the reasonableness of the precautions Genworth took to maintain the secrecy of its client information preclude summary judgment.  Although Genworth has produced evidence of an extensive security protocol protecting its physical office space and electronic records, see generally Murray Aff. (Doc. No. 197-4), the Principal Defendants have produced evidence that Genworth employees habitually removed client papers from Genworth offices, kept electronic client records on their home computers, and retained copies of the ostensibly confidential ACT database after leaving Genworth's employ, see Def.'s L.R. 56(a)(1) Stmt (Doc. No. 203) Ex. 4 (the "O'Brien Dep."), at 32:4-36:22, 38:2-20, 40:13-41:25.  Viewed in the light most favorable to Genworth, a reasonable juror could conclude that Genworth had

taken sufficient steps to protect the secrecy of its customer list and contact information. A reasonable juror, viewing the evidence in the light most favorable to the Principal Defendants, could conclude the opposite.  Given the highly fact-specific nature of this inquiry, the matter is appropriately one for the jury, and summary judgment is not proper for either the Principal Defendants or Genworth.

c.   Tortious Interference With Contractual Relations[10]

Genworth argues that the Principal Defendants tortiously interfered with Genworth's contractual relationships with its customers by misleading them and fomenting the class action against Genworth.  Pl.'s Mem. in Supp. of Mot. for Summ. J. at 33-35.  The Principal Defendants also move for summary judgment on this claim, without citation to authority, on the basis that it is "plainly derivative" of Genworth's other claims.  Def.'s Mem. in Supp. of Mot. for Summ. J. at 33-34.  This court concludes that sufficient factual disputes remain as to whether the Principal Defendants acted tortiously such that summary judgment is not warranted for either party.

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct."  Appleton v. Bd. of Educ., 254 Conn. 205, 212-13 (2000) (internal quotations omitted).  "[F]or a plaintiff successfully to

---

[10] Although Genworth pleaded this claim in terms of "tortious interference with contractual and/or advantageous business relations," see Compl. ¶¶ 79-85, Genworth only briefed this issue in terms of tortious interference with contractual relations, Mem. in Supp. of Genworth's Mot. for Summ. J. at 33-35.

prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." Solomon v. Aberman, 196 Conn. 359, 365 (1985).

Assuming without deciding that Genworth's evidence leaves no disputed factual issues with respect to the other elements of tortious interference with contractual relations, a triable issue exists as to whether the Principal Defendants acted tortiously. Genworth identifies three types of tortious acts by the Principal Defendants to support its tortious interference claim: (1) misrepresentation to Genworth's customers that Genworth no longer had a relationship with Brinker, (2) provision of material assistance to the class action plaintiffs and their counsel and sending unsolicited communications to Genworth clients informing them about the class action, and (3) disclosure of confidential information to class counsel. Sufficient factual disputes exist as to whether this evidence establishes the Defendant's tortious conduct to preclude summary judgment in Genworth's favor on this claim.[11]

First, Genworth has produced evidence that the Principal Defendants misled Genworth's clients by insinuating that Genworth and Brinker no longer had any affiliation. See Genworth's L.R. 56(a)(1) Stmt. Ex. HH (e-mail from Cook to a third party advising the third-party to ask a third unnamed individual why a link to Genworth for money management services no longer appeared on Brinker's website), Ex. JJ (internal Genworth notes about conversations with clients who understood from the Principal

---

[11] Viewed in the light most favorable to Genworth, the evidence in the record clearly creates a factual dispute such that summary judgment in the Principal Defendants' favor is improper.

Defendants that Brinker's relationship with Genworth had changed and possibly ended). Other evidence suggests that they conveyed only truthful information about the undisputed change in Brinker's relationship with Genworth from exclusive to non-exclusive, see Genworth's L.R. 56(a)(1) Stmt. ¶¶ 51-52; Genworth and Ahluwalia's L.R. 56(a)(1) Stmt. ¶ 8, and the undisputed alteration of Brinker's website to exclude a link to Genworth, see Genworth's L.R. 56(a)(1) Stmt. Ex. JJ, at 2, Ex. II at 1.  Whether viewed in the light most favorable to the Principal Defendants or to Genworth, this evidence creates a triable issue about whether the Principal Defendants tortiously misled any of Genworth's clients about Genworth's relationship with Brinker.

Second, Genworth has presented evidence that the Principal Defendants instigated the class action, provided material assistance to the class action plaintiffs and their counsel, and sent unsolicited communications to Genworth clients informing them about the class action.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 197) Ex. E, at 407:10-410:5, Ex. EE (e-mail communications between McMullan and class counsel about draft documents in the class action, about which McMullan recommended changes "to have more bite"), Ex. FF (e-mail from McMullan to class counsel discussing analysis McMullan performed on a potential plaintiff's Genworth investments), Ex. GG (unsolicited communication to Genworth client about class action enclosing press release issued by class counsel).  Viewed in the light most favorable to the Principal Defendants, a reasonable juror could conclude from this evidence that the Principal Defendants engaged in aggressive business practices without the malice, intimidation, or molestation necessary to establish tortious interference.  See Landmark Inv. Grp., LLC v. Calco Const. & Dev. Co., No. HHB-CV-09-6002117-S, 2011 WL 5925162, at *7

19

(Conn. Super. Nov. 4, 2011) (denying prejudgment remedy on basis of tortious interference claim because "[the defendant]'s action[s] were nothing more that [sic] aggressive business practices."). But, viewed in the light most favorable to Genworth, a reasonable juror could conclude that this conduct did constitute sufficiently tortious conduct to support liability.

Finally, Genworth asserts that the Principal Defendants provided confidential information to class counsel. Genworth cites Judge Bryant's Order granting the preliminary injunction finding that the Principal Defendants had done so. Ruling on Motion for Preliminary Injunction at 14-15 (Doc. No. 101). Judge Bryant's findings of fact are not binding on this court on these motions for summary judgment, Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); Everitt v. DeMarco, 704 F. Supp. 2d 122, 133 (D. Conn. 2010), and are not evidence. Although the evidence cited in Judge Bryant's Ruling, viewed in the light most favorable to Genworth, establishes that the Principal Defendants provided confidential information to class counsel, viewed in the light most favorable to the Principal Defendants it would permit a reasonable juror to conclude otherwise. See Baum Aff. (Doc. No. 76), Ex. E.[12] Genworth also cites McMullan's deposition testimony for this factual content. Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 197) Ex. E, at 407:10-410:5. Viewed in the light most favorable to the Principal Defendants, this evidence if credited by a jury may establish that McMullan provided

---

[12] Again, for reasons that are not immediately clear, Genworth did not submit this exhibit as part of the summary judgment briefing process. Because they have already been submitted in this litigation and Judge Bryant relied upon them in her preliminary injunction ruling, this court may consider them here. See Clinkscales v. Chevron U.S.A., 831 F.2d 1565, 1570 (11th Cir. 1987) ("The affidavits appended to appellant's motion for a preliminary injunction were, however, part of the written record before the district judge at the time he ruled on the summary judgment motions. These affidavits were therefore properly before the district court.").

material assistance to class counsel, not necessarily tortious conduct.  Accordingly, whether McMullan provided confidential information to class counsel is an issue for the jury.

Triable issues therefore exist as to whether the Principal Defendants acted tortiously to establish a tortious interference claim.  Summary judgment is not proper for either the Principal Defendants or Genworth.

> d.   CUTPA

Both Genworth and the Principal Defendants argue that no material facts remain in dispute as to Genworth's CUTPA claim and that summary judgment is proper for both of them.  Because disputed factual issues exist with respect to Genworth's claim based on both an unfairness theory and a deception theory, summary judgment is not proper for the Principal Defendants or for Genworth.

"No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. Ann. § 42–110b(a).  "[W]hether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier."  Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., 242 Conn. 479, 505 (2000).

> i.   CUTPA coverage

The Principal Defendants argue that Genworth's CUTPA claims fail as a matter of law to the extent that (1) Genworth seeks CUTPA relief for wrongs arising out of the former employer-employee relationship with the Principal Defendants, and (2) the CUTPA claim impermissibly duplicates the tortious interference and CUTSA claims. Neither argument has merit.  See Smith v. Snyder, 267 Conn. 456, 462-66 (2004)

21

(defendant liable for both CUTPA and CUTSA violations); <u>Larsen Chelsey Realty Co. v. Larsen</u>, 232 Conn. 480, 493-94 (1995) (actions of employee taken outside employment relationship and in furtherance of competition with employer fall within CUTPA's ambit); <u>Sportsmen's Boating Corp. v. Hensley</u>, 192 Conn. 747, 756-57 (1984) (defendant liable for both tortious interference and CUTPA).  Genworth may therefore seek the remedies authorized by CUTPA, and summary judgment in the Principal Defendants' favor on this basis is denied.

ii.    Unfair Acts

In order to establish CUTPA liability based on the unfair acts prong, a "claimant's evidence must establish that the conduct at issue falls within one of three criteria. A court must decide whether the conduct (1) offends public policy, (2) is immoral, unethical, oppressive or unscrupulous or (3) causes substantial injury to consumers, competitors or other businessmen."  <u>Johnson Elec. Co. v. Salce Contracting Assocs.</u>, 72 Conn. App. 342, 356 (2002).

Genworth claims that the Principal Defendants violated CUTPA's unfairness provision in three separate ways: (1) the Principal Defendants' theft of confidential information and trade secrets violated public policy and was immoral, unethical, oppressive, or unscrupulous; (2) the Principal Defendants' actions caused substantial injury to a competitor, Genworth; and (3) the Principal Defendants provided confidential information to incite the class action, then used its existence as a marketing tool to attempt to woo existing Genworth clients.  This court concludes that, on this record, none of this conduct establishes CUTPA liability as a matter of law; such that summary judgment therefore is not proper.

First, this court has already concluded that questions of fact remain about the status of the client information the Principal Defendants used to set up their competing enterprise as contractually protected confidential information or statutorily protected trade secrets.  See supra at 11-17.  Accordingly, this court concludes that genuine issues of material fact remain about whether the Principal Defendants committed theft of confidential information or trade secrets which also preclude summary judgment in Genworth's favor based on this theory of a CUTPA violation.

Second, material factual questions remain about whether the Principal Defendants caused Genworth substantial injury by competing and persuading former Genworth clients to move to TJT using actionable tactics.  A CUTPA claim resting on the theory that the challenged conduct causes substantial injury "must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided."  McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 569-70 (1984) (internal citations omitted).  Although Genworth has produced evidence of substantial harm, Genworth has not presented any evidence that this harm outweighs the countervailing benefits of a more competitive market for its services.  Accordingly, substantial harm to Genworth, unaccompanied by any improper conduct by the Principal Defendants, cannot support CUTPA liability.

Finally, this court has already concluded that factual disputes remain about

whether the Principal Defendants provided confidential information to class counsel.[13]

See supra at 19-21.  This is the only theory of unfairness liability put forth by Genworth,

and therefore summary judgment for Genworth is not appropriate.

iii.    Deceptive Acts

Genworth also argues that the Principal Defendants violated CUTPA's deceptive

provision by (1) abusing McMullan's position with Genworth to convince Brinker to

convert his relationship with Genworth to a non-exclusive one, then misleading

Genworth's clients about the change in Brinker's status, and (2) sending Genworth

client information about the class action without disclosing their role in assisting its

filing.

A CUTPA claim based on deception requires proof of three elements: "First,

there must be a representation, omission, or other practice likely to mislead consumers.

Second, the consumers must interpret the message reasonably under the

---

[13] Genworth does not appear to argue that the Principal Defendants' role in the class action in and of itself gives rise to CUTPA liability on an unfairness theory.  It is clear, based on the doctrine announced in California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508 (1972), United Mine Workers v. Pennington, 381 U.S. 657 (1965), and E. R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) (the "Noerr-Pennington Doctrine"), that "the filing of a single non-sham lawsuit . . . cannot form the basis of a claim under CUTPA ."  Suburban Restoration Co. v. ACMAT Corp., 700 F.2d 98, 102 (2d Cir. 1983); see also Zeller v. Consolini, 59 Conn. App. 545, 554 (2000).  Three United States Courts of Appeals have extended the Noerr-Pennington Doctrine to parties who finance or otherwise aid litigation by third parties to advance their own objectives.  Baltimore Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 400-401 (4th Cir. 2001); Liberty Lake Investments, Inc. v. Magnuson, 12 F.3d 155, 157-59 (9th Cir. 1993); Opdyke Inv. Co. v. City of Detroit, 883 F.2d 1265, 1273 (6th Cir. 1989).  One Connecticut Superior Court judge has held, in the analogous abuse of process context and without citation to the Noerr-Pennington Doctrine, that abuse of process liability does not arise from aiding a third-party's non-sham, non-frivolous lawsuit in order to use the lawsuit as a marketing tool.  Fiondella, Inc. v. Reiner, Reiner & Bendett, No. HHDCV085025357S, 2009 WL 5342490, at *5-7 (Conn. Super. Dec. 4, 2009).  Had Genworth raised the argument that the Principal Defendants' participation in the class action, without more, violated CUTPA, this court would have to determine whether the Noerr-Pennington Doctrine shields the Principal Defendants' conduct with respect to the class action unless the class action is a "sham."  See Zeller, 59 Conn. App. at 554.  Because Genworth does not raise this argument, this court does not resolve the matter.

circumstances. Third, the misleading representation, omission, or practice must be material-that is, likely to affect consumer decisions or conduct." Caldor, Inc. v. Heslin, 215 Conn. 590, 597 (1990) (internal citations omitted).

First, this court has already concluded that disputed issues sufficient to preclude summary judgment remain with respect to whether the Principal Defendants misrepresented their understanding of Brinker's relationship with Genworth to Genworth clients.[14] See supra at 18-19. Given the fact-specific nature of inquiries into how reasonable people would interpret the representations made by the Principal Defendants to Genworth clients, especially when fact questions remain about the content of the representations, this question is properly for the jury as well.

Second, a genuinely disputed factual issue exists about whether the Principal Defendants' omission of their role in the class action when disclosing the class action to Genworth clients was material. Although it seems likely that a typical Genworth client would view the information differently knowing that the Principal Defendants had a hand in the filing of the class action and might make a different decision about moving his or her assets to TJT as a result, a reasonable juror, on this record, might nonetheless conclude otherwise. Summary judgment is not proper.

e.    CFAA

Genworth argues that it is entitled to summary judgment on its claim for CFAA civil damages because no genuine issue of fact exists about whether Cook and

---

[14] The Principal Defendants' solicitation of Brinker by abusing their position at Genworth in order to gain access to him cannot support CUTPA liability as a deceptive practice. Genworth has come forward with no evidence that the Principal Defendants' misrepresented their employment status with Genworth to Brinker or otherwise misled him.

McFadden intentionally accessed Genworth computers without or in excess of authorization to do so.  This court disagrees and concludes that genuine factual disputes exist about the amount of statutorily compensable losses Genworth suffered such that summary judgment on this claim is inappropriate.

As relevant here, the CFAA prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] ... information from any protected computer."  A "protected computer" is defined as one that "is used in or affecting interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2)(B).  Genworth here pursues civil liability pursuant to § 1030(g) under a theory that the Principal Defendants' actions caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C. § 1030(c)(4)(A)(i)(I).

Losses that may be included to meet the $5,000 threshold include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. 1030(e)(11) (emphasis added).  This section has been interpreted to mean "any remedial costs of investigating the computer for damage, remedying the damage and any costs incurred because the computer cannot function while or until repairs are made."  Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004), aff'd 166 F. App'x 559 (2d Cir. 2006).

As to its "loss[es]," Genworth has submitted an affidavit of its Chief Information

Officer attesting to the various measures Genworth took to assess and remedy McFadden's access to Genworth systems after he left Genworth's employ.[15]  August 9 Murray Aff. (Doc. No. 214-2) ¶¶ 1-6.  Although many of these steps seem plausible, Genworth fails to set forth evidence that would require a finding by a reasonable juror that these were, or even what specific steps were, reasonable.  Id.  While a jury could credit this evidence in its entirety and conclude that Genworth sustained more than $5,000 in qualifying losses, viewing this evidence in the light most favorable to the Principal Defendants, a jury could also plausibly conclude that some of these steps were unreasonable such that Genworth incurred less than $5,000 in losses.[16]  Summary judgment is therefore improper on Genworth's CFAA claim for either Genworth or the Principal Defendants.

       f.     SCA

The Principal Defendants move for summary judgment on Genworth's SCA claim, arguing that there is no genuine factual dispute about whether any access to

---

[15] Genworth did not discuss these measures or cite to Murray's August 9 Affidavit in either of its Local Rule 56 statements.  See generally Genworth's L.R. 56(a)(1) Stmt.; Genworth's L.R. 56(a)(2) Stmt. The Principal Defendants identified the costs to Genworth for responding to any unauthorized computer access as a disputed issue of material fact in their Local Rule 56(a)(2) Statement but cited no evidence to support this claim.  Def.'s L.R. 56(a)(2) Stmt. (Doc. No. 210), Disputed Issues of Material Fact ¶ 5. Although all parties' lack of compliance with Local Rule 56 would suffice to deny both motions for summary judgment as to this claim, this court examines Murray's Affidavit on the merits.

[16] In addition, this evidence calculates the "loss" incurred as part of the investigation and remediation in terms of the total cost of the time expended by various persons and "resources" involved in the investigation and remediation based on the average hourly compensation of salaried employees or contractors.  August 9 Murray Aff. ¶ 6.  Genworth cites no authority holding that expenditures of this type are recoverable "loss[es]" as defined by the CFAA.  The Principal Defendants have not argued that these expenditures are not recoverable.  Accordingly, absent meaningful briefing on this subject, this court assumes without deciding that Genworth may recover these expenditures.

Genworth's electronic communications was authorized.[17]  Genworth counters that summary judgment is inappropriate in the Principal Defendants' favor because factual disputes exist about the scope of the Principal Defendants' authorization.  This court agrees and concludes that summary judgment is not appropriate.

"[W]hoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished."  18 U.S.C. § 2701(a).  "[A]ny provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity."  18 U.S.C. § 2707(a).

Genworth bases its SCA claim on two theories: (1) the Principal Defendants exceeded their authorization by accessing electronic client information for their own purposes while still employed at Genworth, and (2) the Principal Defendants accessed electronic client information without authorization by logging in to websites using Genworth-provided log-in information after they had left Genworth's employ.

As support for its first theory of SCA liability, Genworth relies on the limited authorization granted to the Principal Defendants in the Confidentiality Agreement and

---

[17]  Although Genworth brought a claim for civil damages based on the Principal Defendants' purported violations of 18 U.S.C. § 2701(a), as authorized by 18 U.S.C. § 2707(a), Compl. ¶¶ 73-78, Genworth offers no argument that summary judgment on this claim is appropriate.

the Code.  Viewed in the light most favorable to Genworth, a reasonable juror could conclude that the Principal Defendants had exceeded their authorization while still employed at Genworth.[18]

On its second theory of SCA liability, Genworth relies on evidence that McFadden "accessed 'Genworth's non-public website' and 'the Charles Schwab website' using a Genworth password and login after he resigned."  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 197) ¶ 156.  No factual dispute exists about whether McFadden did so using log-in information which had not been disabled.  See id.; Def.'s L.R. 56(a)(2) Stmt. (Doc. No. 210) ¶ 156.  However, access after a contractual relationship has ended—using log-in information provided during the course of the contractual relationship which has not been disabled—is not per se prohibited by the SCA.  Sherman & Co. v. Salton Maxim Housewares, Inc., 94 F. Supp. 2d 817, 820-21 (E.D. Mich. 2000).  Instead, in order to pursue an SCA claim, a plaintiff must show that access was "restricted by technical means or by [some] express limitation."  Id. at 821. Because of the material dispute about what contractual limitations existed on the Principal Defendants' ability to access non-public client information after they left Genworth, summary judgment is not proper in the Principal Defendants' favor on this claim.[19]

---

[18] Again, Genworth does not argue that it is entitled to summary judgment on the SCA claim. Even if it had,  this court would conclude that the material factual disputes remaining about the terms of the Confidentiality Agreement and the Code which bound the Principal Defendants would preclude summary judgment in Genworth's favor.

[19] Again, the same material factual disputes about the terms of the Principal Defendants' contractual obligations would preclude summary judgment on this claim had Genworth argued that summary judgment in its favor was proper.

2.      Bazon and Rivera

This court concludes that, whether viewed in the light most favorable to

Genworth or Bazon and Rivera, a reasonable juror could find for either Genworth or

Bazon and Rivera on all of Genworth's claims.  Summary judgment is therefore

inappropriate on Genworth's claims as against Bazon and Rivera.

Genworth has produced evidence that Bazon and Rivera spoke to the McMullan,

Cook, and McFadden about leaving Genworth for TJT while all of them still worked at

Genworth.  Genworth's L.R. 56(a)(2) Stmt. (Doc. No. 214) Ex. 13 (the "Rivera Dep."), at

22:9-17, Ex. 20 (the "Cook Dep."), at 231:11-19, Ex. 23 (the "Bazon Dep.") at

114:24-115:6, Ex. 27.  Genworth has also produced evidence of two emails: one from

Rivera to McFadden on July 29, 2009, the morning of Rivera's last day at Genworth,

Rivera Depo. at 20:1-22:12, and the other from Bazon to McFadden on August 3, 2009,

which referred to certain Genworth client documents having been sent to Charles

Schwab two days earlier.  Rivera's July 29 e-mail had four documents pertaining to a

Genworth client attached and, despite not being addressed to Bazon, said, in part,

"Karen please sent [sic] to Tim on Monday . . . thanks."  Genworth's L.R. 56(a)(2) Stmt.

(Doc. No. 214) Ex. 31.  Bazon's Monday, August 3 e-mail contains indicia that Rivera's

July 29 e-mail was forwarded to Bazon, and it also had four similarly titled documents

attached.  Genworth's L.R. 56(a)(2) Stmt. (Doc. No. 214) Ex. 30.  The client in question

appears to have ultimately become a TJT client.  Genworth's L.R. 56(a)(2) Stmt. (Doc.

No. 214) Ex. 2 (the "McFadden Dep."), at 205:6-10.

Viewed in the light most favorable to Genworth, this evidence suggests that

Bazon and Rivera, knowing that they would soon leave Genworth and begin working for

TJT, were already taking direction from McMullan, Cook, and McFadden and helping to establish TJT <u>before</u> leaving Genworth.  It further suggests that Bazon and Rivera did so by helping the Principal Defendants electronically access confidential information for non-Genworth purposes in excess of their authorization to do so, use that information for non-Genworth purposes in violation of the Contract, CUTSA, and CUTPA, and tortiously interfere with Genworth's contracts with this client.  A reasonable juror could therefore conclude that Bazon and Rivera are liable to Genworth on some or all of Genworth's claims.

However, viewed in the light most favorable to Bazon and Rivera, this evidence could permit a reasonable juror to conclude that Bazon and Rivera performed the tasks referred to in these two e-mails on Genworth's behalf and with proper authorization. Although the fact that the client in question ultimately became a TJT client creates an inference that Bazon and Rivera acted as part of a scheme to solicit this client for TJT purposes, the evidence does not establish as much conclusively, and a reasonable juror could decline to draw the inference.  If Bazon and Rivera instead acted at the direction of Genworth and the client, then they would have acted within the scope of their authorization to access this information, used the information for a permissible purpose, and done nothing to interfere with Genworth's contractual relations with the client.  A reasonable juror could therefore conclude that Bazon and Rivera are not liable to Genworth on any of the claims Genworth pursues against them.

Because a reasonable juror could come to different conclusions about Bazon and Rivera's liability to Genworth based on this evidence, genuine issues of fact exist with respect to Genworth's claims as asserted against Bazon and Rivera.  Summary

31

judgment is therefore not appropriate for Genworth or for Bazon and Rivera.

B.      Principal Defendants' Counterclaims and Third-Party Claims

The Principal Defendants have counterclaimed against Genworth and brought third-party claims against Genworth's CEO, Ahluwalia.  Genworth and Ahluwalia have moved for summary judgment.  Although the Principal Defendants state several substantive claims, the gravamen of each is the same series of acts:[20] (1) Cordes' statement to Zandy that McMullan had "stolen" records; (2) Cordes' threats to sue Zandy and Brinker if Brinker did not repudiate his contract with TJT; (3) Ahluwalia's e-mail and letter to certain Genworth clients stating that TJT and McMullan "are not affiliated with . . . Bob Brinker," Ahluwalia Letter at 1; (4) Genworth's continuing, after discovering that the contract between Brinker and TJT was still operative, to claim an "exclusive" relationship with him on its website and its representations to clients that TJT had no relationship with Brinker.

Viewed in the light most favorable to the Principal Defendants, sufficient factual disputes exist to preclude summary judgment on the Principal Defendants' defamation, disparagement, CUTPA, and tortious interference with or business expectancies claims. No such disputes exist as to the Principal Defendants' claim for tortious interference with contractual relations, and summary judgment is proper for Genworth and Ahluwalia on that claim.

1.      Defamation

"To establish a prima facie case of defamation, the plaintiff must demonstrate

---

[20] Because the Principal Defendants do not move for summary judgment on these claims, the facts here are stated in the light most favorable to them.

that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."  Cweklinsky v. Mobil Chem. Co., 267 Conn. 210, 217 (2004).

Here, the evidence viewed in the light most favorable to the Principal Defendants establishes that Cordes' statement to Zandy and the Ahluwalia Letter satisfy the elements of a prima facie case for defamation.  Genworth argues that it is nonetheless entitled to summary judgment because (1) Cordes' statement to Zandy was true, (2) the statements in the Ahluwalia Letter were made innocently, without negligence, and (3) the Principal Defendants' have not shown any damages.  None of these arguments succeeds in this stage.

> a.     Truth

First, genuine issues of material fact remain about whether Cordes' statement that McMullan had "stolen" records was true.  Under Connecticut law, truth of the allegedly defamatory statement is an absolute defense in a civil action for libel. Goodrich v. Waterbury Republican-American, 188 Conn. 107, 112 (1982).  Although the common law rule required the defendant to prove the literal truth of the statement, "the modern rule is that only a substantial proof need be shown to constitute the justification."  Id. at 112-13 (citing Johnson v. Whipple, 117 Conn. 599, 601-602 (1933); Stow v. Converse, 4 Conn. 17, 33 (1821)).  If the defendant

> succeeds in proving that 'the main charge, or gist, of the libel' is true, he need not justify statements or comments which do not add to the sting of the charge or introduce any matter by itself actionable.  The issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced.

Goodrich, 188 Conn. at 113 (internal quotations omitted)

This court has already concluded that a factual dispute exists as to Genworth's claims that McMullan misappropriated trade secrets or used confidential information inappropriately. See supra at 19-21. Genworth has not identified any of McMullan's conduct other than the conduct underlying these claims which might establish the truth of Cordes' statement. It follows that a factual dispute exists as to whether Cordes' statement was, in fact, true, and summary judgment is inappropriate on this basis.

### b.   Negligence

A genuine factual dispute also exists as to whether the statements in the Ahluwalia Letter about the absence of a relationship between TJT and Brinker were made with negligence. Where the plaintiff is a private individual, not a public figure, he need only show that the defendant made the defamatory statement with negligence, not actual malice. Miles v. Perry, 11 Conn. App. 584, 589 (1987).

Here, evidence in the record shows that Genworth knew of the possibility that Brinker had a relationship with TJT; Cordes admits that the purpose of his visit to Zandy was to determine the validity of that information. Cordes Aff. (Doc. No. 200-1) ¶¶ 4-5. Viewing the evidence pertaining to the unpleasant encounter between Cordes and Zandy in the light most favorable to the Principal Defendants, a reasonable juror could conclude that Cordes had reason to doubt Zandy's information because it was procured by intimidation and duress. Zandy Dep. at 96:2-99:11; Brinker Dep. at 124:5-131:11. Cordes himself evidenced some such doubt when he e-mailed Zandy after their meeting to request written confirmation from Zandy and Brinker of the absence of an agreement between Brinker and TJT. Genworth's Reply Mem. in Supp. of Mot. for

34

Summ. J. (Doc. No. 232) Ex. T, at 2.  Construing this evidence in the light most favorable to Genworth, a reasonable jury could conclude that the decision to send the Ahluwalia Letter was made negligently.  Summary judgment on this basis is not proper.

            c.     Damages

Finally, Genworth argues that summary judgment is appropriate on the defamation claim because the Principal Defendants have shown no evidence of damages.  The Principal Defendants counter that Genworth's statements were defamatory per se obviating the need for proof of specific pecuniary harm.  This court agrees with the Principal Defendants.

> When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it. . . .  The individual plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the [defamation] caused him.

Monroe v. Crandall, 3 Conn. App. 213, 221 (1985) (internal quotations omitted). "Slander is actionable per se if it charges incompetence or dishonesty in office, or charges a professional person with general incompetence . . . .   [S]lander is also actionable per se if it charges a crime involving moral turpitude or to which an infamous penalty is attached."  Miles, 11 Conn. App. at 602 (internal citations and quotations omitted).

Here, Cordes' statement that McMullan stole records charges a crime of moral turpitude, and "[a]n oral statement that one has stolen something has been held by [the Connecticut] courts to be actionable per se."  DeVito v. Schwartz, 66 Conn. App. 228, 231 (2001).  Read in the context of the August 2009 war of words between Genworth and TJT, the Ahluwalia Letter plainly asserts that the Principal Defendants dishonestly

claimed to Genworth clients to have an advisory relationship with Brinker. Accordingly, summary judgment is not proper based on the Principal Defendants' failure to adduce specific evidence of economic harm resulting from these statements.

      2.    Disparagement

"Defamation or disparagement of a business' goods and services may be considered trade libel . . . and is recognized by Connecticut and New York courts as a species of defamation." QSP, Inc. v. Aetna Cas. & Sur. Co., 256 Conn. 343, 358 (2001). "More specifically, however where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed." Id. At 358 n.15 (quoting Ruder & Finn, Inc. v. Seaboard Sur. Co., 422 N.E.2d 518, 522 (1981)). As with the Principal Defendants' defamation claim, the Ahluwalia Letter, read in context, clearly impugns the integrity of the Principal Defendants. Because factual disputes exist about whether Genworth and Ahluwalia published these statements negligently, summary judgment is also improper on the Principal Defendants' disparagement claim.

      3.    CUTPA

A CUTPA claim based on deception[21] requires proof of three elements: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be

---

[21] Neither the Principal Defendants' counterclaim and third-party complaint nor its response to Genworth's Motion for Summary Judgment on the counterclaims and third-party claims expressly delineates the CUTPA claim as one based on "deception" or "unfairness." Given that the claim clearly arises out of the same allegedly false statements as the defamation and disparagement claims, this court construes the claim as one based on allegedly deceptive conduct.

material-that is, likely to affect consumer decisions or conduct." <u>Caldor, Inc. v. Heslin</u>, 215 Conn. 590, 597 (1990) (internal quotations omitted).

 The Principal Defendants' evidence—that Genworth and Ahluwalia never retracted the statements in the Ahluwalia Letter, that Genworth failed to remove all references on Genworth's website to Genworth's "exclusive" relationship with Brinker, and that Genworth personnel continued to represent to clients that TJT had no relationship with Brinker—all create genuine factual disputes as to these elements.  A reasonable juror could conclude that both the failure to retract and the persistence of the false statements on the website and by Genworth personnel were likely to mislead, that at least some Genworth clients were misled, and that the representations affected their decisions.  Summary judgment on this basis is not appropriate.

    b. Ascertainable loss

 Under CUTPA, a plaintiff must prove that he has suffered an ascertainable loss due to a CUTPA violation.

> An ascertainable loss is a loss that is capable of being discovered, observed or established. . . .  The term loss necessarily encompasses a broader meaning than the term damage, and has been held synonymous with depravation, detriment and injury. . . .  To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount. . . .  [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known.

<u>Artie's Auto Body, Inc. v. Hartford Fire Ins.</u>, 287 Conn. 208, 218 (2008) (internal citations and quotations omitted).

 Here, the Principal Defendants have presented evidence from Genworth's internal database for tracking interactions with clients.  This evidence shows that at least two Genworth clients understood that McMullan, Cook, and McFadden had left

Genworth to start TJT, that TJT was claiming to have a relationship with Brinker, and that Genworth personnel told the clients there was no such relationship after Genworth knew that this information was false.  App. to Def.'s L.R. 56(a)(2) Stmt. (Doc. No. 208) Exs. 22, 23.  Read in the light most favorable to the Principal Defendants, this evidence also shows that these representations had a material effect on the clients' decision to remain with Genworth instead of moving to TJT.  See id.  This evidence therefore creates a genuine factual dispute about whether the Principal Defendants suffered an ascertainable loss sufficient to support a CUTPA claim, and summary judgment is not appropriate.

### 4.    Tortious Interference with Contractual Relations

The Principal Defendants assert that Genworth and Ahluwalia tortiously interfered with the Principal Defendants' contracts with (1) Brinker, and (2) at least one TJT client who decided to return to Genworth.  Even assuming that all the other elements of tortious interference with contractual relations are met, no genuine dispute exists that the Principal Defendants suffered no actual loss based on this interference. Summary judgment is proper in Genworth's favor as to this claim.

Again, "[a] claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct."  Appleton v. Bd. of Educ., 254 Conn. 205, 212-13 (2000) (internal quotations omitted).

Here, the Principal Defendants suffered no loss based on any interference with

their contract with Brinker.  Although Zandy persuaded Brinker to vitiate the contract after the incident with Cordes, Zandy Dep. at 106:7-11, 113:3-22, the evidence reveals that Zandy and McMullan concluded that the agreement to rescind the contract was invalid.  Genworth's L.R. 56(a)(1) Stmt. (Doc. No. 200) Ex. L.  The contractual relationship between TJT and Brinker continued through 2010 and ended for unrelated reasons.  Genworth's Reply Mem. in Supp. of Mot. for Summ. J. (Doc. No. 232) Ex. W (the "McMullan Dep."), at 305:9-307:19.  Because TJT's contract with Brinker continued to exist after any purported tortious interference and the relationship ended for unrelated reasons, the Principal Defendants could not have suffered any actual loss based on any such interference.

Similarly, the Principal Defendants have not produced admissible evidence sufficient to raise a genuine factual dispute about whether any clients, who moved from Genworth to TJT, switched back as a result of Genworth's alleged tortious interference with TJT's contracts with such clients.  The Principal Defendants rely on McMullan's declaration that one client signed such a contract, then rescinded the agreement after Genworth committed alleged acts of tortious interference.  App. to Def.'s Mem. in Opp. to Genworth's Mot. for Summ. J. (Doc. No. 209) Ex. 3 (the "August 3 McMullan Decl."), ¶ 42.  The statement about the reason for the client's change of heart is inadmissible hearsay, and this court cannot consider it on summary judgment.  See Fed. R. Evid. 801; Fed. R. Civ. P. 56(c)(2), (4).  Furthermore, the exhibit which purports to be the contract signed by this client and later rescinded is not evidence that any rescindment ever took place and is certainly not evidence of the basis for any such rescindment. App. to Def.'s L.R. 56(a)(2) Stmt. (Doc. No. 208) Ex. 27.

The Principal Defendants having presented no admissible evidence that they suffered any actual loss resulting from Genworth's purported tortious interference with its contractual relationships, this court concludes that no genuine factual dispute exists about whether such actual loss occurred.  Summary judgment is proper on the Principal Defendants' tortious interference with contractual relations claim.

> 5.   Common Law Unfair Competition / Tortious Interference with Business Expectancy

Connecticut "recognizes under the umbrella term of 'unfair competition' such causes of action as tortious interference with business expectancy . . . and 'unjustifiable interference with any [person's] right to pursue his [or her] lawful business or occupation.'"  Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 501 n.23 (1995). Because the Principal Defendants do not argue that Genworth unjustifiably interfered with their right to pursue their lawful business, this court construes the Principal Defendants' common law unfair competition claim as a tortious interference with a business expectancy claim.

> It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. . . .  Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss, . . . it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss.

Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27 (2000).

Here, as with the Principal Defendants' CUTPA claim, the Principal Defendants have presented evidence which, viewed in the light most favorable to them, demonstrates that Genworth knew TJT had solicited certain of its clients, that Genworth

40

misled them as to the absence of a relationship between TJT and Brinker, and that the

clients acted on the misrepresentations by not moving to TJT.  App. to Def.'s L.R.

56(a)(2) Stmt. (Doc. No. 208) Exs. 22, 23.  This evidence therefore creates a genuine

factual dispute on the merits of the Principal Defendants' tortious interference with a

business expectancy claim, and summary judgment is not proper.

## IV.    CONCLUSION

For these reasons, Genworth's Motion for Summary Judgment (Doc. No. 195) is

**denied**, Genworth's and Ahluwalia's Motion for Summary Judgment (Doc. No. 198) is

**granted in part** with respect to the tortious interference with contractual relations claim

and **denied in part** as to all other claims; and the defendants' Motion for Summary

Judgment (Doc. No. 201) is **denied**.

SO ORDERED.

Dated at Bridgeport, Connecticut, this 30th day of March, 2012.


___/s/ Janet C. Hall _____
Janet C. Hall
United States District Judge