UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GENWORTH FINANCIAL WEALTH
MANAGEMENT, INC.

Plaintiff,
vs.

TIMOTHY MCMULLAN, JAMES
COOK, TIMOTHY MCFADDEN,
KAREN BAZON, TAMARA RIVERA
AND TJT CAPITAL GROUP, LLC

Defendants.
_____

TIMOTHY MCMULLAN, JAMES
COOK, TIMOTHY MCFADDEN, AND
TJT CAPITAL GROUP, LLC

Third-Party Plaintiffs,
vs.

GURINDER AHLUWALIA

Third-Party Defendant.

Civil Action No. 3:09-CV-01521-JCH

October 24, 2012

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION IN LIMINE NUMBER TWO**

Genworth's Motion in Limine No. 2 epitomizes Genworth's litigation tactics in this lawsuit: intentional distortion of the record, cutthroat attacks on the integrity of its former employees, and demands for extreme remedies designed to prevent a full and fair trial of the merits of the parties' claims based upon a consideration of all the evidence. Having failed to persuade this Court to enter summary judgment in its

favor, Genworth now seeks to accomplish the same end by demanding that the Court make adverse inferences in its favor on the ultimate issues in this case – namely, whether any of the pertinent customer information at issue, consisting of customer names, addresses, and account titles, qualifies as a trade secret or contractually protected confidential information.

Genworth claims an entitlement to an inference that the customer names, addresses, and account titles that the Principal Defendants used in their competitive activities to reach out to their former clients with whom they had established relationships should be deemed Genworth "trade secrets" or contractually protected confidential information.[1] Genworth believes it is entitled to such an inference because Defendants allegedly discarded "stolen" materials containing customer information.[2] It seeks such an inference notwithstanding the fact that Genworth has admitted that communications with clients are not "Genworth's confidential information" (Docket No. 269 at 5), and the fact that the allegedly spoliated evidence consists of communications and materials ultimately obtained from Charles Schwab at an early stage of this litigation, and thus has been available to Genworth throughout this litigation. Genworth also ignores the inconvenient fact that such an inference does not logically flow from the alleged spoliation of evidence and the fact that the ultimate determination as to whether the customer contact information qualifies as

---

[1] Genworth formally approved for years the fact that the clients were indeed the clients of Defendant McFadden in his annual performance review. Furthermore, and consistent with this practice, Genworth voluntarily provided voluminous information to Defendant McFadden and other advisors in a variety of formats that included names, addresses, and account titles of clients.

[2] The fact that Genworth never notified any client or state agency that information was allegedly stolen, as required by law, undermines Genworth's contention that any material was "stolen."

trade secret information or confidential information is dependent, not on the Principal Defendants' alleged conduct in disposing of its copies of materials containing such information, but rather, almost entirely on facts concerning the manner in which the customer information was maintained **at Genworth** and any contractual protections employed, or not employed, **by Genworth** to restrict the use of such customer contact information.  See, e.g., Nationwide Mut. Inc. Co. v. Mortensen, 606 F.3d 22, 28 (2d Cir. 2010) (finding that a company must adequately protect the information in all mediums in order to be entitled to trade secret protection).

Genworth's motion speaks volumes about Genworth's fear of its inability to actually establish at trial that the customer contact information it seeks to protect deserves protection as contractually protected confidential information or as company trade secrets.  That same fear has motivated Genworth to misrepresent repeatedly the facts in this case – initially to claim that the information was confidential, then to admit that it was not, and only now to change its story back.[3]  Genworth asks the Court to find, without a trial and without consideration of any contrary evidence, that "Defendants used Genworth's **confidential** client information," that Defendants engaged in the "wrongful use of Genworth **confidential** client data," and that "the client identities were not available from public sources." (Docket # 303 at 2, 20) (emphases added).  In a transparent attempt to avoid litigating these issues, Genworth goes so far as to request that "Defendants be precluded from arguing or

---

[3]  Moreover, Genworth has gone so far as to rely on and submit documentation to the Court which, on its face, contains blatantly false information. See, e.g., Doc. No. 214-49 (Plaintiff's Ex. 46) (a chart proffered by Genworth purporting to detail "records of the training each employee underwent," and listing four of the Individual Defendants as having "attended" a "Records Management" course on April 21, 2011, nearly two years **after** those Defendants had ceased working at Genworth).

submitting documentary evidence or testimony during trial that they did not use Genworth's proprietary client information. . . ." (Docket # 303 at 2) (emphasis added). Genworth has the materials and information that the Defendants did use. It is entitled to argue at trial that the customer information that was used was trade secret information. It is not entitled, however, to an advance ruling or inference that the information was confidential. Such a determination can only legitimately be made upon an examination of the manner in which the customer information was maintained and treated at Genworth.

In addition, insofar as Genworth seeks by the present motion the imposition of sanctions in the form of attorneys' fees and costs, that request for relief is premised on a mischaracterization of the record and constitutes an inappropriate attempt by Genworth at a second bite at the apple, having previously moved for sanctions for the same alleged misconduct. Judge Bryant previously awarded costs to Genworth for that alleged misconduct, but only those costs "associated with seeking th[e] motion [to compel]." (Docket # 100 at 11, 13). Genworth now uses that decision as a basis for demanding fees and costs well-beyond those that were previously awarded. See Docket # 303 at 21 ("Costs and fees have only increased since the Court's initial ruling in 2010."). Genworth had the opportunity to seek additional relief at the time that it filed its first motion for sanctions (and then subsequently, when it requested adjudication of the amount of fees to be awarded), but did not do so (see Docket # 178). Having elected for strategic reasons not to seek such relief, it is not entitled to do so now. Finally, Genworth seeks a calculation of attorneys' fees, prior to trial, despite the Court's admonition that a determination of those fees would not be

considered until "the conclusion of **all** proceedings in this case," unless the Court decides, *sua sponte*, to address the issue earlier (Docket # 189) (emphasis added). Nothing has transpired in this case since the Court's prior order to justify a change of course. Genworth's current request for sanctions is nothing but an attempt to intimidate and harass Defendants in order to threaten them, once again, with additional financial burdens in the hope of financially ruining them for having had the temerity to challenge and blow the whistle on a Fortune 250 company's fraudulent activities.

## I.     The Evidence at Issue is and has been Available

An adverse inference may be considered when the party seeking the adverse inference "establish[es] that the **unavailable** evidence is 'relevant' to its claims or defenses," and adduces "sufficient evidence from which a reasonable trier of fact could infer that '**the destroyed [or unavailable] evidence** would have been of the nature alleged by the party affected by its destruction." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108-09 (2d Cir. 2002) (emphases added) (citations omitted); see also Klezmer v. Buynak, 2005 U.S. Dist. LEXIS 802 (E.D.N.Y. 2005) ("To obtain an adverse inference charge, a party must establish that the **unavailable** evidence is relevant to its claims. . . .") (emphasis added). Thus, it is fundamental that the evidence must at least be **unavailable** for an adverse inference to be contemplated. This is so because one of the primary purposes of an adverse inference is "to restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." Aktas v. JMC Dev. Co., No. 1:09-CV-01436 (MAD/DRH), 2012 U.S. Dist. LEXIS 89735, at *36-37,

(N.D.N.Y June 28, 2012) (citing Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)).

      Here, Genworth's request for an adverse inference is misplaced because the evidence about which it complains is actually available.  The evidence from which Genworth seeks an adverse inference consists of the emails and spreadsheets the individual Principal Defendants sent to Charles Schwab representatives after their departure from Genworth (Docket # 303 at 2-3).  Genworth concedes that it obtained the emails and spreadsheets from Charles Schwab in response to its subpoena directed to Charles Schwab.  See Docket # 303 at 3 ("The emails evidencing this were produced by Schwab"; "The emails were produced by Schwab"); at 7 (". . . pursuant to Genworth's subpoena Schwab produced hundreds of pages of documents . . . in particular, emails sent by the Defendants in early and mid August 2009, attaching pages of 'voluminous and detailed' lists of Genworth client names, addresses and account information, all sent from Defendants' home email addresses.").  Genworth never took issue with the completeness of Charles Schwab's response to the subpoena and never claimed that Charles Schwab had withheld responsive documents or information.  Despite the fact that all of the evidence concerning the nature and extent of the communications and the materials exchanged between Charles Schwab and Defendants was provided and made readily available to Genworth at an early stage of this litigation, Genworth nonetheless claims an entitlement to an adverse inference that the information contained in those materials and allegedly taken and used by Defendants was "proprietary" in nature and/or constituted trade secrets of the company.  It seeks such an inference in the hope of

avoiding having the Court, as the trier of fact, make a factual determination based on the evidence.

Genworth does not seek an adverse inference because it has somehow been prejudiced by the unavailability of evidence; rather, Genworth seeks the adverse inference in order to avoid having actually to litigate the primary issue in this case – namely, whether the customer contact information at issue qualifies as company trade secrets or is otherwise protected confidential information.  This Court has already ruled that this is an issue about which there remain material questions of fact that must be determined at trial (Docket # 280).  Genworth's motion in limine is nothing more than another backdoor attempt to avoid having to establish that the customer contact information is entitled to confidential or trade secret protection.

Genworth is well-aware that the instant action will be tried to the Court and not a jury.  In that setting, the "adverse inference" is particularly ill-suited.  See, e.g., Innis Arden Golf Club v. Pitney Bowes, Inc., No. 3:06-CV-1352 (JBA), 2009 U.S. Dist. LEXIS 43588 (D. Conn. 2009) (noting "the somewhat awkward way that an adverse inference would be applied in th[e] bench trial. . . ."); Acosta v. Rock, No. 11-CV-1071(ARR), 2012 U.S. Dist. LEXIS 49701, at *11 n.2 (E.D.N.Y. Mar. 30, 2012) (noting that there was no abuse of discretion in a bench trial where an adverse inference charge was not issued because "[t]he trial judge is undoubtedly aware of the permissible inferences he can draw based on the availability or non-availability of witnesses and evidence.").  Under the circumstances of this case, not only is an adverse inference unwarranted, but it is clear that Genworth's motion merely seeks to prevent an actual trial of the facts and evidence.

**II.     Genworth's Overreach in its Motion in Limine No. 2**

Not only is Genworth's request for an adverse inference unwarranted, but its proposed relief exceeds what would be appropriate even if this were a case involving evidence that could not be, and was not, obtained from another source.  Specifically, Genworth seeks adverse inferences that are not at all related to the evidence at issue. In particular, no adverse inference could legitimately be drawn that "Defendants used Genworth's **confidential** client information," that Defendants committed "wrongful use of Genworth **confidential** client data," and that "the client identities were not available from public sources" based solely on the alleged disposal of materials containing the information at issue (Docket # 303 at 2, 20) (emphases added).

Even if Defendants disposed of materials containing customer contact information, it does not logically follow that the customer contact information itself, contained in the disposed materials, was actually "confidential client information," "confidential client data," or trade secret data belonging to Genworth.  Whether Defendants sent customer information and what information Defendants may have sent is not indicative that the customer information itself constituted protected confidential or trade secret information.  Likewise, even if Genworth could somehow establish that the customer information Defendants used was obtained, in whole or in part, from Genworth, it does not logically follow that the customer information was "not available from public sources" or was not readily ascertainable.  Yet, that is precisely the sleight of hand Genworth attempts to accomplish with its motion in limine. Genworth seeks inferences based on correlations where none exists in its desperate attempt to avoid having actually to litigate the central issues in this case.  Simply

-8-

because materials may have been destroyed does not support an inference that the information within those materials was confidential or a trade secret, particularly where, as here, the materials have been obtained from another source and their contents can be assessed. Likewise, evidence of the fact that the customer contact information can be obtained from public sources or was readily ascertainable outside of Genworth cannot properly be precluded simply because some of the materials in Defendants' possession containing such information were not retained by Defendants.

Ultimately, whether the customer names, addresses, and account titles are trade secrets or protected confidential information depends on the treatment **by Genworth** of the customer contact information throughout the years, and not on whether or how Defendants subsequently used it. Likewise, whether the customer contact information was "available from public sources" or was readily ascertainable does not depend on any actions by Defendants – the information either exists in the public sphere or it does not; an inference that it is not available from public or other readily available sources is therefore unreasonable and inappropriate.

Genworth is desperately trying to preclude all evidence demonstrating that the information is publicly available or readily ascertainable in large measure because there is overwhelming evidence to support this defense, including Genworth's own admissions in this case, which completely undermines any notion that Defendants sent protected confidential information to Schwab or that the information deserves trade secret protection. First, Genworth has already conceded that "[i]t has **never** been Genworth's position that communications between Genworth's clients and Genworth employees, during the course of their employment with Genworth, is

-9-

disclosure of confidential information," and that communications with clients "are therefore not based on Genworth's confidential information, but on third party communications." (Docket # 269 at 2, 5) (emphasis added). Given that it is indisputable that communications with clients unquestionably involved the disclosure of client names, addresses, and account information, it is inconceivable how Genworth can claim that the same information is a trade secret, when communications containing that information is not even confidential.[4]  Second, Genworth representatives and employees, as well as Charles Schwab's non-public information specialists, have repeatedly acknowledged that names, addresses, account titles, and CUSIP numbers are considered public information and not

---

[4] In its most recent filing, Genworth once again backtracks from its position, and attempts to reinterpret and re-characterize its position. In its Reply Memorandum in Support of its Motion in Limine No. 1, Genworth claims that it did not concede that communications with clients are not confidential, but, instead, that "[w]hat Genworth said . . . is that Genworth's communications with its own clients did not make their identities or their holdings public information." Docket No. 319 at 7. However, Genworth's embarrassing attempt at reinterpretation conflicts with its previously unambiguous position, when it clearly stated that: "It has never been Genworth's position that communications between Genworth clients and Genworth employees, during the course of their employment with Genworth, is disclosure of confidential information barred by this Court's June 10, 2010 injunction"; and that "Genworth has not taken the position that these third party client communications are confidential information or are barred from disclosure under the Injunction." Docket No. 269 at 2, 5. Defendants need not "interpret" what Genworth has previously said; the direct quotes are clear on their face. Genworth, however, changes its interpretation of what they deem confidential or trade secret depending on which interpretation benefits them at the moment.

Specifically, Genworth initially sought to restrain the Principal Defendants from communicating to others information that "Defendants learned by virtue of their employment at Genworth," including descriptions of the communications between the Principal Defendants and their clients. Doc. No. 271-2 (4/12/10 TRO Hearing Transcript at 36). Genworth changed its tune, however, when faced with pressure from the United States District Court for the Eastern District of New York with regard to depositions in the class action to not "take the position that [the Principal Defendants] can't answer any questions," and that the court would know that Genworth's objections would be futile if it did not "parse it out." See Goodman, et al. v. Genworth Financial Wealth Management, Inc., et al., Docket No. 09-cv-05603, Doc. No. 71 at 8 (E.D.N.Y. Nov. 4, 2011). Genworth therefore chose to change course and assert, in direct contradiction to its prior position, that communications between the Principal Defendants and their clients were not confidential during the depositions in the class action. Now that those depositions have been completed, however, Genworth has reverted to its earlier position. This Court should recognize Genworth's litigation tactics for what they are: opportunistic shifting of its basic legal positions to maximize its legal posture without regard for the truth.

confidential.  <u>See</u>, <u>e.g.</u>, D'Angelo Depo. at 8-9, 55 (attached as <u>Exhibit 1</u>); Joseph Depo. at 188 (attached as <u>Exhibit 2</u>); Murray Depo. at 125-26 (attached as <u>Exhibit 3</u>). Moreover, despite Genworth's attempts now to protect customer names, addresses, and account titles, Genworth has previously, and as a matter of course, defined financial advisors and third-party broker dealers as the "clients," rather than the investing end-clients, based upon Genworth's business model which identified end-clients as the advisors' clients.  <u>See</u>, <u>e.g.</u>, Genworth Press Release (attached as <u>Exhibit 4</u>) (Genworth press release dated January 9, 2012, where its President and Chief Executive Officer, Third-Party Defendant Gurinder Ahluwalia, declared, "We can now focus 100% on serving our clients – financial advisors and third party broker dealers").

    The Court should see Genworth's motion for what it really is: a blatant overreach based on mischaracterizations and strained correlations in a desperate attempt to avoid having actually to prove that the customer contact information at issue is entitled to any contractually protected confidential or trade secret protection.[5]

---

[5] As it has been wont to do, Genworth again propounds numerous mischaracterizations in its Motion in Limine No. 2 in order to, once again, engage in character assassination in its attempt to influence the Court's perception of Defendants in the hopes of attaining favorable rulings on unreasonable requests. Of particular note, Genworth makes a blatantly false accusation regarding the (unrelated) production of an ACT CD when it has already been appraised of the circumstances surrounding the production of the CD.  <u>See</u> Docket # 303 at 8, fn. 2 (alleging that Defendant McFadden "impeach[ed] his sworn testimony" when he "produced through counsel" a copy of the ACT CD "over a year and a half" after testifying he no longer possessed such material).  Genworth engages in character assassination knowing full well that prior counsel for Defendants provided a sworn declaration stating that the ACT CD was **in counsel's possession** for the entire time period rather than being "kept" by Defendant McFadden.  <u>See</u> Docket # 209-50, at ¶¶ 5-7 (Declaration of Thomas B. Lewis).  Genworth nevertheless ignores this sworn declaration by counsel when it knowingly and falsely accuses Defendant McFadden of providing false testimony.  Likewise, Genworth again relies heavily on findings previously made by Judge Bryant prior to the completion of discovery in support of its positions, and which this Court has made clear are not binding on a disposition of the merits and which should not form the basis for adopting the conclusions Genworth seeks.  <u>See</u>, <u>e.g.</u>, Docket # 303 at 4, 11.

Simply put, Genworth is terrified of the voluminous and compelling evidence that undermines its claims that the customer contact information, consisting of customer names, addresses, and account titles, deserves such protection. The key is whether the information was adequately protected – and it was not. It is for that reason that Genworth seeks an adverse inference based on issues completely unrelated to whether the customer contact information constitutes a trade secret of the company or is otherwise entitled to confidential protection. Genworth does not even attempt to hide from the fact that it is attempting to prevent a trial on the issues based on the evidence, given its brazen request that "Defendants be precluded from arguing or submitting documentary evidence or testimony during trial" regarding these issues.[6] (Docket # 303 at 2). The Court should deny Genworth's motion, and assess the issues on the merits based on the facts and the evidence, as this Court has already ruled is necessary (Docket # 280).

### III.     **Genworth's Abuse of the Motion in Limine to Request Sanctions**

Genworth's request for sanctions in its motion in limine is unwarranted and abusive. First, Genworth already sought such relief based on the same alleged misconduct (Docket # 35). Judge Bryant granted relief to Genworth based on that

---

[6] Genworth is fully aware that it faces a number of hurdles in establishing any entitlement to trade secret or contractually binding confidential protection, including the fact that its own Chief Technology Officer admitted that Genworth's TNET did not log or report who "ran reports" or downloaded data, despite the ease with which it could be done, and the fact that TNET data was provided voluntarily in a variety of formats. See Murray Depo. at 109-10, 119, 129, 176 (attached as Exhibit 3). Moreover, while Genworth attempts to concoct a story about Defendants' attempt "to get around Schwab's protocol for protecting against the misuse of confidential client data" (Docket # 303 at 8), the fact is that, contrary to Genworth's characterization, Schwab's specialist on non-public information confirmed that there was nothing unusual about the manner in which Defendants sent, and Schwab received, the information. See D'Angelo Depo. at 55, 64, 84 (attached as Exhibit 1). Once again, Genworth's characterization is nothing more than an intentional distortion of the record and an unfounded attack on Defendants' character and motivation, even as it seeks to prevent Defendants from presenting any evidence contrary to its mischaracterizations.

motion, but did so by awarding Genworth costs solely "associated with seeking th[e] motion [to compel]." (Docket # 100 at 11, 13). Genworth now seeks to take a second bite at the apple and request additional relief and additional sanctions based on the same alleged misconduct while mischaracterizing Judge Bryant's order by requesting fees and costs well beyond those that were previously awarded. See Docket # 303 at 21 ("Costs and fees have only increased since the Court's initial ruling in 2010."). Genworth had the opportunity to seek the relief it now requests at the time it filed its first motion for sanctions, and then again when it requested adjudication of the amount of fees to be awarded (Docket # 178). It chose not to do so. It is not entitled to do so now by piggybacking the request in its motion in limine.

Second, Genworth has also previously sought an adjudication of the fees pursuant to Judge Bryant's order (Docket # 178). In denying Genworth's request, the Court ruled, in no uncertain terms, that a determination of the fees would not be considered until "the conclusion of **all** proceedings in this case," unless the Court decided, *sua sponte*, to address the issue earlier (Docket # 189) (emphasis added). Nothing has transpired in this case to justify a change of course. Nevertheless, despite the Court's clear ruling, Genworth again seeks a determination on the fees and, moreover, seeks additional fees beyond those that were awarded.

There is absolutely no reason for the Court to adjudicate any sanctions or fees in conjunction with the present motion in limine. Genworth's current request for sanctions is abusive of the process, and is nothing more than a tactic designed solely to intimidate Defendants and to impose additional financial burdens on them in the

hope of financially destroying them for blowing the whistle on fraudulent activity at Genworth.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Genworth's Motion in Limine No. 2 be denied in its entirety.

Respectfully submitted,

DEFENDANTS TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA AND TJT CAPITAL GROUP, LLC

AND

THIRD-PARTY PLAINTIFFS TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN AND TJT CAPITAL GROUP, LLC

By:   /s/ David P. Friedman
David P. Friedman (ct03558)
dfriedman@murthalaw.com
Ka Fei Wong (ct28130)
kwong@murthalaw.com
Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, Connecticut  06901
Phone:  203-653-5400
Fax:     203-653-5444

-15-

## CERTIFICATION

I hereby certify that on October 24, 2012, a copy of the foregoing was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing though the Court's CM/ECF System.

      /s/ David P. Friedman
David P. Friedman (ct03558)

4110397v4