# EXHIBIT 3

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
 4     ---------------------------------
       GENWORTH FINANCIAL WEALTH       )
 5     MANAGEMENT INC.,                )
                                       )
 6              Plaintiff,             )
                                       )
 7              vs.                    ) Civil Action No.
                                       )
 8     TIMOTHY MCMULLAN, JAMES COOK,   ) 3:09-cv-1521(VLB)
       TIMOTHY MCFADDEN, KAREN BAZON,  )
 9     TAMARA RIVERA and TJT CAPITAL   )
       GROUP, LLC,                     )
10                                     )
                Defendants.            )
11     ---------------------------------
       TIMOTHY MCMULLAN, JAMES COOK,   )
12     TIMOTHY MCFADDEN and TJT CAPITAL)
       GROUP, LLC,                     )
13                                     )
            Third-Party Plaintiffs,)
14                                     )
                vs.                    )
15                                     )
       GURINDER AHLUWALIA,             )
16                                     )
            Third-Party Defendant. )
17     ---------------------------------
18
19       RULE 30(b)(6) DEPOSITION of JOHN MURRAY, taken at
20     15433 Ventura Boulevard, Sherman Oaks, California,
21     commencing at 9:04 A.M., Tuesday, March 29, 2011,
22     before Ricki Q. Melton, CSR 9400, RPR 45429.
23
24
25
```

Page 109

1  Q. How long did it take to get that analytical
2  work completed, if you know?
3  A. Well, so there are multiple parts. The
4  first step is to try to determine whether or not
5  there was access, and my belief is that was done in
6  a week or so or less.
7  Q. Let me just stop you right there.
8     You indicated that there was access to the
9  website.
10 A. Uh-huh.
11 Q. Does that mean there were also physical
12 downloads from the website of lists of client
13 information?
14 A. The client information -- so the kinds of
15 information -- in -- in a system like TNET, you can
16 do relatively significant bulk data downloads. In
17 the website, that's generally not needed. There's
18 not a business purpose for it. So you can
19 certainly print off screens.
20    Any screen you can see, you can hit
21 "Print" and get a printout of that. So you can get
22 a list of names of clients, but then you would have
23 to drill into a client to get their address or
24 their holdings or whatever.
25 Q. Right.

Page 110

1    A.   I don't believe -- and that website is now
2    shut down so I'm not as familiar with it -- there
3    was a way to say, "Give me everything about all
4    clients."  I don't think that was a function of the
5    website because why would we build that.  That's
6    not an ordinary need.
7    Q.   Okay.  And was there another part of the
8    analytical work that was performed a review of
9    whether or not actual downloads from TNET had
10   occurred?
11   A.   Once you are not an employee -- so TNET
12   has a report-writing function.  TNET is a
13   significantly older application.  It is not as
14   granular in its ability to log activities.  The
15   report-writing function is used as part of normal
16   roles and responsibilities by various people.
17        So, for example, in the trading function,
18   they might download a list of securities from the
19   night before and trades to reconcile against
20   information from our trading partners.  So there's
21   a report-writing function in TNET that is essential
22   to the execution of employment responsibilities.
23        I don't believe that it logs and can report
24   out who specifically ran what reports at what times.
25   Q.   So does that mean, to a lay lawyer, that

Page 119

1  inquiry?
2      A.  No, sir.
3      Q.  Do you know whether any of the analytical
4  work had surfaced facts relating to actual
5  downloads from the system while the former
6  individuals had been employees, in other words,
7  prior to termination?
8      A.  Which system?
9      Q.  You tell me.  Whichever system was looked
10 at.  Any system.
11     A.  As I stated earlier, reports generated in
12 TNET would not have been logged.
13     Q.  Uh-huh.
14     A.  I don't believe that the point of the
15 investigation was to look at the access of persons
16 while they were employees.  I think the focus of
17 our initial investigation was to determine was
18 there ongoing access and was that related to some
19 threat to our business.
20     Q.  Okay.  So if there was no determination --
21 I'm sorry.
22         If there was no analytical review of
23 whether or not there was access while persons were
24 employees, that would have excluded going back in
25 time over e-mails to see whether somebody was

Page 125

1  sorry.
2      Q.   Okay.  Are you aware that Genworth had a
3  relationship with Schwab Institutional as an
4  authorized custodian for the Private Client Group?
5      A.   Yes.
6      Q.   Are you aware that that authorization
7  allowed clients to maintain their portfolios
8  physically under the custody of Schwab?
9      A.   Schwab was an authorized custodian for
10 people who were using us to manage the Brinker
11 strategies.
12     Q.   And are you aware of the type of
13 information that Schwab had in its systems relating
14 to Genworth Brinker clients?
15     A.   No.  I believe I mentioned earlier that I
16 was not a user of that system for all the right
17 reasons.  So I would have no knowledge of that.
18     Q.   Thank you.
19          Do you know what a CUSIP number is?
20     A.   Yes, sir.
21     Q.   Is a CUSIP number confidential?
22     A.   A CUSIP number is an identifier for a
23 security.  The CUSIP number in and of itself would
24 not be confidential.  The CUSIP number in relation
25 to a person as identifying them as a holder of that

Page 126

1  security would indeed be confidential.
2      Q.   If a client of PCG gives a copy of its --
3  his or her statement which lists the assets in the
4  Genworth account to another person at a different
5  firm to transfer their account out of Genworth, is
6  that a breach of security, as far as you know?
7      A.   If a client -- if a client of our firm
8  takes a document we have sent them in the mail and
9  provides it to any third party for their own
10 purposes, it's their issue.
11     Q.   All right.  And are you aware that, as
12 part of an account transfer process, all firms
13 would require that a customer provide them with the
14 most recent monthly quarterly account statement?
15     A.   I am not aware that all firms require
16 that.
17          I am aware that some firms it facilitates
18 the transaction if that is done, but my belief is
19 that firms have a variety of methods for achieving
20 that same outcome.
21          MR. ZAHNER:  Mr. Murray is not designated
22 on the transfer process.
23          MR. LIEBERMAN:  I know.
24          MR. ZAHNER:  But he can answer to his own
25 knowledge.

Page 129

1       Amjad was historically a Genworth
2  employee.  So he did know how to do it, and Tejraj,
3  who was an offshore contract person who was
4  physically in Phoenix is someone who is familiar
5  with and had been involved in the management of
6  this system, and it says "Tejraj:  Give us a list
7  of the admin users of PCG."
8       Q.   Well --
9       A.   And it looks like, based on my read of
10 this -- now, this is a website that has been turned
11 off, and it says, if their SSOs are terminated,
12 they will not be able to access the PCG site.
13          So one of the distinctions I made in your
14 notes earlier is that automatic connection versus
15 not automatic connection.
16      Q.   Right.
17      A.   This system looks like it was
18 automatically connected so it should have
19 terminated their access, but we will read this
20 thread and see what, in fact, was happening.
21      Q.   And if I can turn your attention to the
22 August 20 e-mail sent at 1:28 P.M. from
23 Mr. Brooks-Manas to Mr. --
24      A.   Hannoneh.
25      Q.   -- Hannoneh regarding access to the PC

Page 176

1  are five levels of access.  They have level 1 and
2  2.  So it's primarily read access and then limited
3  ability to do updates.
4       Q.   So if I understand that -- and I may
5  not --
6       A.   That's okay.
7       Q.   -- if the PCG people only have level 1 and
8  2 access to TNET to read and update only, does that
9  mean they can't print?
10      A.   Oh, no, no.  Excuse me.
11           So the distinction I'm making is, for
12  example, they can't go in and execute trades.
13  That's the kind of difference in responsibility.
14           They had, to my knowledge, access to the
15  report writer, and once you have access to the
16  report writer, you can download data.  You can put
17  it into Excel.  You can upload it into ACT.  You
18  can do whatever with the data.
19      Q.   Okay.  And what people do by way of
20  utilizing the report writer, are those monitored in
21  any way to ensure that the report writing is
22  appropriate?
23      A.   So the first level of control is who is in
24  TNET, and it's job related, right, that you are in
25  TNET.  Then it's within the business unit, each

Page 256

1   STATE OF CALIFORNIA    ) ss:
2   COUNTY OF LOS ANGELES  )
3
4       I, RICKI Q. MELTON, CSR No. 9400, RPR No. 45429,
    do hereby certify:
5
        That the foregoing deposition testimony of
6   JOHN MURRAY was taken before me at the
    time and place therein set forth, at which time the
7   witness was placed under oath and was sworn by me to
    tell the truth, the whole truth, and nothing but the
8   truth;
9       That the testimony of the witness and all objections
    made by counsel at the time of the examination were
10  recorded stenographically by me and were thereafter
    transcribed under my direction and supervision, and
11  that the foregoing pages contain a full, true, and
    accurate record of all proceedings and testimony to
12  the best of my skill and ability.
13      I further certify that I am neither counsel for
    any party to said action nor am I related to any
14  party to said action, nor am I in any way interested
    in the outcome thereof.
15
16
17      IN WITNESS WHEREOF, I have subscribed my name
    this 8th day of April, 2011.
18
19
20
21
22
23      _____
24          RICKI Q. MELTON, C.S.R. No. 9400
25