## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC., | |
| Plaintiff, | Civil Action No. 3:09-CV-1521-JCH |
| v. | |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA and TJT CAPITAL GROUP, LLC, | **PLAINTIFF'S REPLY ON MOTION IN LIMINE NO. 2** |
| Defendants. | |
| TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, AND TJT CAPITAL GROUP, LLC, | |
| Third-Party Plaintiffs, | |
| v. | |
| GURINDER AHLUWALIA, | |
| Third-Party Defendant. | October 30, 2012 |

## SUMMARY OF REPLY

Defendants' Opposition to Genworth's Motion in Limine No. 2 is remarkable for what it does not say:

- Defendants do not dispute that they had a duty to preserve, and not destroy, evidence beginning no later than July 2009 when their counsel unequivocally informed them that they could not use Genworth's client information after they left Genworth.

- Defendants do not dispute that they intentionally spoliated the e-mails and spreadsheets that they sent to Schwab in August 2009 containing client information for Genworth's clients.

- Defendants offer no response to Genworth's argument that had Mr. McMullan not destroyed the personal computer from which he sent those e-mails to Schwab, it is virtually certain that Genworth would have discovered that Mr. McMullan improperly kept Genworth's client information on that computer and used it as the source for his e-mails. In particular, Defendants are silent about Genworth's showing that the client data they transmitted to Schwab in a series of chopped-up, coded spreadsheets designed to mask the origin of the data is a match to client data from Genworth's TNET system, down to the same idiosyncrasies in the data.

- Defendants do not dispute that the evidence which they spoliated would have shown that the client data they sent to Schwab and used to solicit Genworth's clients after they left to form TJT originated from Genworth's TNET system.

Instead, Defendants seek to shift the focus away from their misconduct by deliberately misconstruing the nature of the relief sought by Genworth on this Motion. Genworth is not seeking an *in limine* ruling that its client data was confidential or a trade secret. Genworth intends to prove that at trial. Rather, Genworth seeks an adverse inference that client data which the Defendants used to create their own client spreadsheets upon forming TJT, which data they used to contact Genworth's clients and which was reflected in the spreadsheets that the Defendants sent to Charles Schwab, was in fact taken from Genworth by the Defendants.

Defendants also take a myopic view of the spoliation that is at issue in Genworth's Motion, claiming that no adverse inference or any other sanction is warranted because Schwab, a third-party, produced the e-mails and spreadsheets that Defendants sent to Schwab and then

deleted from their computers.  While Schwab's production is relevant because it puts the lie to Defendants' shifting arguments that they somehow recalled Genworth's client data from memory or obtained it from "public" sources such as the internet or client account statements, Defendants' spoliation of those specific e-mails and spreadsheets is not the whole story.  Rather, those spreadsheets, which Defendants uniformly deleted in order to conceal their existence, show that there is no other explanation for how Defendants obtained the underlying client data other than by copying it wholesale from Genworth's TNET system.  Thus, Defendants must have had in their possession one or more spreadsheets of Genworth's client data that they created while at Genworth but then failed to produce in this case.  Indeed, Mr. McMullan destroyed the entire computer from which he sent the e-mails to Schwab, with what Judge Bryant found was a "consciousness of wrongdoing."

Moreover, Defendants' argument that sanctions are not warranted because a third-party ultimately produced some (*not* all) of the missing evidence is inconsistent with Second Circuit law, under which there are three important goals to be achieved in the imposition of spoliation sanctions: (1) <u>punish</u> Defendants for their intentional spoliation of evidence and their lies and shifting stories to this Court in sworn testimony and affidavits, (2) <u>deter</u> other litigants from flouting their document preservation obligations and lying to the Court; and (3) <u>restore</u> Genworth to as good a position as it would have been in the absence of the Defendants' spoliation.

Defendants are also wrong in suggesting that an adverse inference is not appropriate in a bench trial.  The Court has the inherent discretion to manage its own proceedings and to award appropriate sanctions, including an adverse inference, where warranted, and has done so in the non-jury context.  *See, e.g., Southern New England Tel. Co. v. Global NAPs, Inc.*, 251 F.R.D. 82, 92 (D. Conn. 2008) (Hall, J.) (on motion for sanction of default judgment due to spoliation of

evidence, the court "draws an inference from the destruction of evidence on Janet Lima's computer that defendants possessed relevant financial documents which they destroyed to avoid their discovery").  To indulge Defendants' argument would inappropriately incentivize litigants in non-jury cases to be less diligent in their document preservation obligations.

Finally, Genworth's request for attorneys' fees as a further sanction is entirely appropriate in light of Defendants' egregious spoliation of critical evidence, their repeated and flagrant untruthful sworn testimony to this Court, and the unnecessary multiplication of these proceedings as a result of that conduct.  Plaintiffs' argument that somehow this issue has already been ruled upon, or that on a prior occasion Genworth chose not to seek sanctions for this conduct, is simply wrong.  The basis for the Court's prior award of sanctions against Defendants was that Genworth was required to bring a motion to compel a forensic imaging of the Defendants' computers, which motion was filed before Schwab even produced the documents that revealed to Genworth just how deep the Defendants' lies and spoliation went.  This Motion, on the other hand, relates to the totality of the Defendants' spoliation and false testimony to this Court, and the resulting multiplication of these proceedings.

## ARGUMENT

I.    **The Court Has Discretion To Fashion An Appropriate Sanction For Spoliation, Including The Use Of An Adverse Inference In A Bench Trial**

In cases where a party has destroyed or refused to produce evidence, "a district court has broad discretion in fashioning an appropriate sanction, including . . . an adverse inference[.]" *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *Nicholson v. Bd. of Trustees for the Conn. State Univ. Sys.*, 2011 WL 4072685 at *4 (D. Conn. Sep. 12, 2011).  *See also, e.g., West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999) ("For example, the trial judge could: (1) instruct the jury to presume that the exemplar tire was

overinflated; (2) instruct the jury to presume that the tire mounting machine and air compressor malfunctioned; and (3) preclude Mrs. West from offering evidence on these issues."); *Johnson v. Waterford Hotel Group, Inc.*, 2011 WL 87288 at *5 (D. Conn. 2011) ("the Court will give the jury an adverse inference instruction stating that the contents of the discarded journal would have been favorable to the Defendant and unfavorable to the [spoliator]").

Defendants argue that an adverse inference is "ill-suited" to the context of a bench trial. (Opp., p. 7.)  But, to indulge Defendants' argument and only permit the sanction of an adverse inference in jury trials would not only be fundamentally unfair to the party deprived of the spoliated evidence, but would both reward, and not sufficiently hold accountable, spoliators in non-jury cases.  Parties cannot be incentivized to flout or be less mindful of their document preservation obligations in a non-jury case.

Moreover, there is nothing inherently difficult about the Court, rather than a jury, relying on an adverse inference sanction to assume that destroyed evidence would have been unfavorable to the spoliator and, instead, would have supported the innocent party's position. Where, as here, the circumstances warrant an adverse inference in a non-jury context, courts do not hesitate to do so.  For example, in *Southern New England Tel. Co. v. Global NAPs, Inc.*, 251 F.R.D. 82 (D. Conn. 2008) (Hall, J.), this Court was presented with a motion for default judgment as a discovery sanction, and as part of the Court's analysis it applied an adverse inference based on the spoliator's destruction of a computer: "Furthermore, the court draws an inference from the destruction of evidence on Janet Lima's computer that defendants possessed relevant financial documents which they destroyed to avoid their discovery."  *Id.* at 92.  *See also, e.g.*, *Libutti v. United States*, 107 F.3d 110, 120-24 (2d Cir. 1997) (holding that, in bench trial context, "[t]here is compelling evidence in the present case which the district court could readily

rely upon to support the drawing of adverse inference"; remanding for district court to consider adverse inference issue); *Libutti v. United States*, 178 F.3d 114, 119-20 (2d Cir. 1999) (affirming district court's ruling on remand that adverse inference was admissible and entitled to significant weight); *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002) (in bench trial, court was "entitled to draw adverse inference[]" from refusal to testify); *Beaven v. United States Dept. of Justice*, 622 F.3d 540, 555 (6th Cir. 2010) ("district court did not abuse its discretion in imposing a non-rebuttable adverse inference" as sanction for spoliation in bench trial).

The cases cited by Defendants do not hold otherwise.  In *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 2009 U.S. Dist. LEXIS 43588 at *32 (D. Conn. 2009), the court only declined an adverse inference for a bench trial in order to impose a *more severe* sanction: "merely sanctioning Innis Arden with an adverse inference does not adequately serve the prophylactic and preventative purposes of the spoliation doctrine under these circumstances." *Id.*  In *Acosta v. Rock*, 2012 U.S. Dist. LEXIS 49701 at *9 (E.D.N.Y. March 30, 2012), a case involving a bench trial, the court stated that the issue of whether to grant an adverse inference "is in the sound discretion of the trial court." *Id.* at *10.

## II.   Plaintiffs Erroneously Argue That Genworth Seeks An Adverse Inference Establishing That Its Client Data Is Confidential Or Trade Secret

With no response to virtually every argument in Genworth's Motion, Plaintiffs seek to divert the Court's attention from their admitted spoliation of critical evidence by ranting about whether Genworth's client data is trade secret and confidential, and falsely claiming that this Motion seeks a ruling on that subject.  For example, the very first paragraph in Plaintiffs' opposition argues that Genworth is "demanding that the Court make adverse inferences in its favor on the ultimate issues in this case -- namely, whether any of the pertinent customer

information at issue, consisting of customer names, addresses, and account titles, qualifies as a trade secret or contractually protected confidential information.  (Opp., pp.1-2.)

But, this Motion plainly does <u>not</u> seek that ruling.  Instead, Genworth seeks an adverse inference that focuses on establishing that the client data used by Defendants in forming TJT, contacting Genworth clients and sending client data to Schwab, came from Genworth's TNET system, and was not simply recalled by Defendants from memory or otherwise obtained from "public" sources such as the internet or client statements.[1]  For example, Genworth states in its Motion that "the [spoliated] evidence, had it been produced in this case, ***would have unequivocally demonstrated that the source of the client information the Defendants sent to Schwab was Genworth's client data from its TNET system***."  (Mot., p. 18 (emphasis added).)  To the extent that Genworth's Motion used the words "confidential" or "trade secret" in describing the client data that Defendants used, the context makes clear that those words were being used as adjectives to describe the client data and Genworth's belief that its data is in fact confidential and its clients lists a trade secret, but they were not describing the relief that Genworth is seeking on this Motion.

Ultimately, whether any of Genworth's client data or the compilation thereof was confidential and trade secret is a related but distinct question from whether the information

---

[1] Defendants do not address that Genworth also seeks an Order precluding Defendants from arguing that they used any material to create their client lists that they have either destroyed or not produced in this litigation.  (Doc. No. 303, pp.2, 20-21.)  As Genworth noted in its opening brief, after Mr. Cook first swore that he did not use any Genworth information after he resigned and that he did not have any Genworth client information at his home, he later recanted his story and claimed that, for approximately 20% of his client relationships, he used 'documents that were present in my home' in creating the spreadsheets that were sent to Schwab.  (Doc No. 303-5 (Ex. E), at ¶ 2.)  But, just as Mr. Cook destroyed the e-mails and spreadsheets he sent to Schwab, he eventually admitted that "I have not retained copies of those documents I used for cross-referencing."  (*Id.*)  Mr. Cook's explanation also does nothing to address the other 80% of the clients for whom he transmitted information to Schwab and whose information matches data in Genworth's TNET system.

actually used by Defendants originated from Genworth or some other source.[2]  Genworth intends

to prove at trial (among other things) that the data that Defendants wrongfully took and used is

trade secret and confidential.  That issue is not before the Court on this Motion.

**III.    An Adverse Inference Sanction Is Appropriate Regardless Of The Fact That Schwab Produced Copies Of Certain E-Mails And Spreadsheets Which Defendants Sent To Schwab**

In addressing the substance of Genworth's spoliation argument, Defendants focus

narrowly on the specific e-mails and spreadsheets they sent to Schwab, and argue that because

Schwab ultimately produced those particular documents to Genworth, no sanctions are warranted

since those documents are not "unavailable."  But this argument proceeds from a false premise

because it ignores the bigger picture of Genworth's spoliation argument.  Genworth focuses on

the Schwab production because it was what finally caught Defendants red-handed in their theft

and misuse of Genworth's client information.  As explained in Genworth's opening brief, the

spreadsheets sent to Schwab reflect unequivocally that Defendants could only have obtained the

Genworth client data that they sent to Schwab from one source: Genworth's TNET system.  The

client data in those spreadsheets, despite Defendants' best efforts to mask the origin of the data

---

[2] Though the issue of whether Genworth's client data is confidential and trade secret is beyond the scope of this Motion, Genworth cannot let some of Plaintiffs' misstatements go unanswered.  For example, as the predicate for arguing that none of Genworth's client is confidential, Plaintiffs claim that "Genworth had admitted that communications with clients are not 'Genworth's confidential information.'"  (Mot., p.2 (citing Doc. No. 269).)  Not so.  The import of Doc. No. 269 is that Genworth's communications with its own clients did not make those clients' identities or their holdings public information.  More fundamentally, Defendants' repeated harping on Doc. No. 269 here and in other filings reflects a misunderstanding of Genworth's trade secret argument.  Genworth does not contend that individual client statements are trade secret or confidential simply because they contain client data.  As Genworth explained in its Motion in Limine No. 1, "what Defendants purloined from Genworth and used to start their competing business is the totality of Genworth's Private Client Group client list and related data -- which is comprised of both public and non-public information, compiled at great expense over many years, and stored principally in several safeguarded, proprietary databases such as TNET and ACT. . . . Individual client statements, client correspondence and other 'public' documents that Defendants seek to use at trial have no bearing on whether Genworth's client databases constitute protectable trade secrets."  (Doc. No. 319, at 6-7.)

by sending it to Schwab bit by bit in a series of chopped-up, coded spreadsheets from their personal e-mail accounts over a series of several weeks, is virtually an identical match to the client data in Genworth's TNET system, down to very specific idiosyncrasies in the data.  The inference is that Defendants improperly took copies of Genworth's client data in one or more documents when they left Genworth, and then used it to create the spreadsheets that they sent to Schwab.  But, Defendants never produced any such documents, and in fact Mr. McMullan threw into the garbage the very computer which he had used to send those e-mails.

Schwab's third-party production does not come close to remedying Defendants' spoliation.  Genworth has been deprived of critical evidence that Defendants have never produced but which Genworth has demonstrated must have existed, *i.e.*, one or more spreadsheets created while they were still employed at Genworth and which contain Genworth's client data from the TNET system.  In addition, because Defendants never produced the native versions of the spreadsheets they sent to Schwab, Genworth has also been deprived of the ability to analyze the metadata of those documents and evaluate the circumstances under which they were created by Defendants.  For example, were those spreadsheets created and sent to Schwab within a matter of minutes, reflecting that Defendants simply pasted data from some other source which has not been produced?  Although Schwab produced native versions of the spreadsheets that Defendants sent to them, that is a poor substitute for the files directly from Defendants' computers because metadata, including file creation and modification information, certainly could have changed in the process of those spreadsheets being transmitted to Schwab, within Schwab, from Schwab to its counsel, then back from Schwab's counsel to Genworth's counsel.

Thus, Defendants' argument that their spoliation is excused because Schwab produced some information which overlaps with the full scope of the missing evidence is unavailing.

*Southern New England Tel. Co.*, 251 F.R.D. at 91-92 (D. Conn. 2008) (rejecting defendants'
argument that because some financial information was already available to plaintiff as a result of
third-party accountant's production, they should not be sanctioned for failing to produce their
general ledger); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73-74 (S.D.N.Y. 1991) ("a
party's discovery obligations are not satisfied by relying on non-parties to preserve documents").

  Moreover, Defendants' "no harm, no foul" argument -- *i.e.*, look at only whether the
prejudice to the innocent party has been remedied -- is inconsistent with the law in this Circuit.
After a finding of spoliation, "the applicable sanction should be molded to serve the
prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West v.
Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Defendants' exclusive focus on
the "remedial" rationale ignores both the equally important punitive and prophylactic rationales
for imposition of sanctions for spoliation.

  If Defendants were allowed to flout their obligations and destroy evidence without any
consequence, merely because some of the same evidence was available from another source, and
then repeatedly lie to the Court and Genworth, their misconduct would go unpunished. Imposing
no sanction at all would certainly not constitute a solution molded to serve the punitive rationale.
The prophylactic purpose of the spoliation doctrine also requires imposition of an appropriately
severe sanction. The sanction "should be designed to . . . deter parties from engaging in
spoliation." *Goodyear*, 167 F.3d at 779. Put simply, individuals must have no incentive to
destroy evidence, and the only way to achieve that important goal is to set the example that
spoliation is a serious offense which carries with it serious consequences, particularly when, as
here, the missing evidence is so central to the case and it was destroyed with obvious bad faith.

**IV.    Genworth's Request For Attorneys' Fees Is Appropriate And Not Duplicative Of Prior Motion Practice**

The Court undoubtedly has the authority to award attorneys' fees to Genworth due to Defendants' spoliation, repeated lies to this Court, and undue multiplication of these proceedings and waste of judicial resources.  *Doe v. Norwalk Community College,* 248 F.R.D. 372, 381 (D. Conn. 2007); *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 201 (S.D.N.Y. 2007) "Such a monetary award may be appropriate to punish . . . deter . . . [and] mak[e] the opposing party whole for costs incurred as a result of the spoliator's wrongful conduct."  *In re NTL*, 244 F.R.D. at 201.

Defendants try to get around that by arguing that Genworth is precluded from obtaining an award of attorneys' fees because it purportedly already sought the same "relief based on the same alleged misconduct" and already "sought an adjudication of the fees."  (Opp., p.12-14.) This is revisionist history.  The motion to which Defendants refer was Genworth's February 5, 2010 Expedited Motion to Compel Forensic Imaging of Defendants' Computers, and For Order for Preservation of Evidence, Production of Evidence, Appointment of Neutral Forensic Expert, and Sanctions.  (Doc. No. 36.)  That motion had nothing to do with Genworth's current request for sanctions.  In fact, that motion was filed *before* Schwab even produced the e-mails and spreadsheets which caught Defendants in their lies and revealed the full scope of their spoliation.

Instead, that motion was brought because Defendants and their counsel had refused to make "mirror images" of the computers and electronic devices used by Defendants.  (Doc. No. 35, p.2.)  Genworth requested "attorneys' fees and costs associated with their Motion to Compel," not broader sanctions associated with the full scope of Defendants' spoliation and false statements to this Court.  (*Id.*, p.19.)  Accordingly, when the Court granted Genworth's motion and awarded fees, the award was based solely on Defendants' refusal to image their computers: "The defendants were wholly unjustified in their position as they tacitly admitted by finally

hiring a computer imaging expert.  The Defendants have wasted the Plaintiff and the Court's resources in necessitating the judicial resolution of this discovery dispute."  (Doc. No. 100, p.11.) Thus, the Court awarded fees "associated with seeking this motion."  (*Id.*, p.13.)

Defendants also make the throwaway argument that "Genworth seeks a calculation of attorneys' fees, prior to trial, despite the Court's admonition that a determination of those fees would not be considered until 'the conclusion of all proceeding in this case,' unless the Court decides, *sua sponte*, to address the issue earlier."  (Opp., p.4-5 (quoting Doc. No. 189).)  But, Defendants do not point to where Genworth asked for fees to be calculated now, the reason being that Genworth in fact made no such request.

## **CONCLUSION**

Genworth respectfully requests that the Court grant its Motion in Limine No. 2, and issue an Order granting the adverse inferences requested on pages 1-2 of Genworth's opening brief. (Doc. No. 303, pp.1-2.)

Dated: October 30, 2012

Respectfully Submitted,

/s/ Reid Ashinoff
Reid L. Ashinoff  *(admitted phv)*
Sandra D. Hauser *(admitted phv)*
Brendan E. Zahner *(admitted phv)*
SNR DENTON US LLP
1221 Avenue of the Americas
New York, NY 10020
reid.ashinoff@snrdenton.com
sandra.hauser@snrdenton.com
brendan.zahner@snrdenton.com
Tele: (212) 768-6700
Fax: (212) 768-6800

McCARTER & ENGLISH, LLP
Eric W. Wiechmann (CT 04331)
Elizabeth M. Smith (CT 19808)
City Place I, 185 Asylum Street
Hartford, Connecticut 06103-3495
ewiechmann@mccarter.com
esmith@mccarter.com
Tele: 860-275-6763
Fax: 860-560-5970

*Counsel for Plaintiff Genworth Financial Wealth Management, Inc. and Third-Party Defendant Gurinder Ahluwalia*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I have caused to be served a true and correct copy of the foregoing document on this 30th day of October 2012 via email and electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.


/s/ Elizabeth Smith

17775217