# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENWORTH FINANCIAL WEALTH MANAGEMENT, INC. )<br>)<br>     Plaintiff,          )<br>vs.                             )<br>)<br>TIMOTHY MCMULLAN, JAMES )<br>COOK, TIMOTHY MCFADDEN, )<br>KAREN BAZON, TAMARA RIVERA )<br>AND TJT CAPITAL GROUP, LLC )<br>)<br>     Defendants.         )<br>_____ )<br>)<br>TIMOTHY MCMULLAN, JAMES )<br>COOK, TIMOTHY MCFADDEN, AND )<br>TJT CAPITAL GROUP, LLC )<br>)<br>     Third-Party Plaintiffs, )<br>vs.                             )<br>)<br>GURINDER AHLUWALIA )<br>)<br>     Third-Party Defendant. ) | Civil Action No. 3:09-CV-01521-JCH<br><br><br><br><br><br><br><br><br><br><br>November 2, 2012 |

### DEFENDANTS / THIRD-PARTY PLAINTIFFS' REPLY TO RESPONSE TO MOTION FOR CLARIFICATION

Defendants and Third-Party Plaintiffs Timothy McMullan and Timothy McFadden respectfully submit this reply in further support of their motion for clarification (Docket Entry No. 321) of the Court's preliminary injunction order dated June 10, 2010 (Docket Entry No. 101) (the "Injunction Order").

**ARGUMENT**

<u>The FINRA Investigation</u>

Genworth, as it has done from the outset of this litigation, seeks to dictate and restrict how Defendants should be permitted to defend themselves against outrageous charges asserted against them outside of this litigation designed to destroy them personally and professionally.  Genworth has the audacity to insist that it has the right to gag Defendants Timothy McMullan and Timothy McFadden (collectively, the "Individual Defendants") in their defense of a FINRA investigation initiated by an undisclosed source and prevent them from disclosing the fraud perpetrated by Genworth on thousands of clients involving more than $1 billion in assets and on Defendants, all of which is directly relevant to the FINRA investigation, for no other purpose than to hide the fraud.  It is apparent that Genworth does not agree with Defendants' assessment of what is relevant to their defense in those proceedings in which it is not named as a party.  But it is the Individual Defendants' future livelihoods, and not those of Genworth or its representatives, that are at stake in the FINRA investigation.  Quite frankly, under these circumstances, it is abusive for Genworth to proclaim that it has the right to forbid the Individual Defendants from defending themselves in the manner that they deem most appropriate against the highly suspicious allegations submitted to FINRA.

Genworth's hypocrisy in opposing Defendants' request is apparent from the fact that it seeks to do what it wrongly accuses Defendants of trying to do, that is, to be the "sole arbiter of what [Defendants] can disclose" in connection with the FINRA investigation.  <u>See</u> Docket Entry No. 338 at 4.  While proffering a host of

mischaracterizations and making numerous invalid assumptions, Genworth ignores several key points regarding the FINRA investigation. First, Genworth glosses over the fact that (1) the FINRA investigation seeks more information and is much broader than Genworth has suggested; (2) FINRA has specifically requested that the Individual Defendants provide an explanation of the "reasons" for using any data that they may have used; (3) FINRA has requested that the Individual Defendants produce "any other relevant information and/or documentation" that they deem appropriate; and (4) FINRA has warned that "withhold[ing] any responsive document or information" must be accompanied by an explanation and identification of what is being withheld. See Docket Entry No. 321-1. Genworth's suggestion that the Individual Defendants' response must be limited to what **Genworth** deems appropriate or relevant is an exhibition of extraordinary hubris and an unreasonable intrusion into and an attack upon the Individual Defendants' due process right to defend themselves against trumped up charges initiated by the undisclosed source.

Second, Genworth completely ignores the fact that the FINRA investigation is a regulatory agency proceeding that is confidential. Defendants are not seeking to participate in a voluntary public "airing" of its grievances in which there is any reasonable possibility that FINRA will publicly disseminate the information it gathers in conjunction with the investigation. Genworth's suggestion to the contrary is offensive and absurd. The confidentiality of the proceedings and the information submitted in connection with those proceedings is exemplified by FINRA's denial, based upon the confidentiality of the investigation, of the requests by the Individual Defendants for information regarding the author of the complaint against them. Genworth's purported

concern that FINRA will publicly divulge the information it receives from the Individual Defendants is manufactured bunk.  Simply put, this is not a situation where a "protective order" is required.  Nor is this a situation where Genworth needs to be "present to defend" itself against allegations, given that this is an investigation against the Individual Defendants and not Genworth, and given the fact that, as Genworth readily admits, it is not even a member of FINRA.  See Docket Entry No. 338 at 2, 5.  Genworth's transparent motive in opposing Defendants' request is to prevent the Individual Defendants from defending themselves against a complaint initiated by an unnamed source designed to continue inflicting harm on their ability to pursue their livelihoods and to inflict further financial damage upon them.

It is highly ironic that Genworth, which has relied so heavily on Judge Bryant's preliminary injunction ruling, neglected to inform this Court that Judge Bryant stated that "Well, a whistleblower statute permits disclosure of believed illegal activity . . . to a public body."  See 4/8/10 Hearing Transcript at 137 (attached as Exhibit 1).  FINRA, indeed, has an Office of the Whistleblower to investigate potentially illegal or unethical activity.  Notably, Judge Bryant, in addressing the request for a preliminary injunction, rejected any notion that disclosures to a governmental or regulatory agency would be precluded by an injunction, and noted that Genworth was not even seeking such relief.  See Exhibit 1 at 136-137 (the Court stating:  "I don't think that's what the Plaintiffs are seeking to do, to preclude [Defendants] from going to the SEC or some other agency").  Yet, that is precisely the relief that Genworth is now seeking when it opposes the Individual Defendants' request to disclose information in defending

themselves in the FINRA investigation, particularly where the defense hinges in part on the disclosure of illegal and fraudulent activities by Genworth.

Having no legitimate basis on which to object to Defendants' motion, given that deceptive, illegal or fraudulent activity simply cannot qualify for protection as a trade secret, Genworth again attempts to classify and define matters in a grossly misleading manner. Its constant references to "so-called class action allegations" that Genworth claims Defendants seek to "air" mischaracterizes what Defendants seek to do in order to properly defend themselves against a complaint that was initiated in FINRA and which directly affects their livelihoods. While the class action in the District Court for the Eastern District of New York does involve claims of fraud orchestrated by Genworth, the fraudulent conduct at Genworth extended well beyond the fraud that is the subject of that action. Much of that conduct goes directly to the Individual Defendants' defenses against the complaint filed against them that resulted in the FINRA investigation. Thus, contrary to Genworth's contention, Magistrate Judge Smith's discovery orders in this case have no bearing on how the Individual Defendants should be permitted to defend themselves in the FINRA investigation. Simply put, the FINRA investigation is separate and distinct from this case and from the class action.

Genworth's alternative suggestion that Defendants should be "required to detail exactly" to this Court the documents and information that they want to provide to FINRA so that Genworth can "be heard" on whether the Individual Defendants should be permitted to defend themselves as they deem appropriate is equally offensive in that it seeks to legitimize Genworth's efforts to control Defendants and dictate to them

how, in Genworth's view, they should defend themselves against the spurious allegations from an undisclosed source that instigated the FINRA investigation.

### The Expungement

Contrary to Genworth's counsel's repeated suggestion that the FINRA arbitration matter has been finalized, the FINRA arbitration has, in fact, not been concluded inasmuch as FINRA has yet to address the Individual Defendants' motion for expungement. Moreover, Genworth is well aware of that fact inasmuch as the Individual Defendants filed their Motion for Expungement and provided a copy to Genworth prior to Genworth filing its opposition papers to the Court on October 30, 2012. The Individual Defendants have filed the present motion for clarification so that they can document their claims regarding expungement in the upcoming hearing. See Exhibit 2 (FINRA Expungement Rules). This motion is necessary because the Court's ruling on Defendants' prior request for clarification dealt with discovery that had been requested primarily by the Claimants in the FINRA arbitration. This Court ordered that, for the Claimants to obtain certain discovery, the Claimants needed to sign a protective order. At this juncture, however, there is no issue regarding the Claimants' demand for documents. Rather, the issue raised by this motion pertains to the Individual Defendants' right to use information to present evidence in support of their motion for expungement. Genworth's suggestion that the Court's prior ruling is sufficient to cover these circumstances therefore is plainly erroneous. Genworth's effort to limit the Individual Defendants' presentation of evidence in the FINRA arbitration is particularly out of line given that: (1) Genworth readily admitted that the issues in the FINRA arbitration were "not based on Genworth's confidential

information" (Docket Entry No. 269 at 5); and (2) the claims in the FINRA arbitration involved claims that the Individual Defendants "aided and abetted" Genworth's fraudulent activities.  Given the "aiding and abetting" claims against the Individual Defendants, they must be allowed to present evidence regarding the fraudulent activities at Genworth in order to properly articulate the fraudulent activities engaged in by Genworth and to demonstrate that they did not "aid and abet" such fraudulent activities.  The Individual Defendants need to present evidence to the arbitration panel in order to clear their names regarding all claims, including the claim that they aided and abetted fraud, without Genworth dictating and controlling what they may or may not present.

### The "Confidential Information"

Genworth has taken every opportunity to define virtually everything that relates to its operations as protected confidential and trade secret information.  Genworth, however, has gone back and forth in defining and redefining what it deems to be the protected trade secret information.  For a long time, the alleged trade secret consisted of the customer lists, and, more specifically, the customer names, addresses, and account titles.  See Docket No. 196 at 26 ("There is no question that the **identity and contact information** of Genworth's clients are not known outside of Genworth's business and cannot be learned by legitimate means". . . . "The identities of Genworth's clients are closely guarded. . . .") (emphasis added).  In its more recent filings, however, Genworth has taken a different approach, alleging that it is its **databases** that constitute its trade secrets, even if those databases are comprised of public and non-public information.  See Docket Entry No. 319 at 6-7 (describing "the

totality of Genworth's Private Client Group client list and related data – which is comprised of both public and non-public information" as being "stored principally in several safeguarded, proprietary databases such as TNET and ACT," and stating that the issue is "whether Genworth's client databases constitute protectable trade secrets"); see also Docket Entry No. 337 at 7, n.2 (conceding that "Genworth does not contend that individual client statements are trade secret or confidential **simply because they contain client data**") (emphasis added).  This is so because Genworth's prior position that client identities and contact information were not readily ascertainable has all but been disproven by the fact that client statements, correspondence, and communications with Defendants were never treated as confidential and could be and were obtained by Defendants through legitimate means. Genworth now focuses instead on its alleged "databases", and apparently concludes that everything that is contained in those databases is confidential and a trade secret, even if the same information was public information when it entered the databases and even if that information is available from other non-confidential sources, such as client statements.

     It is in this context that Genworth repeatedly refers to any and all information about Genworth's operations as "confidential" and as "Genworth customer information" to the point where even the FINRA arbitration panel admonished Genworth for abusively "stretching" the use of the term "confidential" (see Exhibit 3). It is also in this context that Genworth now seeks to prevent Defendants from proffering relevant information to FINRA in response to a complaint filed by an unknown source against them, including information regarding the fraud at Genworth,

i.e., potentially illegal activity. Genworth's attempt to define every aspect of its operations as protected confidential and trade secret information is ill conceived and should not be endorsed by this Court. Nor should Genworth be permitted to hide its fraudulent activity from being disclosed based upon its incantation that the information constitutes "confidential Genworth client information" protected by the injunction order.

Genworth's opposition to Defendants' motion for clarification epitomizes the extreme and unconscionable efforts that Genworth has taken and apparently will continue to take to destroy the lives of the Defendants and to hide its fraud from scrutiny by anyone in any setting. Fraud is not a protectable trade secret and we urge this Court to recognize Genworth's current campaign for what it truly is – a campaign of personal destruction. We urge this Court to reject Genworth's attacks and afford Defendants the opportunity to defend themselves and their professional livelihoods.

WHEREFORE, Defendants respectfully request that the Court clarify the Injunction Order to enable Defendants to properly and adequately respond to the investigation by FINRA and to submit materials and information in support of their motion for expungement without exposing themselves to jeopardy for violating the Injunction Order.

Respectfully submitted,

DEFENDANTS TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN, KAREN BAZON, TAMARA RIVERA AND TJT CAPITAL GROUP, LLC

AND

THIRD-PARTY PLAINTIFFS TIMOTHY MCMULLAN, JAMES COOK, TIMOTHY MCFADDEN AND TJT CAPITAL GROUP, LLC

By:   */s/ David P. Friedman*
        David P. Friedman (ct03558)
        dfriedman@murthalaw.com
        Ka Fei Wong (ct28130)
        kwong@murthalaw.com

Murtha Cullina, LLP
177 Broad Street, 4th Floor
Stamford, Connecticut  06901
Phone:  203-653-5400
Fax:  203-653-5444

## CERTIFICATION

I hereby certify that on November 2, 2012, a copy of the foregoing Motion for Clarification was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing though the Court's CM/ECF System.

                                                 */s/ David P. Friedman*
                                                 David P. Friedman (ct03558)

4159025v3