# EXHIBIT 3



## CT Cellar Doors, LLC v. Stephen Palamar

### UWYCV105016075S

### SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATERBURY AT WATERBURY

### *2010 Conn. Super. LEXIS 3247*

### December 10, 2010, Decided
### December 10, 2010, Filed

**NOTICE:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE RE-VIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** [*1] Wilson J. Trombley, J.

**OPINION BY:** Wilson J. Trombley

**OPINION**

MEMORANDUM OF DECISION RE PLAIN-TIFF'S APPLICATION FOR TEMPORARY INJUNC-TION--# 101

I. Nature of the Proceedings

This case arises out of an employer (plaintiff) and employee (defendant) relationship that terminated in May 2010, when the defendant, without prior notice, terminated his employment with the plaintiff. In this action, the plaintiff seeks, *inter alia*, a permanent and temporary injunction that would prohibit the defendant from competing with the plaintiff in the business of designing and installing metal basement entry doors and accessories in violation of a restrictive covenant not to compete that was signed by the defendant in 2007.

In his verified complaint, signed by the "owner" of the plaintiff and filed on October 7, 2010, the plaintiff avers that it is in the business of installing cellar doors, windows and other accessories. [1] In August 2007, while employed by the plaintiff, the defendant signed a "non-competition-nondisclosure agreement" wherein the de-fendant agreed, in the event his employment with the

plaintiff was terminated, not to compete with the plaintiff anywhere in the state of Connecticut for a period of three years after [*2] said termination. The plaintiff claims that on May 24, 2010, the defendant left voluntarily without notice and since that time has been doing busi-ness as Custom Cellar Doors and has been advertising and performing the same services that he performed while in the plaintiff's employ in direct competition with the plaintiff and in violation of the restrictive covenant. The plaintiff asserts that the defendant's conduct in com-peting with the plaintiff has caused and continues to cause the plaintiff irreparable harm, including injury to its goodwill, reputation and name, for which there is no adequate remedy at law. The plaintiff brings its com-plaint in two counts, the first alleging a breach of con-tract, i.e., the restrictive covenant; the second alleging that the defendant's actions are in violation of the Con-necticut's Unfair Trade Practices Act (CUTPA). In addi-tion to a temporary and permanent injunction enjoining the defendant from installing cellar doors and other ac-cessories, the plaintiff seeks an accounting, compensa-tory and punitive damages, including attorneys fees, costs, interest and such other relief as deemed appropri-ate by the court.

> 1   *General Statutes Sec. 52-471(b)* provides: No injunction may be issued unless the facts stated in the application therefor are verified by the oath of the plaintiff or of some competent witness.

On October 12, 2010, the defendant was [*3] served in hand with said complaint in addition to an application for a temporary injunction, an order to show cause and a notice of hearing. The initial hearing date was October 28. The matter, however, was continued to permit the defendant to obtain counsel. On November 4, 2010, the

court conducted a hearing on the plaintiff's application for a temporary injunction at which both parties appeared with their respective attorneys. The court heard from three witnesses, to wit, the principal and managing member of the plaintiff, Claude Raffin; the plaintiff's office manager, Gayle Nelson; and the defendant. The court received seven documentary exhibits into evidence, six of which were submitted by the plaintiff and one submitted by the defendant. After considering the testimony of the witnesses and assessing the credibility of each; after reviewing each of the exhibits; and after considering the oral arguments advanced by the parties, for reasons hereinafter stated the court will deny the plaintiff's application for a temporary injunction. The court finds that the restrictive covenant executed by the defendant is unenforceable as it unfairly and unreasonably restrains competition.

## II. Factual [*4] Background

Raffin started his business in late 2003. The business consists of the design and installation of metal outside entry cellar doors and accessories including bottom entry doors, stairs, custom basement windows, window well systems and covers. The plaintiff has built a business that includes six employees and some temporary employees. Currently, the plaintiff has orders from fifty customers throughout the state of Connecticut. Plaintiff's exhibit #1. Raffin takes pride that the business he has built has become an expert in the design and installation of what he refers to as "custom-made" cellar doors, although it appears that many of the plaintiff's installations consist of pre-manufactured standard entry doors of the type that are readily available at the Home Depot, a fact confirmed by the defendant. Plaintiff's exhibits #4 and #5 consist of advertisements in the Clipper magazine that contain photos of such doors. Despite the wide availability of standard cellar doors Raffin boasted that: "We do custom installation that no one else does!"

The plaintiff hired the defendant as an installer in January 2006, however, in August 2007, the defendant was offered and accepted a promotion [*5] to the position of operations foreman. The promotion was accompanied by a substantial increase in salary (Plaintiff's exhibit #2); it was conditioned on the defendant's acceptance and the defendant's signature on a document entitled "Noncompetition And Nondisclosure Agreement." Plaintiff's exhibit #3. Pertinent to the issues before the court is paragraph 2.2 of said agreement, which prohibited the defendant "for a period of *three years* following termination of the employee's employment for whatever reason" from competing, as an employee or principal, with the plaintiff in any manner or from connecting with any company "that provides *similar* services as those provided by [the plaintiff] and is located in the *state of*

*Connecticut*." Emphasis added. The defendant was further prohibited from establishing a business relationship with any former customers of the plaintiff that would enable the defendant to provide services similar to those he provided while employed by the plaintiff.

Section 1 of the agreement contained an extensive definition of what the plaintiff considered to be "confidential information" which the defendant was prohibited from using in any business that competed with the [*6] plaintiff. No time limits accompanied the prohibitions contained in this section of the agreement. On August 21, 2007, one week after the offer of promotion, the plaintiff signed the agreement. The defendant did not recall the execution thereof, however, the agreement was signed in the presence of Ms. Nelson, who did recall the event.

In May 2010, for reasons not disclosed by either party, the defendant decided to terminate his employment without providing any notice to the plaintiff. [2] Within a few days thereafter, the defendant registered with the department of consumer affairs as a home improvement contractor. Plaintiff's exhibit #6. After receiving word from some vendors and some of the plaintiff's employees that the defendant was installing basement stairs in competition with the plaintiff, Raffin, upon further investigation, discovered that the defendant was advertising his new business, Custom Cellar Doors, in the September-October and October-November issues of Clipper magazine, the same publication in which the plaintiff promoted its business. [3] See Plaintiff's exhibit #4(a-e) and #5(a-e). In comparing the defendant's ad with that of the plaintiff, there is no question that the [*7] defendant is advertising "similar" if not identical services to those he performed while employed by the plaintiff. Both advertisements promote the installation of "bottom entry doors, stairs, custom basement windows, window well systems and covers." The plaintiff's ad indicates that the company installs "all types of cellar doors," while the defendant advertises the ability to install "*custom* doors of any size and shape." Emphasis added. The plaintiff claims to be "New England's largest cellar door entry specialist," while the defendant advertises that his business is "serving all Connecticut." Both parties guarantee their work; the plaintiff offers a written guarantee.

2  Ms. Nelson, who has been the plaintiff's office manager for the past four years, testified that, due a downturn in the economy in January 2009, the plaintiff was compelled to impose an across-the-board decrease in salaries and wages. The defendant suffered a $220 reduction from his $1,100 weekly salary. Nelson explained that the pre-reduction levels were reinstated in two increments long before the defendant terminated his employment in May 2010.

2010 Conn. Super. LEXIS 3247, *

3   Raffin testified that he places advertisements in Clipper magazine in each of the seven counties in the state of Connecticut, while the defendant testified that his ad appeared in the Fairfield County publication only. The plaintiff was unable to find an advertisement for the defendant's business in any other Clipper publication.

The defendant readily admits to the placement of the advertisement in the Fairfield County Clipper magazine. He testified, however, that since September 2010, he has obtained two jobs, a cellar door installation in Stamford which was completed and a pending order for a similar installation in Norwalk. The defendant is certainly knowledgeable about basement doors. He identified the three major manufacturers--Bilko, Gordon and Steelway--all of which provide standard doors. He explained that his major task while employed [*8] by the plaintiff was to perform certain measurements of the foundation and to insert the results on a form or sketch created by Raffin. It was left to Raffin to determine whether a standard or custom designed door was needed for a particular job.

The defendant claimed that he has been installing the standardized cellar doors that he purchases from Bilko or Gordon. He has not installed any so-called customized cellar doors, which are only available from Steelway in Pennsylvania. In response to questions by his attorney, the defendant stated that he is willing to agree to limit his installations to the standard doors and is willing to limit his potential customers to those in Fairfield and New Haven counties. He is even willing to remove "custom" from his trade name.

The defendant testified he graduated from high school in 1980 and became a certified carpenter in 1989. His work as a carpenter included the installation of basement doors, which he has been doing since 1985. He testified that in his experience, "90% of the doors he installed were standard doors" and that most modifications, if required, could be performed with the aid of accessories that are furnished by the manufacturer. [*9] He explained the only additional items needed were common carpentry tools, i.e., a square, a measuring tape, a saw and a hammer. His new business currently consists of one employee, himself, and a recently purchased 1988 Chevy truck.

Based upon a comparison of the advertisements and the defendant's own admissions, it appears to be undisputed that from the time that Palamar ended his employment with the plaintiff he has been engaged in direct competition with his former employer in violation of section 2.2 of the Noncompetition And Nondisclosure Agreement. The parties agree, however, that the critical issue that the court must address is whether the restrictive covenant that the defendant agreed to in August

2007 is enforceable under Connecticut law. In this regard, counsel for each of the parties agreed that the plaintiff has the initial burden of going forward and proving that the restrictive covenant was signed by the defendant and that the defendant is in violation of that covenant. Once that is established by the plaintiff, counsel agreed that the burden is then upon the defendant to show that the restrictive covenant unduly restricts trade, is against public policy and should therefore [*10] not be enforced by the court.

III. Claims of the Parties

A. The Plaintiff's Claim

In response to a query as to why the court should enforce the restrictive covenant, Raffin explained that he has expended a lot of time and money in building his business over the past seven years. He is concerned that the defendant will promote his new business by contacting customers of the plaintiff, many of whom are likely to contact the plaintiff for maintenance of previous installations or for new work. He is concerned that, should the defendant be permitted to continue to install basement entry doors and accessories within the state of Connecticut, the business that Raffin worked so hard to build would be placed in serious jeopardy.

Raffin conceded, however, that, although the plaintiff is in violation of the terms of the restrictive covenant by continuing to install basement entry doors in competition with the plaintiff, he is making no claim that the defendant took a list of customers when he departed; he is not claiming that the defendant removed from the plaintiff's premises any confidential information such as custom designs or plans. In effect, the plaintiff is not claiming that there is anything [*11] *unfair* in the manner in which the defendant is competing; it is the fact that he is competing and is in violation of the restrictive covenant that has caused the plaintiff to file this action and, in particular, the application for a temporary injunction.

Despite, on the part of the defendant, the lack of any unfair acts or practices, as alleged by the plaintiff in the CUTPA count of its complaint, the plaintiff argues that as a licensed carpenter, the defendant is free to perform all types of services unconnected with the installation of cellar doors. Therefore, should the court enforce the restrictive covenant the defendant would not be prohibited from making a living. Moreover, the plaintiff has built a unique business, has become an expert in the installation of custom cellar doors and has amassed goodwill and a customer base throughout the entire state. The plaintiff asserts that allowing the defendant to continue to compete within that customer base in violation of an agreement that he signed, which resulted in a significant pro-

motion and higher wages, would be inequitable and would cause irreparable injury to the plaintiff for which there would be no adequate remedy at law. Given [*12] the facts and circumstances of this case, the plaintiff argues that the equities are, on balance, in its favor and support the issuance of a temporary injunction.

B. The Defendant's Position

The defendant argues that the restrictive covenant signed by him in August 2007, lacked "adequate consideration" and is an unreasonable restraint of trade. The defendant points out that the evidence shows that the plaintiff is currently servicing fifty customers while the defendant, since August, has serviced only two. The defendant asserts he has a right to earn a living at what he has been doing for twenty-five years; he has a right to install cellar entry doors and accessories. He argues that it would be inequitable and unreasonable for the court, via a temporary injunction, to prohibit him from doing so.

IV. Applicable Law

A. Temporary Injunction

The purpose of a temporary injunction is to preserve the status quo by prohibiting the performance of certain acts described in the applicant's verified complaint until final determination of the party's rights after a hearing is held on the merits. *Clinton v. Middlesex Mutual Assurance Company, 37 Conn.App. 269, 270, 655 A.2d 814 (1995); Deming v. Bradstreet, 85 Conn. 650, 659, 84 A. 116 (1912).* [*13] In considering whether to grant or to deny an application for a temporary injunction a court is obligated to consider four factors: whether or not irreparable or imminent injury is implicated; whether or not the applicant has an adequate remedy at law; the likelihood that the applicant will be successful at the trial on the merits; and whether the balancing of the equities favors or disfavors granting the applicant's request. *Waterbury Teachers Assn. v. Freedom of Information Commission, 230 Conn. 441, 446, 645 A.2d 978 (1994).* If the applicant proves that irreparable injury will be the result unless the injunction is granted, the court ought to grant the injunction, unless it is clear that the applicant will not prevail at a trial on the merits. *Olcott v. Pendleton, 128 Conn. 292, 295, 22 A.2d 633 (1941).* An irreparable injury is an injury that is of such a nature that it cannot be adequately compensated in damages, or cannot be measured by any pecuniary standard. *Connecticut Asso. Clinical Laboratories v. Conn. Blue Cross, Inc., 31 Conn. Supp. 110, 113, 324 A.2d 288 (1973).*

B. Restrictive Covenant In Employment

When a temporary injunction involves a restrictive covenant arising out of an employment situation, most trial courts [*14] have followed Judge Adams' opinion in *POP Radio v. News America Marketing In-Store, 49 Conn.Sup. 566, 577, 898 A.2d 863, [40 Conn. L. Rptr. 332] (2005).* "Connecticut law supports a distinctly moderated level of proof required to establish the elements of irreparable harm and lack of an adequate remedy at law necessary for the issuance of a temporary injunction where the circumstances involve an alleged breach of a noncompetition agreement." Judge Levin recently held in *Fairfield County Bariatrics and Surgical Associates, P.C. v. Timothy B. Ehrlich, MD. et al. (FBT-CV-10-50291046), Judicial District of Fairfield at Bridgeport, March 8, 2010; 2010 Ct.Sup.6436, 2010 Conn. Super. LEXIS 568:* "Specifically, this court holds that irreparable harm and lack of adequate remedy at law are rebuttably presumed where a covenant not to compete, which has been found to impose only a *reasonable restraint* has been violated." Emphasis added.

"By definition, covenants by employees not to compete with their employers after termination of their employment restrain trade in a free market . . . Consequently, these covenants may be against public policy, and, thus, are enforceable only if their imposed restraint is reasonable, an assessment that depends [*15] upon the competing needs of the parties as well as the needs of the public. These needs include: (1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need to earn a living; and (3) the public's need to secure the employee's presence in the labor pool." *Deming v. Nationwide Mutual Ins. Co., supra, 279 Conn. 761.* "To meet this test successfully, the restraint must be limited in its operation with respect to time and place and afford no more than a fair and just protection to the interests of the party in whose favor it is to operate, without unduly interfering with the public interest." *Mattis v. Lally, 138 Conn. 51, 54, 82 A.2d 155 (1951).* "[W]e have held that time and geographic restrictions in a covenant not to compete are valid if they are *reasonably limited* and fairly protect the interests of both parties." *Robert S. Weiss & Associates, Inc. v. Wiederlight, 208 Conn. 525, 530, 546 A.2d 216 (1988).* Emphasis added.

"Under the law, restrictive stipulations in agreements between employer and employee are not viewed with the same indulgence as such stipulations between a vendor and a vendee of a business and it's good will." *Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 252, 108 A. 541 (1918).* [*16] When employee agrees to be subjected to future work restrictions, he or she does so in order to obtain employment and ordinarily gets nothing in return for giving up this important freedom. Thus, the employee is at a great bargaining disadvantage; there-

2010 Conn. Super. LEXIS 3247, *

fore, courts generally give such restrictive covenants great scrutiny since the agreement seriously impairs an employee's ability to make a living once the relationship is terminated. *Fairfield County Bariatrics and Surgical Associates, P.C., supra*, citing *Rash v. Tocca Clinic Medical Association, 253 Ga. 322, 320 S.E.2d 170 (1984)*.

In the *Fairfield County Bariatrics* case, *supra* (involving the enforcement, via a requested temporary injunction of a restrictive covenant contained in an agreement between the shareholders and principals of the plaintiff corporation, which prevented the defendant physician from practicing bariatric medicine within a certain defined area), Judge Levin, after an extensive review of appellate case law in Connecticut, concluded: "In every case in which the court upheld a covenant not to compete, the party whom the covenant benefitted was seeking to protect against something other than mere competition--the use  [*17*] of his customer lists, information concerning potential customers in a limited area the employee had acquired, the impairment of good will he had purchased, confidential data or trade secrets or some other advantage the employee had acquired while in his employ which would make his immediate competition *unfair*." Emphasis added. [4]

> 4   "In that opinion, Judge Levin reviewed the following cases: *Robert S. Weiss and Associates Inc. v. Wiederlight, supra, 208 Conn. 525 (1988); Scott v. General Iron and Welding Co., 171 Conn. 132, 368 A.2d 111 (1976); Mattis v. Lally, supra, 138 Conn. 51 (1951); Cook v. Johnson, 47 Conn. 175 (1879); Domurat v Mazzaccoli, 138 Conn. 327, 84 A.2d 271 (1951); Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 12 A.2d 780 (1940); New Haven Tobacco Co. v Perrelli, 18 Conn.App. 531, 559 A.2d 715*, cert. denied, *212 Conn. 809, 564 A.2d 1071 (1989); May v. Young, 125 Conn. 1, 2 A.2d 385 (1938); Rossler v. Burwell, 119 Conn. 289, 176 A. 126 (1934); Samuel Stores, Inc. v. Abrams, supra, 94 Conn. 248 (1918); Beit v. Beit, 135 Conn. 195, 63 A.2d 161 (1948)*, rearg. denied, *135 Conn. 413, 65 A.2d 171 (1949)*; and *Styles v. Lyon, 87 Conn. 23, 86 A. 564 (1913)*.

C. Burden of Proof

As previously noted, at the conclusion of the hearing on the plaintiff's application for temporary injunction, counsel agreed that while the plaintiff had the initial burden of proving that the defendant signed the agreement containing the restrictive covenant and that the defendant was acting in violation thereof, it falls upon the defendant to then persuade the court that the covenant is unen-

forceable. In this case, it is virtually undisputed that on August 21, 2007, the defendant signed the agreement at issue, and thereby agreed to the restrictive covenant. Further, it is undisputed that the defendant is currently installing metal cellar doors and other accessories within the state of Connecticut in apparent violation of the terms of said covenant. The plaintiff, having met his two-pronged burden, it is up to the defendant to sustain the [*18*] burden of proving to this court that the restrictive covenant is an unenforceable and unreasonable restraint of trade. This court finds that the defendant has successfully met that burden.

IV. DISCUSSION

Certainly, Raffin, the plaintiff's principal, has a right to protect a business which he developed over the years through substantial investment of his time and money from being destroyed or seriously impaired via unfair or unscrupulous competitive conduct by a former employee. The plaintiff clearly has the right to invoke legal process via a request for injunctive relief in order to prevent a former employee from engaging in unfair competition by ignoring the terms of the restrictive covenant not to compete with his former employer that was signed by said employee. As made apparent by the cases cited herein, however, such a covenant must be reasonably limited as to time and geographic area consistent with the nature of the business that the employer seeks to protect. Our courts have imposed such limitations in recognition of every person's right to earn a living and the public's need to have that former employee as part of the labor force. Therefore, restrictive covenants in employment  [*19*] will be enforced by our courts only if the restraint imposed thereby is reasonable. If the restriction is overly broad the covenant will not be enforced and any requested injunctive relief will be denied, thereby negating any finding of irreparable harm or lack of adequate remedy at law. *Fairfield County Bariatrics, supra*.

As noted, Raffin, the plaintiff's principal, confirmed that the defendant did not take any trade secrets, customer lists, confidential data, maps, designs, or schematics when he left the plaintiff's employ in May 2010. Any unfairness, which Judge Levin discerned was the common thread in the cited appellate cases in which the enforcement of the restrictive employment covenant was upheld, is totally lacking in this case. The facts do not support any of the allegations contained in the second count of the plaintiff's complaint, i.e., the CUTPA count.

Since leaving his employment with the plaintiff, the defendant has managed to obtain only two customers, while at the time of the hearing, the plaintiff was currently servicing or held orders for fifty customers. During his employment with the plaintiff (from January 2006 to May 2010) the defendant installed outside metal

2010 Conn. Super. LEXIS 3247, *

[*20] basement entry doors and accessories which he had been doing since 1985 as part of his trade as a carpenter. While employed by the plaintiff the defendant was not responsible for nor did he make the decision as to when to install so-called "custom made" cellar doors. Since his separation from the plaintiff the defendant has been installing standard cellar doors which he obtains from the three major manufacturers. In the process of doing this work the defendant makes use of the square, a measuring tape, a saw and a hammer--all basic tools of his carpentry trade. In balancing the equities, while the plaintiff has a right to utilize the court to make sure that his former employee does not engage in unfair competition, the plaintiff does not have a right to use the injunctive process to completely prevent an employee, who possesses all the skills necessary to install outside metal basement entry doors and who had done so for many years prior to commencing employment with the plaintiff, from continuing to pursue his chosen occupation, simply because he opted to sign a restrictive covenant in order to obtain a significant promotion, particularly, when that covenant prevents him from doing [*21] so for three years throughout the entire state of Connecticut.

This court finds that covenant under the facts and circumstances of this case and based upon the cited precedent is an unenforceable, unfair and unreasonable restraint of trade and is contrary to the public policy of this state. Based upon the foregoing, this court finds that it is unlikely that the plaintiff will be successful at a trial on the merits. The plaintiff's application for a temporary injunction is DENIED.

Wilson J. Trombley, Judge



**Webster Bank, N.A. et al. v. Daniel Cahill et al.**

**CV094018982S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF
WATERBURY AT WATERBURY**

*2009 Conn. Super. LEXIS 1672*

**June 16, 2009, Decided
June 16, 2009, Filed**

**NOTICE:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE RE-VIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** [*1] Robert C. Brunetti, J.

**OPINION BY:** Robert C. Brunetti

**OPINION**

*MEMORANDUM AND ORDER*

This matter is before the court on the plaintiff' application for a Temporary Injunction. The court, after review of the evidence, exhibits, and the applicable law, grants the plaintiff' application.

*BACKGROUND*

The plaintiff Webster Bank (Webster) is a financial institution with it principal office located in Waterbury, Connecticut. The plaintiff UVEST FINANCIAL SERVICES (UVEST) is a securities broker/dealer with its principal office located in Charlotte, North Carolina. The defendant Daniel Cahill (CAHILL) is a former employee of the plaintiff. The defendant RBC Capital (RBC) is security's broker/dealer with its principal office located in St. Paul, Minnesota. The defendant Daniel Cahill is now and has been employed by RBC since February 13, 2009. This controversy arises out of Cahill's resignation from Webster/UVEST and subsequent employment by RBC.

Mr. Cahill started his employment with Webster on April 11, 1995, as a teller in the Bristol, Connecticut offices of Webster. He subsequently was promoted and in 2001 started working for Webster Investment Services, as a financial consultant. Webster Investment Services was the [*2] securities division of Webster Bank, providing retail brokerage services to the banks' clients. In 2007 Webster Investment Services decided it needed a partner in its brokerage business. [1] Webster entered into an agreement with UVEST wherein UVEST would provide the brokerage services to Webster's brokerage clients. As part of this partnership, financial consultants such as Cahill were required to sign dual employment agreements. (plaintiff Exhibit 3.) Mr. Cahill thereafter had dual employers' UVEST through which he conducted his brokerage transactions and Webster, who provided him with an office in its Bristol branches and paid him his salary. At all times herein Cahill provided the brokerage services out of the three Bristol, Connecticut offices of Webster. On February 12, 2009, Cahill was scheduled to be at a conference in New Britain, Connecticut after reporting to be ill. Cahill at approximately 3:34 P.M., faxed a letter of resignation to UVEST/Webster effective immediately. On February 13, 2009, Cahill began working at the Hartford, Connecticut office of RBC. On April 2, 2009, the plaintiffs filed this action seeking to enforce the restrictive covenants in Cahill's dual employment [*3] agreement and enjoin both Cahill and RBC from any actions that conflicts with these restrictions.

1 Though the exact nature of the relationship between Webster and UVEST is not clear, the testimony was that Webster is both a partner and client of UVEST.

2009 Conn. Super. LEXIS 1672, *

The restrictions the plaintiffs are seeking to enforce are found in paragraphs seven and eight of the dual employment agreement. The specific provisions of paragraph seven which the plaintiffs are seeking to enforce are 7a and 7b, which states: the employee, will not for one year within a 25-mile radius of the employee's base of operations will not conduct any business activity that is in competition with the business conducted by UVEST, and in 7b(iii) the employee shall not solicit by mail, phone, personal meeting or any other manner, any customer of UVEST whose name became known to the employee as direct or indirect result of his employment with the plaintiffs.

In paragraph 8a of the agreement, the employee agrees to keep confidential and not disclose all information, plans, trade secrets, business secrets, and confidential and other data of UVEST or Webster. "Trade Secrets" includes the names of any UVEST or Webster's customers, or information [*4] concerning such customers' accounts or portfolios, or any other information concerning the business of UVEST and/or Depository, its manner of operation, its plans, or other data. In paragraph 8b, the employee agrees upon termination of his/her employment that he or she will immediately return to the Depository (Webster) any property, customer list, information, forms, formulae, plans, documents, memoranda, notes, records, or other written or computer material or data, software or firmware, or copies of the same, belonging to UVEST or the Depository.

Cahill in his testimony admitted that he violated both paragraphs' seven and eight. He admitted that RBC is a direct competitor of UVEST and that he now works for RBC in their Hartford office which the parties stipulated is within the twenty-five mile radius of his former Bristol office. Cahill also admitted that he took with him a customer list of approximately 2,900-3,000 accounts representing about 875 customers, and that solicitation letters were sent out to all these customers on RBC stationery, some of which included a handwritten note from Cahill. [2] These letters are dated February 13, 2009, the day after Cahill left UVEST/Webster. [*5] Cahill also testified that he gave the list to a company called Broker to Broker, a third party intermediary around February 8-9, 2009. As to any confidential information, Cahill testified this was returned to Webster/UVEST. Cahill admitted that approximately 350-400 accounts have transferred to him at RBC representing 150-200 people. Thomas Howe, Executive VP of Webster testified that approximately 200 people have moved their accounts representing approximately five million dollars in assets.

2   plaintiff's Exhibits seven through nineteen, are copies of the letters including the handwritten note.

Cahill and RBC's position is, that even though Cahill admittedly violated the terms of the dual employment agreement, a temporary injunction should not be issued. They argue that because Cahill was a licensed and registered securities dealer and a financial representative of a firm (UVEST) which was a member of the Financial Industry Regulatory Authority (FINRA) he was allowed to take this information. That under the rules and regulations of FINRA, this matter belongs in arbitration with FINRA, not in this court. Cahill also claims that he followed the rules found in another agreement called [*6] the "Protocol" [3] which governs what information a broker moving from one firm to another can take from his former employer. According to the protocol, a broker moving from one firm to another can take a copy of the customer list, with names, addresses, phone numbers and email addresses. The broker may not take account numbers. The broker must also leave a copy of the customer list on his or her desk. Cahill testified that he did this. Mr. Howe of Webster testified that they never found any list.

3   The Protocol was described as a voluntary agreement between securities firms governing the recruiting and hiring of brokers from competitors. A copy of this document is attached to the defendant's motion in opposition as Exhibit C.

As to the affiliations, Mr. Robert Summa, Sr., VP of UVEST, testified that UVEST is a member of FINRA, but not a member of the Protocol. Webster Bank is not a signatory of either FINRA or the Protocol.

The court finds that since both Webster and UVEST are not signatories of the Protocol, the defendants' argument that this matter is governed by FINRA and the Protocol to be unavailing. This is a contract action dealing with a restrictive covenant and will be decided [*7] in accordance with the laws of the State of Connecticut.

*DISCUSSION*

The purpose of a temporary injunction is to preserve the status quo until there is a final determination of the issues after a hearing on the merits. *Rustici v. Malloy, 60 Conn. App. 47, 56, 758 A.2d 424*, cert. denied, *254 Conn. 952, 762 A.2d 903 (2000).* In order to obtain a temporary injunction, the moving party must show "1) irreparable harm or injury; 2) the likelihood of success on the merits; 3) the lack of an adequate remedy at law; and 4) that the balancing of equities favors granting the injunction." *Waterbury Teachers Association v. Freedom of Information Commission, 230 Conn. 441, 446, 645 A.2d 978 (1994).* Where a preliminary injunction is sought to enforce the terms of a restrictive covenant "irreparable injury and lack of an adequate remedy at law is automatically established." *Kim's Hair Studio LLC v. Rogers,*

*Super.Ct., J.D. of Middlesex, 2005 Conn. Super. LEXIS 1805, 2005 WL 1971259 \*1 (Aurigemma, J., July 20, 2005)*, citing, *Lampson Lumber Co. v. Caporale, 140 Conn. 679, 685, 102 A.2d 875 (1954)*. The court after review of all the exhibits and testimony finds that the plaintiffs have satisfied their burden and a temporary injunction is issued. The court finds 1)  [*8] that if the defendants are allowed to keep soliciting the clients of Webster/UVEST, irreparable harm may result. Once these clients are lost, they will never return. 2) that there is a likelihood of success on the merits, 3) that there is a lack of an adequate remedy at law, and 4) the balancing of equities favors granting the injunction.

As to the second prong, the court finds the restrictive covenants found in the dual employment agreement to be reasonable. By definition, covenants by employees not to compete with their employers after termination of their employment restrain trade in a free market. *Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 519, 12 A.2d 780 (1940)*. Consequently, these covenants may be against public policy, and, thus, is enforceable only if their imposed restraint is reasonable, an assessment that depends upon the competing needs of the parties as well as the needs of the public. In evaluating the reasonableness of a restrictive covenant contained in an employment agreement, the courts in Connecticut consider whether (1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need  [*9] to earn a living; and (3) the public's need to secure the employee's presence in the labor pool. *Scott v. General Iron & Welding Co., 171 Conn. 132, 137, 368 A.2d 111 (1976)*. In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial, and restricted in its operation in respect either to time or place and must be reasonable, that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. *Scott, Id. 137*. In this action, the contract does not require an employee's *express* promise not to compete after termination of employment; instead, it requires that for one year he will not compete within a twenty-five mile radius of Bristol, Connecticut. The court finds the restrictions imposed here pass the test set forth in *Scott*. Cahill testified that in addition to Hartford, RBC has offices in Glastonbury, New Haven, Southport and Stamford. Cahill testified that working in one of these offices would make it inconvenient for his clients to travel to these offices to see him.  [*10] The court finds this argument unavailing. In the business world of today where we have cell phones, email, voice mail, fax machines, blackberry's and the old fashioned telephone, there is no reason Mr. Cahill's client could not contact

him at anytime day or night. The court also finds the one year period is reasonable.

As to the third prong an adequate remedy at law, though it would appear that money damages would seem to suffice, the court finds that since these accounts involve personal service and relationships which would be lost forever, simply paying money damages would not be an adequate remedy. As to the fourth prong, the court finds the balancing of the equities favors Webster/UVEST. The testimony was that Cahill, with no prior notice, terminated his employment with the plaintiffs. That this action was obviously planned well in advance and executed with the help of RBC. That during his fourteen years of employment with Webster, he had been provided with numerous educational opportunities paid for by Webster. That under the pretext of the "Protocol," he took with him confidential information of the plaintiffs. The court recognizes that in today's world employees change jobs [*11] frequently, however, it should be done in a professional manner which did not occur here.

So for the reasons stated, the court issues the following temporary injunction.

1. That the defendant RBC Capital Markets cease and desist from employing Daniel Cahill in its Hartford Office or any office within a 25-mile radius of Bristol, Connecticut for a period of Twelve (12) months from February 13, 2009.

2. That the Defendant RBC Capital Markets is enjoined from the use or disclosure of the plaintiff' trade secrets or confidential and proprietary information.

3. That the defendants Daniel Cahill and RBC Capital Markets are enjoined from soliciting by mail, phone, personal meeting or contacting in any other manner, any customers of UVEST and/or of Webster Bank that Cahill (I) serviced during his dual employment; or (ii) any customer of UVEST and/or Webster Bank whose name became known to Cahill as a direct or indirect result of his duel or prior employment with Webster Bank for one year from February 13, 2009.

4. The defendants Daniel Cahill and RBC Capital Markets are ordered to immediately return any data, files, customer information including without limitation customer names, addresses, policy  [*12] numbers, to UVEST or Webster. The defendants shall cease and desist from using any trade secrets, and all other confidential and proprietary information owned and developed by UVEST and/or Webster Bank and acquired by Cahill as a result of his dual employment with the plaintiffs.

Said orders to remain in effect until further order of the court.

2009 Conn. Super. LEXIS 1672, *

BRUNETTI, J.



**TyMetrix, Inc. v. Peter T. Szymonik et al.**

**CV064019412S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HART-FORD, AT HARTFORD**

*2006 Conn. Super. LEXIS 3865*

**December 28, 2006, Decided**
**December 28, 2006, Filed**

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** Lois Tanzer, Judge.

**OPINION BY:** Lois Tanzer

**OPINION**

*MEMORANDUM OF DECISION*

This is an action to enforce restrictive covenants in an employment agreement between Plaintiff TyMetrix, Inc. and its former employee, Defendant Peter T. Szymonik ("Employment Agreement"), and for violation of the Connecticut Trade Secrets Act, *General Statutes § 35-51, et seq.* Before the court is TyMetrix's application for temporary injunctive relief as to Szymonik and the co-defendant, SpectoWise, Inc. In reaching its decision, the court has reviewed and considered the volumes of documents, the testimony and credibility of the parties and their numerous witnesses presented during several hearing days, as well as counsels' helpful post-trial briefs.

TyMetrix, Inc. provides web-based systems for electronic invoicing, performance management metrics, matter and document management, budgeting, forecasting and reporting on spending related to legal services. TyMetrix's clients are primarily law departments of Fortune 2000 corporations, [*2] law firms and claim organizations such as insurance companies. Its customers are located throughout the United States and its potential customers include companies in the United Kingdom and Australia.

TyMetrix and Szymonik entered into an Employment Agreement in July 2002 in connection with the hiring of Szymonik as Director of Client Services. In that position, Szymonik was responsible for managing a number of TyMetrix's largest accounts. He had regular contact with customers and had access to confidential information concerning marketing plans, pricing, revenues, budgets, forecasts, and customer contact information. In January of 2004, Szymonik was promoted to the office of Vice President, Technical Operations, the company's chief technology and security officer. During his employment he had access to TyMetrix's confidential information and trade secrets concerning its products and product development, its customers, marketing plans and strategies.

The Employment Agreement signed by Szymonik contains post-employment restrictive covenants that prohibit 1) the retention, use, or disclosure of confidential information and require the return of company documents and data; and that [*3] prohibit for a period of two years following termination of employment; 2) the production, development, sale, solicitations, or promotion of products or services that are similar to or in competition with those offered by TyMetrix; 3) the solicitation of or calling on of TyMetrix clients or prospective clients and 4) the solicitation or hiring of company employees.

On March 10, 2005, TyMetrix terminated Szymonik's employment. Around July 2005, Szymonik formed the co-defendant, SpectoWise, Inc. Szymonik is the President and one of the founders of SpectoWise. TyMetrix claims that Szymonik has retained confidential

2006 Conn. Super. LEXIS 3865, *

information and data, has solicited its clients or prospective clients, has solicited or hired its employees and has developed, sold, promoted products and services similar to or competitive with those offered by TyMetrix. In effect, TyMetrix claims that Szymonik has violated all aforesaid restrictions in the Employment Agreement, and it seeks to enjoin those violations.

### TEMPORARY INJUNCTIVE RELIEF

"The principal purpose for a temporary injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits." (Internal [*4] quotation marks omitted.) *Clinton v. Middlesex Mutual Assurance Co., 37 Conn.App. 269, 270, 655 A.2d 814 (1995).* There is normally a four-part test for the issuance of a temporary injunction: "(1) the plaintiff ha[s] no adequate legal remedy; (2) the plaintiff would suffer irreparable injury absent [the injunction]; (3) the plaintiff [is] likely to prevail . . .; and (4) the balance of the equities favor[s] the issuance of the injunction]." *Waterbury Teachers Ass'n. v. Freedom of Information Commission, 230 Conn. 441, 446, 645 A.2d 978 (1994).*

"The standard for granting a temporary injunction to enforce a covenant not to compete, however, is somewhat different in that the plaintiff does not need to prove irreparable harm. While ordinarily proof of imminent harm is essential, in this type of case there is no such requirement. It has long been recognized in this state that a restrictive covenant is a valuable business asset which is entitled to protection . . . Irreparable harm would invariably result from a violation of the defendant's promises . . . The reason for this is that such a plaintiff's actual injury is not susceptible of determination [*5] to its entire extent but is estimable largely by conjecture and prediction. The standard is also different in that the plaintiff does not have to demonstrate that there is no adequate remedy at law. While the plaintiff could maintain a claim for damages as to each violation that causes injury the difficulty of proof and the inefficiency of repetitive suits render inadequate the use of successive remedies at law, and injunctive relief is therefore warranted to protect the plaintiff from harm which the restrictive covenant was intended to prevent." (Citations omitted; internal quotation marks omitted.) *Access America v. Mazzotta*, Superior Court, judicial district of Middlesex at Middletown, Docket No. CV 05-40033 89 (September 14, 2005, Silbert, J.).

The court concludes that an Employment Agreement with post-termination restrictive covenants exists between the parties and that the plaintiff is likely to prevail on the merits for the reasons set forth below.

1. The Employment Agreement provides in Paragraph VIII as follows: "You shall, without demand, therefore, deliver over to the Corporation all documents and data of every nature pertaining to Your work with the Corporation, including, [*6] without limitation, marketing surveys, product specifications, operating manuals, price lists, memoranda, resumes, client lists, correspondence with Clients or Prospective Clients, computer programs, software applications, systems and other written or electronically-stored matter emanating from the Corporation or any of its suppliers to You, or vice versa, and You agree that You will not take with you or reproduce by any means any of the above-mentioned material."

It is undisputed that when he was terminated, Szymonik had DVDs (the equivalent of 24 boxes of documents) in his possession containing TyMetrix materials, many of which contained non-public information, customer contacts and financial information, and information considered confidential by TyMetrix such as product source codes, competitive analyses, responses to RFPs, and revenue projections and budgets. Szymonik has not returned the DVDs. He maintains he has not utilized the information contained on the DVDs but has kept them to assist him in litigation with TyMetrix.

TyMetrix expends significant sums and employee time on product development and on identifying and establishing relationships with individuals in positions [*7] with potential clients to influence the decision to contract with TyMetrix. It maintains databases of confidential customer requirements and preferences in secure files. TyMetrix takes measures to ensure the confidentiality of its information. It requires all employees and customers to sign confidentiality/non-disclosure agreements and utilizes passwords and source codes to limit access to confidential information concerning its customers and its product development. Whether Szymonik has used the information on the DVDs is not, at this point in the proceedings, the relevant consideration. His possession and retention of the DVDs is in violation of the terms of the employment agreement.

2. Section VI(1) of the Employment Agreement provides as follows:

(1) You covenant and agree that you will not, directly or indirectly, for Your own account or as agent, officer, director, consultant, servant or employee, or as shareholder of any corporation or member of any firm, engage or attempt to engage in the production, development, sale, distribution, solicitation or promotion of the sale or distribution of the Products or Services (as hereinafter defined) . . . for a period of two (2) years [*8] following the termination of Your employment hereunder (hereinafter referred to as "the Restriction Pe-

riod,") anywhere in the continental United States or in any foreign country in which the Corporation shall have sold its Products or Services during the one year period immediately preceding the termination of Your employment hereunder (the "Restricted Area").

The Employment Agreement defines "Products or Services" as the "products and services of [TyMetrix] or any of its affiliates (or product or services similar thereto or competitive therewith) which were sold, distributed, or rendered by [TyMetrix] or any of its affiliates at the time [Szymonik's] employment ceased or during the period one year prior thereto."

The defendants claim that this restriction should not apply because the SpectoWise "product and services" are not the same as those offered by TyMetrix. As of March 2005, TyMetrix was providing and servicing what it refers to as legacy e-billing, matter management, and reporting applications to the majority of existing customers. TyMetrix utilizes e-billing and matter management applications as a means for gathering data from disparate sources such as law firms and [*9] non-law firm vendors that can be translated into reports, metrics, analytics, and business intelligence, which is the most valuable part of TyMetrix's business. The generated reports allow customers to make risk management decisions, manage finances, assess and manage the performance of outside counsel and view trends in legal expenditures. TyMetrix also creates customized reports for clients and offers advisory and consultative services.

There is substantial evidence in the record upon which this court concludes that the products and services offered or to be offered by the defendants are substantially similar to those offered by the plaintiff and are, or would be, in direct competition to those offered by the plaintiff as they are specifically targeted for the very clients serviced by the plaintiff and specifically offered to fill the same functional needs of the client. One need only review the defendants' marketing materials to so conclude. Additionally, the defendants' solicitation of and attempts to join league with known competitors of TyMetrix in an effort to take over its clients is a further violation of this restriction and is well supported in the documentary evidence.

[*10]  3. The Employment Agreement in Paragraph VI(1) also provides that "You covenant and agree that you will not, directly or indirectly, for Your own account or as agent, officer, director, consultant, servant or employee, or as shareholder of any corporation or member of any firm, solicit or call on any Client or Prospective Client (in each case as hereinafter defined) with respect to the Products or Services for a period of two (2) years following the termination of Your employment hereunder (hereinafter referred to as "the Restriction Pe-

riod,") anywhere in the continental United States or in any foreign country in which the Corporation shall have sold its Products or Services during the one year period immediately preceding the termination of Your employment hereunder (the "Restricted Area").

Paragraph VI(2) provides: "You further covenant and agree that You will not, directly or indirectly, for Your own account or as agent, director, officer, consultant, servant or employee, or as a shareholder of any corporation, or member of any firm, engage, hire, employ or solicit the employment of any employee or former employee of the Corporation or any of its affiliates during the Restricted [*11] Period."

The defendants have violated these covenants. Szymonik and SpectoWise have solicited employees of TyMetrix, have already hired John Fabi a former TyMetrix employee, and have represented to potential clients that they plan to have valuable TyMetrix employees on board. Szymonik and SpectoWise have also solicited TyMetrix customers.

4. In a special defense, the defendants contend that the covenants in the employment agreement are unenforceable because TyMetrix breached its covenant of good faith and fair dealing because its termination of Szymonik was wrongful and violated an important public policy. Over plaintiff's objection that an "at will" employee such as Szymonik cannot raise such a defense, the court has allowed Szymonik to proceed on this special defense. [1]

1 *TyMetrix, Inc. v. Peter T. Szymonik et al,* Superior Court, judicial district of Hartford at Hartford, Docket No. CV 06-4019412S (February 9, 2006, Tanzer, J.).

"A cognizable claim for wrongful discharge requires the plaintiff to establish [*12]  that the employer's conduct surrounding the termination of the plaintiff's employment violated an important public policy." *Carnemolla v. Walsh, 75 Conn.App. 319, 323 n.5, 815 A.2d 1251,* cert. denied, *263 Conn. 913, 821 A.2d 768 (2003).* "The public policy exception to the at-will employment doctrine, however, is to be construed narrowly. Under that narrow exception, the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy. In evaluating such claims, our Supreme Court has looked to see whether the plaintiff has alleged that his discharge violated any explicit statutory or constitutional provision or whether he alleged that his dismissal contravened any judicially conceived notion of public policy." (Citations omitted; internal quotation marks omitted.) *Gambardella v. Apple Health Care, Inc., 86 Conn.App. 842, 852-53, 863 A.2d 735 (2005).*

Szymonik contends that he was terminated because he voiced concerns about deficiencies in the security of clients' data and about misrepresentations to clients regarding data security. The credible evidence, adduced at this temporary injunction [*13] stage, does not support Szymonik's contention. In his supervisory role as Vice President of Technology Operations, Szymonik did encounter incidents of deficiency in the security of client data, some of a substantial nature. His complaints, however, were responded to and acted upon by management. Both the timing and the nature of the claims of misrepresentations delivered by Szymonik to Diane Brown around the time of his termination and the nature of "marketing" materials and public statements generated by Szymonik about the competence of data security at TyMetrix during his tenure as Vice President of Technology Operations undermine the credibility of this claim. Rather, the evidence supports the plaintiff's position that Szymonik was terminated because of his disagreements with and inability to work with management, particularly with John Weber, General Manager of TyMetrix, and because of management's dissatisfaction with Szymonik's behavior. The defendants are not likely to prevail on this special defense having failed to present credible evidence that the plaintiff violated any explicit statutory or constitutional provision or contravened any judicially conceived notion of public [*14] policy.

The court must now also consider the reasonableness of the restrictive covenants in the Employment Agreement. "A covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable." *New Haven Tobacco Co. v. Perrelli, 18 Conn.App. 531, 533, 559 A.2d 715* cert. denied, *212 Conn. 809, 564 A.2d 1071 (1989)*. In determining whether a covenant is reasonable, "[t]he five factors to be considered . . . are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." *Robert S. Weiss & Associates, Inc. v. Wiederlight, 208 Conn. 525, 529 n.2, 546 A.2d 216 (1988)*. A party challenging the validity of a covenant not to compete bears the burden of proof on this issue. *Scott v. General Iron & Welding Co., 171 Conn. 132, 139, 368 A.2d 111 (1976); Milaneso v. Calvanese, 92 Conn. 641, 103 A. 841 (1918).* [*15]

Under the Employment Agreement, a period of two (2) years following the termination of employment is the "the Restriction Period." The duration or time limitation of two years from the date of termination is not unreasonable given the expense and time that it takes to develop the products and services offered by TyMetrix, the

expense and time that it takes to develop client contacts and that it takes to recoup those expenses. The average sales cycle for TyMetrix to obtain new customers is one and a half years. TyMetrix does not typically recover its investment in obtaining a customer until a year after the sale. Under the circumstances of this case, I do not find a two-year limitation unreasonable.

The geographical limitation, referred to in the Employment Agreement as the "Restricted Area" is defined as "anywhere in the continental United States or in any foreign country in which the Corporation shall have sold its Products or Services during the one year period immediately preceding the termination of Your employment hereunder." There is no dispute that the plaintiff, its clients and prospective clients are large web-based entities and that the business of TyMetrix is national [*16] and international. This restriction is not unreasonable, especially in light of the distinction it draws between the continental United States and "any foreign country."

As to the fairness to the plaintiff, the public and the defendants, Szymonik began his employment with TyMetrix in August of 2002 and was terminated in March of 2005. Prior to his employment with TyMetrix, he had many years of experience in technology fields unrelated to TyMetrix's business, including having worked for a law firm and a consulting firm that provided technology advisory services to law firms. Szymonik had not worked in TyMetrix's industry before joining TyMetrix, and he did not bring customers or clients with him. The evidence presented by Szymonik as to his attempts to find other employment or his ability to do so during the period before he formed SpectoWise is dirth, except that he turned down a job offer. The defendant has the burden to prove that imposing the restrictions and obligations to which he agreed under the Employment Agreement would be unfairly burdensome as to him.

The court also finds that the plaintiff invested time, effort and money in developing its products and services and in [*17] tailoring those services to the needs of its clients. Szymonik had access to the plaintiff's client base, its product development and strategies, its sales and marketing methods and other confidential information which created an interest which the plaintiff could legitimately seek to protect through restrictive covenants.

Under the totality of the circumstances, I find that the equities lie with the plaintiff, that the public will not be unduly burdened by the restrictions sought, that the defendant will not be unduly burdened by the restrictions and that it is fair to the plaintiff to grant the application for temporary injunctive relief and enter the following orders:

(1) Szymonik and SpectoWise shall immediately return to TyMetrix all TyMetrix documents, in whatever

form or media maintained or stored, without retaining any copies of such materials;

(2) Szymonik and SpectoWise, and all parties acting in concert with or as agents of either Szymonik or SpectoWise, are enjoined, from using or disclosing any of TyMetrix's trade secrets or confidential information, including customer lists, strategy plans, contractual and financial arrangements between TyMetrix and its customers, [*18] information about the requirements of, needs of, or solutions developed for TyMetrix customers, implementation guides, product specifications;

(3) Szymonik and SpectoWise, and all parties acting in concert with or as agents of either Szymonik or SpectoWise, are enjoined from engaging, hiring, employing, or soliciting for employment any TyMetrix employees until at least March 14, 2007;

(4) Szymonik and SpectoWise, and all parties acting in concert with or as agents of either Szymonik or SpectoWise, are enjoined from soliciting or calling on any client or prospective client as those terms are defined in the Employment Agreement until at least March 14, 2007;

(5). Szymonik and SpectoWise, and all parties acting in concert with or as agents of either Szymonik or SpectoWise, are enjoined from engaging or attempting to engage in the production, development, sale, distribution, solicitation or promotion of the sale or distribution of the products and services defined in the Employment Agreement until at least March 14, 2007.

TyMetrix has requested that this court's orders include an order "extending the restrictive periods stated above . . . in [orders] 3-5, pursuant to Article VI(8) [*19] of the Employment Agreement, beyond March 14, 2007, for a period of time equal to the period of time during which Szymonik has been in breach of the restrictive covenants contained in the Employment Agreement" pursuant to Section (8) which provides, "In the event that You shall be in violation of the aforementioned restrictive covenants, then the time limitation thereof with respect to You shall be extended for a period of time equal to the period of time during which such breach or breaches did occur; and, in the event [TyMetrix] should be required to seek relief from such breach in any court . . . Then the covenant shall be extended for a period of time equal to the pendency of such proceedings, including all appeals."

In recognition of the fact that a legitimate question remains as to the appropriate duration of the restrictive covenants, these restriction shall be in effect until further order of the court but not for any longer than two years from the date of termination, that is until March 14, 2007 unless, upon motion by the plaintiff, or after a full hearing on the merits, it is extended by further court order.

BY THE COURT

Tanzer, Judge



<strong>Mec-Gar, S.R.L. et al. v. James L. Hard et al.</strong>

<strong>CV020077396S</strong>

<strong>SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF ANSONIA - MILFORD, AT MILFORD</strong>

<strong><em>2002 Conn. Super. LEXIS 3314</em></strong>

<strong>October 2, 2002, Decided</strong>

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Defendants enjoined for a period of one year from the date of this order from performing any activities relating to the sale, promotion or distribution of LPA products and from soliciting sales or selling, directly or indirectly, firearm magazines and sights to Smith & Wesson.

**JUDGES:** Judge Jon M. Alander.

**OPINION BY:** Jon M. Alander

**OPINION**

*MEMORANDUM OF DECISION*

The plaintiffs have applied to this court for a temporary injunction enjoining the defendant James L. Hard, a former employee, and the defendant Precision Sights International, LLC ("PSI"), Hard's company, from engaging in competitive business activities or utilizing and disclosing information the plaintiffs deem to be trade secrets. The plaintiff Mec-Gar, S.R.L. is a corporation organized under the laws of the Republic of Italy with its principal place of business in that country. It is a manufacturer of firearm magazines [1] for rifles and pistols. The plaintiff Mec-Gar U.S.A., Inc. is a Connecticut corporation which acts as the representative for Mec-Gar, S.R.L. in [*2] the United States and serves as the resale distributor for Mec-Gar products.

1 A firearm magazine is a compartment, often a small, detachable box, in which cartridges are held to be fed into the firing chamber. The American Heritage Dictionary (Second College Edition 1985).

The defendant James L. Hard was previously the Vice President and General Manager of Mec-Gar U.S.A., Inc. He resigned from the employ of Mec-Gar U.S.A., Inc. on January 31, 2001. The defendant Precision Sights International, LLC ("PSI") was established by Hard in June 2000 and he is the sole owner and principal of PSI. The plaintiffs claim that Hard through PSI engaged in competitive business activities that violated his fiduciary obligations to the plaintiffs and that he is privy to trade secrets of the plaintiffs which could be used by him to their detriment. The plaintiffs seek a temporary injunction under the common law and under the Uniform Trade Secrets Act, *General Statutes § 35-50 et seq.*, enjoining the [*3] defendants from utilizing any trade secrets of the plaintiffs or engaging in certain specified competitive activities. [2]

2 The plaintiffs also assert in their complaint a violation of the Connecticut Unfair Trade Practices Act, ("CUTPA") *General Statutes § 42-110a et seq.* Since the plaintiffs chose not to present any claim of a violation of CUTPA during oral argument or in their memorandum of law in support of a temporary injunction, the court deems that claim abandoned for purposes of the issuance of a temporary injunction. *Collins v. Goldberg, 28 Conn. App. 733, 738, 611 A.2d 938 (1992).*

Based on the evidence presented at the hearing on the plaintiffs' application for a temporary injunction, I find the following facts. James L. Hard was hired by

2002 Conn. Super. LEXIS 3314, *

Mec-Gar U.S.A., Inc. in July 1995 as its Vice President and General Manager. As such, he was responsible for the management of the operation of the business in the United States and for promoting the sale of Mec-Gar [*4] S.R.L. products in the United States. He continued in that role on a full-time basis until July 1997 when his employment became part-time. Although Hard's status changed from full-time to part-time, his title, position and responsibilities remained the same. Hard had no written employment agreement with the plaintiffs. He also never entered into a non-competition agreement nor did he sign any confidentiality agreement with the plaintiffs.

In June 2000, while still employed by Mec-Gar U.S.A. Inc., Hard established Precision Sights International, LLC ("PSI") of which he is the sole owner. Hard did not inform anyone at Mec-Gar U.S.A., Inc. or Mec-Gar S.R.L. of the formation of the company or his involvement with it.

In July 2000, PSI purchased from Mec-Gar U.S.A., Inc. approximately 4,500 magazines of various types manufactured by Mec-Gar S.R.L. for which PSI paid $ 24,366. No one at Mec-Gar U.S.A. or Mec-Gar S.R.L. was aware of Hard's association with PSI. In fact, Hard took steps to conceal his affiliation. Hard intentionally did not use his usual signature on the check sent by PSI to Mec-Gar U.S.A., Inc. and he made his signature illegible.

On subsequent occasions in [*5] 2001, PSI did business with Mec-Gar U.S.A., Inc., purchasing magazines and sights. On each occasion, Hard failed to disclose to either Mec-Gar U.S.A., Inc. or Mec-Gar S.R.L. that PSI was his alter ego. PSI subsequently resold for a profit the items it purchased from Mec-Gar U.S.A., Inc.

From PSI's inception in June 2000 until his resignation from Mec-Gar U.S.A., Inc. on January 31, 2002, Hard continued to deceive the plaintiffs concerning his relationship with PSI. For example, in an e-mail to Mec-Gar S.R.L. dated May 10, 2001 Hard stated that PSI would be at a particular trade show and that he would speak to them about specific products. He purposefully sought to conceal the fact that he was PSI.

In the spring of 2001, Mec-Gar U.S.A., Inc. received notice from LPA, a manufacturer of gun sights, that LPA was terminating its resale distribution contract with Mec-Gar U.S.A., Inc. effective December 31, 2001. LPA terminated the relationship because the sale of LPA sights by Mec-Gar U.S.A., Inc. had fallen substantially over the years. Shortly thereafter, Hard on behalf of PSI entered into an arrangement with LPA for PSI to replace Mec-Gar U.S.A., Inc. as the resale distributor [*6] of sights manufactured by LPA. At the time of Hard's negotiations

with LPA, Mec-Gar U.S.A., Inc. was still the resale distributor of LPA sights.

Hard resigned from the employ of Mec-Gar U.S.A., Inc. on January 31, 2002. Prior to resigning, Hard entered into agreements with three companies, Act-Mag, Checkmate Industries, and Novaks, Inc. for PSI to act as a resale distributor of their products. Act-Mag and Checkmate Industries manufacture gun magazines and are direct competitors of Mec-Gar S.R.L. and Mec-Gar U.S.A., Inc. Novaks Inc. sells in its own name magazines manufactured by Act-Mag.

In early January 2002, Hard met with representatives of Smith & Wesson, a gun manufacturer and customer of magazines manufactured by Mec-Gar S.R.L. At that meeting, Hard promoted magazines manufactured by Checkmate Industries.

Prior to leaving the employ of Mec-Gar U.S.A., Inc., Hard drafted and submitted a directory listing for PSI for the 2002 Shot Show, a trade show and conference which was to be held February 2-5, 2002 in Las Vegas Nevada. The directory listing identified PSI as a resale distributor for Act-Mag and Checkmate magazines and Novaks products. Hard also submitted prior to [*7] his resignation an advertisement in American Handgunner Magazine for publication after January 31, 2002. The ad featured PSI as the distributor of products for Act-Mag, Checkmate Industries, Novaks Inc. and LPA.

Mec-Gar S.R.L. and Mec-Gar U.S.A., Inc. had been expecting Hard to attend the 2002 Shot Show as their representative. He was listed as their representative in their directory listing and they paid for Hard's transportation and lodging to attend the show. Although Hard had been planning for months to submit his resignation, he did not do so until two days before the commencement of the Shot Show.

I

Breach of Fiduciary Duty

The plaintiffs first assert that Hard violated his fiduciary duty to Mec-Gar U.S.A., Inc. by engaging in secret self-dealing transactions with the plaintiffs and by diverting to his own benefit business opportunities of the plaintiffs. The defendants maintain that Hard owed no fiduciary duty to the plaintiffs and that none of his actions were in violation of any such duty. The court agrees with the plaintiffs.

Hard as an employee of the Mec-Gar U.S.A. was a fiduciary during the term of his employment with respect to matters within the [*8] scope of his employment. [3] *Town & Country House & Homes Service v. Evans, 150 Conn. 314, 317, 189 A.2d 390 (1963).* See also *Taylor v. Hamden Hall School, Inc., 149 Conn. 545, 552, 182 A.2d*

*615 (1962).* As an employee, he was obligated to exercise the utmost good faith, loyalty and honesty toward his employer and he was bound not to compete with his employer concerning the subject matter of his employment. *Id.* As an agent of Mec-Gar U.S.A., Inc., Hard was subject to a duty not to deal with his principal as an adverse party without his principal's knowledge. 2 *Restatement (Second), Agency § 389* (1958).

    3   The plaintiffs also claim that Hard had a fiduciary relationship with them due to his position as Vice President and General Manager and, by virtue of that relationship, the burden of proving fair dealing shifts to the defendant Hard and the standard of proof for establishing fair dealing becomes one of clear and convincing evidence. See *Konover Development Corp. v. Zeller, 228 Conn. 206, 229, 635 A.2d 798 (1994).* It is unnecessary for me to determine whether the parties' relationship was such that "there is a justifiable trust confided on one side and a resulting superiority and influence on the other," *Dunham v. Dunham, 204 Conn. 303, 320, 528 A.2d 1123 (1987),* so as to impose fiduciary obligations on Hard because I have found that Hard had fiduciary obligations as an employee of Mec-Gar U.S.A., Inc. which he violated.

[*9]  In the absence of a restrictive agreement, such as a covenant not to compete, an employee, upon termination of employment, can properly compete with his employer in matters for which he had been employed. *Town & Country House & Homes Service v. Evans, supra, 150 Conn. at 317.* "Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment . . . in direct competition with the employer's business." *Id.,* citing 2 *Restatement (Second), Agency § 393, comment e.*

During the term of his employment with Mec-Gar U.S.A., Inc., Hard failed to honor his fiduciary obligations to his employer. Through PSI, he secretly entered into numerous transactions with Mec-Gar U.S.A., Inc. thereby violating his duty not to deal with his principal as an adverse party without his principal's knowledge. An employee may not, without his employer's knowledge, sell the employer's products to himself. 2 *Restatement (Second), Agency § 389* (1958). This principle holds even in cases where there is no harm [*10] to the principal. 2 *Restatement (Second), Agency § 389, comment c* (1958). [4] Therefore, the defendants' claim that the plaintiffs benefitted from the sale of sights and magazines to PSI because the products consisted of dormant and unsaleable inventory is unavailing. It is also unavail-

ing because PSI subsequently resold the sights and magazines for a profit. That opportunity to sell the items for a higher price should have been provided to Hard's employer, not usurped by him.

    4   This is so because the purpose of the rule against self-dealing is to prevent a conflict of interest on the part of an agent whose duty is to act solely for the benefit of his principal. 2 *Restatement (Second), Agency § 389, comment c* (1958).

Hard also violated his fiduciary duties to Mec-Gar U.S.A., Inc. by establishing PSI and using it to compete for business held by his employer. *Town & Country House & Homes Service v. Evans, supra, 150 Conn. at 317.* "Unless otherwise agreed, an agent is subject to a duty not [*11]  to compete with the principal concerning the subject matter of his agency." 2 *Restatement (Second), Agency § 393* (1958). While employed by Mec-Gar U.S.A., Inc., Hard on behalf of PSI entered into an arrangement with LPA for PSI to replace Mec-Gar U.S.A., Inc. as the resale distributor of sights manufactured by LPA. Hard through PSI was competing with his employer for LPA's business. The fact that LPA had notified Mec-Gar U.S.A., Inc. that it was terminating its contract with Mec-Gar U.S.A., Inc. was immaterial since Mec-Gar U.S.A., Inc. was interested in retaining LPA's business. Hard was also competing against his employer by seeking to sell LPA sights at a time when Mec-Gar U.S.A. was trying to sell its unsold inventory of LPA sights.

Hard in dealing with LPA through PSI was also improperly acting with conflicting interests in derogation of his duty to serve his employer. "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." 2 *Restatement (Second), Agency § 387* (1958). It was a conflict of interest for Hard to pursue LPA's business while his employer was concerned with [*12]  the loss of that business. Hard desired LPA's business for himself at a time when his employment with Mec-Gar U.S.A., Inc. mandated that he work to mend LPA's relationship with his employer. He chose to serve his self interest by contracting with LPA to replace Mec-Gar U.S.A. as the resale distributor of LPA gun sights.

The plaintiffs also complain of other activities undertaken by Hard during his employment which they claim violate his fiduciary responsibilities to his employer. They assert that Hard took action to compete with Mec-Gar U.S.A. by drafting and submitting for publication in the directories for the 2002 Shot Show and the 2002 IWA trade show material for PSI that promoted competitors of Mec-Gar U.S.A., Inc.; by receiving samples of Act-Mag and Checkmate Industries products for display at the PSI booth at the Shot Show; by drafting

and submitting an advertisement for PSI for American Handgunner Magazine; and by reaching verbal agreements with Act-Mag, Checkmate Industries and Novaks Inc. for PSI to act as the distributor of their products. The defendants maintain that these actions were proper because they constituted preparation for Hard to compete with Mec-Gar U.S.A. [*13] once his employment ended.

An agent, while still an agent, may properly make arrangements to compete with his principal upon termination of the agency. 2 *Restatement (Second), Agency § 393, comment e* (1958). The court agrees with the defendants that Hard's preparation of directory listings and advertisements that were not published until after the termination of his employment were mere preparations to compete with Mec-Gar U.S.A., Inc. Similarly, the actions of Hard in entering into agreements with competitors of Mec-Gar U.S.A., Inc. to sell their products after termination of his employment constitute permissible steps toward competition, not acts of competition themselves.

In one instance, however, Hard went beyond simply laying the groundwork to compete with his employer in the sale of gun magazines and transgressed into actually competing with it. In early January 2002, prior to his departure from the employ of Mec-Gar U.S.A., Inc., Hard solicited Smith & Wesson, a customer of Mec-Gar U.S.A., Inc. and a purchaser of Mec-Gar S.R.L. magazines. Hard sought to interest Smith & Wesson in the purchase of magazines manufactured by Checkmate Industries, a competitor of the plaintiffs. [*14] In doing so while still employed by Mec-Gar U.S.A., Inc., Hard breached his fiduciary duty not to compete with his employer or to act for persons whose interests conflict with those of his employer concerning the subject matter of his employment. *Town & Country House & Homes Service v. Evans, supra, 150 Conn. at 317.* See also 2 *Restatement (Second), Agency § 393* and *§ 394* (1958).

Finally, the plaintiffs assert that Hard diverted a business opportunity of his employer to a competitor when Novak's Inc. chose Act-Mag, rather than Mec-Gar S.R.L., to manufacture its magazines. Additional factual background is necessary to understand this claim.

In June 2001, Novaks Inc. inquired of the plaintiffs whether Mec-Gar S.R.L. would be interested in manufacturing magazines which Novak's Inc. would then sell under its own name. Novak's Inc. asked the plaintiffs for a price quote to produce the magazines. Novak's Inc. and the plaintiffs never consummated an agreement. Novak's Inc. ultimately arranged for Act-Mag to manufacture magazines for sale with Novak's logo and PSI became a distributor of Novak's products upon the termination of Hard's employment with Mec-Gar U.S.A., Inc.

[*15] The plaintiffs assert that Hard diverted to Act-Mag their opportunity to manufacture magazines for Novak's Inc. The plaintiffs failed however to offer any evidence that Hard had anything to do with their loss of that opportunity. No evidence was presented that Hard discouraged Novak's from working with the plaintiffs or that Hard encouraged Novak's to enter into an agreement with Act-Mag. Hard also did not expropriate the opportunity to manufacture magazines for Novak's to himself. PSI is not in the business of manufacturing magazines and it does not manufacture magazines for Novak's. Without more, this court declines to infer from PSI's subsequent role as a distributor of Act-Mag and Novak's products that Hard interfered with a potential business relationship between Mec-Gar S.R.L. and Novak's Inc.

II

Violation of The Uniform Trade Secrets Act

The plaintiffs contend that Hard acquired during his employ information that constitutes trade secrets and that he will inevitably use those trade secrets as he competes through PSI with the plaintiffs in the future. They seek an injunction under the Uniform Trade Secrets Act, *General Statutes § 35-52(a)* [*16] , against the use of the information by the defendants. The defendants argue that such an injunction is inappropriate as none of the information which Hard gained over the course of his employment with Mec-Gar U.S.A., Inc. rises to the level of trade secrets. I concur with the defendants.

The Uniform Trade Secrets Act defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *General Statutes § 35-51(d).*

The plaintiffs claim that information which Hard was privy to concerning their business methods and their internal cost data comprise trade secrets. Regardless of whether this information meets the first prong of the trade secret test under subsection (1) of *General Statutes § 35-51(d),* the information [*17] fails to satisfy the requirement of subsection (2) of the statute. The information which concerns the plaintiffs was not the subject of efforts that were reasonable under the circumstances to maintain its secrecy.

The plaintiffs argue that the details involved in the solicitation and sale of their products to particular customers who are original equipment manufacturers

2002 Conn. Super. LEXIS 3314, *

(OEMs) constitute business methods which are trade secrets. These details include the source and specific type of materials used by Mec-Gar S.R.L. to manufacture particular stainless steel magazines, unique aspects of its fabrication process and the particular needs of its OEM customers. The plaintiffs also claim that internal cost data relative to the prices charged Mec-Gar U.S.A., Inc. for products manufactured by Mec-Gar S.R.L. is confidential and protected as a trade secret.

The plaintiffs failed to provide any evidence that they took any significant steps to keep this information secret. The only measures taken by the plaintiffs to maintain the secrecy of the information were occasional verbal instructions to employees that information should be kept confidential. Hard was not asked at any time during [*18] his employ to sign a confidentiality agreement and no evidence was presented that any other employee signed such an agreement. No written confidentiality policy was drafted or distributed. No evidence was presented that warnings or cautionary legends were placed on any documents containing information that the plaintiffs now seek to protect from disclosure. There is no evidence before me that information now deemed by the plaintiffs to be confidential was segregated or secured in any way. See *Elm City Cheese Co. v. Federico, 251 Conn. 59, 79, 752 A.2d 1037 (1999)* ("Reasonable efforts to maintain secrecy 'often include some of the following techniques: requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; posting of warning or cautionary signs, or placing legends on documents; taking precautions regarding visitors, by requiring them to sign confidentiality agreements, having them sign in, and shielding the process from their view; segregating information, so that no one person or written source discloses the entire manufacturing process; and using unnamed or coded ingredients,' " citing 1R. *Milgrim,* [*19] *Trade Secrets (1999) § 1.04*, pp. 1-178 through 1-189.)

While the aforementioned methods of insuring secrecy are not exclusive, the plaintiffs have not offered evidence of any alternative methods utilized by them to maintain the secrecy of their business methods or internal cost data. Occasional verbal instructions that information generally is confidential without anything more do not constitute reasonable efforts under the circumstances to maintain the secrecy of the specific information the plaintiffs seek to keep from disclosure.

Nor is this case similar to the situation in *Elm City Cheese Co. v. Federico, supra, 251 Conn. at 59.* In *Elm City Cheese Co.*, the Supreme Court found the company's method of conducting business to be a trade secret because sufficient information was kept confidential to make it impossible for any employee to utilize the company's business methods to compete and the Supreme

Court upheld the trial court's issuance of an injunction against Federico because he was the one employee with knowledge of the entire business operation. Here, the plaintiffs have not shown that they took any specific steps to keep portions of their business [*20] operations confidential and Hard is not knowledgeable about the entire operation of Mec-Gar S.R.L.

III

Injunctive Relief

The plaintiffs ask the court to enter an injunction that enjoins the defendants from disclosing or utilizing any information relating to the business methods or operations of the plaintiffs; soliciting sales or selling, directly or indirectly, firearm magazines and sights to any entity that was a customer of the plaintiffs during Hard's term of employment; and performing any activities relating to the sale, promotion or distribution of LPA products. The plaintiffs request that the injunction extend through January 31, 2004.

A party seeking injunctive relief has the burden of establishing irreparable harm and the lack of an adequate remedy at law. *Walton v. New Hartford, 223 Conn. 155, 165, 612 A.2d 1153 (1992).* "Where an injury is of such a nature that it cannot be adequately compensated in damages, or cannot be measured by any pecuniary standard, it is irreparable. Whether damages are to be viewed by a court of equity as 'irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the [*21] pecuniary measure of the loss suffered." (Quotation marks and citations omitted.) *New London v. Perkins, 87 Conn. 229, 235, 87 A. 724 (1913).* In its consideration of a request for an injunction, the court may consider and balance the injury complained of with that which will result from interference by an injunction. *Moore v. Ganim, 233 Conn. 557, 616 n.25, 660 A.2d 742 (1995).* The court must properly weigh the equities between the parties and only grant that relief compatible with the equities of the case. *Walton v. New Hartford, supra, 223 Conn. at 167.*

The Uniform Trade Secrets Act also provides that a court may enjoin "actual or threatened misappropriation" of a trade secret. *General Statutes § 35-52(a).* The potential loss of a trade secret is not measurable in money damages and constitutes irreparable harm. *FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984).* "A trade secret once lost is, of course, lost forever." *Id.*

The plaintiffs' request for an injunction prohibiting the use or disclosure of information related to their business methods or operations [*22] is premised on their claim that the information entails trade secrets under the Uniform Trade Secrets Act. Since that claim fails as a

2002 Conn. Super. LEXIS 3314, *

result of my finding that the plaintiffs have not shown reasonable efforts to maintain the information's secrecy, so too must the plaintiffs' request forbidding disclosure.

The plaintiffs have shown that Hard violated his fiduciary obligations to Mec-Gar U.S.A., Inc. The injury suffered by the plaintiffs as a result of Hard's self-dealing through the purchase by PSI of sights and magazines from Mec-Gar S.R.L. is the loss of an opportunity usurped by Hard to sell those products at an increased profit. That injury is not irreparable and can be adequately compensated by the award of damages. The measure of the plaintiffs' damages is readily ascertainable and is the reduction in price given by the plaintiffs to PSI and the profit obtained by the defendants upon resale.

Hard also violated his fiduciary duty by soliciting the customers of his employer prior to the termination of his employment with Mec-Gar U.S.A., Inc. Hard entered into an arrangement with LPA to use PSI to sell LPA manufactured products and he approached Smith & Wesson about purchasing [*23] magazines of a competitor. Mec-Gar U.S.A., Inc. is entitled to an injunction restraining Hard and PSI, as his alter ego, from performing any service for LPA or Smith & Wesson in competition with Mec-Gar U.S.A., Inc. *Town & Country House & Homes Service v. Evans, supra, 150 Conn. at 318*. The nature of Hard's breach of his fiduciary obligations does not warrant extending injunctive relief to any entity that was a customer of the plaintiffs during Hard's term of employment. *Holiday Food Co., Inc. v. Munroe, 37 Conn. Supp. 546, 549-50, 426 A.2d 814 (1981)*.

The plaintiffs request that the term of any injunction be eighteen months. Weighing the injury to the plaintiffs with the extent of an injunction's interference with the defendants, the court determines that an injunction of one year's duration is appropriate.

Based on the foregoing, the defendants are hereby enjoined for a period of one year from the date of this order from performing any activities relating to the sale, promotion or distribution of LPA products and from soliciting sales or selling, directly or indirectly, firearm magazines and sights to Smith & Wesson.

BY THE COURT

Judge [*24] Jon M. Alander